**NO. 26-10127**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

SPECTRUM WT

*Plaintiff-Appellant*,

v.

WALTER WENDLER,

*Defendant-Appellee.*

---

# APPENDIX TO JOINT PETITION FOR INITIAL HEARING EN BANC

---

On Appeal from the United States District Court for the
Northern District of Texas, Amarillo Division,
Civil Action No. 2:23-CV-48
Hon. Matthew J. Kacsmaryk, Presiding

---

JT Morris
*Counsel of Record*
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave., S.E.
Ste. 340
Washington, D.C. 20003
Tel: (215) 717-3473
jt.morris@fire.org
sam.rudovsky@fire.org

Sara Berinhout
Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473, ext. 251
sara.berinhout@fire.org
adam@fire.org

*Attorneys for Plaintiffs-Appellants*

(Counsel for Appellee on next page)

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Appellee*

# INDEX

Tab

District Court's Findings of Fact and Conclusions of Law.....................1

District Court's Order of Final Judgment.........................................2

# Tab 1: District Court's Findings of Fact and Conclusions of Law

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| SPECTRUM WT,<br><br>Plaintiff,<br><br>v.<br><br>WALTER WENDLER,<br><br>Defendant. | 2:23-CV-048-Z |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

Founding-era letters, pamphlets, charters, and even draft Constitutions reflect the religious and philosophical *pluralism* of the Colonies and their people: one-part Natural Law, one-part Enlightenment, one-part Religion. *See* Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246, 284 (2017). In aggregate, these documents reflect a shared First Amendment vision: Free Speech, Press, Petition, and Assembly rights combine to protect and elevate the public discourse necessary to self-government—*not* self-expression in all forms, and certainly not the libertine "expressive conduct" absolutism envisioned by Plaintiff Spectrum WT. *See id.* at 256, 287.[1] And not a sexualized striptease in the presence of minors. *See Woodlands Pride, Inc. v. Paxton*, 157 F.4th 775, 786 n.9 (5th Cir. 2025).[2]

---

[1] "There is no evidence, for instance, that the Founders denied legislative authority to regulate expressive conduct in promotion of the public good . . . . Some expressive conduct, like instinctive smiles, surely fell on the side of inalienability. But when expressive conduct caused harm and governmental power to restrict that conduct served the public good, there is no reason to think that the freedom of opinion nonetheless immunized that conduct."

[2] "We have genuine doubt, however, that pulsing prosthetic breasts in front of people, putting prosthetic breasts in people's faces, and being spanked by audience members are actually constitutionally protected—especially in the presence of minors."

Spectrum's repeated failure to present a forum-appropriate drag show is inevitable because their proposal is a category error:

> 1. Spectrum will perform a "provocative," "transgressive," "gender-bending" performance that "shatters" sex, sexuality, and gender norms through exaggerated caricatures of the female sex, sexuality, and sex roles, with invited performers who routinely simulate masturbation, simulate sex acts, and "frottage" audience members. *See* 2d Exp. Tr. 58:16–18, 63:16.[3]
>
> 2. But the performance will be entirely appropriate for a limited public forum with minors in the audience because Spectrum aspires to (but cannot enforce) something like a "PG-13" show. *See* Exp. Tr. 12:23:19–27.

The *raison d'être* of Spectrum's drag show *is* sexual provocation—but they promise it won't be *too* sexualized, *too* provocative.

Not surprisingly, Spectrum failed to enforce its intended "PG-13" format during a drag show held off campus, as professional *and* student performers tasked with "breaking" and "destabilizing" sexual norms engaged in sexualized conduct more akin to a striptease than the University Sing and Jingle Mingle comparators argued by counsel. *See* Exp. Tr. at 12:35:03–43. Spectrum promised Santa Claus in *Miracle on 34th Street* but some performers digressed into something like the 1996 movie *Striptease*. Last year, Spectrum failed to enforce the advertised "R" rating at a Valentine's Day lip-synching event that descended into "BDSM" simulated sex acts. *See* Fanelli Dep. at 55:6–58:11.

Spectrum failed to prove that its nascent 2026 program deserves the requested injunctive relief. First, the proposed 2026 performance is not "expressive conduct" warranting First Amendment protection. Second, even if the 2026 program is "expressive conduct,"

---

[3] Due to technical difficulties at trial, the Court lacks an official transcript of the proceedings. But the Court desires to provide the parties with swift resolution, much deserved considering both parties' diligence and professionalism in preparing for trial on an expedited schedule. *See* ECF No. 126. The Court will therefore use an unofficial, expedited transcript ("Exp. Tr.") and will cite trial testimony according to the timestamp associated with each statement. Roughly the second half of trial was recorded in a separately formatted unofficial transcript ("2d Exp. Tr."). Citations to that transcript will reference page and line numbers.

Legacy Hall is a limited public forum—not a designated public forum. Third, *Christian Legal Society v. Martinez* is controlling precedent in this forum. The Court accordingly **DENIES** Spectrum's request for injunctive relief.

## BACKGROUND

The Court held a bench trial on January 14, 2026. During the trial, the Court heard live testimony from two witnesses and examined numerous exhibits.[4] The Court reviewed the record in its entirety and observed the witnesses to assess their credibility and weigh their testimony. The Court now sets out its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. *See* FED. R. CIV. P. 52(a)(1) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately."). In doing so, the Court provides "a clear understanding of the basis for [its] decision," as the Fifth Circuit requires. *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998).

## FINDINGS OF FACT

### I. Parties

Plaintiff Spectrum WT is a recognized student organization ("RSO") in good standing at West Texas A&M University. Spectrum's stated mission is to "provide a safe space for LGBTQ+ students and allies to come together," to "raise awareness of the LGBTQ+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community." ECF No. 144 at 16. Spectrum generally maintains about thirty members. Minors can join, because Spectrum does not have a policy of excluding minors from membership. Fanelli Dep. 21:13–22:19.

---

[4] At the Pretrial Conference held on January 9, 2026, the Court preadmitted all but twelve of President Wendler's 445 exhibits. The Court also sustained many of Spectrum's objections to other exhibits, preadmitting them only for limited purposes (for example, non-hearsay purposes). President Wendler did not object to any of Spectrum's seventy-eight exhibits.

Defendant Walter Wendler is the President and chief executive officer of West Texas A&M, serving since 2016. He earned his undergraduate degree in architecture from Texas A&M University, a master's degree in architecture from the University of California, Berkeley, and a Ph.D. in Education from the University of Texas at Austin. He began his academic career as a professor at Louisiana State University and Texas A&M. Before becoming President of West Texas A&M, he served as Chancellor and Professor of Architecture at Southern Illinois University. President Wendler has served in university administrative roles since approximately 1992.

**II. The Texas A&M University System**

On February 28, 2025, the Texas A&M University Board of Regents adopted a system-wide resolution addressing drag on Texas A&M System campuses.[5] The resolution provides that on all eleven university campuses within the Texas A&M System, the System has a "special interest" in maintaining "Special Event Venues" such as "meeting rooms, theaters, auditoriums, and other venues available to student, staff and faculty organizations in which the organizations periodically host events that are open to members of the public" as "limited forums." Def.'s Ex. 6. The resolution further notes:

> [T]he Board finds that it is inconsistent with the System's mission and core values of its Universities, including the value of respect for others, to allow Special Event Venues of the Universities to be used for drag shows that involve biological males dressing in women's clothing, wearing exaggerated female make up and/or exaggerated prosthetics meant to parody the female body type, and that are: open to the public; involve sexualized, vulgar or lewd conduct; and involve conduct that demeans women (Drag Show Events); and . . .
>
> the Board finds that Drag Show Events are likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX of the Education Amendments of 1972 (Title IX), as these events often involve unwelcome and objectively offensive conduct based on sex for many members of the respective communities of the Universities, particularly when they involve the mockery or objectification of women . . . . *Id.*

[5] As of the date of this Order, this resolution remains enjoined. *See Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792 (S.D. Tex. 2025).

Relatedly, President Wendler testified that he would also consider an Executive Order issued by President Trump on January 20, 2025, in deciding whether to permit Spectrum to hold a drag show in Legacy Hall. *See* Def.'s Ex. 49. The Order states that it is "the policy of the United States to recognize two sexes, male and female," and defines "gender ideology" as an "internally inconsistent" concept that "diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." It also identifies as a "false claim" the idea that "males can identify as and thus become women and vice versa." And it provides that "[f]ederal funds shall not be used to promote gender ideology."

Governor Abbott sent a similar letter to Texas state agencies on January 30, 2025. *See* Def.'s Ex. 51. The letter states that "[t]he State of Texas recognizes only two sexes—male and female—and sex discrimination consists in treating a member of one sex less favorably than the other." President Wendler testified that he would also consider this letter, which he summarized as requiring state institutions like West Texas A&M to comply with Texas law's recognition of only two sexes. He also stated that he shares the letter's view that gender ideology "distort[s] commonsense notions of biological sex."

**III. West Texas A&M University**

West Texas A&M is a public university within the Texas A&M University System. Accordingly, it is governed by the System's Board of Regents. Approximately 9,000 students attend West Texas A&M. Not all are college students. Many are secondary school students enrolled in West Texas A&M courses through dual enrollment programs, principally the school's Pre-University Program ("PUP"). Most of these secondary students are minor children. PUP students, even those who are minors, receive a university ID card identical to those held by adult students. This ID card does not indicate the student's age.

Several West Texas A&M policies informed President Wendler's decisions to cancel the 2023 and 2024 drag shows. Most fundamental is West Texas A&M's "Expressive Activity on Campus" policy. It states that "[f]reedom of expression is of critical importance" and that the freedoms of speech and assembly are "central to the mission of institutions of higher education." Pl.'s Ex. 6 at 1. But even this seemingly categorical statement contemplates *exceptions*. "Expressive activities" that are "not protected" anywhere on the West Texas A&M campus include: "physical abuse or assault," inciting "imminent lawless action," and "illegal harassment." *Id.* at 2. What's more, the policy expressly labels the "common outdoor areas of the university's campus" as "traditional public forums," offering "public streets, sidewalks, plazas, lawns, and parks" as examples. *Id.* at 2, 5. Absent from the policy is any mention of indoor spaces like the Jack B. Kelley Student Center (the "JBK"), the home of Legacy Hall.

Relevant here is the JBK "Procedures and Guidelines" policy, last revised on March 5, 2025. It expressly states:

> The JBK Student Center staff reserves the right to deny space usage for any group/event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies. The JBK Student Center reserves the right to cancel or interrupt any event in the interest of public safety, noncompliance with university policies, or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University.

Def.'s Ex. 4 at 4. These policies provide that "candidates of political or student government elections [are] not allowed" to set up tables in the JBK "unless sponsored by a registered student organization" and imposes restrictions on alcohol use and the content of advertisements, which cannot contain "obscene words." It also addresses drag shows under a "Prohibited Events" heading:

> In accordance with the Texas A&M University System's Board of Regents resolution regarding Certain Public Events on the Campuses of Universities in the Texas A&M System, dated February 28, 2025, Drag Show Events are prohibited at Special Event Venues on the campus of West Texas A&M University.

*Id.* at 8.

At trial, President Wendler made much of West Texas A&M's mission, often using terms such as "core values"—specifically, "respect." The term "core values" appears verbatim in West Texas A&M's "University Statements":

> The core values of West Texas A&M University are reflective of, inspired by, [and] responsive to the people we serve, regardless of background, family history, personal beliefs, or aspirations.
>
> The people of the plains, in towns and communities, on ranches and farms spend every day living out their commitment to family, faith, hard work, and service to neighbors—locally regionally, and globally. From these same Panhandle values, grow WT's core values.

Def.'s Ex. 140. The University Statements also list "ASPIRE"—"Academic Freedom," "Service," "Pragmatism," "Innovation," "Respect," and "Engagement"—as West Texas A&M's six core values.

**IV. Legacy Hall**

West Texas A&M offers several campus spaces that students, RSOs, and the public may seek to reserve. Legacy Hall is one such space, an enclosed venue in the JBK. The JBK is located on the West Texas A&M campus and is funded in part by a Student Center Fee paid by all students. RSOs are not required to pay usage fees to reserve Legacy Hall. However, West Texas A&M officials have the discretion to deny or cancel reservations if the proposed use of Legacy Hall would be inconsistent with the University's educational mission.

In the past, Legacy Hall has hosted "beauty pageants, singing competitions, concerts, religious worship, banquets, wedding ceremonies, wedding receptions, holiday parties, movie screenings, dance-off competitions, fashion shows, talent shows . . . [and] press conferences." ECF No. 144 at 6. West Texas A&M students also used Legacy Hall to hold a drag show in 2019.

President Wendler testified at trial that going forward, Legacy Hall will continue to host a wide range of events. But not just anyone can use Legacy Hall for any purpose. For example, the aforementioned West Texas A&M policies list the types of speech to which Legacy Hall is *not* open—for example, political speech by anyone who is not a member of an RSO. President Wendler also testified that he previously canceled a Kevin Gates rap concert in a similar forum because his research showed that the performer's concerts often featured "fist fights" and "gunplay." Exp. Tr. at 11:11:10–13. This concert received "tentative approval" from West Texas A&M staff, but he canceled the event because he believed holding it on campus would be inconsistent with the values of the University.

President Wendler also testified that the Texas A&M System Board of Regents adopted a new regulation on November 13, 2025, entitled "Expressive Activity on Campus." *See* Pl.'s Ex. 9. This regulation defines designated public forums as "parts of campus that may become temporarily available for expressive activity as designated by the member" university. By contrast, it states that limited public forums are forums with "limited open access for public expression, or they may be limited to particular groups or particular topics." President Wendler testified that this regulation also requires West Texas A&M to implement this regulation within six months:

> **Q.** And do you anticipate that in the rules and regulations that West Texas A&M University will adopt to implement the November 13th, 2025, policy of the A&M University System, that West Texas A&M will formally designate Legacy Hall as a limited public forum?
>
> **A.** I do believe that.
>
> **Q.** And that is your intention?
>
> **A.** That's my intention.
>
> **Q.** And do you anticipate that that'll be completed prior to April 2026?
>
> **A.** I do.

Exp. Tr. at 11:34:10–47. And even the former president of Spectrum agreed that Legacy Hall would not be an appropriate venue for an overly sexualized performance. 2d Exp. Tr. at 64:8.

President Wendler expressly stated that he would *not* permit an event featuring blackface to be held in Legacy Hall. Exp. Tr. at 12:27:44. He also stated that he would likely not permit Legacy Hall to be used by any group that sought to denigrate others based on their race, such as a white supremacist organization. Exp. Tr. at 12:30:30–59. He further stated he would not allow an event which proposed to mock LGBT+ students. Exp. Tr. at 11:08:34–51. He noted that these events might not be consistent with past uses of Legacy Hall. However, he testified that he *might* permit an event that featured only explicit speech to be held there, such as George Carlin's "Seven Dirty Words" skit.[6] Exp. Tr. at 12:27:45–12:28:41.

**V. Spectrum's March 2023 and March 2024 Shows**

In late 2022, Spectrum planned to hold a drag show in Legacy Hall. After negotiations with West Texas A&M staff, Spectrum scheduled the show for March 31, 2023. According to Spectrum, the show would have included "choreographed dance, lip syncing, character creation, stylized hair, make-up, costumes, and amplified music." Then-President of Spectrum Barrett Bright stated that the drag show—and all drag shows—are about "breaking gender norms," or "gender bending." Bright Dep. 104:24–105:15, 107:22–108:5. While this often involves cross-dressing, it could involve a biological male performing as a man or a woman as a woman, exaggerating certain gender characteristics. Bright Dep. 108:6–109:10. The show would also fundraise for the Trevor Project, a nonprofit organization dedicated to suicide prevention among LGBT youth. Spectrum promoted the show on social

[6] The "seven dirty words" are seven profanities that comedian George Carlin listed in his 1972 "Seven Words You Can Never Say on Television" monologue. A radio broadcast featuring Carlin's seven dirty words led to *F.C.C. v. Pacifica Foundation*, 438 U.S. 726 (1978), in which the Supreme Court held that the First Amendment did not prevent the FCC from regulating indecent material on public airwaves.

media using hashtags such as #pride, #lgbt, #gay, and #trans. Spectrum also described the March 2023 show as "PG-13." Other promotional material, such as this draft flyer, contemplated a more sexually explicit theme:




**Def.'s Ex. 352**

West Texas A&M staff tentatively approved the March 2023 show on or about February 23, 2023. On March 20, 2023, however, President Wendler canceled it. Vice President for Student Affairs Dr. Christopher Thomas informed Spectrum that "Wendler believes drag shows discriminate against women." President Wendler reiterated this view in a letter to the West Texas A&M community on March 20, 2023:

> Does a drag show preserve a single thread of human dignity? I think not. As a performance exaggerating aspects of womanhood (sexuality, femininity, gender), drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood. . . .

> WT endeavors to treat all people equally. Drag shows are derisive, divisive and demoralizing misogyny, no matter the stated intent. Such conduct runs counter to the purpose of WT. . . . I would not support "blackface" performances on our campus, even if told the performance is a form of free speech or intended as humor. It is wrong. I do not support any show, performance or artistic expression which denigrates others—in this case, women—for any reason. . . .
>
> A harmless drag show? Not possible. I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, even when the law of the land appears to require it. Supporting The Trevor Project is a good idea. My recommendation is to skip the show and send the dough.

Pl.'s Ex. 1.

At trial, President Wendler explained that while his letter did not "directly" address his concerns about the performance's lewdness, he nonetheless understood drag shows to caricature womanhood as a "purely sexual experience." Exp. Tr. at 11:05:15. He understood drag to include the use of prosthetics, sexual gestures (such as "grabbing their crotches"), and audience engagement with those gestures that is "inappropriate for young people." Exp. Tr. at 11:06:43–11:07:07. He also understood that Spectrum's proposed performance was for people over the age of eighteen, though he doubted the feasibility of enforcing such a rule. With that understanding, he declined to approve the event in Legacy Hall.

In contrast, President Wendler *allowed* an on-campus student protest that featured participants and pedestrians *walking* in drag. That protest occurred shortly after his announcement canceling the 2023 proposed drag show. President Wendler observed the students in drag. He testified that he "didn't sense that" the protestors were acting in a way "demeaning to women." Exp. Tr. at 10:36:52–59. He allowed the protest to proceed on campus, though in an "open public forum," unlike Legacy Hall. Exp. Tr. at 10:36:50.

On March 24, 2023, Spectrum and two student officers filed suit against President Wendler and Vice President Thomas. They also named the Chancellor of the Texas A&M University System and the members of the System's Board of Regents as co-defendants. The

same day—one week before the March 2023 show was to take place—the Plaintiffs also moved for a temporary restraining order ("TRO") and preliminary injunction. Then on March 29, 2023, Plaintiffs withdrew their request for a TRO and held the March 2023 show at Sam Houston Park in Amarillo, Texas.

The off-campus show raised nearly $9,000 via GoFundMe and $941 in cash at the performance. The event far exceeded all prior estimates for an on-campus show's attendance and revenue. Spectrum donated $7,000 to the Trevor Project after paying roughly $2,300 to the City of Amarillo for use of the park stage and security provided by off-duty police officers. Children were among the attendees. While some adults placed their dollar bills directly into the performers' underwear, at least one child acted as a courier, bringing donations from the audience to the performers on the stage.

Spectrum intended for the off-campus show to remain PG-13—just as it advertised for the event in Legacy Hall. Spectrum instructed performers to avoid "lewd" conduct at the March 2023 show. Despite this admonition, the show included at least one performance with provocative dancing and a sexualized striptease. For the sake of the minors present in the public park, the performer announced she would be removing clothing, but that she would not "be showing any more than you would be seeing at a swimming pool." The performance included the performer removing her undergarments and top. At least some of her body may have been covered by a nude suit. *See* Def.'s Ex. 375.

Spectrum applied again in 2024 to hold a similar drag show in Legacy Hall. President Wendler canceled that show as well.[7]

---

[7] On March 18, 2024, President Wendler sent another campus-wide email concerning his decision to cancel the March 2024 show. That letter reads in its entirety:

> Spectrum WT asked three courts to prevent the denial of their pending application to conduct an on-campus drag show. I did not rule on the application out of respect for

**VI. Michael Arredondo, or "Myss Myka"**

The 2023 on-campus show "was to be emceed" by a man named Michael Arredondo, whose drag performer name is "Myss Myka." *Spectrum WT v. Wendler*, 151 F.4th 714, 719 (5th Cir. 2025) (citation modified), *reh'g en banc granted, opinion vacated*, 157 F.4th 678 (5th Cir. 2025). Michael "had performed in a highly sexual drag show" in February 2023, about a month before Spectrum's show would have taken place in Legacy Hall. *Id.* He also performed in the off-campus March 2023 show—and would have performed in Legacy Hall, had the show taken place there.

Myss Myka's performances routinely veer into salacious, sexualized conduct. For instance, in a five-minute span during a February 2023 performance, he made the sign of the cross before gradually stripping off his angel costume, twerking, and graphically simulating male masturbation onto an audience member. He also squeezed his prosthetic breasts together suggestively and placed a spectator's hand on them. He ended his routine by grinding his near-bare crotch on another audience member, an act sometimes described as "frottage." Spectrum "d[id] not dispute" that Michael engaged in this behavior during its appeal of this Court's denial of a preliminary injunction. *Spectrum WT*, 151 F.4th at 719 n.2.

---

> the judicial process. On March 15th, a unanimous United States Supreme Court rejected the attempt to prevent another denial.
>
> And so, the Spectrum WT application to conduct an on-campus drag show is denied for the reasons given previously and for the reasons further explained in court filings and those provided by the courts themselves.
>
> Moreover, it is denied because S.B. 12 went into effect as a Texas law in September 2023, as well as a number of other compelling considerations.
>
> When the court makes a final decision, it will be implemented.

Pl.'s Ex. 2. Though President Wendler cited S.B. 12 as a reason to cancel the March 2024 show, it had been enjoined before it went into effect. *See Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820 (S.D. Tex. 2023), *vacated and remanded*, 157 F.4th 775 (5th Cir. 2025). On November 6, 2025, however, the Fifth Circuit vacated that injunction. *See Woodlands Pride*, 157 F.4th at 789. This means S.B. 12 is now in full force and effect.



**Def.'s Ex. 363**

Michael Arredondo's shows also feature graphic acts of "bondage & discipline, dominance & submission, and sadism & masochism," or "BDSM." During one performance, he dragged two other participants by the leash as if they were dogs. Indeed, they were dressed as dogs, and they barked while he "walked" them on all fours. He ended the routine by shoving his crotch in one participant's face. He posted a video of this interaction on his public Instagram page:



**Def's Ex. 404**

Spectrum expressly invited Myss Myka to host its 2023 and 2024 drag shows. Children—of any age—would have been present at these shows. Spectrum's only requirement was that minor children be accompanied by a parent or guardian. But Spectrum had no way to ascertain whether a child was accompanied by a parent or guardian, as opposed to any other adult. Nor could Spectrum have known whether participating PUP students were minors: PUP participants receive the same student ID as full-time West Texas A&M students, and those IDs do not list students' ages. Even professors do not know which of their students are PUP students.

**VII. Spectrum's Proposed 2026 Show**

Spectrum applied to hold another drag show in Legacy Hall later this year. That show is currently scheduled for April 17, 2026. Spectrum has not applied to hold the drag show in any other on-campus forum. Spectrum has not determined the details of the performance, as it is in a very early planning stage. Regardless of whether its Legacy Hall application receives approval, off-campus forums remain open to Spectrum.

Neither the university nor President Wendler has taken any action against Spectrum or interfered with its activities, save cancelling the 2023 and 2024 proposed drag shows. Spectrum has continued to hold non-sexualized events and meetings on campus, including in the JBK, throughout 2023, 2024, and 2025.

Though all plans remain tentative, Spectrum asserts that its 2026 show will feature content no more explicit than would warrant a PG-13 rating. But that very PG-13 rating permits "nudity" that is "brief or infrequent," including "naked backside or breasts." Def.'s Ex. 156. It was also the rating Spectrum gave its sexualized off-campus 2023 show. Spectrum states that it would pre-screen performances to ensure the appropriateness of the content.

Spectrum recently used that pre-screening during its "Valentine's Lip Synch Variety Show," held on campus in February 2025. Spectrum jointly planned the event with another

student group. It featured performers lip synching to music with choreographed dances, much like a typical RuPaul Drag Show episode. Spectrum previewed performers' routines prior to that event. However, at least one participant departed from her planned routine and "performed a sort of simulated BDSM session thing with her partner." Fanelli Dep. at 55:6–58:24. Consequently, the performance was much more sexually explicit than Spectrum promised, despite Spectrum's attempt to pre-screen routines.

## CONCLUSIONS OF LAW

### I. Jurisdiction and Venue

This case arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. Section 1983, and the Declaratory Judgments Act, 28 U.S.C. Sections 2201–02. This Court accordingly has subject-matter jurisdiction under 28 U.S.C. Sections 1331 and 1343.[8] This Court has personal jurisdiction over Defendant because he resides in the State of Texas. Venue is proper in the Northern District of Texas under 28 U.S.C. Section 1391(b) because the acts and injuries alleged occurred in and continue to occur in this judicial district, Defendant Wendler resides in this district, and he is a resident of the State of Texas.

### II. Expressive Conduct

The Constitution protects "the freedom of Speech." U.S. CONST. amend. I; *see also Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("The First Amendment literally forbids the abridgment only of 'speech.'"). But since at least the twentieth century, the Supreme Court has extended the First Amendment's protection of "speech" to certain symbolic gestures and conduct. *See Johnson*, 491 U.S. at 404 (noting that the Supreme Court has "long recognized

---

[8] In response to Spectrum's Motion for Summary Judgment, President Wendler argued that Spectrum lacks standing. Specifically, he contended that the February 2025 decision by the Texas A&M University System, which stated that the System's Board of Regents "will determine policy as to on-campus drag shows on a system-wide basis," means that Spectrum cannot prove causation, since this decision "apparently" denies Wendler the authority to approve or disapprove drag shows. That resolution by the Texas A&M System, however, remains enjoined. *See Mahomes*, 772 F. Supp. 3d 792.

that [the First Amendment's] protection does not end at the spoken or written word"); *see also Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 632 (1943) ("[T]he flag salute is a form of utterance. Symbolism is a primitive but effective way of communicating ideas."). Courts refer to activities that are not literally speech but nonetheless receive First Amendment protection as "expressive conduct." *See, e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).[9]

Nearly all conduct can be considered expressive in some sense; but not all conduct is entitled to First Amendment protection. *See City of Dall. v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every *activity* a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." (emphasis added)); *United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Because courts do not presume conduct is expressive, "it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark*, 468 U.S. at 293 n.5.

The Supreme Court holds that conduct must be "sufficiently imbued with elements of communication" to warrant First Amendment protection. *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974). In particular, the Court has required (1) "[a]n intent to convey a particularized message"; and (2) a "great" likelihood "that the message would be understood by those who viewed it." *Id.* at 410–11. Applying this test to flag burning at a political rally,

---

[9] It is doubtful that First Amendment protection, as understood by the Framers, extended to most of what is called "expressive conduct" in today's jurisprudence. *See* Campbell, supra, note 1, at 286–87 ("[W]hen expressive conduct caused harm and governmental power to restrict that conduct served the public good, there is no reason to think that the freedom of opinion nonetheless immunized that conduct."); *See generally* DAVID LOWENTHAL, NO LIBERTY FOR LICENSE: THE FORGOTTEN LOGIC OF THE FIRST AMENDMENT (1997).

the Supreme Court held that "[t]he expressive, overtly political nature of [the] conduct was both intentional and overwhelmingly apparent," thus meriting First Amendment protection. *Johnson*, 491 U.S. at 404–06. In contrast, the Supreme Court has found that a law school's decision to block military recruiters from campus to protest military policy "is not inherently expressive," and thus does not warrant free speech protections. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 64–70 (2006).

Since *Johnson*, the Supreme Court has "never invalidated the application of a general law simply because the conduct that it reached was being engaged in for expressive purposes and the government could not demonstrate a sufficiently important state interest." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 577 (1991) (Scalia, J., concurring).

Spectrum seeks only prospective relief. *See* ECF No. 28 (Plaintiff's First Amended Complaint); ECF No. 156 (Joint Final Pre-Trial Order). Therefore, the Court must consider whether the planned on-campus 2026 drag show would entail "expressive conduct" that warrants First Amendment protection. In doing so, the Court weighs the available evidence regarding the planned 2026 show, as well as evidence regarding past shows Spectrum planned and held to the extent they show what is likely to occur at the proposed 2026 show.

*A. Sexualized Drag Shows Are Not Constitutionally Protected When Minors Are Present.*

At the preliminary injunction stage, this Court found that Spectrum had not shown that either its planned 2023 drag show or sexualized drag shows in general are expressive conduct. ECF No. 59 (Memorandum Opinion and Order, Sept. 21, 2023), *Spectrum WT v. Wendler*, 693 F. Supp. 3d 689 (N.D. Tex. 2023), *aff'd in part, rev'd in part and remanded,* 151 F.4th 714 (5th Cir. 2025), *reh'g en banc granted, opinion vacated,* 157 F.4th 673 (5th Cir. 2025). No intervening legal development compels a different conclusion. While a divided Fifth Circuit panel initially reversed this court's preliminary injunction decision, the Fifth Circuit

vacated the opinion and withheld the mandate. It is not currently binding on this Court. *See United States v. Jackson*, 549 F.3d 963, 980 (5th Cir. 2008) ("This court's decisions are not final until we issue a mandate." (internal marks omitted)). And while other courts have come to a different conclusion on whether drag is expressive conduct, those courts have mostly avoided rigorous analysis of the issue, thus failing to persuade. *See, e.g.*, *Naples Pride, Inc. v. City of Naples*, No. 2:25-CV-291, 2025 WL 1370174, at *10 (M.D. Fla. May 12, 2025); *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1286 (D. Utah 2023). One Florida district court's decision finding drag is expressive conduct was initially upheld by an Eleventh Circuit panel, but as in this case, that panel opinion was vacated for rehearing *en banc*. *HM Fla.-ORL, LLC v. Griffin*, 679 F. Supp. 3d 1332, 1335 (M.D. Fla. 2023), *aff'd sub nom., HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207 (11th Cir. 2025), *reh'g en banc granted, opinion vacated sub nom., HM Fla.-ORL, LLC v. Sec'y of Fla. Dep't of Bus. & Pro. Regul.*, 160 F.4th 1282 (11th Cir. 2025). And of course, those decisions are not binding on this Court.

An intervening Fifth Circuit opinion suggests drag is not *always* "expressive conduct." After noting that a drag performance is "arguably" speech for standing purposes, the Court said it has "genuine doubt, however, that pulsing prosthetic breasts in front of people, putting prosthetic breasts in people's faces, and being spanked by audience members are actually constitutionally protected—especially in the presence of minors." *Woodlands Pride*, 157 F.4th at 786 n.9 (5th Cir. 2025). The conduct that the Fifth Circuit "doubt[s]" is constitutionally protected is extremely similar to the conduct Spectrum presented at two pre-screened shows: the "PG-13" Sam Houston Park show and the Valentine's Lip Synch Variety Show.

It is likely that the 2026 show would be sexually graphic in the way described by the Fifth Circuit. Though the current Spectrum President expressed a desire for the 2026 show to be "appropriate," past shows Spectrum planned *and* held are strong evidence to the

contrary. For its planned on-campus shows in 2023 and 2024, Spectrum invited Myss Myka to emcee and perform at the show. As shown in the screenshots from Defendant's Exhibit 363 above, Myss Myka regularly performs sexually explicit shows, replete with "pulsing prosthetic breasts" and "putting prosthetic breasts in people's faces." *Cf. Woodlands Pride*, 157 F.4th at 786 n.9. Spectrum avers that Myss Myka's past performances are not indicative of future excess. But why does Spectrum repeatedly invite, advertise, and display Myss Myka and similarly sexualized content? Assuming Spectrum intends "appropriate" content, past sexualized shows demonstrate an inability (or unwillingness) to restrain the stripteases, bouncing prosthetics, and frottage. At the off-campus Sam Houston Park show in 2023, with minors present, a performer expressly stated her striptease was inappropriate for minors—then proceeded to striptease. Spectrum admits it was unaware the stripper would striptease. And in a 2025 on-campus lip-synching event Spectrum helped plan, a performer took the stage to simulate BDSM acts. Again, Spectrum admits it was unaware of the performer's gameplan. Drag, by its "provocative," "transgressive" nature, veers into sexualized content, and Spectrum's proven inability to control the content elides any argument that the planned 2026 show will be "appropriate."

It is also likely that minors will be present at the proposed 2026 show. Spectrum expressly invited minors to the planned 2023 and 2024 shows. And minors attended the off-campus 2023 show. While Spectrum's current President stated that minors are not invited to the 2026 show, it is not clear how Spectrum would accomplish this in practice. Minor high school students attend classes at West Texas A&M through the Pre-University Program ("PUP"). There is no differentiation between PUP and regular West Texas A&M students—in fact, professors do not know which classroom students are PUP students. Minors can even join Spectrum. Consequently, PUP students might conceivably *perform* at the show. Considering these facts, the Court finds it likely that minors will attend the 2026 drag show.

State restrictions on minors' access to sexual content do not trigger heightened constitutional scrutiny. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 474 (2025). In particular, the government "may prevent minors from accessing works that (a) taken as a whole, and under contemporary community standards, appeal to the prurient interest *of minors*; (b) depict or describe specifically defined sexual conduct in a way that is patently offensive *for minors*; and (c) taken as a whole, lack serious literary, artistic, political, or scientific value *for minors*." *Id.* Performances with stripteases, prosthetic breasts, and sexualized erotic dancing appeal to the prurient interests *of minors*, are patently offensive *for minors*, and lack serious value *for minors*. If restrictions on such performances burden adults' rights to access such speech, such restrictions are arguably subject to intermediate scrutiny. *Id.* at 478. And it may be impractical to restrict minors' access to shows on campus, given the presence of minors undifferentiated from adults through the PUP program. The planned 2026 show may lack constitutional protection for that reason alone.

*B. Spectrum's Planned Show Is Not Expressive Conduct.*

The Court now applies the traditional *Spence* framework to Spectrum's planned 2026 show. To be constitutionally protected "expressive conduct," *Spence* requires (1) "[a]n intent to convey a particularized message"; and (2) a "great" likelihood "that the message would be understood by those who viewed it." *Spence*, 418 U.S. at 410–11.

Does Spectrum intend to convey a particularized message at its 2026 show? Not according to Spectrum's President and organizer of the show. When asked whether Spectrum has any "specific message" it intends to convey with its 2026 show, the President responded: "[w]e are not trying to convey a specific message." Thus, Spectrum's planned performance lacks an "intent to convey a particularized message," or in fact any message at all.

Nonetheless, at trial Spectrum posited at least three messages that the proposed 2026 show will convey. The Court considers each in turn.

First, Spectrum argued the show would convey support for charitable donations to pro-LGBT organizations.[10] But without a specific connection to the content of the drag show, merely raising money for charity does not correlate or connect the "message" dots. Rock bands routinely donate concert proceeds to charity—but that does not transmogrify the expressive message of the songs they perform into a message of support for that charity.[11] This argument fails at step one of the *Spence* test.

Second, Spectrum argued the 2026 show, like the planned 2023 and 2024 shows, would convey a message of acceptance and support for the "LGBT community." But this is a highly generalized message that isn't tied to the specific conduct of a drag show. *All* of Spectrum's events can be said to convey a message of acceptance and support for the LGBT community. In fact, *all* conduct can be said to convey a message of acceptance and support for the members of the organizing group—or a broader group of which they are part. This

---

[10] The planned 2023 on-campus show was intended as a fundraiser for the Trevor Project, and the off-campus 2023 show did indeed raise funds for the Trevor Project. It's not clear if a specific charitable organization has been identified for the 2026 show.

[11] To be sure, sometimes songs are written with a *message* that correlates to the charitable purpose of the song. For example, the expressive message of "We Are the World," is expressly linked to the USA for Africa fundraiser. *See We Are The World*, USA AFRICA (2025), https://usaforafrica.org/we-are-the-world/ [perma.cc/TB54-RJHA]. One degree removed, Bob Geldof's Live Aid concert is forever linked to famine relief in Ethiopia—even though the songs are not expressly about famine relief. *See, e.g.*, Ravi Mattu, *40 Years After Live Aid, It's Still Personal for Bob Geldof*, N.Y. TIMES (Oct. 21, 2025), https://www.nytimes.com/2025/07/13/arts/music/live-aid-bob-geldof-anniversary.html [https://perma.cc/U2PE-W6U5]. But sometimes proceeds are donated to charity without any meaningful connection between the charity and the message. Billie Eilish recently donated proceeds from her tour to TreeFolks, a Texas organization that plants trees. *See, e.g.*, Tara Brolley, *Billie Eilish's Tour Donates Funds to Central Texas Nonprofit Dedicated to Planting Trees*, CBS AUSTIN (Jan. 13, 2026, 4:03 PM), https://cbsaustin.com/news/local/billie-eilishs-tour-donates-funds-to-central-texas-nonprofit-dedicated-to-planting-trees [https://perma.cc/P3AK-X97Q]. This does not mean her song "Bad Guy" is about planting trees. Here, a nascent drag show "not trying to convey a specific message," but historically prone to impromptu striptease, frottage, and BDSM is like the third category—a bridge too far from the message of the charity.

would turn "an apparently limitless variety of conduct" into speech in an impermissible way. *O'Brien*, 391 U.S. at 376. This argument also fails at *Spence* step one.

Third, Spectrum's former President testified that all drag shows, including the planned 2023 and 2024 shows convey a message of "bend[ing] gender norms." While Spectrum's current President did not advance this argument, the Court considers it nonetheless. While some drag performances feature men dressing as stylized women and vice versa, in others men perform as men and women as women. With no performances yet scheduled for the 2026 show, it is unclear if any performances will feature the cross-dressing that most directly conveys a message of "bending gender norms." However, for the sake of argument, the Court will assume even performances that don't feature cross-dressing could still convey a message of "bending," or at least challenging, gender norms. For example, a woman might perform in a costume that exaggerates certain aspects of femininity with an intent to make some statement about "gender norms."

But even if Spectrum *intends* to convey a message of bending gender norms, this Court cannot find that there is a great likelihood "that the message would be understood by those who viewed it." *Spence*, 418 U.S. at 411. Spectrum has not selected performers—nor the content of their performances. This makes it difficult to evaluate whether viewers will understand a message of "gender bending." Not all drag show performances convey a message of gender bending that would be understood by those who view it. On this record alone, there are at least two performances the Court finds do not meet that standard. First, President Wendler presented video at trial of a performance at the off-campus 2023 show. This appears to be a video of a woman dancing and stripping. It does not obviously convey a message of "bending gender norms." *See Rumsfeld*, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it."). For example, without added contextual clues, the

reasonable observer might infer that a sexually-oriented business was publicly protesting the Red Light zoning ordinance. *See id.* ("An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else."). Second, at an R-rated on-campus lip-synching event in 2025 jointly held by Spectrum and another group, one performer simulated "BDSM" sex acts. This type of performance does not send a clear enough message of "gender bending" that a viewer would likely understand it. Thus, even if the 2026 show intends to message "gender bending," it is not clear that the audience would likely understand it as such. No performers have been selected for the show, and as demonstrated by these two performances, it is not clear that every "drag" performance portrays that message to the audience.

Accordingly, Spectrum has not shown that its planned 2026 drag show has both (1) "[a]n intent to convey a particularized message"; and (2) a "great" likelihood "that the message would be understood by those who viewed it." *Spence*, 418 U.S. at 410–11.

Spectrum argues that this application of the *Spence* test is precluded by intervening Supreme Court precedent. Specifically, Spectrum relies on the following statement from *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*:

> [A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a "particularized message," would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.

515 U.S. 557, 569 (internal citations omitted). Thus, Spectrum argues, conduct warrants protection if there is an intent to convey *any* message, and the viewer would likely understand that there is a message, even if they disagree or are unsure of the message. But again, since *all* conduct conceivably portrays some message, applying this test too broadly would turn "an

apparently limitless variety of conduct" into speech in an impermissible way. *O'Brien*, 391 U.S. at 376. *Hurley* is better understood as ensuring that conduct that is inherently expressive by nature retains First Amendment protection, not as modifying or abrogating the *Spence* test in *all* cases. *See Rumsfeld*, 547 U.S. at 63 ("The expressive nature of a parade was central to our holding in *Hurley*."). Since *Hurley,* courts have required a sufficient nexus between conduct and message to warrant First Amendment protection. *See, e.g.*, *Edge v. City of Everett*, 929 F.3d 657, 667–70 (9th Cir. 2019) (baristas intended message of "empowerment and confidence" not sufficiently connected to wearing only "pasties and g-strings").

Finally, Spectrum avers that drag is the inherently expressive conduct contemplated in *Hurley*, primarily because it is "live entertainment" and could take place on stage. They cite *Schad v. Borough of Mount Ephraim* for the proposition that "live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." 452 U.S. 61, 65 (1981). But the *Schad* Court dealt with a statute that banned *all* "live entertainment." *Id.* "By excluding live entertainment . . . [the] ordinance prohibits a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments." *Id.* In other words, the *Schad* Court found that live entertainment includes *some* First Amendment protection for "expressive conduct." It does not follow that *any* live performance can be categorized as "inherent" expressive conduct. *Southeastern Promotions, Ltd. v. Conrad* is no more helpful. In that case, the Supreme Court found that a performance of the musical 'Hair' is expressive conduct, because "the acting out—or singing out—of the written word . . . mixes speech with live action or conduct." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975). Spectrum does not—and could not—argue that sexualized drag is the "acting out of the written word" like a traditional play or musical. *Id.*

To be sure, the Supreme Court has found that nude dancing in the context of "adult entertainment" is "expressive conduct"—before going on to uphold regulations of that conduct. *See Barnes*, 501 U.S. at 563–72; *City of Erie v. Pap's A.M.*, 529 U.S. 277, 282–302 (2000); *but see Edge*, 929 F.3d at 667–70 (9th Cir. 2019) (baristas' choice to wear only "pasties and g-strings" not expressive conduct). However, even if nude dancing is "expressive conduct," the Court has emphasized that it is "only marginally so"—such conduct is exiled to the far "outer perimeters of the First Amendment." *Barnes*, 501 U.S. at 565–66; *see also Pap's*, 529 U.S. at 289 ("[N]ude dancing of the type at issue here is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection." (citing *Barnes*, 501 U.S. at 565–66)). Here, even assuming Spectrum's proposed show *is* expressive conduct, the Court finds it would fall only within the outer perimeter of First Amendment protection. For the reasons discussed below, Spectrum would still not be entitled to the relief it seeks.

**III. Forum Analysis**

The Supreme Court has long "recognized that the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.'" *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (quoting *U.S. Postal Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981)); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985) ("Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."). Instead, the degree of public access to government property depends on the type of forum at issue. *See Little v. Llano Cnty.*,

138 F.4th 834, 858 (5th Cir. 2025) (en banc) ("Forum analysis assesses when government can regulate private speech on property it owns or controls.").

Supreme Court precedent distinguishes between four types of forums: the "(1) traditional public forum, (2) designated public forum, (3) limited public forum, and (4) nonpublic forum." *Three Expo Events, L.L.C. v. City of Dall., Tex.*, 182 F. Supp. 3d 614, 624 (N.D. Tex. 2016) (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–16 (2015)). "Traditional public forums include sidewalks, streets, and parks that the public since time immemorial has used for assembly and general communication." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)). "[T]he government may not prohibit all communicative activity" in these forums. *Perry*, 460 U.S. at 45. Rather, in traditional public forums, "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)).

Another kind of public forum may "be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802 (citing *Perry*, 460 U.S. at 45, 46 n.7). Designated public forums "exist where a government has 'reserved a forum for certain groups or for the discussion of certain topics.'" *Walker*, 576 U.S. at 215 (quoting *Rosenberger*, 515 U.S. at 829 (citation modified)). The government must intend to open the forum's doors to the same extent as a traditional public forum; it cannot "create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id.* (quoting *Cornelius*,

473 U.S. at 802); *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998) ("[T]he government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' to use it." (internal citation omitted)). Stated differently: The government must have "opened [the forum] for all types of expressive activity" for it to qualify as a designated public forum. *Hotel Emps. & Rest. Emps. Union, Loc. 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (citing *Cornelius*, 473 U.S. at 802). "The state's power to control a speaker's access to these 'designated public forums' is 'subject to the same [F]irst [A]mendment constraints that apply to traditional public forums.'" *Three Expo Events*, 182 F. Supp. 3d at 624 (quoting *Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989)).

Unlike traditional or designated public forums, a *limited* public forum is open only to "public expression of particular kinds or by particular groups." *Freedom from Religion Found.*, 955 F.3d at 426. "When the government creates a limited public forum of this sort, the government is not required to, and often does not, allow persons to engage in every type of speech." *Three Expo Events*, 182 F. Supp. 3d at 625 (citing *Good News Club*, 533 U.S. at 106). To the contrary, in a limited public forum, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* (quoting *Perry*, 460 U.S. at 46); *see also Perry*, 460 U.S. at 46 ("[T]he state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (citing *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 131 n.7 (1981))). Distinguishing limited and designated public forums, the Supreme Court noted in *Arkansas Education Television*

*Commission v. Forbes* that a "designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." 523 U.S. 666, 679 (1998). Instead, selective access generally means that a given venue is a *limited* public forum. *See id.* (tracing the general–selective access distinction back to *Cornelius*).

The final category is the nonpublic forum, "which describes public property that is not by tradition or designation open for public communication." *Three Expo Events*, 182 F. Supp. 3d at 625. A "forum may be considered *nonpublic* where there is clear evidence that the state did not intend to create a public forum or where the nature of the property at issue is inconsistent with the expressive activity, indicating that the government did not intend to create a public forum." *Estiverne*, 863 F.2d at 376 (citing *Cornelius*, 473 U.S. at 803). As in limited public forums, "[t]he government can restrict access to a nonpublic forum 'as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Forbes*, 523 U.S. at 677–78 (quoting *Cornelius*, 473 U.S. at 800).

In no forum may the government discriminate based on a speaker's viewpoint without surviving strict scrutiny. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395–96 (1992) (applying strict scrutiny to viewpoint-discriminatory city ordinance). This ban on viewpoint discrimination is one of "two distinct but related limitations that the First Amendment places on government regulation of speech," the other being *content* discrimination. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 169 (2015). The Supreme Court contrasted the two by emphasizing that

"Government discrimination among viewpoints . . . is a 'more blatant' and 'egregious form of content discrimination.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829). A regulation is based on content if it "applies to particular speech because of the topic discussed"; a regulation is based on viewpoint if it "target[s] viewpoints within that subject matter" for unfavorable treatment. *Id.* at 163, 169. The Court has thus distinguished "between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 829–30 (citing *Perry*, 460 U.S. at 46).

Like all forms of viewpoint discrimination, other kinds of regulations often must pass strict scrutiny, too. But not always. Whether strict scrutiny applies depends on the type of forum.

*A. Legacy Hall Is a Limited Public Forum.*

To determine the type of forum at issue, courts examine two factors: "(1) the government's intent with respect to the forum, and (2) 'the nature of the [forum] and its compatibility with the speech at issue.'" *Spectrum WT*, 151 F.4th at 727 (quoting *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001)). Neither party contends that Legacy Hall is a traditional public forum analogous to public "streets or parks." *Chiu*, 260 F.3d at 347. Nor do they argue that Legacy Hall is a nonpublic forum. This leaves the middle two categories: designated public forums and limited public forums. Spectrum contends that Legacy Hall is a designated public forum, while President Wendler argues it is a limited public forum.

Designated and limited public forums are adjacent in the Supreme Court's forum taxonomy, but there is a doctrinal chasm between them. The Fifth Circuit reduced the aforementioned four categories to "two broad categories": "traditional and designated public

forums," and "limited public forums and nonpublic forums." *Freedom from Religion Found.*, 955 F.3d at 426 (citing *Chiu*, 260 F.3d at 344–47). The primary difference is that content-based restrictions on speech in traditional and designated public forums are subject to heightened scrutiny, while the same restrictions in limited and nonpublic forums are not.

First, the government's intent for Legacy Hall strongly indicates it is a limited public forum. Start with West Texas A&M's "Expressive Activity on Campus" policy. It notes that "[f]reedom of expression is of critical importance" and that the freedoms of speech and assembly are "central to the mission of institutions of higher education." Pl.'s Ex. 6 at 1. But several types of "[e]xpressive activities" are "not protected" anywhere on the West Texas A&M campus, including those involving "physical abuse or assault," inciting "imminent lawless action," and "illegal harassment." *Id.* at 2. The policy also expressly calls the "common outdoor areas of the university's campus . . . traditional public forums," offering "public streets, sidewalks, plazas, lawns, and parks" as examples. *Id.* at 2, 5. There is no mention of Legacy Hall in this policy.

The JBK "Procedures and Guidelines" policy, last revised on March 5, 2025, is also relevant. Already quoted at length above, it provides that West Texas A&M officials "reserve[] the right to deny" applications to use Legacy Hall if the proposed event would conflict with the University's mission or policies. Def.'s Ex. 4 at 4. It also empowers staff to "cancel or interrupt any event" if the event could "be viewed as inappropriate or not consistent with the mission of West Texas A&M University." *Id.*

At trial, President Wendler emphasized West Texas A&M's mission to be a "welcoming" place for all students, often using terms such as "core values." This term appears repeatedly in West Texas A&M's "University Statements," which include "Respect" as a core value. The Statements define respect as "treat[ing] others with [the] dignity which flows from the humanity of each individual." Def.'s Ex. 140 at 1. President Wendler testified that

"respect" was the core value he relied on most heavily when he canceled the March 2023 and March 2024 drag shows. In his view, respect is a "top value" for West Texas A&M, behind only the health and safety of the student body. Drag shows violate the core value of "respect" because such shows caricature and reduce women to nothing more than their sexuality. He believes allowing such shows would "diminish respect" for women on campus. And women constitute roughly half of all students on campus.

Second, "determining the status of a forum is highly fact-intensive," and several key facts show an inconsistency between Spectrum's proposed drag show and historic uses of Legacy Hall. *Three Expo Events*, 182 F. Supp. 3d at 628 (citing *Verlo v. Martinez*, 820 F.3d 1113, 1132 (10th Cir. 2016)). While the Fifth Circuit's now-vacated panel opinion stated that neither party offered "evidence that a request for use has been denied to a student or an outside group," evidence adduced at trial now shows otherwise. President Wendler testified that he canceled a proposed concert featuring the rapper Kevin Gates because his concerts had a history of fistfights and "gunplay." He stated that allowing the concert to go forward would not have been "consistent with the values of West Texas A&M University." Importantly, this concert would have taken place not in Legacy Hall, but in the First United Bank Center, West Texas A&M's basketball arena. This arena is also on the West Texas A&M campus, and other testimony at trial suggested that it is more open to the public than Legacy Hall. For example, West Texas A&M routinely rents out the Center for large-scale commercial use, while Legacy Hall is primarily used by students and RSOs such as Spectrum.

Further, President Wendler testified at trial that there are a number of other events he would not allow to take place in Legacy Hall. First and foremost, President Wendler would never permit "blackface" performances at West Texas A&M. To President Wendler, drag denigrates women in the same way that blackface denigrates African Americans: both mock

vulnerable groups by caricaturing aspects of their identity.[12] Drag exaggerates women's breasts, buttocks, and other physical attributes, while blackface emphasizes African Americans' skin color and offensive cultural stereotypes. But the purpose is the same: to reduce an entire group to merely its sexuality (in the case of drag) or skin color (in the case of blackface). The only difference is that one performance is "abhorred by cultural elites" while the other is in vogue—at least for now. *Spectrum WT*, 151 F.4th at 735 (Ho, J., dissenting).

President Wendler expressly testified that he would not allow performances denigrating several other groups:

> **Q.** If [an] RSO applied to hold a performance or rally to express support for the holocaust or advocate anti-Semitic views[,] is that something that you would have a concern with and would cancel?
>
> **A.** I would.
>
> **Q.** If a registered student organization at West Texas A&M wanted to conduct a blackface performance or other performance at Legacy Hall that mocked or denigrated racial groups, is that a performance that you would allow or that you would cancel?
>
> **A.** I would not allow it.
>
> **Q.** And if [an] RSO at West Texas A&M wanted to put on a performance in Legacy Hall that mocked or denigrated LGBTQ plus people[,] is that a performance that you would allow or would not allow?
>
> **A.** I would not allow it.
>
> **Q.** Assuming it is a {RSO], would [West] Texas A&M University allow the Palestine Solidarity Committee to perform in Shakespearean [S]hylock costumes . . . caricaturing Jews with prosthetic noses and other stereotypical costumery to raise awareness about the alleged Gaza genocide or the war in Gaza?
>
> **A.** I would be prone to say no on that one.

[12] President Wendler's campus-wide email canceling the March 2023 show leaned heavily on this analogy, as did Judge Ho's dissent in the August 18 panel opinion. *See* Pl.'s Ex. 1; *Spectrum WT*, 151 F.4th at 738 (Ho, J., dissenting) ("Like blackface performances, drag shows violate the university's fundamental mission to ensure a welcoming educational environment for all.").

Exp. Tr. 12:29:49–12:30:11; Exp. Tr. 11:07:43–11:08:51.

Even without this evidence, conspicuously absent from the record is any indication that an event like Spectrum's proposed drag show has ever occurred in Legacy Hall.[13] Spectrum claims that its April 2026 show would be "PG-13" and thus appropriate for Legacy Hall. But its 2023 and 2024 shows were also advertised "PG-13," and although neither of those shows took place on the West Texas A&M campus, the 2023 off-campus show *did* transpire in an Amarillo public park. And *that* show—the only show that has actually taken place—featured stripping and near-nude dancing more appropriate for a strip club than a university campus. And minor children were present.

Spectrum's current President testified at trial[14] that Spectrum's 2026 show will be different. Specifically, Fanelli noted that Spectrum's current plans are to allow only student performers, only "appropriate" PG-13 performances, and no minors in the audience. But Fanelli also testified via deposition that Spectrum remains "in the very, very early planning stages" for the 2026 show and so far has not selected any performers, performances, costumes, or music. Spectrum's show will simply be whatever the still-unidentified performers wish to do on stage.

This "wait-and-see" approach betrayed Spectrum in the past. On February 21, 2025, during a show that *did* take place on the West Texas A&M campus, a performer engaged in behavior that Fanelli described as "R-rated." Specifically, one performer "went up on stage

---

[13] Plaintiff introduced evidence showing that a student drag show also took place in Legacy Hall in 2019. However, neither party testified to that show's content. With little to no evidence in the record about the 2019 show, the Court is not equipped to assess how that show might compare to the decidedly off-color shows Spectrum wished to hold on campus in 2023 and 2024, or to the show it hopes to hold in April 2026.

[14] Counsel for Plaintiff introduced Spectrum President Johnathan-Jayce Fanelli's testimony via deposition excerpts rather than through live testimony.

and performed a sort of simulated BDSM session with" the performer's partner. Fanelli admitted that the performance was "very uncomfortable" to watch. And although Spectrum held rehearsals for this show, this particular performer did not engage in BDSM during the rehearsal or inform Spectrum of her plans. These graphic simulated sex acts were "something that she just decided to do on a whim." The show was entitled the "Valentine's Lip Synch Variety Show"—hardly the kind of show where one might expect to watch performers simulate sex on stage. But one performer did anyway, because once a performer is up on the stage, what they do is out of Spectrum's control.

The Valentine's Lip Synch Variety Show colorfully illustrates the incompatibility of drag shows with Legacy Hall. First, a lip-synching show is by definition more appropriate than a drag show: in the former, performers merely mimic the singing of a musician, while in the latter, performers dance and often strip while wearing "provocative" or "transgressive" clothing. If a lip-synching show can unexpectedly descend into R-rated BDSM, surely a drag show could, too.

And Spectrum's plans for the April 2026 drag show are significantly less concrete than its preparations for the Valentine's show. While Spectrum intended the Valentine's show to feature only lip-synching, Fanelli testified that the term "drag show . . . applies to a lot of different stage performances," and that Spectrum is not yet sure what form the April 2026 show will take. Further, unlike the Valentine's show, where Spectrum held rehearsals in an attempt to ensure no performer engaged in inappropriate behavior, Spectrum has not committed to screening performers or their routines before the April 2026 show. Nor did Spectrum screen performers' routines ahead of the March 2023 off-campus show, the only drag show Spectrum has actually hosted since this litigation began.

In sum, Legacy Hall is a limited public forum. This is evidenced by West Texas A&M and the Texas A&M System's intent for venues like Legacy Hall, as well as past events held

there, which show that Spectrum's proposed drag show would be a radically different event.

In a limited public forum, President Wendler's actions need only be viewpoint neutral and reasonable in light of Legacy Hall's purpose. *See Fairchild*, 597 F.3d at 758 ("The government may restrict speech in these limited public forums, as long as the regulation '(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum.'" (quoting *Chiu*, 260 F.3d at 346)); *see also Freedom from Religion Found.*, 955 F.3d at 429 ("[R]estrictions on speech in limited public forums and nonpublic forums must be both reasonable *and* viewpoint neutral."); *S.A. Firefighters' Ass'n, Loc. 624 v. City of S.A.*, 404 F. Supp. 3d 1045, 1057–58 (W.D. Tex. 2019) (noting that regulations on speech in limited public forums must be "viewpoint neutral and reasonable in light of the purpose served by the forum" (citing *Good News Club*, 533 U.S. at 106)).

"[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806. Here, however, President Wendler never tried to suppress the *viewpoint* Spectrum wishes to express. Spectrum desires to support the LGBT community through its drag show, in part by raising money for the Trevor Project. President Wendler has never opposed that message. Far from it: In his letter canceling the March 2023 show, he wrote that raising money for suicide prevention "in the LGBTQ community" is a "noble cause." Pl.'s Ex. 1. And he testified at trial:

> **Q.** Do you agree with the purpose of supporting LGBTQ plus students at West Texas A&M[] University?
>
> **A.** We support all students at the University.
>
> **Q.** So if that was the purpose of Spectrum in the drag shows that they proposed for Legacy Hall, do you have a disagreement with the purpose of supporting LGBTQ students or people?
>
> **A.** I do not.

Exp. Tr. at 11:14:45–11:15:21.

President Wendler never retaliated against Spectrum or any of its student members. He never attempted to revoke Spectrum's RSO status and never tried to cancel its other on-campus events, including queer movie nights, lavender prom, and queer history nights. He made no attempt to interfere when protestors dressed in drag flocked to the West Texas A&M campus to protest his decision. It is clear that President Wendler takes issue not with the *ideas* Spectrum wishes to express, but the way they would do it: by denigrating West Texas A&M's female students. *See also State of Tex. v. Knights of Ku Klux Klan*, 58 F.3d 1075, 1081 (5th Cir. 1995) ("The fact that the State wishes to exclude only one group with a certain viewpoint does not alone make the exclusion viewpoint-based.").

*Cornelius* also provides the touchstone for reasonableness: "the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." 473 U.S. at 809. This is a contextual inquiry, and a low bar for the government to meet. *See Perry*, 460 U.S. at 61 n.5 (Brennan, J., dissenting) (noting that in limited public forums, the government still has the "right 'to preserve the property under its control for the use to which it is lawfully dedicated'"); *Mansky*, 585 U.S. at 12 ("[T]he government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated.'" (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966))).

President Wendler meets that low bar here. His restriction on Spectrum's proposed drag show in Legacy Hall is reasonable in light of Legacy Hall's stated purpose of providing a venue for speech on topics that, pursuant to the University's core values, do not denigrate any member of the West Texas A&M community. His trial testimony about the many other types of expressive activity he would not allow in Legacy Hall only underscored this further.

In summary: The government may not discriminate based on viewpoint, no matter the forum. If it does so, even in a "limited forum," it must pass strict scrutiny. But here, President Wendler's drag decision is not based on viewpoint. And it manifestly rises to meet the low bar of reasonableness and viewpoint neutrality. *See Fairchild*, 597 F.3d at 758. Accordingly, the regulation is permissible in Legacy Hall.

*B. Wendler Has Not Imposed a Prior Restraint.*

Spectrum also argues that President Wendler's restrictions on drag shows impose an unconstitutional prior restraint. Even in a limited public forum, prior restraints are disfavored. But they are not *per se* invalid. Rather, a party imposing a prior restraint in a limited public forum must employ "neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum *and* (2) viewpoint-based censorship." *Freedom from Religion Found.*, 955 F.3d at 429. The First Amendment's primary concern in this context is "unfettered discretion" vested in the decisionmaker, because this "intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* at 427 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760 (1988)). The solution is "adequate safeguards to protect against the improper exclusion of viewpoints." *Id.* at 429 (quoting *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 384 (4th Cir. 2006)).

Here, President Wendler has not imposed a prior restraint. To date, he has merely told Spectrum that there is one place where they may *not* hold their desired drag show: Legacy Hall. This is not a complete ban on Spectrum's speech; it may be free to hold the show elsewhere on campus, such as in a traditional public forum. This makes President Wendler's actions a "time, place, or manner" restriction rather than a prior restraint. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 734 (2000) (holding that a statute barring pro-life demonstrators

from protesting near abortion clinics was not a prior restraint because they remained free to protest elsewhere); *Frisby v. Schultz*, 487 U.S. 474, 483–84 (1988) (upholding ordinance prohibiting picketing near residential dwellings on ground that "ample alternative" locations remained for speakers to express their views); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 692 (2010) (declining to discuss prior restraints despite fact that challenged policy imposed restrictions on speech more severe than the one here). Further, unlike the typical prior restraint case, where the plaintiff seeks to invalidate a preexisting policy that categorically forbids certain speech, no such policy exists here. President Wendler testified that he has not yet decided whether to permit the April 2026 show to take place in Legacy Hall. His decision surely will be informed by his past decisions, but if the April 2026 show is materially different from Spectrum's past shows, his decision might be, too.

And even if President Wendler's actions did constitute a prior restraint on speech, West Texas A&M has safeguards that meaningfully limit his discretion. For example, President Wendler explained at trial that his decision was based on respect for others' identities. This is not merely an abstract idea, but a core value of West Texas A&M that is codified in the University's mission statement.

Nor is this case like *Healy v. James*, 408 U.S. 169 (1972), on which Spectrum has relied heavily. But Spectrum's absolutist reading of *Healy* is foreign to the case itself. Spectrum breathes into *Healy* the broad proposition that the "First Amendment bars college presidents from denying recognition to student groups whose views they believe 'abhorrent' and contrary to the college's mission and values." ECF No. 144 at 13 (quoting 408 U.S. at 187–88 (citation modified)). Not so. *Healy* involved a college president's outright denial of *any* official recognition for a student group due to the group's viewpoint. This meant the group was effectively exiled from campus, and the Supreme Court thus found an unconstitutional

prior restraint. Here, by contrast, President Wendler has taken no action whatsoever against Spectrum or its members, save one: Spectrum may not use *one* venue to host *one* type of event. He testified at trial that Spectrum remains free to hold any other event it likes in Legacy Hall and may even be permitted to host a drag show elsewhere on campus. Spectrum remains an RSO in good standing and continues to host many types of LGBT-oriented events all over campus. This case is a far cry from *Healy*.

**IV. *Christian Legal Society v. Martinez***

Having found Legacy Hall is a limited public forum, the case *Christian Legal Society v. Martinez* warrants special discussion. Whether that case has controlling or persuasive effect, it illustrates the reasonableness of President Wendler's restriction on access to Legacy Hall.

Owing to "the special characteristics of the school environment," educators enjoy considerable discretion to impose and enforce nondiscrimination policies. *See Martinez*, 561 U.S. at 692; *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) ("A university's mission is education, and decisions of this court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities."). That principle adheres with special force in limited public forums on state-run college campuses. *See Martinez*, 561 U.S. at 692 ("[W]e have repeatedly stressed that a State's restriction on access to a limited public forum 'need not be the most reasonable or the only reasonable limitation.'" (quoting *Cornelius*, 473 U.S. at 808)).

In *Christian Legal Society v. Martinez*, the Supreme Court recognized that a university's "all-comers" policy—an application of its broader nondiscrimination policy—allowed the school to withhold benefits from an organization whose bylaws it deemed discriminatory. *Id.* at 690. Specifically, the university's policy forestalled the Christian Legal

Society's (CLS) "access to the student-organization forum." *Id.* at 669. It even did so *before* any discrimination had occurred by looking at the *content* of the group's bylaws and objecting to the "Statement of Faith" requirement. The Statement of Faith, by its terms, excluded no one, but merely required a forward-looking agreement to abide by the Statement. *See id.* at 672–73.

Characterizing all registered student organizations as a limited public forum, the *Martinez* Court cited several fact-sensitive arguments supporting the reasonableness of Hastings' policy. First, registered student organizations (the class to which CLS aspired) were funded by "mandatory student activity fees" paid by every student. *Id.* at 688. Second, the university's "all-comers" policy effectively implemented its "Nondiscrimination Policy without inquiring into [a student group's] motivation." *Id.* at 688. Third, the policy encouraged diversity and tolerance (values Hastings could permissibly promote). *Id.* at 689. Fourth, the policy "subsume[d]" state-law and "advance[d] state-law goals" by "declin[ing] to subsidize . . . conduct of which the people of California disapprove." *Id.* at 689–90. Under these facts, the Court upheld the school's denial of CLS from its forum.

Beyond its facts, *Martinez* counsels judges to "respect university officials when it comes to regulating student activities to ensure an inclusive educational environment for all." *Spectrum WT*, 151 F.4th at 733 (Ho, J., dissenting), *reh'g en banc granted, opinion vacated*, 157 F.4th 678 (5th Cir. 2025). Once an administrator finds that a proposed activity would discriminate, it need not "subsidize" the activity—certainly not in a limited public forum. *Martinez*, 561 U.S. at 690. So long as the school's regulation of speech is (1) reasonable and (2) viewpoint neutral, the policy will survive judicial review. *Id.* at 697. Before assessing a policy's reasonableness, judges must embrace humility because they "lack the on-the-ground expertise and experience of school administrators" and should not "substitute their own

notions of sound educational policy for those of the school authorities which they review." *Id.* at 686; *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982). In other words, judges may squint at a school policy's lawfulness, but not its prudence. *See Martinez*, 561 U.S. at 692 ("[T]he *advisability* of Hastings' policy does not control its *permissibility*.") (emphasis in original).

Factual similarities draw this case well within the orbit of *Martinez*. Just as CLS did, Spectrum attempts to access a limited public forum funded by mandatory student fees. *Id.* at 669. Now, as then, the University declined Spectrum's proposed use of the forum pursuant to its viewpoint-neutral policy and without regard for the group's "motivations." *Id.* at 688. Indeed, President Wendler even supports Spectrum's stated message and purpose of support for LGBT students. Once again, the school's policy serves to advance values of respect and inclusion. *See id.* at 689. And, even as before, the University rule furthers values expressed by state law. *See id.* at 690; Def.'s Ex. 51; Def.'s Ex. 222. The factual spheres of these two cases draw so near as to almost eclipse one another. The chief differences between *Martinez* and the instant case lie in (1) the specifics of the school policies and (2) the completeness of each group's denial from the forum.

First, compare the policies. Whereas Hastings' policy from *Martinez* conditioned access to its forum on an organization's "agreement to open eligibility for membership and leadership to all students," here the policies governing Legacy Hall condition its use on omitting inappropriate material.[15] *Martinez*, 561 U.S. at 668. Despite the obvious differences,

---

[15] The full policy examined in *Martinez* reads as follows: [Hastings] is committed to a policy against legally impermissible, arbitrary or unreasonable discriminatory practices. All groups, including administration, faculty, student governments, [Hasting]-owned student residence facilities and programs sponsored by [Hastings], are governed by this policy of nondiscrimination. [Hastings'] policy on nondiscrimination is to comply with applicable law. [Hastings] shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation. This nondiscrimination policy covers admission, access and treatment in Hastings-sponsored

both policies represent viewpoint-neutral conditions (for reasons explained above) and are therefore legally analogous. While West Texas A&M's policy might seem broader than an "all-comers" rule, even the *Martinez* "all-comers" policy was merely one "interpretation" of a much broader nondiscrimination policy as applied to student group registration. *Id.* at 711 (Alito, J., dissenting). President Wendler's cancellation of Spectrum's drag show for its reasonably anticipated offensiveness and hyper-sexualization is equally a narrow application of the broader rules governing Legacy Hall. The two policies are more alike than they might appear at first glance.

Next, consider the respective denials. While Hastings fully rejected CLS from accessing any RSO benefits, here West Texas A&M has only declined a single proposed use of one specific forum. Spectrum can use—and *has used*—facilities in the JBK for other events and activities. Hastings' refusal to even recognize CLS was a far more severe limitation than President Wendler's forum-specific denial of one proposed event. This difference only serves to cast President Wendler's actions in a more reasonable light.

Because the material facts so closely align, *Martinez* arguably governs the instant case, allowing West Texas A&M to condition the use of its resources on reasonable terms: that students adhere to minimal standards of respect and decorum. *See id.* at 703 (Kennedy, J., concurring) ("To be effective, a limited forum often will exclude some speakers based on . . . the content of their speech . . . .").

Even if the few dissimilarities between the two cases are enough to avoid *Martinez*'s reach, *Martinez* remains a pertinent example of how limited public forum analysis applies in educational spaces. Because "extracurricular programs are, today, essential parts of the

---

programs and activities.

*Martinez*, 561 U.S. at 670.

educational process," a university's "license to choose among pedagogical approaches[] is not confined to the classroom." *Id.* at 686. Accordingly, schools retain "a significant measure of authority over the type of officially recognized activities in which their students participate." *Id.* at 686–87 (quoting *Bd. of Educ. of Westside Cmty. Schs. (Dist. 66) v. Mergens*, 496 U.S. 226, 240 (1990)). That authority would mean little if schools could not encourage good citizenship and respectful dialogue by requiring a modicum of decorum in the campus's more closely monitored spaces. Given the above-described similarities, if Hastings' policy was reasonable in light of the educational environment, so is West Texas A&M's.

When a university tethers certain spaces to the pursuit of its own mission by imposing additional regulations, the forum itself might communicate institutional support for the activities presented therein. Hastings wanted to maintain a forum welcoming to all students and so prohibited criteria that would discourage membership. Similarly, West Texas A&M now wishes Legacy Hall to remain *welcoming to* and *appropriate for* all students, especially since each student helps fund Legacy Hall's operations. It would be absurd if the university could not protect this forum from inappropriate behaviors, including racist, sexist, and overtly sexual conduct. President Wendler may decline to approve a sexualized drag show in Legacy Hall for the same reasons he may withhold approval from a blackface performance, a white-supremacist rally, a cisgendered striptease, or an antisemitic "Shylock" skit mocking Jews. In fact, President Wendler testified he may do exactly that: cancel a blackface or similar antisemitic performance. Exp. Tr. at 12:27:27–12:30:17. Each of these would be inappropriate for the forum and would harm West Texas A&M's mission: to promote a culture of respect among its students. When the university reserves a forum for limited expressive purposes, President Wendler may rightly say "not here" to inappropriate material.

*Martinez* also gives weight to the availability of alternative expressive avenues. "[W]hen access barriers are viewpoint neutral," the Supreme Court has "counted it significant

that other available avenues for the group to exercise its First Amendment rights lessen the burden created by those barriers." *Martinez*, 561 U.S. at 690. Here, Spectrum has manifold other options. It can express the very same message of support for the LGBT community and gender-bending through any number of other means. A speech, debate, signage, or even *other performances* could convey the same message in Legacy Hall. But even if Spectrum's intended message could *only* be expressed through a drag performance, other on and off campus spaces remain available. For example, President Wendler permitted a protest including students in drag. He even testified at trial that he did not find that example of drag to be inappropriate. And, as in 2023, off-campus spaces also remain open for Spectrum's proposed drag show. Because myriad "alternative channels" for expression remain available to Spectrum, and President Wendler's cancellation was done "without reference to the reasons motivating" the prospective performance, West Texas A&M's forum-specific rules appear "all the more creditworthy." *Id.* at 690, 696.

Simply put, whether *Martinez* controls or merely persuades, it weighs in favor of President Wendler's viewpoint-neutral application of Legacy Hall's reasonable restrictions. If Hastings can promote diversity and respect by policing the content of CLS's constitution and *anticipating* future discrimination, then West Texas A&M can promote the same values by refusing to host an event when it reasonably foresees conduct inappropriate for the forum.

**CONCLUSION**

Spectrum's proposed show is likely not protected expressive conduct. Even if it were, Legacy Hall is a limited public forum, where Spectrum's proposed show would not be appropriate. Accordingly, Spectrum has not proven by a preponderance of the evidence its claims against President Wendler.

The Court accordingly **DENIES** Spectrum's request for injunctive and declaratory relief. This case is **DISMISSED** with prejudice.

**SO ORDERED**.

January 17, 2026.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

# Tab 2: District Court's Order of Final Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT,

Plaintiff,

v.

WALTER WENDLER,

Defendant.

2:23-CV-048-Z

**JUDGMENT**

The Court **DENIED** Spectrum's request for injunctive and declaratory relief. This case is **DISMISSED** with prejudice.

Judgment is entered accordingly.

**SO ORDERED**.

January 17, 2026.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE