No. 26-10127

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

SPECTRUM WT

*Plaintiff-Appellant*

v.

WALTER WENDLER, in his official capacity as
the President of West Texas A&M University,

*Defendant-Appellee*

On Appeal from the United States District Court for the Northern
District of Texas, Amarillo Division, Civil Action No. 2:23-cv-48
Hon. Matthew J. Kacsmaryk Presiding

## APPELLANT'S EN BANC BRIEF

JT Morris
  *Counsel of Record*
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
Tel: (215) 717-3473
jt.morris@fire.org
sam.rudovsky@fire.org

Sara Berinhout
Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
sara.berinhout@fire.org
adam@fire.org

*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF INTERESTED PARTIES

The cause number and style of the case is *Spectrum WT v. Wendler* (USDC Civil No. 2:23-CV-48, Northern District of Texas).

Counsel of record certifies that the following listed persons or entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant**
Spectrum WT

**Attorneys for Plaintiff-Appellant**
JT Morris
Conor T. Fitzpatrick
Samuel Rudovsky
Foundation for Individual Rights and Expression
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003

Adam Steinbaugh
Sara Berinhout
Jeffrey Daniel Zeman
Foundation for Individual Rights and Expression
510 Walnut Street, Ste. 900
Philadelphia, PA 19106

**Defendant-Appellee**
Dr. Walter Wendler

**Attorneys for Defendant-Appellee**
William R. Peterson
William F. Cole
Christopher John Pavlinec
Monroe David Bryant, Jr.
Zachary Berg
Munera Al-Fuhaid
Alexia Baker
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711

**Former Parties and Other Interested Parties**
Barrett Bright
Marcus Stovall f/k/a Lauren Stovall
John Sharp
Glenn Hegar
Robert L. Albritton
James R. Brooks
Jay Graham
Michael A. Hernandez, III
Tim Leach
Bill Mahomes
Elaine Mendoza
Michael J. Plank
Cliff Thomas
Demetrius L. Harrell, Jr.
West Texas A&M University
Texas A&M University System

Respectfully,

/s/ JT Morris

*Counsel of Record for*
*Plaintiff-Appellant*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ..........................................ii

TABLE OF CONTENTS ...................................................................iv

TABLE OF AUTHORITIES...............................................................vii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT....................................................... 4

STATEMENT OF ISSUES ................................................................ 5

STATEMENT OF THE CASE ............................................................ 6

SUMMARY OF THE ARGUMENT..................................................... 16

ARGUMENT.................................................................................. 20

I.  Standard of Review .................................................................. 20

II. The District Court Erred in Finding No First Amendment
    Violation................................................................................ 21

    A.  Like any stage performance, the First Amendment
        protects Spectrum WT's drag show.................................... 21

        1.  The First Amendment protects stage
            performances, like Spectrum's, because they are
            inherently expressive............................................... 21

        2.  The district court applied the wrong test to
            determine whether the First Amendment protects
            expressive conduct like Spectrum's stage
            performances........................................................... 25

        3.  The district court compounded its legal errors by
            narrowing the First Amendment's protective
            reach. ..................................................................... 30

B.   Restricting Spectrum's performances because the "ideology" is "demeaning" and "disrespectful" is viewpoint discrimination. ...................................... 36

   1.   Censoring Spectrum's performances based on an official's view that they "demean" and "disrespect" is unconstitutional viewpoint discrimination.............. 37

   2.   The record paints an unmistakable picture of viewpoint-based censorship against an "ideology." ..... 42

   3.   The First Amendment's protection against viewpoint discrimination applies forcefully at public universities........................................................ 44

C.   Defendant is imposing an unconstitutional prior restraint twice over. .............................................. 45

   1.   The ban on Spectrum's performances is a classic prior restraint because it prohibits speech before it occurs. ........................................................... 46

   2.   The president's unbound authority to cancel expression he deems "demeaning and disrespectful" has turned Legacy Hall's reservation process into an unconstitutional prior restraint................................................................... 50

D.   Wendler and WTAMU have imposed an unconstitutional content-based prohibition in a designated public forum. ...................................... 53

   1.   The district court erred by not holding that Legacy Hall is a designated public forum. ............................ 54

   2.   Wendler's content-based exclusion triggers strict scrutiny in all cases. ................................................. 59

E.   Wendler has made no attempt to satisfy strict scrutiny, and established law proves why he cannot........................... 60

        1.      Wendler cannot show a compelling interest................ 60

        2.      Wendler cannot satisfy narrow tailoring..................... 63

    F.     *CLS v. Martinez* does not control this case.......................... 66

III.  The District Court Should Have Granted a Permanent Injunction............................................................................... 69

    A.     The Drag Show Ban Is Irreparably Harming Spectrum. .... 69

    B.     The Public Interest and Balance of the Equities Strongly Favor a Permanent Injunction. ............................................ 70

IV.  The District Court Erred by Not Granting Declaratory Relief..... 72

CONCLUSION ..................................................................................... 72

CERTIFICATE OF SERVICE ............................................................. 74

CERTIFICATE OF COMPLIANCE ...................................................... 75

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ....................................................... 21, 31

*Alexander v. United States,*
509 U.S. 544 (1993) .............................................................. 45

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) ...................................................... passim

*Cantwell v. Sterling,*
788 F.3d 507 (5th Cir. 2015) ................................................ 6

*Cath. Leadership Coal. v. Reisman,*
764 F.3d 409 (5th Cir. 2014) ................................... 45, 46, 50

*Chiles v. Salazar,*
146 S. Ct. 1010 (2026) ........................................................ 31

*Chiu v. Plano Indep. Sch. Dist.,*
260 F.3d 330 (5th Cir. 2001) ......................................... 36, 59

*Chiu v. Plano Indep. Sch. Dist.,*
339 F.3d 273 (5th Cir. 2003) ......................................... 51, 52

*Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of
Law v. Martinez,*
561 U.S. 661 (2010) .................................................. 13, 67, 68

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) .............................................. 71

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) ......................................................... 41, 65

*Clark v. Cmty. for Creative Non-Violence,*
468 U.S. 288 (1984) ............................................................ 28

*Concerned Women for Am., Inc. v. Lafayette Cnty.*,
883 F.2d 32 (5th Cir. 1989) ...................................................... 18, 57, 63

*Crown Castle Fiber, L.L.C. v. City of Pasadena*,
76 F.4th 425 (5th Cir. 2023)............................................................ 20

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ...................................................................... 61

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) ..................................................... 30

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) ...................................................................... 35

*Gay Student Servs. v. Tex. A&M Univ.*,
737 F.2d 1317 (5th Cir. 1984) ....................................................... 50

*Ginsberg v. New York*,
390 U.S. 629 (1968) .................................................................. 35, 36

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992) ......................................................... 58

*Healy v. James*,
408 U.S. 169 (1972) ............................................................... passim

*Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ................................................. 26, 27

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995) ............................................................... passim

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026)............................................ 25, 63, 65, 66

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993) ......................................................... 25

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ...................................................................... 22

*Just. for All v. Faulkner,*
410 F.3d 760 (5th Cir. 2005) ...................................................... 54, 55, 60

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ............................................................................... 30

*Matal v. Tam,*
582 U.S. 218 (2017) ..................................................................... passim

*McCauley v. Univ. of the V.I.,*
618 F.3d 232 (3d Cir. 2010) .................................................................. 32

*Miller v. California,*
413 U.S. 15 (1973) ...................................................................... 32, 33, 35

*Neb. Press Ass'n v. Stuart,*
427 U.S. 539 (1976) ......................................................................... 16, 45

*Nken v. Holder,*
556 U.S. 418 (2009) ............................................................................... 71

*Norma Kristie, Inc. v. City of Oklahoma City,*
572 F. Supp. 88 (W.D. Okla. 1983) ..................................................... 25

*Papish v. Bd. of Curators of Univ. of Mo.,*
410 U.S. 667 (1973) ................................................................... 44, 60, 62

*Pernell v. Fla. Bd. of Gov. of State Univ. Sys.,*
No. 22-13992, 2026 WL 1955783 (11th Cir. July 7, 2026) ............ 19, 71

*Pro-Life Cougars v. Univ. of Hou.,*
259 F. Supp. 2d 575 (S.D. Tex. 2003) ................................................. 48

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ................................................................... 18, 59, 60

*Reeves v. McConn,*
631 F.2d 377 (5th Cir. 1980) ............................................................... 41

*Robinson v. Hunt Cnty.,*
921 F.3d 440 (5th Cir. 2019) .............................................. 37, 38, 39, 40

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995) ....................................................................... passim

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,*
547 U.S. 47 (2006) ................................................................................ 21

*S. Utah Drag Stars v. City of St. George,*
677 F. Supp. 3d 1252 (D. Utah 2023) .................................................. 25

*Sable Commc'ns v. FCC,*
492 U.S. 115 (1989) ............................................................................. 32

*Salge v. Edna Indep. Sch. Dist.,*
411 F.3d 178 (5th Cir. 2005) .............................................................. 20

*Saxe v. State Coll. Area Sch. Dist.,*
240 F.3d 200 (3d Cir. 2001).................................................................. 61

*Schacht v. United States,*
398 U.S. 58 (1970) ............................................................................... 23

*Schad v. Borough of Mount Ephraim,*
452 U.S. 61 (1981) ......................................................................... 22, 31

*Se. Promotions, Ltd. v. City of West Palm Beach,*
457 F.2d 1016 (5th Cir. 1972) ....................................................... 50, 58

*Se. Promotions, Ltd. v. Conrad,*
420 U.S. 546 (1975) .................................................................... passim

*Shelton v. Tucker,*
364 U.S. 479 (1960) ............................................................................... 3

*Shuttlesworth v. City of Birmingham,*
394 U.S. 147 (1969) ............................................................................. 51

*Spectrum WT v. Wendler,*
151 F.4th 714 (5th Cir. 2025)................................................... 12, 13, 22

*Spectrum WT v. Wendler,*
157 F.4th 673 (5th Cir. 2025)......................................................... 12, 13

*Speech First, Inc. v. Cartwright,*
  32 F.4th 1110 (11th Cir. 2022)......................................................... 1, 69

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ................................................................ 2

*Spence v. Washington,*
  418 U.S. 405 (1974) ............................................................................ 26

*Tex. A&M Queer Empowerment Council v. Mahomes,*
  772 F. Supp. 3d 792 (S.D. Tex. 2025) ................................................ 25

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
  732 F.3d 535 (5th Cir. 2013) .............................................................. 70

*Texas v. Johnson,*
  491 U.S. 397 (1989) ................................................................ 21, 26, 41

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969) ............................................................................ 49

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000) ...................................................................... 60, 63

*United States v. Schwimmer,*
  279 U.S. 644 (1929) ............................................................................ 71

*United States v. Sineneng-Smith,*
  590 U.S. 371 (2020) ............................................................................ 34

*United States v. Stevens,*
  559 U.S. 460 (2010) ............................................................................ 31

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015) ...................................................................... 54, 57

*Whitney v. California,*
  274 U.S. 357 (1927) ............................................................................ 72

*Whole Woman's Health v. Smith,*
  896 F.3d 362 (5th Cir. 2018) .............................................................. 20

*Widmar v. Vincent,*
  454 U.S. 263 (1981) ................................................................. 48, 49, 59

**Statutes**

28 U.S.C.
  § 1291 ................................................................................................. 4
  § 1331 ................................................................................................. 4
  § 1343 ................................................................................................. 4
  § 2201 ............................................................................................... 72

Tex. Educ. Code § 51.9315(g) ................................................................. 6

**Rules**

Fed. R. App. P. 43(c)(2) .......................................................................... 16

**Regulations**

WTAMU Policy 08.02.99.W1, Expressive Activity on Campus
  (revised Apr. 27, 2026) .................................................................. 6, 55

## INTRODUCTION

This case boils down to competing visions of free expression at public universities. Spectrum WT asks only that West Texas A&M University (WTAMU) not impose viewpoint- and content-based restrictions on Spectrum's ability to express itself in a campus public forum. The core First Amendment protections against such restrictions are ones the Supreme Court has upheld time and again.

But WTAMU and its President, Walter Wendler, would have those constitutional protections mean nothing on the Canyon, Texas, campus. Under their vision, public university officials have unbridled authority to restrict campus expression if they believe it is offensive, armed only with speculative concerns and subjective conceptions of "discrimination" and "harassment." That view clashes with Supreme Court precedent. And it mirrors the university speech codes courts have routinely invalidated as unconstitutional because "loaded terms" like "discriminatory" inevitably invite campus officials to stifle speech based on viewpoint and content. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125–27 (11th Cir. 2022) (enjoining a public university's discriminatory-harassment policy in a First Amendment challenge by students wanting to express opposition to

1

abortion, affirmative action, and illegal immigration); *accord Speech First, Inc. v. Fenves*, 979 F.3d 319, 338–39 & n.17 (5th Cir. 2020) (collecting cases).

The district court erred by not enjoining Wendler from maintaining a viewpoint-based prior restraint, akin to an unconstitutional speech code, on Spectrum's PG-13 campus drag performances. To start, the court applied an overly cramped test that defies Supreme Court precedent governing when expressive conduct receives First Amendment protection. No matter what one thinks about drag shows, the First Amendment protects them, like any stage performance, because they are inherently expressive.

Even Wendler agrees that drag performances express an "ideology." He just finds it offensive to women. But that is not a lawful reason for restricting expression in advance. In all cases, when an official blocks speech in the name of avoiding offense—whether to women, to another group, or to even the official's own views—he violates constitutional protections against viewpoint discrimination and prior restraints.

To that end, the district court also erred by not faithfully applying the Supreme Court's legion of cases invalidating speech restrictions

based on a public official's opinion about which messages are agreeable and which are not. Left to stand, the court's reasoning is a perilous path toward censorship at public universities. Take a student group inviting a critic of modern feminism to speak, or a campus art show featuring a painting of Eve handing Adam the forbidden fruit. One can readily envision a university banning the lecture or painting as "disrespectful" to women, just as WTAMU has done with Spectrum's performances.

That cannot stand at a public university, where First Amendment protections are "nowhere more vital." *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). This Court should reverse and enjoin Defendant's viewpoint- and content-based prior restraint on student drag performances.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291 because Spectrum appeals from the district court's January 17, 2026, final judgment. ROA.3888. Spectrum noticed its appeal on February 12, 2026. ROA.3901–02.

## STATEMENT OF ISSUES

1. From stage performances to video games, the Supreme Court has long held the First Amendment protects art and entertainment as inherently expressive. Spectrum wishes to perform a PG-13 drag show at WTAMU, which the University's president agreed is "performance" and "artistic expression" conveying an "ideology." Did the district court err in concluding that Spectrum's stage performance lacks First Amendment protection?

2. Public officials violate the First Amendment when they stifle protected expression based on its viewpoint. Before anyone took the stage, WTAMU's president banned drag shows in a campus forum open to expression of all kinds, because he determined they express an ideology he disagrees with. Did the district court err in not enjoining this viewpoint-based prior restraint on protected expression?

## STATEMENT OF THE CASE

WTAMU opens certain campus spaces for students, recognized student organizations, and members of the public to use for a broad range of expressive activity. ROA.4447–52; ROA.4116–17. Both Texas law and university policy bar administrators from denying access to these spaces based on students' "political, religious, philosophical, ideological, or academic viewpoint" or the content of their "expressive activities." Tex. Educ. Code § 51.9315(g); ROA.4448.[1]

One of these spaces is Legacy Hall in WTAMU's JBK Student Center. ROA.4115–18; ROA.3500–3503 (88:17-91:10). The university maintains Legacy Hall and its stage as an open forum for students' expressive activities like concerts, theatrical performances, and other entertainment. *Id.* Students and the public alike use Legacy Hall for an array of events, including beauty pageants, singing competitions, concerts, worship, political events—and, as recently as 2019, student

---

[1] WTAMU amended its expressive activity policy after trial, maintaining the bar on viewpoint discrimination against student organizations. WTAMU Policy 08.02.99.W1, Expressive Activity on Campus (revised Apr. 27, 2026) https://www.wtamu.edu/_files/docs/about/rules-procedures/08-02-99-W1-Expressive-Activity-on-Campus.pdf [perma.cc/T2YE-WAF6] ("April 2026 Amended Expressive Activities Policy"). This Court may take judicial notice of the policy on the University's website. *See Cantwell v. Sterling*, 788 F.3d 507, 509 (5th Cir. 2015).

drag shows. *Id.*; ROA.991 ¶ 41 (admitting prior campus drag shows). It is "by far the most desirable" event space on campus. ROA.4115–16 (30:22-31:2).

**Spectrum, a recognized student group, organizes a drag show in Legacy Hall.**

Spectrum is an officially recognized student organization at WTAMU. ROA.3207 ¶ 15. Spectrum's mission is to promote awareness and acceptance of the LGBTQ+ community on campus. ROA.4758–64. To advance its mission, Spectrum often organizes campus events focusing on issues important to the LGBTQ+ campus community. *See* ROA.4183 (98:16-24); ROA.4259 (174:18-25).

To that end, in November 2022, Spectrum started planning a March 31, 2023, charity drag show at Legacy Hall. ROA.3207 ¶¶ 17–18. For Spectrum and its members, the show was important for expressing support and advocating on behalf of the campus LGBTQ+ community—a traditional message of drag performances. ROA.4244 (159:13-24); ROA.4250–51 (165:22-166:8); ROA.4258–59 (173:16-174:25). Proceeds from the event would also benefit a suicide prevention charity. ROA.4250–51 (165:22-166:8).

True to the tradition of drag shows, Spectrum's performance also intended to express ideas challenging traditional gender norms. ROA.4240–41 (155:24-156:13); ROA.4246–49 (161:23-164:2); ROA.4249–51 (164:16-166:1); ROA.4254–55 (169:25-170:14). The show would include student performers on stage doing choreographed dance and lip syncing to amplified music. *Id.* They would perform and speak to the audience in chosen characters ranging from elegant to comedic, featuring stylized hair, makeup, and costumes. *Id.*; ROA.4252–54 (167:25-169:11); ROA.4255–56 (170:15-171:20).

The students planned their event carefully. ROA.3408 (34:11-15). Spectrum described the planned performances as appropriate for those over 13 years old. ROA.4446. They instructed performers to avoid profane music and anything exceeding PG-13 standards, and reviewed students' performances beforehand to ensure they met those standards. ROA.3407–08 (33:21-34:15); ROA.4282 (197:15-17); ROA.4284 (199:18-20). And being even more cautious, given the broader cultural debate over drag shows, Spectrum also barred minors from attending unless accompanied by a parent or guardian so performers' family members could attend. ROA.4246 (161:6-15); ROA.4313 (228:11-18).

University administrators relied on trusted staff and faculty—including WTAMU Director of University Communications and Media Relations Chip Chandler and Professor Kristina Drumheller—to guide the students. ROA.3207 ¶ 21. Spectrum reserved Legacy Hall for the performance, following WTAMU's event approval process. ROA.3505–07 (96:3-98:4). Administrators worked with the students to mitigate any risks to participants or the audience and helped them compile the event's promotional materials. *E.g.*, ROA.4631–38. They also concluded Spectrum had a First Amendment right to put on the show. ROA.3528–29 (129:21-130:2). And no one raised concerns that Spectrum's performance would violate the Student Handbook or WTAMU's community standards. *See* ROA.4323 (238:1-23).

On February 27, 2023, WTAMU staff issued tentative approval for the event, and there were no remaining steps for final confirmation. ROA.3207 ¶ 22; ROA.3506 (97:5-16). By March 20, Spectrum had completed the remaining requirements for the event to move forward at Legacy Hall, and staff determined that all risks were substantially mitigated. ROA.3506 (97:5-16); ROA.3542 (145:14-18).

**President Wendler cancels Spectrum WT's performance, describing drag shows as "expression which denigrates others."**

Eleven days before the show, in a public edict posted online and emailed to the campus community, President Wendler declared that "West Texas A&M will not host a drag show on campus" because a "harmless drag show" could never be "possible." ROA.4437–39. His 734-word edict focused on the "ideology" underlying drag shows. ROA.4438. Drag, he wrote, is "a performance exaggerating aspects of womanhood (sexuality, femininity, gender)" that "are derisive, divisive and demoralizing." ROA.4437–38.

At the same time, Wendler admitted the Constitution stood in his way: "I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, *even when the law of the land appears to require it.*" ROA.4439 (emphasis added). His email mentions nothing about "lewdness" or minors in the audience. ROA.4437–39. Before making his decision, Wendler did not speak with any of Spectrum's members about what the performance would involve. ROA.4134–36 (49:14-50:16; 50:24-51:6). Nor did he speak with WTAMU staff who understood what the performance would involve. ROA.4137 (52:16-20).

**The district court denies injunctive relief.**

On March 24, 2023, Spectrum and two of its then-officers, Barrett Bright and Lauren Stovall, sued President Wendler and Texas A&M System officials. ROA.34–76. The same day, they moved for a temporary restraining order and a preliminary injunction so the campus show could go on. ROA.144–46. They explained that without immediate relief, they would have to seek an off-campus venue, as the banned campus event was scheduled for the next Friday. ROA.175.

Three days later, the district court ordered Defendants to respond to the TRO motion by March 30, just one day before the Legacy Hall show. ROA.181. Left with little choice, the students withdrew their TRO to avoid simultaneously planning two events—one on-campus if the district court granted the TRO, and another off-campus if the court denied relief. ROA.190–91; ROA.254 ¶ 122. Blocked from performing on campus, Spectrum scrambled to raise funds and held an off-campus show at a public park far from WTAMU. *See* ROA.190–91; ROA.4288 (203:17-20).

Soon, Plaintiffs amended their complaint and preliminary injunction motion. ROA.230–93; ROA.299–301. On September 21, 2023, the Court granted Defendants' Rule 12(b)(6) motion to dismiss the

damages claim and denied a preliminary injunction. ROA.867–92. Plaintiffs timely appealed the denial of a preliminary injunction. ROA.900–01.

**President Wendler cancels another Spectrum drag performance.**

Spectrum applied to hold a PG-13 drag show in Legacy Hall on March 24, 2024, once again receiving tentative approval from campus staff. ROA.3208; ROA.3546–47 (149:4-150:17). Before this Court's panel heard oral argument, Wendler announced in another campus-wide email that he was canceling Spectrum's 2024 performance, "for the reasons given previously and for the reasons further explained in court filings and those provided by the courts themselves." ROA.4441.

**The panel reverses and remands.**

On August 18, a panel of this Court reversed and remanded. Writing for the majority, Judge Southwick explained that the First Amendment protects Spectrum's planned drag performances because, given their context, "the message sent by parading on a theater stage in the attire of the opposite sex would have been unmistakable." *Spectrum WT v. Wendler*, 151 F.4th 714, 726 (5th Cir.), *reh'g en banc granted, opinion vacated*, 157 F.4th 673 (5th Cir. 2025) (per curiam). Next, the

majority held Legacy Hall is a designated public forum, highlighting how WTAMU policy and practice open the venue to expression from students and the public alike. *Id.* at 727–28. And because Wendler's ban is a content-based restriction on expression in a designated public forum, the majority concluded, it violates the First Amendment unless it satisfies strict scrutiny, and "Wendler did not argue, either before the district court or on appeal, that restricting the intended drag show would survive strict scrutiny." *Id.* at 729.

Judge Ho dissented. He reasoned that the Supreme Court's decision in *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010) (*CLS*), authorizes Wendler to ban drag performances over his concerns that they discriminate against women. *Spectrum WT*, 151 F.4th at 735–36, 738 (Ho, J., dissenting).

On October 27, 2025, this Court granted rehearing en banc, vacating the panel opinion. *Spectrum WT*, 157 F.4th at 674.

**Spectrum applies a third time to host a drag performance at Legacy Hall.**

Spectrum applied to hold a performance in Legacy Hall on April 17, 2026. ROA.4731–35; ROA.4345 (260:18-22). Spectrum again aimed to

13

communicate support for the LGBTQ+ community and promote students' artistic expression. ROA.4328–29 (243:10-23; 243:25-244:8). Like the planned 2023 and 2024 shows, the 2026 show would have incorporated a range of theatrical features, including character creation, choreographed dance, and music, ROA.4348 (263:20-23), thus conveying ideas about gender norms, like all drag shows. And again, Spectrum was cautious in planning the performance, ensuring the student-only performers would "not [be] inappropriate in any way," intending it to "be somewhere between PG [and] PG-13." ROA.4731; ROA.4349–50 (264:4-265:6); ROA.4329 (244:10-19).

**The district court expedites a bench trial and denies Spectrum injunctive and declaratory relief, mooting rehearing en banc.**

After this Court ordered rehearing en banc, the district court set the trial for January 14, 2026, just days before en banc arguments. After denying Spectrum's summary judgment motion, ROA.3832–40, the district court held a one-day bench trial. ROA.4086–4432. Three days later, it issued final judgment against Spectrum on January 17, 2026, denying a permanent injunction and declaratory relief. ROA.3888.

To start, the district court concluded the First Amendment "likely" does not protect Spectrum's stage performances because they would not

14

convey a specific, discernible message and are "sexualized." ROA.3857–67, ROA.3886. Next, the district court held Legacy Hall is not a designated public forum but a limited public forum, and Wendler's ban does not violate the First Amendment bar against viewpoint discrimination. ROA.3867–79. It also concluded Wendler has not imposed a prior restraint, reasoning Wendler's ban is a "time, place, or manner restriction" confined by the University's "value" of "respect." ROA.3879–81. Finally, the district court held the Supreme Court's decision in *CLS* authorizes Wendler to "promote diversity and respect … by refusing to host an event" he foresees as "inappropriate." ROA.3881–86.

**The drag show ban is irreparably harming Spectrum WT.**

While Spectrum has every intention of putting on future drag shows at Legacy Hall, *see* ROA.4731–35; ROA.4345 (260:18-22), Wendler's actions and public statements have led Spectrum to fear WTAMU will again cancel its future performances, ROA.4329–30 (244:21-245:13). In fact, as public attention grew after Spectrum sued, Wendler stressed WTAMU's continued resolve to ban campus drag

shows, stating in an interview he "wouldn't have done anything any differently." ROA.4736.[2]

Wendler acknowledged at trial that he will cancel any performance he believes disrespects any group, even if no student, staff, or faculty complain about it. ROA.4153–54 (68:14-69:3); ROA.4162 (77:9-15). He also reaffirmed his view that drag performances are "demeaning" and "disrespectful," and that nothing in three years has changed that view. ROA.4128 (43:22-25); ROA.4165 (80:17-23); ROA.4193 (108:17-20).

## SUMMARY OF THE ARGUMENT

For over three years, a public university has imposed a prior restraint on protected expression, "the most serious and the least tolerable" of First Amendment violations. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). This act of censorship stands on the view that a planned drag performance in an on-campus designated public forum is "demeaning" and "disrespectful."

---

[2] On June 23, Wendler announced his plan to retire as WTAMU president, effective September 1, 2026. His official-capacity successor will be substituted as a party under Fed. R. App. P. 43(c)(2). WTAMU has given no indication that it or Wendler's successor intends to lift the ban on campus drag shows.

By not enjoining this censorship, the district court made several legal errors, overlooking basic constitutional principles and long-settled precedent. Start with its holding that the First Amendment does not protect Spectrum's PG-13 performances. Whether offering sharp political views, pure "slapstick" humor, or anything in between, the First Amendment protects stage performances like Spectrum's because they are inherently expressive. Under the district court's reasoning—which the Supreme Court has rejected—no expression subject to interpretation would enjoy First Amendment protection. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 569 (1995). Even if Spectrum's shows would send no political message (they do) or could be tinged with sexual themes (they won't), it makes no constitutional difference: The First Amendment protects them. The district court erred in holding otherwise.

By barring drag performances from Legacy Hall on the view that their "ideology" is offensive to women, President Wendler and WTAMU are violating the First Amendment three times over. First, they are discriminating based on viewpoint, which violates the First Amendment in any forum. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S.

17

819, 829–30 (1995); *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion). Second, they are imposing an unconstitutional prior restraint, blocking expression in advance based on an administrator's subjective and unbounded judgments. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–58 (1975). And third, they are discriminating based on content in a designated public forum open to academic and non-academic expression alike. *See Concerned Women for Am., Inc. v. Lafayette Cnty.*, 883 F.2d 32, 33–35 (5th Cir. 1989).

Even Wendler understands all of this, acknowledging "the law of the land" protects Spectrum's performance. ROA.4439. It is no surprise, then, that he made scant effort to satisfy the strict scrutiny required for content-based bans on expression in designated public forums. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Nor could he. After all, despite Wendler's hand-wringing about "harassment," not a single person—woman or otherwise—complained to him that Spectrum's planned performance would harm them. *E.g.*, ROA.4133 (48:17-25); ROA.4138–39 (53:15-18; 53:23-54:3).

The district court erred in holding that Wendler's actions satisfy First Amendment scrutiny, skipping past binding precedent. And the

18

court's reliance on *CLS* cannot save its holding from reversal. At most, *CLS* applies only to viewpoint-neutral restrictions in limited public forums at public universities, unlike the ban here. Nor does it apply when campus officials wield unfettered discretion to censor speech based on their subjective opinions, as Wendler has done. And by no means does *CLS* require that courts broadly defer to university administrators' decisions to restrict expression, as the district court suggested.

Rather, when it comes to public universities, "federal courts" must "police the First Amendment," including when the government stifles speech under the banner of preventing discrimination or offense. *Pernell v. Fla. Bd. of Gov. of State Univ. Sys.*, No. 22-13992, 2026 WL 1955783, at *18 (11th Cir. July 7, 2026) (affirming injunction against viewpoint-based restrictions on public university classroom instruction). If anyone finds Spectrum's performance offensive, they have every right not to attend, urge others not to attend, and publicly criticize it. But the Constitution prevents WTAMU's president from blocking Spectrum's campus performance because he disagrees with the viewpoint and content.

Only injunctive relief can remedy the irreparable First Amendment harm Spectrum has endured for years, and protect the public's interest in ensuring university campuses remain strongholds for free expression. This Court should reverse.

## ARGUMENT

### I. Standard of Review

"In cases raising First Amendment issues," the Court "has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Whole Woman's Health v. Smith*, 896 F.3d 362, 369 (5th Cir. 2018) (citation omitted) (cleaned up); *see also Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005) ("*De novo* is … our standard for reviewing district court rulings that concern First Amendment issues, in which instances we examine the whole record."). A party seeking a permanent injunction must show (1) actual success on the merits; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in that party's favor; and (4) an injunction is in the public interest. *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023).

## II. The District Court Erred in Finding No First Amendment Violation.

### A. Like any stage performance, the First Amendment protects Spectrum WT's drag show.

When Americans get on stage and express themselves, the First Amendment protects their expression, even if the performance is not a government official's cup of tea. *Se. Promotions*, 420 U.S. at 557 (invalidating viewpoint-based prior restraint on the musical *Hair*). And that includes drag performances on the Legacy Hall stage at WTAMU. By holding otherwise, the district court departed so sharply from deep-rooted First Amendment precedent that even a student group performing a silent Nativity or wearing armbands in protest could fall victim to campus censors. This Court should reverse that error.

#### 1. The First Amendment protects stage performances, like Spectrum's, because they are inherently expressive.

If conduct is "inherently expressive," the First Amendment protects it. *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) (*FAIR*) (citing *Texas v. Johnson*, 491 U.S. 397, 406 (1989)); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) (First Amendment protects "all persons engaged in expressive conduct"). That makes sense. Some expressive conduct is so self-evidently expressive that "a narrow,

succinctly articulable message is not a condition of constitutional protection." *Hurley*, 515 U.S. at 569.

That's why the First Amendment protects drag performances, just as it does any stage performance. After all, when performers take the stage, they do so to express themselves to the audience. And an audience member does not need a narrator to know the performers intend to convey *some* message, even if open to interpretation. That has been true since the ancient Greeks took the Athenian stage and Shakespeare's plays captivated audiences at the Globe Theatre. As the panel majority rightly held in Spectrum's first appeal—and the dissent did not contest— for a stage performance to receive constitutional protection, it suffices that it aims to "convey[] *some* message, even if nearly opaque or perhaps smeared." *Spectrum WT*, 151 F.4th at 724–25 (emphasis added).

To that end, "live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (affirming First Amendment protection for video games); *Se. Promotions,* 420 U.S. at 557–58 (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)) (affirming First

Amendment protection for stage performance). So whether "crude and amateurish" or highbrow, theatrical performances receive full First Amendment protection. *Schacht v. United States*, 398 U.S. 58, 61–62 (1970).

Drag performances, including Spectrum's, are no exception. They feature choreographed performers dancing as gender-challenging characters on stage. ROA.4246–48 (161:23-163:14); ROA.4348 (263:20-23). Those performers carefully choose costumes that convey characters ranging from comedic to elegant and music that enhances those characters. *See, e.g.*, ROA.4348 (263:20-23); ROA.4257 (172:8-19). In fact, drag performances like Spectrum's feature even more, with performers answering questions in character—in short, acting. ROA.4255–56 (170:15-171:20); *cf. Se. Promotions*, 420 U.S. at 557–58 ("By its nature, theater usually is the acting out—or singing out—of the written word, and frequently mixes speech with live action or conduct."). Likewise, they celebrate the LGBTQ+ community as an essential part of its culture, ROA.4328–29 (243:25-244:8), just as reenactments of the Battle of the Alamo celebrate Texan pride.

So however audience members interpret a drag performance, one thing is clear—they understand the performance is saying *something*.[3] Even Wendler understands this. He did not need to see Spectrum's planned performances—or even talk to its members about what the performances entailed—to know they would constitute "artistic expression." ROA.4438; ROA.4134–36 (49:14-50:16; 50:24-51:6). And he admits WTAMU's expressive activities policy applies to Spectrum's drag shows. ROA.4120 (35:3-23).

What's more, Wendler canceled Spectrum's performances in advance because of the "ideology" he believes drag performances express. ROA.4438; ROA.4127 (42:3-15). That underscores their essence as protected expression. By their nature, drag performances convey ideas about gender that challenge norms. ROA.4248 (163:6-20). If Wendler understood this without even seeing Spectrum's performance, so would the audience watching it.

---

[3] Although Spectrum had not selected its student performers for its planned 2026 campus show, that would not make it less deserving of First Amendment protection, contrary to the district court's suggestion. *See* ROA.3865. As with any drag performance, audience members would have seen a drag performance with costumed students on the Legacy Hall stage dancing to choreographed music. ROA.4348 (263:20-23).

This all underscores why Spectrum's performances are inherently expressive conduct protected under the First Amendment. And that protection does not waver just because Spectrum intends to perform at a public university. *Healy*, 408 U.S. at 180. As the Fourth Circuit correctly concluded, the First Amendment protects entertainment at a public university even if some might find it "low quality" and "crude." *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390–93 (4th Cir. 1993) (holding a fraternity's "ugly woman contest" was protected expressive conduct). So too here.

> **2. The district court applied the wrong test to determine whether the First Amendment protects expressive conduct like Spectrum's stage performances.**

Decades of Supreme Court decisions establish why the First Amendment protects drag performance. That is why lower courts have time and again held drag performances are protected expression.[4] In

---

[4] *See, e.g.*, *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 855–58 (9th Cir. 2026); *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88 (W.D. Okla. 1983); *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792 (S.D. Tex. 2025) (*QEC*) (enjoining campus drag show ban); *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252 (D. Utah 2023). *Queer Empowerment Council* is pending in this Court and consolidated with this appeal for en banc argument.

holding otherwise, the district court made a fundamental legal error this Court should reverse.

It concluded Spectrum's drag performance is not entitled to First Amendment protection because there is not "a great likelihood 'that the message would be understood by those who viewed it.'" ROA.3864 (quoting in part *Spence v. Washington*, 418 U.S. 405, 411 (1974)); *see also Johnson*, 491 U.S. at 403–05 (applying the *Spence* test to political flag burning). That makes little sense, given the district court described a message of Spectrum's show—an "ideology" of breaking gender norms—throughout its decision. *E.g.*, ROA.3843; ROA.3846; ROA.3850.

More to the point, the Supreme Court rejected the district court's reasoning 30 years ago. In *Hurley*, it explained that whether expressive conduct conveys "a narrow, succinctly articulable message is not a condition of constitutional protection." 515 U.S. at 569; *see also Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (holding that under *Hurley*, "in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message").

In effect, *Hurley* "liberalized" the test for when the First Amendment protects expressive conduct, *Holloman,* 370 F.3d at 1270, ensuring courts do not deny inherently expressive conduct constitutional protection by applying a more inflexible standard. In fact, the district court recognized as much: "*Hurley* is better understood as ensuring that conduct that is inherently expressive by nature retains First Amendment protection." ROA.3866. With that, it should have faithfully applied *Hurley*'s commonsense rule and held the First Amendment protects Spectrum's drag performances because they are inherently expressive. *See supra* Section I.A.1.

Instead, the district court ultimately—and wrongly—demanded Spectrum prove its audience would discern a single, specific message from Spectrum's performance. ROA.3865–66. Under that view, no art, entertainment, parade, or any other expressive conduct open to interpretation would be safe from the censor's pen. *Hurley* rejects that outcome, warning that under too strict a test, the First Amendment "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley,* 515 U.S. at 569.

Suppose Spectrum were instead a recognized student ministry, taking the Legacy Hall stage to reenact the Nativity. Some audience members might perceive a righteous expression of faith, or even a historical message. Others might see it as demeaning to other religions, or perhaps to women. In no event would those divergent interpretations deprive the performance of First Amendment protection. *See Hurley*, 515 U.S. at 569. The same is true here, even if, as the district court concluded, not all would share an understanding about the shows' message. *See* ROA.3864–65.

Further revealing the district court's error is how it ignored the specific context of Spectrum's drag shows. That context reinforces why the First Amendment protects the shows. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) ("It is also true that a message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative."). Spectrum's flyers for the 2023 event leave no doubt about its communicative context as an LGBTQ+ group event expressing ideas about gender norms and sending a message of support for an LGBTQ+ charity:



ROA.4446; *see also* ROA.4251–52 (166:19-167:14).

And audience members, having bought a ticket to view a show promoted to further the group's mission and support a suicide prevention charity, would see performers in gender-bending characters on stage, dancing under lights to choreographed music. ROA.4246–48 (161:23-163:20); ROA.4348 (263:20-23). With those cues, the audience would know Spectrum's performers are communicating a message. That holds even if some, like Wendler, interpret it differently.

That context differentiates Spectrum's drag performances from its other events, a key point the district court missed in implying those events are indistinguishable from Spectrum's drag shows. *See* ROA.3863,

ROA.3865–66. Just as context distinguishes a coach kneeling in prayer at the 50-yard line from one kneeling to tie his shoe, *see generally Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022), it distinguishes a choreographed drag show on stage before a ticketed audience from getting dressed for the day. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1243 (11th Cir. 2018) (holding that a food-sharing event was protected expression because context differentiated it from "a picnic in the park").

### 3. The district court compounded its legal errors by narrowing the First Amendment's protective reach.

The district court made two more legal errors in concluding the First Amendment does not protect Spectrum's drag performances. First, it incorrectly suggested the First Amendment protects only rights "necessary to self-government." ROA.3842. And second, it misdirected its focus in declaring Spectrum's planned campus performances "sexualized." *E.g.*, ROA.3842–43; ROA.3861.

Start with the district court's cramped—and dangerous—view that the First Amendment extends only as needed to "elevate the public discourse necessary to self-government." ROA.3842. Not so. "The First

Amendment 'envisions the United States as a rich and complex place' where all enjoy the 'freedom to think as you will and to speak as you think.'" *Chiles v. Salazar*, 146 S. Ct. 1010, 1020 (2026) (quoting *303 Creative*, 600 U.S. at 584). That is why it protects expression like talk therapy, *Chiles*, 146 S. Ct. at 1023, violent video games, *Brown*, 564 U.S. at 790, footage of illicit dog fighting, *United States v. Stevens*, 559 U.S. 460, 468 (2010), and racial epithets, *Matal*, 582 U.S. at 243. Likewise, it protects dramatic performance, on-stage and off. *Schad*, 452 U.S. at 65.

Courts are bound to uphold the First Amendment, not arbitrate whether expression is valuable enough to "public discourse." As the Supreme Court has "long recognized," when it comes to First Amendment protection, "it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown*, 564 U.S. at 790. The district court ignored that warning. And it compounded that error by overlooking how drag performance arose from protesting traditional views on gender. ROA.4249 (164:3-15). Spectrum's off-campus performance even featured a performer protesting Wendler's censorship. ROA.4254 (169:12-24). That is political speech, no less than a stage performance criticizing drag shows would be.

The district court likewise erred in deeming Spectrum's planned PG-13 performances "too sexualized" and "too provocative" for First Amendment protection. ROA.3843. The district court may believe drag performances are "more akin to a striptease" than other performances, *id.*, but that does not impact the analysis under the First Amendment, which, short of obscenity, fully protects sexually themed speech. *See Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment."). And that holds true on public university campuses, where "students are given opportunities to acquit themselves as adults." *See McCauley v. Univ. of the V.I.*, 618 F.3d 232, 246 (3d Cir. 2010) (distinguishing an unconstitutional university policy targeting "offensive" protected speech from one meeting the demanding standard for unprotected obscenity under *Miller v. California*, 413 U.S. 15 (1973)).

In reaching its conclusion, the district court relied heavily on a video of Spectrum's 2023 off-campus show. *E.g.*, ROA.3853 (citing Def. Ex. 375, at ROA.12592); ROA.3864. This Court can watch those videos and determine whether the district court miscast the show as "sexualized." But by any measure, nothing in those videos or the rest of

the record establishes that the off-campus show—or Spectrum's planned campus shows—crossed the line into unprotected obscenity. *See Miller*, 413 U.S. at 24 (defining obscenity).

Consider what Spectrum's planned campus performances and off-campus show did not include. There was no nudity—something WTAMU's Director of Communications, who attended the off-campus show, confirmed. ROA.3425–26 (58:17-59:1); *see also* ROA.12592. At most, a performer at the off-campus show donned a flesh-colored bodysuit, ROA.4308 (223:12-16), which covers noticeably more than a college cheerleader's uniform. Nor was there any "lewd" conduct. If there had been, one would imagine the police providing security would have stepped in. ROA.4307 (222:8-22). And Spectrum's members forbid any lewdness for its PG-13 shows. *See* ROA.4282 (197:9-17); ROA.4329 (244:10-19). Even WTAMU's Director of Communications confirmed Spectrum took deliberate steps to ensure its show was not sexualized in any way—let alone obscene—and no one at WTAMU raised concerns otherwise. ROA.3406–08 (32:16-33:3, 33:21-34:15); ROA.3435 (68:11-19).

So even if the district court were within reason to use the off-campus show as a rough proxy for what Spectrum's planned PG-13

performances in Legacy Hall might entail, there was no basis to conclude Spectrum's planned on-campus shows would fall into the narrow category of unprotected obscenity. Tellingly, the district court avoided that conclusion—as it should have. Wendler conceded obscenity "is not an issue in the present case." ROA.449; *see also* ROA.3212 (Wendler making no mention of obscenity in his pre-trial contested issues of law); ROA.4380 (295:7-8) (reminding the district court that Wendler agreed obscenity is not an issue). That alone resolves this issue in Spectrum's favor, because federal courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (citation omitted) (reversing a court of appeals that violated party-presentation principle).

On the other hand, the district court erred in relying on the obscene-as-to-minors doctrine to hold the First Amendment does not protect Spectrum's performances. ROA.3862. Given how it acknowledged Spectrum planned not to allow minors to attend its 2026 show, ROA.3875, invoking the doctrine in ruling on a claim for prospective relief was error.

In addition, the district court erred in both its interpretation and its application of the law. As Justice Thomas recently explained, PG-13 (even R-rated) content presents no basis for departing from the Court's enduring decisions upholding First Amendment protections for expression, even when minors are present. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 481 n.7 (2025). WTAMU understands this—it has permitted PG-13 and R-rated stage performances and movie showings on campus. ROA.3208 ¶ 35.

So even if minors attending Spectrum's 2023 off-campus drag performance in a public park were relevant, the show contained no nudity, no lewd conduct, or anything else obscene as to minors; none of it "appealed to the prurient interest of minors" or depicted "sexual conduct in a way that is patently offensive for minors." *Free Speech Coal.*, 606 U.S. at 474 (citing *Miller*, 413 U.S. at 24; *Ginsberg v. New York*, 390 U.S. 629, 638 (1968)). Nor could a theatrical performance rooted in a tradition of political and social protest "lack serious literary, artistic, political, or scientific value for minors." *See Free Speech Coal.*, 606 U.S. at 474 (citing *Miller*, 413 U.S. at 24; *Ginsberg*, 390 U.S. at 635).

Moreover, mindful of both the cultural debate over drag shows and younger siblings who wanted to support student performers, Spectrum required a parent or guardian to accompany any minor attending its performances. ROA.4246 (161:6-15); ROA.4313 (228:11-18). First Amendment protection does not wane just because the government feels like dictating "what [it] thinks parents *ought* to want." *Brown*, 564 U.S. at 804.[5]

### B. Restricting Spectrum's performances because the "ideology" is "demeaning" and "disrespectful" is viewpoint discrimination.

This is a straightforward case of viewpoint discrimination, the most "egregious form of content discrimination" which is "presumptively unconstitutional," *Rosenberger*, 515 U.S. at 829–30, in "any forum," *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001). Wendler's undisputed testimony that he (and by extension, WTAMU) is censoring Spectrum's performances because they are in his "subjective judgment … offensive or inappropriate" proves classic viewpoint discrimination. *See*

---

[5] While Spectrum's performances are far from obscene for minors, the Supreme Court in *Ginsberg* emphasized that "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." 390 U.S. at 639.

*Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019). And Wendler's undisputed testimony also establishes another viewpoint-discriminatory reason for the censorship: he disagrees with drag performances' "ideology." *Rosenberger*, 515 U.S. at 829. The district court erred in failing to acknowledge these concessions and the fundamental First Amendment principles they violate.

### 1. Censoring Spectrum's performances based on an official's view that they "demean" and "disrespect" is unconstitutional viewpoint discrimination.

Because Wendler has blocked Spectrum's performances based on his view that they "demean" and "disrespect," he is violating the "bedrock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal*, 582 U.S. at 223. The district court erred by ignoring that bedrock principle.

Take Wendler's 2023 public edict announcing the ban. He insisted drag performances are "derisive, divisive and demoralizing misogyny" that "stereotype women in cartoon-like extremes for the amusement of others and discriminate[s] against womanhood." ROA.4437–39. At trial, he confirmed he chose those words carefully and stated the edict is the "best representation" of his reasons for canceling the show. ROA.4123–

24 (38:18-24, 39:16-21); ROA.4129 (44:7-13). And he admitted he resolved to cancel Spectrum's shows—even before knowing the details—because he "decided that drag shows are demeaning and disrespectful to women." ROA.4136 (51:15–22); ROA.4232–33 (47:20–48:4); *see also* ROA.4437–39; ROA.4128 (43:22-25). His "subjective judgment that the content of protected speech is offensive or inappropriate" establishes unconstitutional viewpoint discrimination. *Robinson*, 921 F.3d at 447 (citing *Matal*, 582 U.S. at 243).

*Matal* and *Robinson* clearly establish that Wendler is violating the First Amendment's prohibition on viewpoint discrimination. Yet the district court cited neither of them nor engaged with their holdings.

If anything, *Matal* alone resolves the question here. There, the lead singer of "The Slants" sought to trademark the band's name, which they chose "to 'reclaim' and 'take ownership' of stereotypes about people of Asian ethnicity." 582 U.S. at 228. The Trademark Office denied registration, claiming it violated the Trademark Act's bar against registering any mark "that disparages any person, group, or institution." *Id.* at 243, 246 (emphasis omitted). In turn, the Supreme Court

38

invalidated the disparagement clause because it discriminated based on viewpoint. *Id.* at 243.

The Court rejected the government's argument that the prohibition could be viewpoint neutral because it "evenhandedly" barred disparagement. *Id.* Even though the disparagement clause "applie[d] equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue," it still discriminated based on viewpoint because, ultimately, "[g]iving offense is a viewpoint." *Id.* To that end, the Court explained, "[o]ur cases use the term 'viewpoint' discrimination in a broad sense." *Id.*

Wendler's rationale for banning Spectrum's shows maps onto *Matal* so well that it could be a verbatim quote: He finds their message "mocking," "[d]emeaning," and "divisive." ROA.4437–39. Just as the Trademark Office cannot refuse to register marks it thinks will disparage, a public university cannot ban a drag performance because its president thinks it will demean. *See Matal*, 582 U.S. at 223; *see also Robinson*, 921 F.3d at 447, 452 (reversing denial of preliminary injunction against county's policy prohibiting "inappropriate" comments on the sheriff office's Facebook page).

*Matal* thus rejects the district court's reasoning entirely. The court held Wendler's ban is viewpoint neutral because it is "clear" he "takes issue not with the *ideas* Spectrum wishes to express, but the way they would do it." ROA.3878. That echoes the Trademark Office in *Matal*, which took issue not with The Slants' idea of reclaiming a historically racist slur, but with *how* the band wanted to express that idea. "[T]hat is viewpoint discrimination." *Matal*, 582 U.S. at 243. So too here. Wendler might not "have a disagreement with … supporting LGBTQ students or people." *See* ROA.3877. But he and WTAMU are telling Spectrum: You can express your ideas about gender and a pro-LGBTQ message—but only in a way that, in our view, does not offend.

The Supreme Court's reason for adopting its "broad" view of viewpoint discrimination is an important one. If the government could circumvent the First Amendment's bar on viewpoint discrimination by censoring views conveyed in ways it deems offensive, First Amendment protection would mean little. Officials could say, for instance, that while they have no objection to anti-abortion views, they find images of aborted fetuses offensive, limiting anti-abortion advocates to written flyers. That is not the law, as decisions like *Matal* and *Robinson* affirm.

More broadly, the government cannot "justify a restraint on some particular means that the speaker finds more effective." *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir. 1980). There is a reason anti-abortion advocates find images of aborted fetuses an especially effective form of advocacy, just as some dissidents find that burning a flag in protest is more effective than handing out pamphlets. *See Johnson,* 491 U.S. at 415 ("[N]othing in our precedents suggests that a State may foster its own view of the flag by prohibiting expressive conduct relating to it."). Likewise with Spectrum's shows. A drag performance conveys ideas challenging gender norms in ways that other types of expression cannot. ROA.4259 (174:9-25); ROA.4328–29 (243:25-244:8).

In short, the *medium* is essential to the message. The district court thus erred in holding WTAMU can censor Spectrum's shows because it may have other, but less effective, avenues of expression. *See City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (invalidating ordinance banning residential signs even though other avenues for expression existed).

**2. The record paints an unmistakable picture of viewpoint-based censorship against an "ideology."**

President Wendler's words prove he and WTAMU are also violating the First Amendment bar against viewpoint discrimination out of disagreement with a "specific motivating ideology … or perspective." *Rosenberger*, 515 U.S. at 829. Again, consider Wendler's 2023 edict canceling Spectrum's campus performance. He described the performance as "artistic expression" conveying a certain "ideology." ROA.4437–39.

And at trial, Wendler emphasized it is drag performances' "ideology" that he takes issue with:

> Q: You would agree with me that based on this, your view is that drag conveys some ideology, right?
>
> A: Correct.
>
> Q: Okay. And that's because in your view, demeaning women, disrespecting women and offending women promotes some sort of ideology, right?
>
> A: Correct.
>
> Q: And that ideology in your view also includes your belief that drag shows create a monolithic view of what a woman is and her purpose; is that true?
>
> A: That's what I've stated.

ROA.4127 (42:3-15).

What's more, even though the district court glossed over the Texas A&M University System's 2025 systemwide ban on drag shows, it failed to address how that ban explicitly targets "gender ideology" and performances "that demean[] women."[6] *Compare* ROA.3845, *with* ROA.4896–97. So, while President Wendler is the current mouthpiece for WTAMU's ban, it is unmistakably the *university's* policy.

These undisputed facts prove WTAMU and its president are restricting drag performances based on their "specific motivating ideology or … perspective." *Rosenberger*, 515 U.S. at 829. As the trial record confirms, drag performances convey ideas challenging traditional views on gender. ROA.4240–41 (155:24-156:13); ROA.4246–48 (161:23-163:20); ROA.4249–51 (164:16-166:1); ROA.4254–55 (169:25-170:14). And Wendler left no doubt: Spectrum's perspective "portray[s] women in a certain way, one that [he] disagree[s] with." ROA.4214 (129:12-21). Because WTAMU is "target[ing] … particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829.

---

[6] That system policy is currently enjoined, and the injunction is on appeal in the companion case *QEC*. *See supra* note 4.

### 3. The First Amendment's protection against viewpoint discrimination applies forcefully at public universities.

The constitutional principles broadly prohibiting viewpoint discrimination apply just as strongly at public universities. In *Healy*, the Supreme Court held a university president could not deny recognition to a student club because he found the group's "views" and "philosophy" "abhorrent." 408 U.S. at 187. A year later, the Court invoked *Healy* in holding "mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam) (holding that the First Amendment prohibited university from punishing student who distributed political cartoons of "policemen raping the Statue of Liberty" (citing *Healy*, 408 U.S. at 180)). And *Rosenberger* affirmed campus officials cannot restrict student speech based on ideological disagreement. 515 U.S. at 829.

Yet the district court did not address *Papish*. And while it briefly addressed *Healy*, it misread the decision. Calling Spectrum's reading of *Healy* "absolutist," the district court viewed *Healy* as cabined to

44

university officials imposing prior restraints by "effectively exil[ing]" student groups from campus. ROA.3880. *Healy* is not so narrow.[7] If it were, the Supreme Court would not have invoked it to invalidate a university's post-hoc punishment for protected speech in *Papish.* Whether university officials exile a group from campus or from the Legacy Hall stage, *Healy* confirms the First Amendment prohibits them from doing so based on disagreement with the group's "views" or "philosophy." 408 U.S. at 187.

C.   **Defendant is imposing an unconstitutional prior restraint twice over.**

The ongoing three-year prohibition on student drag performances at WTAMU is an unconstitutional prior restraint, "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. By "forbidding certain communications" or expression "in advance of the time that such communications are to occur," Wendler is imposing a "classic prior restraint." *Cath. Leadership Coal. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). Whatever "power to deny use of

---

[7] Of course, Healy underscores why Wendler and WTAMU have imposed an unconstitutional prior restraint. *See infra* Section I.C.1.

a forum in advance of actual expression" WTAMU grants its president, that power is not bound by narrow, objective, or definite standards as the First Amendment requires. *See Se. Promotions*, 420 U.S. at 553. Rather, it unconstitutionally rests on the president's subjective evaluation of whether speech is appropriate for a voluntary audience. *See id.* at 549; *see also id.* at 563 (Douglas, J., concurring) (observing that allowing officials to subjectively determine which performances are "culturally uplifting" is the practice of "socialist regimes"). And as Wendler cannot overcome the "heavy presumption" against prior restraints' constitutionality, *id.* at 558, the district court erred in not enjoining the dual prior restraints that have hung over Spectrum's protected expression since 2023.

> **1.    The ban on Spectrum's performances is a classic prior restraint because it prohibits speech before it occurs.**

In his 2023 campuswide email, President Wendler was unequivocally preemptive: "West Texas A&M University will not host a drag show on campus." ROA.4437. And he has enforced his promise, twice preventing Spectrum from performing at Legacy Hall. That is a "classic prior restraint." *Cath. Leadership Coal.*, 764 F.3d at 437.

*Southeastern Promotions* shows why. There, the Court held city officials imposed a prior restraint by blocking the musical *Hair* from a municipal theater because it did not fit the city's view of what was "clean and healthful and culturally uplifting." 420 U.S. at 549. Wendler has imposed a nearly identical prior restraint, barring drag performances from campus forums because they do not meet WTAMU's view of what is "respectful" and "appropriate." *E.g.*, ROA.4136 (51:15-22); ROA.4188–89 (103:19-104:7); ROA.4216 (131:7-16).

Even worse, Wendler has banned Spectrum's performances from the Legacy Hall stage while knowing nothing about their content, relying instead on his "judgment" about what is "inappropriate" expression for the public forum. ROA.4188–89 (103:19-104:7). He admitted he made no effort to speak with Spectrum's members or Legacy Hall staff to better determine what the performance would involve. ROA.4134–36 (49:14-50:16, 50:24-51:6); ROA.4137 (52:16-20). Yet based on a few internet searches on "the general tradition" of drag performances, he deemed Spectrum's unseen performances too "demeaning" and "disrespectful" to allow in Legacy Hall. ROA.4139–41 (54:4-56:22).

His actions violate the cornerstone rule that "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand" because "the risks of freewheeling censorship are formidable." *Se. Promotions*, 420 U.S. at 559; *see also Pro-Life Cougars v. Univ. of Hou.*, 259 F. Supp. 2d 575, 583–84 (S.D. Tex. 2003) (granting a preliminary injunction against a prior restraint on a campus public forum). Whatever speculative concerns Wendler had about discrimination or potential harms to the University's "educational environment" cannot justify a prior restraint. *See* ROA.3885. Wendler readily conceded that before he decided to cancel Spectrum's performance, nobody complained to him about harassment. ROA.4138–39 (53:23-54:3); ROA.4161 (76:12-24). And before Wendler decided to cancel Spectrum's performances, no one at WTAMU was concerned that the shows would interfere with academic functions. ROA.3465–66 (27:20-28:5).

This "absence of empirical evidence" is fatal under the First Amendment. *Widmar v. Vincent*, 454 U.S. 263, 275 (1981). Just as the university in *Widmar* could not exclude religious expression from a campus forum based on abstract concerns over violating the

Establishment Clause, *id.*, Wendler cannot block drag shows from Legacy Hall based on abstract concerns over violating anti-harassment and anti-discrimination laws and policies. He admits as much, agreeing WTAMU policy allows the university to sanction unlawful harassment only "after conduct occurs." ROA.4159–60 (74:18-75:10); ROA.4448.

*Healy* provides an even more apt example. 408 U.S. at 175. There, the Supreme Court held a university president imposed an unconstitutional prior restraint by denying a student group recognition based on his belief that its "philosophy was antithetical to the school's policies." *Id.* at 175, 184, 194. The First Amendment problem, the Court explained, was "that there was no substantial evidence" that the group "would constitute a disruptive force on campus," showing the president acted upon "the sort of 'undifferentiated fear or apprehension of disturbance which is not enough to overcome the right to freedom of expression.'" *Id.* at 190–91 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969)) (cleaned up).

The same is true here: Wendler and WTAMU have imposed a prior restraint based on nothing but "undifferentiated fear or apprehension" that a drag performance might "disrespect" or "demean" some students.

The district court erred by not upholding this well-settled rule and ignoring Wendler's testimony compelling its application.

### 2. The president's unbound authority to cancel expression he deems "demeaning and disrespectful" has turned Legacy Hall's reservation process into an unconstitutional prior restraint.

By vesting its president with unfettered authority to deny students access to speak in Legacy Hall, WTAMU has imposed another unconstitutional prior restraint. When officials require "registration" and approval to access a forum for expression, as WTAMU does for Legacy Hall, they create prior restraints. *Cath. Leadership Coal.*, 764 F.3d at 437; *see also Se. Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d 1016, 1019 (5th Cir. 1972). These prior restraints may not be per se invalid, but they carry "a heavy presumption against [their] constitutionality." *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (citation and quotation marks omitted).

Only if the government shows an official's "authority" to deny access to speak is carefully "bounded by precise and clear standards" can the restraint overcome that "heavy presumption." *Se. Promotions*, 420 U.S. at 553, 558. The reason for that is simple: The "danger of censorship

and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Id.* at 553. The Constitution thus categorically prohibits the government from "regulating speech contingent on the will of an official." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003).

This is a high bar. A merely nominal limit on an official's discretion will not do. Instead, limits must be "narrow, objective, and definite" or the prior restraint "is unconstitutional." *Se. Promotions*, 420 U.S. at 553 (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)).

Wendler's testimony proved WTAMU places no "objective" limitations on its president's authority—let alone ones that are "narrow" and "definite." *See id.* Wendler conceded that, as WTAMU president, he alone made the decision to cancel Spectrum's 2023 and 2024 drag shows. ROA.4147 (62:1-8). He insisted, too, that the authority to interpret what is "disrespectful or demeaning" to *any* group, "contrary to the University's mission," belongs to the president alone. ROA.4147–48 (62:20-63:3); ROA.4177–78 (92:5-93:1); ROA.4216 (131:7-16). And Wendler exercised that subjective authority when blocking Spectrum's shows, relying on the

"Golden Rule" (or the "Law of Reciprocity"), ROA.4146 (61:19-25),[8] his notions of "campus culture," ROA.4144–45 (59:1-60:22), and his "judgment" that Spectrum's shows would be "inappropriate or inconsistent with" WTAMU's "educational mission," ROA.4188–89 (103:19-104:7).

These confessions should be dispositive. *See, e.g.*, *Se. Promotions*, 420 U.S. at 553; *Chiu*, 339 F.3d at 280. Yet the district court disregarded Wendler's testimony to conclude that "West Texas A&M has safeguards that meaningfully limit his discretion." ROA.3880. What safeguards are those?

The district court identified only one: Wendler's "decision was based on respect for others' identities," a "value" found in "the University's mission statement." *Id.* But a university president's interpretation of what violates "respect for others' identities" is neither "objective" nor "narrow" nor "definite"—it is about as subjective and indefinite a standard as one can imagine.

---

[8] Wendler describes the "Golden Rule" as "the concept of the expectation that what treatment you render, you receive back." ROA.4145 (60:7-12).

The Supreme Court made exactly this point when it invalidated the almost indistinguishable prior restraint in *Southeastern Promotions*. The Court considered "a long line of [its] decisions" to conclude that a prior restraint resting on officials' subjective view of what was "clean and healthful, and culturally uplifting" lacked "precise and clear standards" and was thus unconstitutional. 420 U.S. at 549, 552–53. If authority to determine which theatrical performances are "clean and healthful, and culturally uplifting" was unconstitutional for lack of objective criteria, Wendler's authority to determine which theatrical performances reflect adequate "respect for others' identities" is equally unconstitutional, if not more so.

**D. Wendler and WTAMU have imposed an unconstitutional content-based prohibition in a designated public forum.**

As WTAMU policy and practice establish that Legacy Hall is a designated public forum, the district court erred in holding that the venue is a limited public forum. To this end, it also erred in not applying strict scrutiny to the presumptively unconstitutional content-based ban on drag performances in Legacy Hall—a standard Wendler cannot hope to satisfy.

### 1. The district court erred by not holding that Legacy Hall is a designated public forum.

The district court's treatment of Legacy Hall misapplied the settled rule that forum classification turns on the government's "policy and practice" and the venue's "compatibility with expressive activity." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–16 (2015). Where a university imposes only "minimal" content limits in a campus space, it is a designated public forum. *Just. for All v. Faulkner*, 410 F.3d 760, 766–69, 766 n.8 (5th Cir. 2005). By contrast, a limited public forum is restricted to defined speakers or subjects. *Walker*, 576 U.S. at 215. Courts assess the particular campus venue, not the entire campus. *Just. for All*, 410 F.3d at 766–67.

Start with WTAMU's policy. No rule limits *who* may reserve Legacy Hall—any member of the public may do so. ROA.4116 (31:3-16); ROA.4218 (133:2-6). And as Wendler confirmed, WTAMU places no meaningful content limits on events in Legacy Hall because WTAMU policy allows only content-neutral limits. ROA.4116–20 (31:17-35:23).

What's more, System policy bars administrators from denying the "benefit" of campus facilities based on "political, religious, philosophical,

ideological, or academic viewpoint" or otherwise protected "expressive activities," which it defines as "any speech or expressive conduct protected by the First Amendment[.]" ROA.4483–85; ROA.4122–23 (37:19-38:3). WTAMU's policy obeys that command, making clear it covers university "buildings" and "facilities." ROA.4447–50; ROA.4120 (35:3-23). Both policies thus use the viewpoint- and content-neutral language that *Justice for All* held creates a designated public forum. 410 F.3d at 768. That choice proves WTAMU's intent to treat Legacy Hall as a designated public forum.

The University's amended April 2026 policy underscores that intent.[9] Wendler anticipated that the amended policy would define Legacy Hall as a limited public forum. ROA.3849; ROA.4191–92 (106:11-107:3). But he was wrong. The amended policy provides, "in no circumstance will any [facility reservation] decision be based on the content or viewpoint of the expressive activity."[10] Nothing in it confines Legacy Hall to a subject or speaker class.

---

[9] April 2026 Amended Expressive Activities Policy, *supra* note 1, at 1–3.

[10] April 2026 Amended Expressive Activities Policy, *supra* note 1, at § 4.5.

The district court misconstrued WTAMU's policies as omitting indoor spaces. ROA.3847. Those policies expressly cover "buildings" and "facilities." ROA.4447–50, 4483–85. Nor do those policies exclude any protected expression. *See* ROA.3847. Instead, they merely identify unprotected conduct like assault, incitement, and illegal harassment. *Id.*

The district court further erred by invoking a savings clause tucked away in a handbook—predating and subordinate to the System and WTAMU policies—to conclude that staff may cancel events that someone might view as "inappropriate" or inconsistent with the University's mission.[11] ROA.3847. But again, the superseding System and WTAMU policies forbid such content-based denials. And in any event, an amorphous limit on "inappropriate" content would invite the exact viewpoint discrimination and unbounded prior restraint that violate the First Amendment. *See supra* Sections I.B–C.

While the district court made much of WTAMU's mission, *e.g.*, ROA.31–32, WTAMU's stated mission only underscores the district court's error. In fact, WTAMU policy deems student expression "central

---

[11] The district court also noted a handbook provision prohibiting "Drag Show Events" due to a Texas A&M systemwide policy. ROA.3847. The injunction in *QEC* currently bars that policy. *See also supra* notes 4, 6.

to the mission" of WTAMU, ROA.4447, and WTAMU routinely hosts events unrelated to academics.

WTAMU's practice likewise proves Legacy Hall is a designated public forum. As Wendler and Legacy Hall's chief administrator acknowledged, the venue has hosted concerts, beauty pageants, plays, parties, political talks, worship services, fashion shows, weddings—and, in 2019, a drag show. ROA.4116–17 (31:17-32:18); ROA.3500–03 (88:17-91:10). Many of those events lack an academic purpose. ROA.4117 (32:19-22); ROA.3500–03; *cf. Concerned Women for Am.*, 883 F.2d at 34 (holding that the library was a designated public forum because it allowed activities having "little to do with" its "educational and artistic mission"). These undisputed facts show both broad access and Legacy Hall's "compatibility with expressive activity," *Walker*, 576 U.S. at 215–16, as it hosts dramatic performances using music, costumes, lighting, and a stage. ROA.3206–07 ¶¶ 9–13; ROA.4115–16 (30:10-31:2); ROA.4627.

Despite all of that, the district court deemed Legacy Hall incompatible with drag shows. ROA.3876. That was error. As a legal matter, compatibility asks whether the venue can host the mode of expression. *See Se. Promotions*, 420 U.S. at 555 (theaters were "designed

for" expressive activities and could accommodate a "production of this size"); *Se. Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d at 1019 (considering "the character of the place" and its capacity for "plays, musicals, and operas"). As logic and history reflect, Legacy Hall is compatible with drag shows.

And as this Court affirmed, a forum's classification turns on "*consistent* practice, not each exceptional regulation that departs from the consistent practice." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992). The district court cited a rap concert Wendler canceled in a *different* venue after the artist's prior concerts led to "fistfights and 'gunplay.'" ROA.3873. That example is irrelevant to WTAMU's consistent practice with Legacy Hall, reflecting a safety judgment about anticipated audience *conduct*, not the performance's expressive content. Likewise, Wendler's testimony that he might cancel *hypothetical* events he considered "denigrating" or "caricaturing" is irrelevant to WTAMU's consistent practice. ROA.3873–74. The district court's lone real-world example and its hypothetical ones thus defy this Court's rule for assessing consistent practice.

It also shows why subjective "values" cannot define a forum: The boundary shifts with an official's prediction of offense. Shielding listeners from offense is viewpoint discrimination, "an egregious form of content discrimination" the First Amendment forbids in any forum. *Matal*, 582 U.S. at 243; *see also Chiu*, 260 F.3d at 350.

### 2. Wendler's content-based exclusion triggers strict scrutiny in all cases.

Because Wendler and WTAMU "target speech based on its communicative content," the drag show ban is content-based. *Reed*, 576 U.S. at 163. By any measure, the ban exclusively targets the content of performers' expression. ROA.4437–4439. So, it is not, as the district court erroneously suggested, a content-neutral time, place, and manner restriction. ROA.3879. It is a content-based restriction in a designated public forum, and strict scrutiny applies. *Reed*, 576 U.S. at 163; *Widmar*, 454 U.S. at 269–70.

Even if Legacy Hall were a limited public forum, strict scrutiny would still govern because Spectrum falls within the forum's speaker class under WTAMU policy: registered student organizations. ROA.4447–52. The government must "respect the lawful boundaries it has itself set," *Rosenberger*, 515 U.S. at 829, and cannot exclude a

speaker who "falls within the class to which" it has generally opened the forum, *Just. for All*, 410 F.3d at 766–67 (citation omitted). Yet the drag show ban does precisely that.

### E. Wendler has made no attempt to satisfy strict scrutiny, and established law proves why he cannot.

Strict scrutiny requires Wendler to prove that restricting drag performances advances a compelling interest through the least restrictive means. *Reed*, 576 U.S. at 163; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). He has never tried. Nor could he meet that burden if he did.

#### 1. Wendler cannot show a compelling interest.

Wendler has cycled through rationales but always returns to his original one: Drag shows offend the "value" of "respect" because he considers them offensive to women. ROA.4128–29 (43:8–44:13) (Wendler's 2023 email is the "best representation" of his reasons); ROA.4131 (46:4–18). Neither that rationale nor the district court's focus on "sexualized" expression supplies a compelling interest, as the Supreme Court's decisions in *Healy* and *Papish* explain.

The Supreme Court has consistently held the government lacks *any* interest—much less a compelling one—in censoring speech because it is potentially offensive. *See, e.g.*, *Matal*, 582 U.S. at 243. In *Healy*, a university president denied recognition to a group whose message advocated, in his view, "destruction of the very ideals" of the university's academic mission. 408 U.S. at 187. Even that assertedly "abhorrent" message provided "no reason" to burden the group's speech. *Id.* at 187–88. Wendler's formulation fares no better.

Likewise, while Wendler has speculated about "humor" becoming "harassment," ROA.4438, that cannot make out a compelling interest. "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001). And for good reason. Any other rule would give cover for administrators to censor disfavored campus expression, from political speech to pure entertainment. In any event, a one-time ticketed performance in an enclosed space cannot meet federal requirements for harassment—which WTAMU policy mirrors. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (defining harassment under Title IX as conduct "so severe, pervasive, and objectively offensive" that it

61

"deprive[s] the victims of access" to "educational opportunities or benefits"); ROA.4450 (WTAMU policy defining "illegal harassment" identically).

Nor do abstract concerns about "lewdness" or minors in the audience supply a compelling interest. Wendler mentioned neither in his "carefully" worded email announcing the ban. ROA.4437–39; ROA.4123 (38:18-24). And if he raises them now, *Papish* forecloses a compelling interest in either. There, the Supreme Court held a public university violated the First Amendment by punishing a student for political cartoons "depicting policemen raping the Statue of Liberty." 410 U.S. at 667. Though the student distributed the cartoons in places "many" minors frequented, *id.* at 675–76 (Rehnquist, J., dissenting), the Court held public universities cannot suppress student speech "no matter how offensive to good taste" to protect "'conventions of decency.'" *Id.* at 670 (per curiam opinion). Any interest in curbing "lewdness" or protecting minors is even less compelling here, given Spectrum's ticketed shows, on a campus intended for adults, will occur in the enclosed and windowless Legacy Hall. ROA.3206–07 ¶¶ 8–11.

Whether or not minors attend (and the district court accepted that Spectrum will not permit them at future shows, ROA.3875), WTAMU's interest "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. While the government may regulate content obscene for minors in narrow circumstances, that is not the case here. *See supra* Section I.A.3. Rather, the ban is not limited to obscene-for-minors content, and in any event "completely overrides parental authority." *Knudsen*, 170 F.4th at 863.

### 2. Wendler cannot satisfy narrow tailoring.

Strict scrutiny requires more than identifying a possible harm. Wendler must also prove his categorical ban is "necessary" to serve a compelling state interest and that no less restrictive means would serve that interest. *Playboy*, 529 U.S. at 813; *Concerned Women for Am.*, 883 F.2d at 34–35. Here, Wendler did not even *consider* alternative measures. He canceled Spectrum's shows before learning the details because he had decided drag shows are "demeaning and disrespectful" to women. *E.g.*, ROA.4135–36 (50:24-51:22). In short, Wendler and WTAMU restricted an entire genre of expression without considering *any* less restrictive action.

But they have a less restrictive means: addressing any actual misconduct *after* it occurs. If, for example, Wendler had concerns about harassment and discrimination, WTAMU's policy allows it to punish unlawful harassment and discrimination *after* an adjudicatory process determines it occurred. ROA.4157, 4159–61 (72:12-21, 74:18-76:11); ROA.4647–4730. Yet Wendler did not even consider the definition of unlawful harassment, let alone that adjudication process, before he decided to block Spectrum's performance. ROA.4157 (72:4-11); ROA.4162 (77:9-15). The First Amendment requires punishing the few who break valid rules instead of "throttl[ing] them and all others beforehand." *Se. Promotions*, 420 U.S. at 559.

Stopping expression in advance based on conjecture is not the least restrictive means of achieving any interest. *See id.*; *see also* ROA.4161 (76:12-24) (Wendler conceding he received no Title IX complaints about harassment or discrimination over Spectrum's planned show). It is a viewpoint-based prior restraint. And it highlights how Wendler's purpose—banning expression he finds offensive—far exceeds any interest he may recite.

WTAMU and Wendler's approach is also overinclusive. It reaches *every* campus drag performance—no matter the content, no matter the performers, and no matter who might attend. It suppresses even Spectrum's 2026 proposed show, as the district court described it: student performers, "appropriate" PG-13 content, and no minors in attendance. ROA.3875. A prohibition "foreclos[ing] an entire medium of expression" warrants "particular concern." *City of Ladue*, 512 U.S. at 55. For example, the Ninth Circuit upheld an injunction against a restriction on drag performances because it captured non-sexualized expression and because the government did not show that notice, opt-out, or other less restrictive safeguards would fail. *Knudsen*, 170 F.4th at 860–65.

Wendler's ban is even more overinclusive. It stifles all campus drag performances, full stop. As Wendler acknowledged, the "whole concept" and "general tradition" of drag shows, not any details particular to Spectrum's, led him to censor campus performances. ROA.4140 (55:3-10).

Even if an individual performer *might* violate an event's rules, *see* ROA.3875–76, that is merely a risk inherent in any live performance. And again, discipline after the fact—not a prior restraint—is the only constitutionally permissible solution. Wendler offered no evidence that

all drag shows cause harm, or any other basis making it necessary to exclude them from campus. By contrast, he admitted that no one complained to him that Spectrum's performances would harm them. ROA.4133 (48:17-25); ROA.4138–39 (53:15-54:3).

The ban is also underinclusive. It leaves untouched books, films, music, and other live performances conveying the same ideas as drag shows. That selectivity "raises serious doubts" WTAMU is pursuing any asserted interest, rather than disfavoring drag's message. *Brown*, 564 U.S. at 802. And as *Knudsen* explains, exempting other modes of expression—there, books—while restricting live performance is fatal to narrow tailoring. 170 F.4th at 862–63.

### F. *CLS v. Martinez* does not control this case.

This case is about a university president unconstitutionally exercising arbitrary power to exclude a student organization from a designated public forum because of its viewpoint. It is a far cry from the Supreme Court's narrow holding in *CLS*. Yet the district court determined *CLS* "weighs in favor" of upholding Wendler's viewpoint-based prior restraint. ROA.3886. This Court should refuse that conclusion. In fact, it need not reach *CLS* at all, for two reasons.

First, Legacy Hall is a designated public forum open to anyone, not just students. *See supra* Section I.D. By contrast, *CLS* centered on the narrow limited public forum for recognizing student organizations. *See* 561 U.S. at 679. On that difference alone, *CLS* is inapplicable.

Second, *CLS* did not involve viewpoint discrimination, unlike this case. *See supra* Section I.B. Rather, it centered on a viewpoint-neutral policy requiring registered student organizations to "allow any student to participate, become a member, or seek leadership positions in the organization, regardless of [her] status or beliefs"—a fact to which the policy's challenger stipulated. 561 U.S. at 675. Even in upholding that policy as constitutional, the Supreme Court pointedly stressed its "series of decisions" that have "emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Id.* at 667–68 (citing *Rosenberger*, *Healy*, and *Widmar*). And here, Wendler has emulated the campus censors in that series of decisions, impeding Spectrum's expression because he perceives its "ideology" as offensive.

*Healy* sheds light on another key distinction from *CLS*. The university president in *Healy* violated the First Amendment by denying

recognized status to a student group based on his arbitrary and subjective determinations about the group's "abhorrent" "philosophy." 408 U.S. at 187–88. But the *CLS* administrators lacked such unfettered discretion. Instead, the policy constrained them to a binary choice: grant recognized status if a student group agreed to let all comers join, or deny it if they did not.

Wendler faces no such constraint. Rather, like the president in *Healy*, he exercises unbounded authority to determine whether speech is "respectful" enough for Legacy Hall. ROA.4153–54 (68:14-69:8). As this case proves, such unfettered discretion invites the very viewpoint discrimination *CLS* warned about. The district court erred in overlooking this key distinction.

Simply put, this case is not about a university "dangling the carrot of subsidy" in the limited public forum that is student organization recognition. *CLS*, 561 U.S. at 683. WTAMU gave Spectrum that carrot by granting it recognized status. ROA.3207 ¶ 15. Rather, this is about WTAMU's president "wielding the stick of prohibition" by denying Spectrum access to a public forum open to all registered student organizations because he finds Spectrum's expression offensive.

68

*CLS* may affirm the unremarkable proposition that campus administrators may deploy reasonable, viewpoint-neutral policies in limited public forums. But it does not require courts to defer wholesale to administrators when they "impose and enforce nondiscrimination policies," as the district court suggested. ROA.3881. When universities enforce those policies in ways that violate the First Amendment, courts must halt them. *E.g.*, *Cartwright*, 32 F.4th at 1126–27. This Court should do just that and reverse.

## III. The District Court Should Have Granted a Permanent Injunction.

Because Wendler and WTAMU are violating the First Amendment, the district court should have permanently enjoined them from imposing viewpoint- and content-based restrictions on Spectrum's ability to perform in Legacy Hall. Spectrum is suffering irreparable harm, and the public interest and balance of equities favor enjoining a prior restraint targeting expression an official deems offensive.

### A. The Drag Show Ban Is Irreparably Harming Spectrum.

Only injunctive relief can stop the ongoing harm to Spectrum's First Amendment rights. This Court has "repeatedly held … loss of First Amendment freedoms for even minimal periods of time constitutes

irreparable injury justifying the grant of a preliminary injunction."

*Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir.

2013) (cleaned up).

While Spectrum has every intention of hosting future drag shows

at Legacy Hall, it fears the university will cancel its show again. That

fear is well-founded. Through Wendler's actions, WTAMU has proven

resolute in preventing drag shows on campus. Wendler has made clear

that the ban is premised on drag performance's "ideology" and "general

tradition," which, in his view as WTAMU president, violate the

university's "primary value" of respect and its anti-discrimination

policies. ROA.4127 (42:3-15); ROA.4139–41 (54:4-56:22); ROA.4153

(68:14-22); ROA.4437–39. He even confirmed at trial that nothing has

changed his view that drag performances are "disrespectful" to women.

ROA.4193 (108:17-20).

Thus, all signs point to continued irreparable harm unless this

Court reverses.

**B.  The Public Interest and Balance of the Equities
    Strongly Favor a Permanent Injunction.**

"Injunctions protecting First Amendment freedoms are always in

the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting

*Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).[12] Some may recoil at the First Amendment's guardrails protecting students "in blackface" and expressing similar racist views, as the district court imagined, ROA.3885, or in President Wendler's case, student drag performances. Yet those same rules equally—and vitally—protect the freedom to criticize those messages, to urge others not to attend shows to which they object, and to persuade them to protest. As the Eleventh Circuit recently explained in upholding an injunction against viewpoint-based restrictions at public universities, "hearing an idea you disagree with is not discrimination; it is an opportunity to come up with a better idea, or maybe even change your mind." *Pernell*, 2026 WL 1955783, at *18.

No doubt, "protecting the freedom for the thought that we hate" is never easy. *See United States v. Schwimmer*, 279 U.S. 644, 654–655 (1929) (Holmes, J., dissenting). But as the Founders understood, censorship is the wrong path toward preserving basic liberty and confronting fear. Instead, they concluded "the path of safety lies in the

---

[12] When the government is the opposing party, the balance of equities and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

## IV. The District Court Erred by Not Granting Declaratory Relief.

The district court erred by not granting Spectrum declaratory relief, for the same reasons it erred in not finding a First Amendment violation. *See supra* Section I. Given Spectrum's desire to hold drag performances on campus (including this year) and WTAMU and Wendler's firm stance on censoring those performances, an "actual controversy" exists, making declaratory relief appropriate. *See* 28 U.S.C. § 2201. This Court should reverse on this ground, too.

## CONCLUSION

Few principles have played a more crucial role in ending segregation, advancing religious liberty, and securing women's rights, both on and off campus, than the First Amendment's protections against viewpoint discrimination and prior restraint. Those crucial advancements would never have been possible if the Constitution did not protect both sides of the ideological debate. No matter one's personal views on Spectrum's drag performance, it has a First Amendment right to perform

on Legacy Hall's stage—even if some take offense. The Court should uphold that fundamental principle here and reverse.

Dated: July 17, 2026

Respectfully,

/s/ JT Morris

JT Morris
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
Tel: (215) 717-3473
jt.morris@fire.org
sam.rudovsky@fire.org

Sara Berinhout
Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
Tel:  (215) 717-3473
sara.berinhout@fire.org
adam@fire.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

This certifies that on July 17, 2026, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.

/s/ JT Morris

JT Morris
*Attorney for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses a proportionally spaced typeface: 14-point Century Schoolbook font for text and 12-point Century Schoolbook font for footnotes.

Dated: July 17, 2026            /s/ JT Morris
                                   JT Morris
                                   *Attorney for Plaintiff-Appellant*