**No. 26-10127**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

SPECTRUM WT,

*Plaintiff-Appellant*,

v.

WALTER WENDLER, in his official capacity as
the President of West Texas A&M University,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

**UNOPPOSED MOTION OF *AMICI CURIAE* PROFESSORS
SPECIALIZING IN LGBT+ STUDIES, LGBT+ LEGAL ISSUES,
AND THE HISTORY OF DRAG TO FILE *AMICUS* BRIEF
IN SUPPORT OF PLAINTIFF-APPELLANT**

Martin J. Siegel
LAW OFFICES OF
   MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568
Martin@Siegelfirm.com

*Counsel for Amici Curiae*

## SUPPLEMENTAL CERTIFICATE
## OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons

and entities, as described in Fifth Circuit Rule 28.2.1, have an interest in the

outcome of this case.  This representation, supplemental to that of the parties and

other *amici*, is made in order that the Judges of this Court may evaluate possible

disqualification or recusal.

1.   *Amici Curiae* Esther Newton, Eliot Tracz, Mark Satta, Joe E. Jeffreys, Scott Skinner-Thompson, Luke Boso, Carlos Ball, and Nancy Marcus

2.  Martin J. Siegel, Law Offices of Martin J. Siegel, P.C., Attorney for *Amici Curiae*

s/    *Martin J. Siegel*

Martin J. Siegel
Attorney for *Amici Curiae*

*Amici* Esther Newton, Eliot Tracz, Mark Satta, Joe E. Jeffreys, Scott Skinner-Thompson, Luke Boso, Carlos Ball, and Nancy Marcus, professors specializing in LGBT+ studies, LGBT+ legal issues, and the history of drag, file this unopposed motion respectfully seeking leave to file an *amicus* brief, attached at Tab 1, in support of Plaintiff-Appellant Spectrum WT, and state the following:

1.　*Amici* are professors of LGBT+ studies, law, philosophy, and other disciplines with an extensive record of scholarship and practice concentrating on LGBT+ rights, constitutional law, and the history and legal status of drag.  As leading authorities in these fields, they are deeply concerned with the development of First Amendment law governing drag and with ensuring that this artistic means of social and political expression receives full constitutional protection.  The qualifications of each *amicus* are detailed in the attached *amicus* brief at pp. 1-3.

2.　Whether Spectrum's planned drag show constitutes expressive conduct worthy of First Amendment recognition is a key issue in this important appeal.  The district court found that Spectrum's performance entailed no such expressive activity, in contrast to the panel majority that heard the interlocutory appeal in this case.  *Compare* ROA.3862-65 *with Spectrum WT v. Wendler*, 151 F. 4th

714, 726 (5th Cir. 2025), *reh'g granted*, 157 F.4th 673 (5th Cir. 2025), *dismissed as moot*, 2026 WL 184215 (Jan 20, 2026).

3.    *Amici's* brief addresses this pivotal question, as well as whether Defendant-Appellee Dr. Wendler committed unconstitutional viewpoint discrimination.  As experts in LGBT+ studies and legal questions as well as the history of drag performance, they bring specialized, unique, and broad knowledge and perspective to the question of what statement is intended by drag artists today when they perform in shows like the one planned by Spectrum and canceled by Wendler, and what message is received by their audiences.  Having studied the past and present of drag in the United States in great depth, they can assist the Court's understanding of what drag shows say and are understood to mean about LGBT+ life and culture and the now passionately debated claim that gender may be mutable. Consequently, their brief has much to offer the Court as it considers the vital question of whether drag is simply contentless and bawdy entertainment that demeans women, as Wendler claims and the district court agreed, or art expressing a social and political message about LGBT+ and gender issues, as Spectrum argues and the interlocutory appeal panel concluded.

4. This Court generally welcomes *amicus* briefing "unless it is obvious that the proposed briefs do not meet Rule 29's criteria as broadly interpreted." *Lefebure v. D'Aquilla*, 15 F.4th 670, 676 (5th Cir. 2021). In *Lefebure*, this Court noted that "courts should welcome *amicus* briefs for one simple reason: '[I]t is for the honour of a court of justice to avoid error in their judgments,'" *Id*. at 675 (quoting *The Protector v. Geering*, 145 Eng. Rep. 394 (K.B. 1686)). Quoting Third Circuit Judge A. Leon Higginbotham, the Court added: "even in a court as learned as ours, we might be able to avoid some unnecessary catastrophes if we have the will and the patience to listen." *Id.* (*quoting Am. College of Obstetricians v. Thornburgh*, 699 F.2d 644, 647 (3d Cir. 1983) (Higginbotham, J., dissenting)).

5. Likewise, in an influential 2002 opinion, then-Judge Alito noted that "a broad reading [of Fed. R. App. P. 29] is prudent." *Neonatology Assoc., P.A. v. Comm'r of Internal Revenue*, 293 F.3d 128, 132 (3d Cir. 2002). "[I]t is preferable to err on the side of granting leave. If an *amicus* brief that turns out to be unhelpful is filed, the merits panel, after studying the case, will often be able to make that determination without much trouble and can then simply disregard the *amicus* brief.

On the other hand, if a good brief is rejected, the merits panel will be deprived of a resource that might have been of assistance." *Id.* at 133.

6.      At an earlier stage in this case, the Court ruled in favor of permitting *amicus* briefs, granting a motion for reconsideration of an order that had denied leave to file an *amicus* brief before the panel. *See Spectrum WT v. Wendler*, Case No. 23-10994, Doc. 80 (Order dated December 12, 2023). *Amici* briefing should likewise be permitted in this appeal, which is all the more important in light of the non-interlocutory posture, the full Court's participation, and the significant precedent likely to emerge from any decision.

7.      All parties have consented to the filing of *Amici's* brief.

For the foregoing reasons, the Court should grant this unopposed motion and permit the filing of *Amici's* brief.

July 24, 2026                                Respectfully Submitted,

s/ *Martin J. Siegel*
Martin J. Siegel
LAW OFFICES OF
    MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568
Email: Martin@Siegelfirm.com

*Attorney for Amici Curiae*

6

## **CERTIFICATE OF CONFERENCE**

I hereby certify under 5th Cir. R. 27.4 and Fed. R. App. P. 29(a)(2) that I conferred with counsel for Plaintiff-Appellant and Defendant-Appellee and both parties have consented to the filing this motion and *amicus* brief.

s/   *Martin J. Siegel*

Martin J. Siegel
*Counsel for Amici*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2026, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing motion and attached brief on all registered counsel of record via the Court's ECF Filing system.

s/          *Martin J. Siegel*
Martin J. Siegel

# CERTIFICATE OF COMPLIANCE

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using the Microsoft Word 2004 for Mac, Version 11.5.6, program in 14 point, Times New Roman font in body text and 12 point, Times New Roman font in footnote text.  This motion complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because it contains 768 words, excluding parts exempted by Fed. R. App. P. 32(f).

s/          *Martin J. Siegel*
Martin J. Siegel

Dated:  July 24, 2026

**ATTACHMENT  1**

**No. 26-10127**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

SPECTRUM WT,

*Plaintiff-Appellant*,

v.

WALTER WENDLER, in his official capacity as
the President of West Texas A&M University,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

## BRIEF OF *AMICI CURIAE* PROFESSORS SPECIALIZING IN LGBT+ STUDIES, LGBT+ LEGAL ISSUES, AND THE HISTORY OF DRAG IN SUPPORT OF PLAINTIFF-APPELLANT

Martin J. Siegel
LAW OFFICES OF
   MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568
Martin@Siegelfirm.com

*Counsel for Amici Curiae*

## SUPPLEMENTAL CERTIFICATE
## OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. This representation, supplemental to that of the parties and other *amici*, is made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. *Amici Curiae* Esther Newton, Eliot Tracz, Mark Satta, Joe E. Jeffreys, Scott Skinner-Thompson, Luke Boso, Carlos Ball, and Nancy Marcus

2. Martin J. Siegel, Law Offices of Martin J. Siegel, P.C., Attorney for *Amici Curiae*

s/       *Martin J. Siegel*
Martin J. Siegel
Attorney for *Amici Curiae*

ii

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ..................................... i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

*AMICI'S* STATEMENT OF IDENTITY AND INTEREST ............................................ 1

INTRODUCTION ........................................................................... 4

ARGUMENT ............................................................................... 6

    I.    Spectrum's Planned Drag Show
        is Expressive Speech ................................................................ 6

        A.    A Spectrum Drag Show Would Express
                Support for LGBT+ Culture and Equality and
                the Gay and Transgender Community ............................... 8

        B.    Spectrum's Show Would Communicate
                a Message About Gender Identity and Fluidity ............... 16

        C.    Wendler's and Other Officials' Statements About
                Drag and Gender Mutability Confirm That
                Drag is Expressive .......................................................... 21

    II.    Wendler's Suppression of Spectrum's Show is Clear
          Viewpoint Discrimination ................................................... 25

CONCLUSION ............................................................................. 29

CERTIFICATE OF SERVICE ............................................................... 30

CERTIFICATE OF COMPLIANCE ........................................................... 31

TABLE OF AUTHORITIES

page:

**Cases**

*Bostock v. Clayon Cty.*,
590 U.S. 644 (2020)................................................................ 10

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000)................................................................ 20

*Defending Education v. Olentangy Local Sch. Dist. Bd. of Ed.*,
158 F.4th 732 (6th Cir. 2025) (*en banc*)................................ 22, 24, 26, 28

*Friends of George's, Inc. v. Mulroy*,
675 F. Supp. 3d  831 (W.D. Tenn. 2023);
*rev'd on other grounds*, 108 F.4th 431 (6th Cir. 2024)........................... 19

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)............................................................... *passim*

*Imperial Sovereign Court of Montana v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) ................................................ 19

*Janus v. Am. Fed. of State, Cty. and Mun. Employees Council 31*,
585 U.S. 878 (2018)................................................................ 5

*Masterpiece Cakeshop v. Colorado Civil Rts. Comm.*,
584 U.S. 617 (2018)................................................................ 6, 27

*Matal v. Tom*,
582 U.S. 218 (2017)................................................................ 25

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2020) .................................................. 22, 26

*Naples Pride, Inc. v. City of Naples*,
2025 WL 1370174 (M.D. Fl., May 12, 2025), *stay granted
on other grounds*, 2025 WL 2382975 (11th Cir., June 6, 2025) .............. 13

*Rosenberger v. Rector and Visitors of the Univ. of Virginia*,
  515 U.S. 819 (1995)................................................................. 25

*Snyder v. Phelps*,
  562 U.S. 443 (2011)................................................................. 28

*Southern Utah Drag Stars v. City of St. George*,
  677 F. Supp. 3d 1252 (D. Utah 2023)........................................... 14, 18, 19

*Spectrum v. Wendler*,
  151 F. 4th 714 (5th Cir. 2025), *reh'g granted*,
  157 F.4th 673 (5th Cir. 2025), *dismissed as moot*,
  2026 WL 184215 (Jan 20, 2026) ..................................................... *passim*

*Spence v. Washington*,
  418 U.S. 405 (1974)................................................................. 6, 13

*Texas v. Johnson,*
  491 U.S. 397 (1989)................................................................. 6, 27

*Tex. A&M Queer Empowerment Council v. Mahomes*,
  772 F. Supp. 3d 792 (S.D. Tex. 2025),
  *reh'g ordered*, 179 F. 4th 314 (5th Cir., June 22, 2026) .......................... 26

*Trump v. Orr*,
  146 S. Ct. 44 (2025)................................................................. 24

*United States v. O'Brien*,
  391 U.S. 367 (1968)................................................................. 16

*United States v. Skremetti*,
  145 S. Ct. 1816 (2025)............................................................... 24

*United States v. Varner*,
  948 F.3d 250 (5th Cir. 2020) ....................................................... 22

*Woodlands Pride, Inc. v. Paxton*,
  694 F. Supp. 3d 820 (S.D. Tex. 2023),
  *rev'd on other grounds*, 168 F.4th 293 (5th Cir. 2026).......................... 14

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ............................................................................ 6

**Constitutional, Statutory, and Administrative Provisions**

U.S. CONST. amend. I ................................................................ *passim*

Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb, 23, 2025) ........................ 24

**Miscellaneous Authorities**

CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/
us/dictionary/English/indoctrination ........................................... 23

Giulia Carbonaro, *Greg Abbott Issues Blistering Response
to Drag Show Ban Controversy*, NEWSWEEK, March 16, 2024,
https://www.newsweek.com/greg-abbott-issues-blistering-
response-drag-show-ban-controversy-1879949 ...................................... 23

*The Latex Ball 2024*, GMHC,
https://gmhc.org/gmhc_events/latex-ball-2024/ ..................................... 10

Matt Lavietes and Jay Valle, *Who Belongs in Drag? First
Straight Man on 'RuPaul's Drag Race' Reignites Debate*,
NBC NEWS, Dec. 9, 2021, https://www.nbcnews.com/nbc-out/
out-pop-culture/belongs-drag-first-straight-man-rupauls-drag-
race-reignites-debate-rcna8112 ............................................ 12, 13

Emily Martin, *From Police Raids to Pop Culture:
The Early History of Modern Drag*, NAT'L GEOGRAPHIC,
June 2, 2023, https://www.national geographic.com/history/
article/drag-queen-drag-balls-early-history-pop-culture ........................... 8

Sergio Martinez-Beltran, *Texas Panel Debates Measure That
Would Prohibit Drag Performances in Front of Minors*,
KUT NEWS, March 23, 2023, https://www.kut.org/politics/
2023-03-23/texas-senate-panel-debates-measure-that-would-
prohibit-drag-performances-in-front-of-minors ................................... 23

MERRIAM-WEBSTER,
   https://www.merriam-webster.com/dictionary/drag................................ 17

Jennifer Minear, *Performance and Politics, An Argument for
   Expanded First Amendment Protection of Homosexual
   Expression*, 10 CORNELL J. L. PUB. POL'Y 601 (2001)............................ 17

Thaddeus Morgan, *How 19th-Century Drag Balls Evolved
   into House Balls, Birthplace of Voguing*, HISTORY,
   https://www.history.com/articles/drag-balls-house-ballroom-
   voguing ...................................................................................... 8

Joshua Nelkin-Zitser, *By Championing Self-Expression, RuPaul's
   'Drag Race' Has Encouraged a Generation of Young LGBTQ+
   Fans to Come Out*, BUSINESS INSIDER, June 23, 2022,
   https://www.businessinsider.com/rupauls-drag-race-helped-
   lgbtq-teens-to-come-out-2021-1 ................................................. 12

Esther Newton, *Mother Camp: Female Impersonators
   in America* (1979 ed.) ................................................. 8, 9, 10, 17

James Michael Nichols and Cole Delbyck, *"RuPaul's Drag Race"
   is Leaving TV's Biggest Gay Network – Now What?*,
   HUFFPOST, March 23, 2017, https://www.huffpost.com/entry/
   rupauls-drag-race-logo-vh1_n_58d1b0bce4b0b22b0d17f9aa.................. 19

Office of the Texas Attorney General, *Press Release: Attorney
   General Ken Paxton Defends Texas A&M's Ban on Drag
   Shows Against Lawsuit from Left-Wing Group*, March 14, 2025,
   https://www.texasattorneygeneral.gov/news/releases/attorney-
   general-ken-paxton-defends-texas-ams-ban-drag-shows-against-
   lawsuit-left-wing-group ........................................................... 23

Office of the Lt. Governor, *Press Release: Lt. Gov. Dan Patrick:
   Statement on the Passage of Senate Bill 12 – Banning Children's
   Exposure to Drag Shows*, April 5, 2023, tgov.texas.gov/ 2023/04/05/
   lt-gov-dan-patrick-statement-on-the-passage-of-senate-bill-12-
   banning-childrens-exposure-to-drag-shows/#:~:text=Lt.,
   Shows%20 %20Lieutenant %20Governor%20Dan% 20Patrick ............ 23

Luna Luis Ortiz, *How GMHC's Latex Ball Has Been Promoting LGBTQ+ Health for 30 Years*, ADVOCATE, Mar. 22, 2022, https://www.advocate.com/commentary/2022/3/22/how-gmhcs-latex-ball-has-been-promoting-lgbtq-health-30-years-luna-luis-ortiz...... 10

Brett V. Ries, *Don't Be a Drag: How Drag Bans Can Violate the First Amendment*, 33 TUL. J. LAW & SEX. 1 (2025).............. 25

Mark Satta, *Shantay Drag Stays: Anti-Drag Laws Violate the First Amendment*, 25 GEO. J. GENDER & L. 95 (2023) ................. 11, 12, 17

Brooke Schultz, *Ed Dept. Imposes Funding Restrictions for 5 Districts Over Transgender Policies*, EDUC. WEEK, Aug. 19, 2025, https://www.edweek.org/policy-politics/ed-dept-imposes-funding-restrictions-for-5-districts-over-transgender-policies/2025/08................. 24

Laurence Senelick, THE CHANGING ROOM: SEX, DRAG AND THEATRE (2000)................................................................... 9

Craig Seligman, *You Just Don't Silence a Drag Queen*, TIME, Mar. 23, 2023, https:// time.com/6265333/ drag-queen-political-act/ ........................................................................ 9, 11

Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES, June 29, 2022, https://www. psychiatrictimes.com /view/the-joy-of-drag ........................................................................ 8, 10

Jazz Tangcay, *'RuPaul's Drag Race' Blends Art and Politics in a Potent Pop Stew That Continues to Draw Viewers*, VARIETY, Aug. 21, 2024, https://variety.com/2024/artisans/ news/rupauls-drag-race-politics-1236109870/ ......................................... 12

Eliot Tracz, *Drag: Art. Obscenity. Crime*, 23 CONN. PUB. INT. L.J. 2024 (2024)................................................. 17, 18

Sasha Velour, *The Big Reveal: An Illustrated Manifesto of Drag* (2023)................................................. 18

### *AMICI'S* STATEMENT OF IDENTITY AND INTEREST

*Amici* are professors of LGBT+ studies, law, philosophy, and other disciplines with an extensive record of scholarship and practice concentrating on LGBT+ rights, constitutional law, and the history and legal status of drag. As leading authorities in these fields, they are deeply concerned with the development of First Amendment law governing drag and with ensuring that this artistic means of social and political expression receives full constitutional protection.

Esther Newton is Professor *Emerita* of Anthropology at State University of New York College at Purchase and retired Term Professor in Gender and Women's Studies at the University of Michigan. She is considered one of the founders of LGBT+ studies and is the author of *Mother Camp: Female Impersonators in America*, the first sociological examination of drag performance. Her articles have been published in many edited collections and academic journals and have been translated into a number of foreign languages.

Carlos A. Ball is Distinguished Professor of Law and Judge Frederick Lacey Scholar at Rutgers Law School. He is a nationally recognized expert in both LGBT+ rights and First Amendment law. His books include *The First Amendment and LGBT Equality* and *Cases and Materials on Sexuality, Gender Identity and the Law* (with Jane Schacter and Douglas NeJaime). His articles on the intersection of

1

LGBT+ law and the First Amendment have been published in the *Harvard Law Review Forum*, the *Yale Law Journal Forum*, and elsewhere.

Joe E. Jeffreys is a nationally recognized historian of drag who teaches at the Tisch School of the Arts at New York University and the Eugene Lang College of Liberal Arts at the New School.  He has published widely on drag in encyclopedias, academic journals, and essay anthologies.  He has also appeared on the topic on CNN, the BBC, PBS, and other outlets, and has been quoted in *Time*, *The New York Times*, and *The Washington Post*.

Scott Skinner-Thompson is a professor and Dean's Scholar at University of Colorado Law School.  He researches and teaches constitutional law, civil rights, privacy law, and LGBT+ issues.  His current writing focuses on the legal construction of gender and legal protections for transgender people.

Nancy Marcus is an Associate Professor of Law at California Western School of Law.  Her scholarship includes works on constitutional law, LGBT+ rights, torts, and race discrimination and has been cited in a U.S. Commission on Civil Rights report, a United Nations shadow report, judicial opinions, casebooks, and treatises.  She has also served as a senior attorney at Lambda Legal Defense and Education Fund, chaired the LGBT+ Rights Subcommittee of the ABA's Civil Rights Litigation Section, and served on the board of the National Lesbian and Gay Law Foundation.

<u>Luke Boso</u> is a co-associate dean of research and a law professor at Southwestern Law School, where he teaches constitutional law and criminal law. His scholarship examines the intersections of law and sexuality, gender, race, and class. He has published on drag and the First Amendment and twice received the Dukeminier Award, an annual prize given by UCLA Law School's Williams Institute honoring the best legal article on sexual orientation and gender identity.

<u>Mark Satta</u> is Associate Professor of Philosophy and Law with a joint appointment in the Philosophy Department and Law School at Wayne State University. He specializes in LGBT+ civil rights, constitutional law, the First Amendment, legal philosophy, and the philosophy of language. He has published on the First Amendment's coverage of drag and other First Amendment topics.

<u>Eliot Tracz</u> is an Assistant Professor of Law at New England Law, Boston, where he teaches property; law and economics; and a seminar on sexual orientation, gender identity and the law. He is the author of the forthcoming casebook *Cases and Problems on Sexual Orientation, Gender Identity, and the Law*, as well as numerous articles on LGBT+ rights.[1]

---

[1] No counsel for any party authored this brief in whole or in part, and no party, party's counsel, or other person contributed money to fund its preparation or submission. All parties have consented to the filing of this brief. The undersigned author of this brief gratefully

**INTRODUCTION**

The LGBT+ student group Spectrum WT planned to hold a drag show at West Texas A&M this past April, but the university's president, Dr. Walter Wendler, vetoed it because he believes drag shows demean women.  He likely understood that squelching a performance because he disagrees with its perceived message violates the First Amendment, since he previously told students, "I will not appear to condone the diminishment of any group [by permitting a drag performance]… even when the law of the land appears to require it."  ROA. 4439. Nonetheless, the district court upheld Wendler's prior restraint largely because it determined that drag isn't expressive conduct and that Wendler somehow hadn't committed viewpoint discrimination.

Both these conclusions are mistaken.  The history of drag and its surrounding culture confirms that it is an art form developed and understood to communicate celebration of LGBT+ culture and equality.  More than that, drag necessarily defies gender norms and stereotypes and consequently makes the controversial suggestion that gender might be mutable.  The panel that decided

---

acknowledges the contributions of Amy Abbott, Caroline Rodriguez, Grace Burgert, and Lauren Santibanez, students at the University of Houston Law Center enrolled in the author's Appellate Civil Rights Clinic in Spring 2025.

Spectrum's interlocutory appeal correctly recognized that drag communicates both these messages.[2]

Of course, many people disagree with what drag has to say.  How to regard gender and the scope of LGBT+ rights and acceptance are now being hotly debated in social settings and the political arena.  As the Supreme Court has commented, "sexual orientation and gender identity… are sensitive political topics, and they are undoubtedly matters of profound value and concern to the public."  *Janus v. Am. Fed. of State, Cty. and Mun. Employees Council 31*, 585 U.S. 878, 913-14 (2018) (quotation omitted).  But no one is confused about the fact that drag shows play a role in that discussion, as witnessed by the controversy they have aroused.

Further, Wendler made clear that he would not allow a Spectrum show on campus *precisely because of* what he takes to be its message about women, sex and gender identity.  Texas officials have also condemned drag because it supposedly "indoctrinates" viewers with what they see as a harmful point of view.  The impermissible viewpoint discrimination at the heart of this case therefore couldn't be clearer.  Accordingly, the Court should enforce the constitutional guarantee of free speech, reverse the judgment below, and permit Spectrum's show to go forward.

---

[2] *See Spectrum v. Wendler*, 151 F. 4th 714, 726 (5th Cir. 2025), *reh'g granted*, 157 F.4th 673 (5th Cir. 2025), *dismissed as moot*, 2026 WL 184215 (Jan 20, 2026).

## ARGUMENT

## I.    Spectrum's Planned Drag Show is Expressive Speech

The Supreme Court "has long held that the Constitution looks beyond written or spoken words as mediums of expression, and that symbolism is a primitive but effective way of communicating ideas." *Masterpiece Cakeshop v. Colorado Civil Rts. Comm.*, 584 U.S. 617, 656 (2018) (Thomas, J. concurring in part) (cleaned up).  Thus "[t]he First Amendment extends to all persons engaged in expressive conduct." *303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023).  Moreover, "a wide array of conduct… can qualify as expressive, including nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop*, 584 U.S. at 657 (Thomas, J. concurring in part); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995).  Such diverse conduct must only be intended to be communicative and, "in context," be "reasonably [] understood by the viewer" as such in order to merit constitutional protection. *Masterpiece Cakeshop*, 584 U.S. at 657 (Thomas, J. concurring in part)*; see also Texas v. Johnson,* 491 U.S.397, 404 (1989); *Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

6

In addition, expressive conduct need not convey only "a narrow, succinctly articulable message" or a single "particularized" meaning. *Hurley*, 515 U.S. at 569. Rather, live performances, like other art forms such as music or literature, are susceptible to various different interpretations by audience members – a truism that in no way diminishes their constitutional protection. *Id*. Many of us struggle with James Joyce, for example, but *Ulysses* and *Finnegan's Wake* are no less expressive and no less protected because readers take a wide variety of different messages from them (if we understand them at all!). And as Spectrum points out, live stage performances of all kinds are in the heartland of traditionally protected expressive activity. *See* Spectrum Brf. 21-23.

Turning to this case, Spectrum exists to "make a safe space for LGBTQ+ and ally students on campus as well as provide outreach and education towards the greater community and help improve awareness towards LGBTQ+ issues." ROA.4244. As its president testified, Spectrum puts on drag shows to convey such support and outreach and to visibly challenge traditional gender roles while fundraising for LGBT+ causes:

> [T]he main like underlying message would be messing and manipulating stereotypical gender roles. The next… [is] outreach to the community of West Texas A&M University, interact with other students, show a building of like conversations with those students, towards leading to LGBTQ+ rights. And finally, we wanted to raise money for the Trevor Project as a charity goal.

ROA.4250-51.

7

### A. A Spectrum Drag Show Would Express Support for LGBT+ Culture and Equality and the Gay and Transgender Community

All Spectrum need show is that its drag performance will be understood by viewers to "say[] *something*," as *Hurley* and other cases confirm. Spectrum Brf. 24 (emphasis in original). But in fact, a drag show communicates easily intelligible messages. First, drag is an art form unmistakably linked with the LGBT+ community, which originated it. Consequently, Spectrum's planned drag show is intended to convey and would be received as a message of solidarity and affinity with that community as well as an endorsement of LGBT+ culture and equality.

While men impersonating women on stage dates to Shakespearean theater if not ancient Greece, the drag familiar to contemporary Americans is deeply rooted in gay and transgender life over the last few decades.[3] "Modern-day drag grew in the 1970s and 80s" in so-called "house balls" in New York and other cities, where LGBT+ performers could express themselves freely and cultivate devoted followings.[4] In her 1972 book, *Mother Camp: Female Impersonators in America*,

---

[3] *See* Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES, June 29, 2022, https://www. psychiatrictimes.com/view/the-joy-of-drag; Emily Martin, *From Police Raids to Pop Culture: The Early History of Modern Drag*, NAT'L GEOGRAPHIC, June 2, 2023, https://www.national geographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture.

[4] Shelton, *supra* note 3; Thaddeus Morgan, *How 19th-Century Drag Balls Evolved into House Balls, Birthplace of Voguing*, HISTORY, https://www.history.com/articles/drag-balls-house-ballroom-voguing.

*Amicus* Esther Newton, a leading cultural anthropologist and one of the founders of LGBT+ studies, observed: "female impersonators are an integral part of the homosexual subculture."[5]  In those days, before broader acceptance of openly LGBT+ people and gay rights, drag represented "the stigma of the gay world."[6] Straight people interpreted its message as both gay and threatening:

> The framework is that of a normal audience and a perverted performer; the performer knows the audience finds his condition bizarre and/or funny, and he laughs with them at himself.  The straight audience is then relaxed and ready to be entertained.
>
> There is no doubt at all that straight people, on the whole, find the fully costumed drag queen an object of both fright and contempt.[7]

In the 1980s, drag grew and began reaching wider audiences with the emergence of HIV.  As LGBT+ people faced the AIDS crisis, drag performers "became recognized as keepers of the flame of gay culture by a gay population finally proud to acknowledge it *had* a culture."[8]  Drag shows projected self-confidence and frank openness in an otherwise besieged community.[9]  As

---

[5]  Esther Newton, *Mother Camp: Female Impersonators in America* 20 (1979 ed.).

[6]  *Id.* at 3.

[7]  *Id.* at 65.

[8]  Craig Seligman, *You Just Don't Silence a Drag Queen*, TIME, Mar. 23, 2023 (emphasis in original), https://time.com/6265333/drag-queen-political-act/.

[9]  Laurence Senelick, THE CHANGING ROOM: SEX, DRAG AND THEATRE 469 (2000).

important, "drag competitions and performances across the country raised awareness and money for research and treatment."[10]  In 1989, the organization Gay Men's Health Crisis established a large drag ball fundraiser, the Latex Ball, which attracted wide publicity, drew tens of thousands of LGBT+ and straight attendees over the years, and continues to this day.[11]

More recently, LGBT+ people and gay culture enjoy much wider public understanding and acceptance.  As Justice Alito has written, "[f]or most 21st century Americans, it is painful to be reminded of the way our society once treated gays and lesbians… To its credit, our society has now come to recognize the injustice of past practices."  *Bostock v. Clayon Cty.*, 590 U.S. 644, 709, 713 (2020) (Alito, J., dissenting).  In this more tolerant environment, drag communicates an open celebration of LGBT+ identity, culture and art, and many straight observers no longer feel the "fright and contempt" Newton recorded a half century ago.[12]

Rather, drag "seems to send the message that LGBTQIA+ people exist along with messages about the value, dignity, and worth of LGBTQIA+ people.  Drag

---

[10]   Shelton, *supra* note 3.

[11]   Luna Luis Ortiz, *How GMHC's Latex Ball Has Been Promoting LGBTQ+ Health for 30 Years*, ADVOCATE, Mar. 22, 2022, https://www.advocate.com/commentary/2022/3/22/how-gmhcs-latex-ball-has-been-promoting-lgbtq-health-30-years-luna-luis-ortiz; *The Latex Ball 2024*, GMHC, https://gmhc.org/gmhc_events/latex-ball-2024/.

[12]   Newton, *supra* note 5 at 65.

10

performances often also send the message that such people and such views are worth celebrating, promoting, patronizing, and applauding."[13]  This is essentially identical to the point made by GLIB, the Irish-American Gay, Lesbian & Bisexual Group of Boston, and recognized as expressive in *Hurley*: "a contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals."  515 U.S. at 574.

Indeed, beyond simply winning understanding and acceptance, drag has flourished and gone mainstream.  Straight people began "flocking" to performances to signal their approval of LGBT+ culture; "the shows were terrific and hilarious, and they got them.  Camp humor, which had begun as a secret code among a coterie of in-the-know urban gay men, had invaded popular culture.  And so, somehow, had queer people – and middle Americans were giving them a thumbs-up."[14]  Just as drag artists make a positive statement about LGBT+ culture and equality, spectators express their own comprehension and support: "Drag performances also create a unique medium

---

[13]  Mark Satta, *Shantay Drag Stays: Anti-Drag Laws Violate the First Amendment*, 25 GEO. J. GENDER & L. 95, 104 (2023).

[14]  Seligman, *supra* note 8.

11

from which audience members can send messages and convey viewpoints. Standing in line to watch, cheering loudly for, and tipping drag performers are all ways of expressing approval of drag and of the various viewpoints that drag represents."[15]

The best example of drag's broader appeal and the public's comprehension of its message may be "RuPaul's Drag Race." For seventeen seasons, the TV show has popularized drag performers competing against each other before a panel of judges and host RuPaul Charles. The show has reached millions of viewers globally, earned high ratings, won 24 Emmy Awards, and generated multiple spin-offs.[16] It also "shed[s] light on issues important to LGBTQ+ communities, such as HIV, substance abuse, transgender identities, family abandonment and coming out. It has also brought the art of female impersonation into the mainstream."[17] As one

---

[15] Satta, *supra* note 13 at 107.

[16] Jazz Tangcay, *'RuPaul's Drag Race' Blends Art and Politics in a Potent Pop Stew That Continues to Draw Viewers,* VARIETY, Aug. 21, 2024, https://variety.com/2024/artisans/news/rupauls-drag-race-politics-1236109870/; Matt Lavietes and Jay Valle, *Who Belongs in Drag? First Straight Man on 'RuPaul's Drag Race' Reignites Debate*, NBC NEWS, Dec. 9, 2021, https://www.nbcnews.com/nbc-out/out-pop-culture/belongs-drag-first-straight-man-rupauls-drag-race-reignites-debate-rcna8112.

[17] Joshua Nelkin-Zitser, *By Championing Self-Expression, RuPaul's 'Drag Race' Has Encouraged a Generation of Young LGBTQ+ Fans to Come Out*, BUSINESS INSIDER, June 23, 2022, https://www.businessinsider.com/rupauls-drag-race-helped-lgbtq-teens-to-come-out-2021-1.

performer who tracks the show put it, drag is now "a celebration of LGBTQ+ Pride."[18]

Considering the past and present of drag as an important feature of LGBTQ+ culture, the interlocutory appeal panel correctly concluded that "a drag show can communicate a message of solidarity and support for the LGBT+ community." *Spectrum*, 151 F.3d at 725. That is particularly true when it comes to Spectrum's show, since it would have raised money for the Trevor Project, a nonprofit that supports LGBT+ youth. See *Spence*, 418 U.S. at 410 ("context may give meaning to the symbol"); *Spectrum*, 151 F.3d at 726 ("context [is] dispositive"). Most other courts to consider the question have also seen drag performances this way. *See* Spectrum Brf. 25 n. 4 (citing cases). They recognize that shows "reflect the historical and current importance of drag performance in the LGBTQ+ community;"[19] that drag is a form of activism conveying political and social messages about "self-expression, gender stereotypes and roles, and LGBTQIA+

---

[18]   Lavietes and Jay Valle, *supra* note 16.

[19]   *Naples Pride, Inc. v. City of Naples*, 2025 WL 1370174 at ** 1-2, 10 (M.D. Fl., May 12, 2025), *stay granted on other grounds*, 2025 WL 2382975 (11th Cir., June 6, 2025) (staying district court order because city ordinance governing open air performances based solely on public safety, not nature of performance or viewpoint).

identity;"[20] and that there are "often political, social, and cultural messages involved in drag performances."[21]

The district court acknowledged that "Spectrum desires to support the LGBT community through its drag show, in part by raising money for the Trevor Project." ROA.3877. Yet it rejected Spectrum's argument that its show would actually succeed in communicating such support to attendees. ROA.3863-64. Initially, the court found that, "without a specific connection to the content of the drag show, merely raising money for charity does not correlate or connect the 'message' dots." ROA.3863. The court analogized to bands that donate to various charities, such as Billie Eilish allocating concert proceeds to an environmental group. *Id*. and n. 11.

As discussed above, however, drag emerged from the LGBT+ community decades ago and the entire art form, then and now, embodies and champions LGBT life and culture. That is widely understood given the spotlight on drag shined by popular shows like RuPaul's Drag Race and recent cultural and political controversies over drag performances. *See* Point C, *infra*. More specifically, drag shows have long fundraised for and supporting LGBT+ causes, as would have happened here and as witnessed by the Latex Ball, which began in 1989 and is still

---

[20] *Southern Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1286 (D. Utah 2023).

[21] *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 844 (S.D. Tex. 2023), *rev'd on other grounds*, 168 F.4th 293 (5th Cir. 2026) (reversing for lack of standing).

14

going strong. *See* p. 10, *supra*. The longtime connection between drag and LGBT charities is therefore nothing like a musician playing her usual set and donating proceeds to a nonprofit to which she has no other obvious or publicly known link. The interlocutory appeal panel was right to give weight to the fact that Spectrum's show was "sponsored by LGBT+ student organizations and designed to raise funds for an LGBT+ suicide-prevention charity," and to consequently conclude that, "[a]gainst this backdrop, the message sent… would have been unmistakable." *Spectrum*, 151 F. 4th at 726.

Second, the district court rejected the argument that Spectrum's show would convey a broader "message of acceptance and support or the 'LGBT community.'" ROA.3863. "*All* of Spectrum's events can be said to convey a message of acceptance and support for the LGBT community," the court reasoned, so the message is too "generalized." *Id.* (emphasis in original). Yet the court never explained why it matters that Spectrum's other events would also transmit a message of support for LGBT+ people. Suppose all Spectrum's programs do? No authority suggests an artist, performer or sponsoring organization only gets a certain number of events each year before they cease to be expressive and constitutional guarantees evaporate. The First Amendment doesn't ration its protection this way. Nor does it matter that, in theory, some other conduct by the same organization might not be sufficiently expressive, such that the caution

15

quoted by the district court from *O'Brien* about a "limitless variety of conduct" qualifying for protection might apply. ROA.3863-64 (*quoting United States v. O'Brien*, 391 U.S. 367, 376 (1968)). The only question here is whether *the drag show at issue* would have constituted expressive activity, not whether everything else Spectrum does would.

In sum, no viewer would have failed to grasp the promotion and espousal of LGBT+ art, culture, and acceptance transmitted by Spectrum's show had Wendler permitted it. It was therefore protected by the First Amendment.

### B.    Spectrum's Show Would Also Communicate a Message About Gender Identity and Fluidity

Spectrum's proposed show would also present a more specific message than simply celebrating one important facet of LGBT+ culture – it would controversially suggest that gender isn't necessarily immutable and that sex-related stereotypes aren't always accurate or uniformly obeyed. As noted above, Spectrum specifically intended to communicate this idea, too, as its "main… underlying message." *See* p. 7, *supra*. And as the interlocutory appeal panel rightly recognized, drag represents a "deliberate and theatrical subversion of gender-based expectations." *Spectrum*, 151 F. 4th at 725-26.

By definition, drag shows upend gender norms by depicting performers costumed as and behaving like members of the opposite sex. Merriam-Webster Dictionary actually defines drag as "entertainment in which performers caricature

16

or *challenge gender stereotypes* (as by dressing in clothing that is stereotypical of another gender, by using exaggeratedly gendered mannerisms, or by combining elements of stereotypically male and female dress) and often wear elaborate or outrageous costumes."[22]

Put differently, drag inherently defies sex roles and gender norms by communicating that what appears normal and expected can actually be altered. This was apparent when Newton completed her groundbreaking study of drag performers in 1972 and remains true today. "Anthropologists say that sex-role behavior is learned," Newton wrote, adding: "The gay world, via drag, says that sex-role behavior is an appearance; it is an 'outside.' It can be manipulated at will."[23] In this sense, another commentator notes, drag "plays with, and often violates, norms of gender expression."[24] When drag artists "misperform their gender… they are exposing gender as a construction."[25] Some people are "burdened" by gender-related norms and "expectations" and therefore seek escape

---

[22] *Drag*, MERRIAM-WEBSTER (emphasis added), https://www.merriam-webster.com/dictionary/drag; *see also* Eliot Tracz, *Drag: Art. Obscenity. Crime*, 23 CONN. PUB. INT. L.J. 2024, 49 (2024) (citing definition).

[23] Newton, *supra* note 5 at 103.

[24] Satta, *supra* note 13 at 97-98.

[25] Jennifer Minear, *Performance and Politics, An Argument for Expanded First Amendment Protection of Homosexual Expression*, 10 CORNELL J. L. PUB. POL'Y 601, 624 (2001).

17

through drag. *Spectrum*, 151 F.4th at 726. Consequently, drag artists are necessarily "transgressive, challenging gender hierarchies through the idea that '*all* expressions of gender could be worthy and useful.'"[26] Spectrum's president explained drag in similar terms:

> "Generally it involves messing or manipulating like what are considered gender norms. And either breaking them or changing them to fit whatever message you're trying to convey as a drag performer….
>
> [N]ormally you'll – what people seem to take as stereotypical drag would be a man dressing up as – women. But we also have women who dress up as men. We have cis men and women dressing up as their own like drag kings and drag queens. And we also have nonbinary people dressing up as nonbinary royalty. So those are like the manipulations.

ROA.4247-48.

The proposition that gender might be mutable also has specifically political resonance today, as discussed more fully below, further cementing drag's expressiveness. For example, one district court recently emphasized "current political events and discussions" as a reason why the performance at issue there was "indisputably protected speech." *Southern Utah Drag Stars*, 677 F. Supp. 3d at 1286. The court quoted a performer who testified that drag transmits "a valuable political message…. that individuals with gender presentation and identities

---

[26]  Tracz, *supra* note 19 at 50 (*quoting* Sasha Velour, *The Big Reveal: An Illustrated Manifesto of Drag* 11 (2023)) (emphasis added).

18

outside the majoritarian norm are welcome in public places." *Id*. RuPaul Charles

has been quoted making the same point:

> "Drag challenges the status quo," RuPaul told HuffPost. "It's always challenged the matrix – the matrix being choose an identity and stick with it the rest of your life because that's how we want to sell products to you, so we'll know who you are and can put you in a box and then sell you beer and shampoo. Well, drag says 'I'm a shapeshifter, I do whatever the hell I want at any given time.' And that is very, very political."[27]

As with the message that drag supports the LGBT+ community, drag's

provocative message about defying gender norms has also been found to be

expressive by other courts. "Performing a male or feminine persona that expresses

a view about masculinity or femininity is… expressive activity." *Imperial*

*Sovereign Court of Montana v. Knudsen*, 170 F. 4th 820, 855 (9th Cir. 2026);

*Friends of George's, Inc. v. Mulroy*, 675 F. Supp. 3d  831, 865 (W.D. Tenn. 2023);

*rev'd on other grounds*, 108 F.4th 431 (6th Cir. 2024) (reversing for lack of

standing).

The district court dismissed this argument for expressiveness, deciding that

"[n]ot all drag show performances convey a message of gender bending that would

be understood by those who view it." ROA.3864. To support this conclusion, the

court dissected two prior Spectrum events and stressed that one performer at the

---

[27]   James Michael Nichols and Cole Delbyck, *"RuPaul's Drag Race" is Leaving TV's Biggest Gay Network – Now What?*, HUFFPOST, March 23, 2017, https://www.huffpost.com/entry/rupauls-drag-race-logo-vh1_n_58d1b0bce4b0b22b0d17f9aa.

2023 off-campus drag show appears simply to be dancing and stripping, and that one performer at a different event in 2025 "simulated 'BDSM' sex acts." ROA.3864-65. The 2023 event featured multiple drag performers, however, not just the one woman the court views as merely "dancing and stripping," while the 2025 event wasn't even a drag show at all. ROA.12521 (showing all performers at 2023 event); ROA.3865 (describing 2025 show as lip-synching event). More important, the court's conclusion ignores the clear teaching of *Hurley*, which confirms that perfect, singular, on-message consistency within a performance isn't necessary: "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." 515 U.S. at 569.

Rather than strain to draw prospective conclusions from two of several performers at past events – one of which wasn't a drag show – the court should have credited testimony from Spectrum's witnesses about what the disallowed program would actually have featured and communicated: performers whose acts would have challenged gender norms, as drag typically does. *See* p. 7, *supra*. Under the First Amendment, Spectrum may shape and define its own speech without creative judicial reinterpretation. *See, e.g., Boy Scouts of America v. Dale*, 530 U.S. 640, 653 (2000) (courts must "give deference to an association's assertions regarding the nature of its expression" as well as its "view of what

20

would impair its expression"). Nor is there merit in the court's point that, "without added contextual clues, the reasonable observer" of the 2023 show "might infer that a sexually-oriented business was publicly protesting the Red Light zoning ordinance." ROA.3864-65. As the interlocutory appeal panel stressed, there *are* obvious contextual clues here: an LGBT+ organization hosting an event for an LGBT+ charity. *See* p. 13, *supra*.

The idea of gender fluidity is therefore a second and more specific meaning attendees would absorb by witnessing a Spectrum show.

### C. Wendler's and Other Officials' Statements About Drag and Changing Genders Confirm That Drag is Expressive

Perhaps the best evidence that Spectrum's drag show would be expressive is the fact that Wendler plainly saw it that way. That's why he nixed it – because of the negative statement he thought it would make. Other government officials have also condemned drag because of its perceived message, eliminating any doubt that drag is expressive conduct.

Wendler cancelled the Spectrum show because, as he emailed the West Texas A&M community in 2023 when this controversy first arose, he believes "drag shows denigrate and demean women." ROA.4439. "As a performance exaggerating aspects of womanhood (sexuality, femininity, gender)," Wendler explained, "drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood." ROA.4437. To

21

Wendler, in other words, drag is "demoralizing misogyny" that transmits a clear and inescapable message: contempt for women and femininity. ROA.4438. While *amici* respectfully disagree with Wendler's view of drag, its accuracy is beside the point. All that matters is that Wendler perceived a specific social message and stifled that message because of its content.

More generally, there is a "passionate political and social debate in our society" that has "spilled over into the broader political arena" over drag and closely related questions like whether gender can be conceived of as chosen or fluid. *Defending Education v. Olentangy Local Sch. Dist. Bd. of Ed.*, 158 F.4th 732, 754 (6th Cir. 2025) (*en banc*); *accord Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2020) (noting "contentious political debate"). This Court has recognized the existence of this public controversy and therefore counseled official neutrality. *See United States v. Varner*, 948 F.3d 250, 256 (5th Cir. 2020) ("Increasingly, federal courts today are asked to decide cases that turn on hotly debated issues of sex and gender identity").

In addition, high-ranking Texas officials besides Wendler have joined the political and social debate over gender identity in recent years and specifically condemned drag for the message it sends. Governor Abbott called the cancelled

22

2023 Spectrum show "indoctrinat[ion]."[28]  How can drag indoctrinate viewers if it expresses nothing?[29]  Attorney General Ken Paxton has called drag shows events "where men pretending to be women engage in obscene, offensive, and degrading behavior… [and] vulgar assaults on our values."[30]  Lieutenant Governor Dan Patrick similarly called drag an example of the "radical Left's degradation of our society and values,"[31] while the Texas senator who sponsored a bill banning drag shows open to minors critiqued them for "expos[ing] children to issues of sexuality and identity."[32]  With this much *amici* agree: drag shows do express a particular viewpoint about "issues of sexuality and identity."

---

[28]  Giulia Carbonaro, *Greg Abbott Issues Blistering Response to Drag Show Ban Controversy*, NEWSWEEK, March 16, 2024, https://www.newsweek.com/greg-abbott-issues-blistering-response-drag-show-ban-controversy-1879949.

[29] *See, e.g.*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/ us/dictionary/English/indoctrination (defining "indoctrination" as "the process of repeating an idea or belief to someone until they accept it without criticism or question").

[30]  Office of the Texas Attorney General, *Press Release: Attorney General Ken Paxton Defends Texas A&M's Ban on Drag Shows Against Lawsuit from Left-Wing Group*, March 14, 2025, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-defends-texas-ams-ban-drag-shows-against-lawsuit-left-wing-group.

[31]  Office of the Lt. Governor, *Press Release: Lt. Gov. Dan Patrick: Statement on the Passage of Senate Bill 12 – Banning Children's Exposure to Drag Shows*, April 5, 2023, tgov.texas.gov/2023/04/05/lt-gov-dan-patrick-statement-on-the-passage-of-senate-bill-12-banning-childrens-exposure-to-drag-shows/#:~:text=Lt.,Shows%20 %20Lieutenant %20Governor%20Dan% 20Patrick.

[32]  Sergio Martinez-Beltran, *Texas Panel Debates Measure That Would Prohibit Drag Performances in Front of Minors*, KUT NEWS, March 23, 2023, https://www.kut.org/politics/2023-03-23/texas-senate-panel-debates-measure-that-would-prohibit-drag-performances-in-front-of-minors.

Texas and federal officials have also condemned the larger concept of gender as mutable or fluid, which, as discussed above, is central to drag. As the district court noted, Governor Abbott has stressed that Texas "recognizes only two sexes." ROA.3846. A federal executive order does likewise and criticizes "gender ideology." ROA.3846. The federal government's view on the immutability of gender has further been expressed through a wide range of policies implemented after the Trump Administration took office.[33]

Of course, all "voices in these debates raise sincere concerns," and "the implications for all are profound." *United States v. Skremetti*, 145 S. Ct 1816, 1837 (2025). People of good will strongly agree with state and federal officials on these topics, just as others ardently agree with the other side. *See, e.g., Defending Education,* 158 F.4th at 753-54. The point is only that drag is a recognized and fully understood part of this ongoing public dialogue. And the contextual expressiveness of drag shows like the one Spectrum planned is heightened and confirmed by the existence of this lively debate. As one commentator has written,

---

[33] These include an executive order barring transgender service members, Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb. 23, 2025); the State Department's policy requiring passports to reflect sex assigned at birth rather than sex later adopted by the passport holder, *see Trump v. Orr*, 146 S. Ct. 44 (2025); and various new policies instituted by the Department of Education, *see, e.g.*, Brooke Schultz, *Ed Dept. Imposes Funding Restrictions for 5 Districts Over Transgender Policies*, EDUC. WEEK, Aug. 19, 2025, https://www.edweek.org/policy-politics/ed-dept-imposes-funding-restrictions-for-5-districts-over-transgender-policies/2025/08.

everyone knows full well what drag is saying in the current atmosphere, whether they agree or disagree:

> Put simply, everything about drag – the definition, makeup, hair, costuming, performance, and even its opposition – stems from its inherent viewpoint about gender nonconformity and expression. It seems that everyone, proponents and opponents alike, are on the same page that drag contains a viewpoint about gender nonconformity. They differ, though, as to whether that viewpoint – expressed through a *particular* form of expressive conduct (drag) – should be shared with others.[34]

## II.    Wendler's Suppression of Spectrum's Show is Clear Viewpoint Discrimination

Lastly, Wendler's candid acknowledgment that he cancelled Spectrum's planned drag show because he believes it would have demeaned women confirms that he committed constitutionally forbidden viewpoint discrimination.

Restricting speech because the ideas communicated offend those doing the censoring – as Wendler was offended by drag – is clearly proscribed by the First Amendment. *See Matal v. Tom*, 582 U.S. 218, 244 (2017) ("the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers" (quotation removed)); *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 828 (1995) ("government may not regulate speech based on its substantive content or the message it conveys"). The district

---

[34]    Brett V. Ries, *Don't Be a Drag: How Drag Bans Can Violate the First Amendment*, 33 TUL. J. LAW & SEX. 1, 13 (2025) (emphasis in original).

court correctly noted that, if Wendler did act based on Spectrum's message, he cannot prevail. ROA.3879 ("The government may not discriminate based on viewpoint, no matter the forum").

Yet Wendler's viewpoint discrimination is plain as day. He can hardly tell students that he is prohibiting a drag show because it broadcasts disrespect for women and still somehow pretend he isn't squelching it because of its message. Indeed, to his credit, he initially didn't try to hide this ball and conceded that his decision likely violated the law. *See* p. 4, *supra*; ROA.4439. As Judge Rosenthal wrote of a parallel situation: "The fact that the Board justifies its ban on drag shows by saying it aligns with the rejection of a certain ideology belies the Board's contrary position that the ban is viewpoint neutral." *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 806 (S.D. Tex. 2025), *reh'g ordered*, 179 F.4th 314 (5th Cir., June 22, 2026).

Even beyond drag performances, other courts have found that suppressing speech on the topic of gender mutability constitutes viewpoint discrimination at odds with the First Amendment. *See, e.g., Defending Education,* 158 F.4th at 754-56; *Meriwether*, 992 F.3d at 517. If teachers' use of one or another pronoun is protected expression on the important question of how to regard gender identity, *see id.*, the same is true of an artistic performance by an LGBT+ student group exploring the same question.

Resisting the inevitable conclusion that Wendler engaged in viewpoint discrimination, the district court notes that he has never otherwise penalized Spectrum and supports donating to the Trevor Project. ROA.3877-78. This means, the court concluded, that "Wendler takes issue not with the ideas Spectrum wishes to express, but the way they would do it: by denigrating West Texas A&M's female students." *Id.*

As Spectrum correctly argues, however, this doesn't cure the problem. *See* Spectrum Brf. 40-41. The reason why is that protection of expressive conduct doesn't hinge on whether government decisionmakers believe there is a kinder and gentler way to make the speakers' point. Said differently, the First Amendment – fortunately – bars government from dictating the medium and method by which we can express ourselves. Were it otherwise, offensive and even profane speech like flag burning, stalking a private memorial, or neo-Nazis marching through Skokie could be curtailed because the speaker could have used more decorous ways of communicating, like giving a respectful speech at a public meeting or writing a thoughtful Op-Ed. Yet free speech may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Johnson*, 491 U.S. at 408-09 (cleaned up). To reprise Justice Thomas, "symbolism is a primitive but effective way of communicating ideas," *Masterpiece Cakeshop*, 584 U.S. at 656, and "speech cannot be restricted

27

simply because it is upsetting or arouses contempt." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). In *Snyder*, for instance, Westboro Baptist Church members picketing a serviceman's private funeral with anti-LGBT signs enjoyed core First Amendment protection for their message "in the whole context of *how and where* [they] chose to say it." *Id*. at 458 (emphasis added). Here too, Spectrum retained the First Amendment right to decide for itself how and where to communicate support for LGBT+ life and challenge accepted views on gender. Wendler's disapproval of Spectrum's show was therefore viewpoint discrimination regardless of how he might have treated a different form of expression that he prefers to drag shows. As the Sixth Circuit held in rejecting this exact argument in *Defending Education*: "the fact that people may speak in other ways does nothing to eliminate the viewpoint discrimination." 158 F. 4th at 756.

28

## Conclusion

Spectrum's proposed drag show is expressive conduct fully protected from viewpoint discrimination by the First Amendment. Accordingly, the Court should reverse the district court's decision allowing Wendler to prohibit it.

July 24, 2026                           Respectfully Submitted,


                                        s/ *Martin J. Siegel*
                                        Martin J. Siegel
                                        LAW OFFICES OF
                                           MARTIN J. SIEGEL, P.C.
                                        2222 Dunstan Road
                                        Houston, Texas 77005
                                        Telephone: (281) 772-4568
                                        Email: Martin@Siegelfirm.com

                                        *Attorneys for Amici Curiae*

29

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2026, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing brief on all registered counsel of record via the Court's ECF Filing system.

s/          *Martin J. Siegel*
Martin J. Siegel

30

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. Civ. P. 32(a)(7)(B) because this brief contains 6,347 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief is printed in a proportionally spaced typeface using the Microsoft Word 2004 for Mac, Version 11.5.6, program in 14 point, Times New Roman font in body text and 12 point, Times New Roman font in footnote text.

s/          *Martin J. Siegel*          
Martin J. Siegel

Dated:  July 24, 2026