**No. 26-10127**

**In the United States Court of Appeals for the Fifth Circuit**

SPECTRUM WT
*Plaintiff-Appellant*

v.

WALTER WENDLER, in his official capacity as the President of West Texas A&M University,
*Defendant-Appellee*

On Appeal from the United States District Court for the Northern District of Texas in No. 2:23-CV-48, Honorable Matthew Joseph Kacsmaryk, U.S. District Judge

# EN BANC BRIEF OF *AMICI CURIAE* NATIONAL COALITION AGAINST CENSORSHIP, DRAMATISTS GUILD OF AMERICA, WOODHULL FREEDOM FOUNDATION, FREEDOM TO READ FOUNDATION, AMERICAN BOOKSELLERS ASSOCIATION, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, COMIC BOOK LEGAL DEFENSE FUND, AUTHORS GUILD, AND FASHION LAW INSTITUTE IN SUPPORT OF APPELLANT AND REVERSAL

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

***Attorneys for Amici Curiae***

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

1. No. 26-10127, *Spectrum WT v. Walter Wendler*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellant's Certificate of Interested Persons and in the Certificates of Interested Persons of the other *Amici Curiae*—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

***Amici Curiae***
National Coalition Against Censorship
Dramatists Guild of America
Woodhull Freedom Foundation
Freedom to Read Foundation
American Booksellers Association
Americans United for Separation of Church and State
Comic Book Legal Defense Fund
Authors Guild
Fashion Law Institute

***Attorneys for Amici Curiae***
Peter B. Steffensen
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275-0116

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305

No publicly traded company has an ownership interest of 10% in the entities listed above.

Respectfully submitted,

*/s/ Peter B. Steffensen*
*Attorney of Record for Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .......................2

TABLE OF CONTENTS .......................................................................................4

TABLE OF AUTHORITIES ..................................................................................5

STATEMENT OF AMICI CURIAE ......................................................................8

INTRODUCTION ...............................................................................................12

ARGUMENT .......................................................................................................14

I. The Doctrine of Prior Restraint Imposes Strict Censorship Guardrails. .....15

II. President Wendler's Repeated Cancellations of Spectrum WT's Drag Shows Were Unconstitutional Prior Restraints. ..........................................17

III. Compared to *Healy* and *Widmar*, *CLS Hastings* is a Poor Fit. ....................25

CONCLUSION ....................................................................................................29

CERTIFICATE OF SERVICE .............................................................................30

CERTIFICATIONS UNDER ECF FILING STANDARDS .................................31

CERTIFICATE OF COMPLIANCE ....................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)....................15, 16

*Brooks v. Auburn Univ.*,
412 F.2d 1171 (5th Cir. 1969)....................18

*Chiu v. Plano Indep. Sch. Dist.*,
339 F.3d 273 (5th Cir. 2003)....................15, 16

*Christian Legal Soc'y Ch. of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
561 U.S. 661 (2010)....................25, 27, 28

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988)....................13, 19

*Forsyth Cty., Ga. v. Nationalist Movement*,
505 U.S. 123 (1992)....................23

*Freedman v. Maryland*,
380 U.S. 51 (1965)....................24

*Freedom from Relig. Found., Inc. v. Abbott*,
955 F.3d 417 (5th Cir. 2020)....................15, 18, 22

*Gay Student Servs. v. Tex. A&M Univ.*,
737 F.2d 1317 (5th Cir. 1984)....................17, 27

*Healy v. James*,
408 U.S. 169 (1972)....................passim

*Heffron v. ISKCON*,
452 U.S. 640 (1981)....................23

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*,
515 U.S. 557 (1995)....................24

*Iancu v. Brunetti*,
588 U.S. 388 (2019)....................13, 22

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967)....................17

*Matal v. Tam*,
582 U.S. 218 (2017)....................20, 21

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ........ 20

*Near v. Minn. ex rel. Olson*,
283 U.S. 697 (1931) ........ 15

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ........ 14, 16

*Org. for a Better Austin v. Keefe*,
402 U.S. 415 (1971) ........ 16

*Pitt. Press Co. v. Pitt. Comm'n on Human Relations*,
413 U.S. 376 (1973) ........ 16

*Pro-Life Cougars v. Univ. of Hous.*,
259 F. Supp. 2d 575 (S.D. Tex. 2003),
*appeal dismissed*, 67 F. App'x 251 (5th Cir. 2003) ........ 15

*Schneider v. State*,
308 U.S. 147 (1939) ........ 28

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) ........ passim

*Shelton v. Tucker*,
364 U.S. 479 (1960) ........ 17

*Staub v. City of Baxley*,
355 U.S. 313 (1958) ........ 15

*Texas A&M Queer Empowerment Council v. Mahomes*,
772 F. Supp. 3d 792 (S.D. Tex. 2025),
*appeal docketed*, No. 25-20108 (5th Cir. Apr. 2, 2025) ........ 23

*Thornhill v. Alabama*,
310 U.S. 88 (1940) ........ 23

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ........ 15

*United States v. Assoc. Press*,
52 F. Supp. 362 (S.D.N.Y. 1943) ........ 17

*Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*,
452 F.2d 564 (5th Cir. 1971) ........ 17

*Widmar v. Vincent*,
454 U.S. 263 (1981) ........ 17, 24, 26, 27

**Other Authorities**

Eugene Volokh, "Fifth Circuit: West Texas A&M Violated First Amendment by Blocking Student Group's Drag Show," The Volokh Conspiracy (Aug. 18, 2025), https://perma.cc/C5AX-Q88G ........................................................................ 22

Stephen R. Barnett, *The Puzzle of Prior Restraint*, 29 Stan. L. Rev. 539 (1977) ........................................................................ 15

Tony Horkins, "Exclusive: Stiller Talks Tropic Thunder," Empire (Mar. 18, 2008), https://web.archive.org/web/20120120063111/http://www.empireonline.com/news/story.asp?NID=22188 ........................................................................ 20

## STATEMENT OF AMICI CURIAE[1]

The **National Coalition Against Censorship** (NCAC) is an alliance of more than 60 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC's mission is to protect freedom of thought, inquiry, and expression and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of authors, readers, publishers, booksellers, teachers, librarians, artists, students, and others. NCAC is dedicated to defending robust First Amendment protections of the public's access to art, literature, and culture. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The **Dramatists Guild of America** is the only professional organization promoting the interests of playwrights, composers, lyricists, and librettists writing for the stage. Established over 100 years ago for the purpose of aiding dramatists in protecting both the artistic and economic integrity of their work, The Dramatists Guild of America continues to educate, and advocate on behalf of, its over 8,000 members. The Dramatists Guild of America believes a vibrant, vital theater is an

---

[1] No party's counsel authored this brief in whole or in part. No party, or party's counsel, made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici curiae* or their counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for *amici curiae* conferred with counsel for the parties via email on July 21, 2026, and no party opposes the filing of this brief.

essential element of this country's ongoing cultural debate, and seeks to protect those individuals who write for the theater to ensure its continued success.

The **Woodhull Freedom Foundation** (Woodhull) is a non-profit group dedicated to affirming sexual freedom as a fundamental human right. It regularly advocates for sexual freedom in the courts, legislatures, and the public sphere. Woodhull is particularly concerned with governmental censorship of sexual expression against LGBTQ+ individuals using a prior restraint such as occurred in this case.

The **Freedom to Read Foundation** was established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections, and make available, any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect, and individuals to access, information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The **American Booksellers Association** (ABA) was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed. ABA represents 3,417 bookstore companies operating in 3,783 locations. ABA's core members are key participants in their

communities' local economy and culture. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, local first, and free expression advocacy, emphasizing the rights of booksellers to freely curate books and events.

**Americans United for Separation of Church and State** is a nonpartisan, not-for-profit educational and advocacy organization that brings together people of all religions and none to protect the right of everyone to believe as they want and stop anyone from using their beliefs to harm others. We fight in the courts, legislatures, and the public square for freedom without favor and equality without exception. We regularly file lawsuits and submit amicus briefs to defend the Constitution, the rule of law, and our cherished American principle of the separation of religion and government. Opposing religiously based censorship has been part of AU's mission since its earliest days.

The **Comic Book Legal Defense Fund** (CBLDF) is a nonprofit organization dedicated to protecting the legal rights of the comic arts community. With a membership that includes creators, publishers, retailers, educators, librarians, and fans, the CBLDF has litigated First Amendment cases in courts across the United States and led important educational initiatives promoting all forms of free expression through the comic arts, including the right to cosplay.

The **Authors Guild** was founded in 1912, and is a national non-profit association of more than 18,000 professional, published writers of all genres. The Guild counts historians, biographers, academicians, journalists, poets, translators, and other writers of non-fiction and fiction as members. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, fighting censorship, and taxation. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. One of the Authors Guild's primary areas of advocacy is to protect the free expression rights of authors.

The **Fashion Law Institute**, a nonprofit organization and the world's first academic center dedicated to the law and business of fashion, was founded by Professor Susan Scafidi with the assistance of the Council of Fashion Designers of America and its then president, Diane von Furstenberg, and is headquartered at Fordham Law School.

## INTRODUCTION

Drag performance has a long and varied history, tracing its roots from Ancient Egypt and Greece, through the Shakespearean era in Europe and Kabuki art in Japan. As modern forms of drag performance have evolved to serve as explicitly political art—expressing solidarity for queer communities and standing against censorship and rigid gender roles—so, too, have unlawful attempts to silence or ban them. This case is an egregious example of this trend. Appellant Spectrum WT has twice planned a PG-13 charity drag show in West Texas A&M University's Legacy Hall to convey a message of support for the LGBTQ+ community. Appellee Walter Wendler has twice intervened to cancel the show because of his personal belief—his viewpoint—that drag shows are offensive to women. Even though President Wendler has freely acknowledged that "the law of the land appears to require" that he tolerate Appellant's drag show, ROA.3852, he has repeatedly wielded his power as WTAMU's highest official to prevent Spectrum WT's drag show from happening.

Wendler's motivations for censoring Spectrum WT's drag shows are viewpoint discriminatory to their core. In multiple public statements explaining his reasoning, Wendler has doubled down on his belief that drag shows "stereotype women in cartoon-like extremes[,]" that they are "derisive, divisive and demoralizing misogyny," and that they "caricature womanhood as a 'purely sexual experience.'" ROA.3851-52. Put simply, Wendler understands drag performances

to convey a message to which he takes offense, and on that basis alone cancelled Spectrum WT's performances before they could be staged.

The trial record further makes President Wendler's viewpoint-based intent clear as day. Wendler testified that he did not interpret student protestors "*walking* in drag" to carry the same offensive meaning he derives from a drag *performance*. ROA.3852, 3886. He thus permitted the protest to proceed, while still insisting that the performance was impermissible. But singling out messages for differential treatment based on their perceived offensiveness is inherently a form of viewpoint discrimination—a principle which should be dispositive here. *See Iancu v. Brunetti*, 588 U.S. 388, 395 (2019) (viewpoint discrimination occurs when denying trademark registration to offensive marks while approving marks "expressing more accepted views on the same topics").

President Wendler's repeated decisions to cancel Spectrum WT's drag shows are the inevitable result of policies which lacked "narrow, objective, and definite standards to guide" Wendler in his decision-making. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Those guardrails are intended to protect against the kind of official overreach that President Wendler exercised here, and which consequently silenced Spectrum WT's speech and chilled the speech of others. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) ("[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior

restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.”).

Having denied Spectrum WT “use of a forum in advance of actual expression[,]” *Conrad*, 420 U.S. at 553, President Wendler had the heavy burden to overcome the presumption of unconstitutionality that attached to the prior restraints he imposed. He failed to carry that burden at trial, and the district court should have concluded Spectrum WT succeeded on its prior restraint claim, and permanently enjoined Wendler on that basis. As explained further below, the judgment of the district court should be reversed.

## ARGUMENT

Appellant’s prior restraint claim provides an independent, compelling basis for reversal. The doctrine of prior restraint is concerned with preventing arbitrary exercises of official discretion which stop the exercise of speech in its tracks. That makes a prior restraint “the most serious and the least tolerable infringement on First Amendment rights.” *Neb. Press Ass’n v. Stuart*, 427 U.S. 539, 559 (1976). And it is why licensing schemes which require official pre-authorization before speakers are given access to a forum must be governed, at a minimum, by “narrow, objective, and definite standards to guide” official decisionmakers—qualities which were entirely lacking here. *Conrad*, 420 U.S. at 553.

## I. The Doctrine of Prior Restraint Imposes Strict Censorship Guardrails.

President Wendler's targeted, ex ante decision to twice bar Spectrum WT's drag show out of dislike for its potential message is a "classic" example of a prior restraint, because it commits the very sin the doctrine is meant to guard against—"regulating speech contingent on the will of an official[.]" *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) (citing *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958)). Wendler's cancellation of Spectrum WT's drag shows was unmoored from any objective standards which constrained him from acting on the basis of viewpoint, a fact to which he freely admitted. ROA.3851-52, 3853-54; *see Freedom from Relig. Found., Inc. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020).

A prior restraint prevents speech—including a publication,[2] an act of protest,[3] or a work of performance art[4]—from ever entering the marketplace of ideas, regardless of its perceived value. *See* Stephen R. Barnett, *The Puzzle of Prior Restraint*, 29 Stan. L. Rev. 539, 543 (1977) ("[T]he doctrine focuses on the form or method of the restraint instead of the substance of the speech (or conduct)."). It is an

---

[2] *Near v. Minn. ex rel. Olson*, 283 U.S. 697, 704-05 (1931); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70-71 (1963).

[3] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 510 (1969) (explaining that "the action of the school authorities appears to have been based upon an urgent wish to avoid the controversy which might result from the expression"); *see also Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575, 582-85 (S.D. Tex. 2003), *appeal dismissed*, 67 F. App'x 251 (5th Cir. 2003).

[4] *Conrad,* 420 U.S. at 553 ("[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use.").

"immediate and irreversible sanction" that "freezes" speech in place, "at least for the time." *Neb. Press*, 427 U.S. at 559; *Conrad*, 420 U.S. at 553 (a trait common to all prior restraints is that they give "public officials the power to deny use of a forum in advance of actual expression."); *see also Pitt. Press Co. v. Pitt. Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) ("The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.").

Accordingly, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books*, 372 U.S. at 70. That "heavy presumption" places a "heavy burden" on the official enforcing the restraint to justify its imposition. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Chiu*, 339 F.3d at 281 (quoting *Conrad*, 420 U.S. at 553).

These requirements apply with equal force to facilities on public university campuses. *Healy v. James*, 408 U.S. 169, 184 (1972). As the Supreme Court has long held, the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* at 180 (quoting *Shelton v. Tucker*,

364 U.S. 479, 487 (1960)); *see also Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" (quoting *United States v. Assoc. Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943))).

Thus, "[w]hen [a] restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint[.]" *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (quoting *Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*, 452 F.2d 564, 566 (5th Cir. 1971)). Consequently, the "'denial [to particular groups] of use of campus facilities for meetings and other appropriate purposes' must be subjected to the level of scrutiny appropriate to *any* form of prior restraint." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) (emphasis added).

## II. President Wendler's Repeated Cancellations of Spectrum WT's Drag Shows Were Unconstitutional Prior Restraints.

President Wendler's repeated decisions to bar Spectrum WT's charity drag shows exhibited all the hallmarks of an unconstitutional prior restraint. His public reasoning was substantially concerned with predicting "in advance the content and consequences" of Spectrum WT's performances. *Gay Student Servs.*, 737 F.2d at 1325; *see* ROA.3851-52, 3873; *see also* ROA.3874 (opining on the kinds of offensive viewpoints he would prohibit from Legacy Hall). And his resulting

decision to override the University's standard procedure for reserving campus facilities and replace it with his own viewpoint-motivated judgment is an exercise of the type of "unbridled discretion" that decades of prior restraint precedent has considered odious. *Freedom from Relig. Found.*, 955 F.3d at 427; *see also Brooks v. Auburn Univ.*, 412 F.2d 1171, 1172 (5th Cir. 1969) (access to a forum made generally available by the University for all forms of expressive activity "cannot be left to the discretion of the university president on a pick and choose basis").

President Wendler's trial testimony bears that conclusion out. He testified that he would bar an event featuring "blackface" from Legacy Hall; that he would "likely not permit Legacy Hall to be used by any group that sought to denigrate others based on their race, such as a white supremacist organization[;]" and that he would intervene to stop events "which proposed to mock LGBT+ students." ROA.3850. On the other hand, he "*might* permit an event that featured only explicit speech to be held [in Legacy Hall], such as George Carlin's 'Seven Dirty Words' skit." *Id.* And Wendler also testified that he had previously stepped in to cancel a planned performance by a hip hop artist because "his research showed that the performer's concerts often featured 'fist fights' and 'gunplay.'" ROA.3849.

These decisions are not tethered to any particular University policy, let alone one that provides "narrow, objective, and definite standards" to guide Wendler's decision-making. *Conrad*, 420 U.S. at 553. Rather, they are a product of Wendler's

own subjective views on what speech *might* violate the University's "core values," including the value of "respect." ROA.3848, 3872-73. Indeed, Wendler previously testified that his own determinations about what speech adequately demonstrates "respect" for others "supersedes any other policy of the university." Pl.'s Br. in Support of Mot. for Summ. J., ECF No. 144 at 34, *Spectrum WT v. Wendler*, No. 2:23-cv-48 (N.D. Tex. Dec. 30, 2025).

The district court's pertinent factual findings compelled the opposite result than the one it reached. The Supreme Court demands that those who administer speech licensing systems be governed by narrow standards to protect against even the *possibility* that officials like Wendler could wield their power for improper purposes. Without those standards, "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *City of Lakewood*, 486 U.S. at 758.

President Wendler's testimony about the kinds of speech he would or would not permit shows his effort to triangulate a viewpoint-neutral definition of "respect" after the fact. But his attempt utterly fails to give the public a reasonable

understanding of what speech he would or would not permit in campus spaces.[5] For example, would President Wendler's categorical bar on events featuring "blackface" prevent a screening of the movie *Tropic Thunder*, in which actor Robert Downey, Jr.'s character famously and controversially donned blackface for his fictional role as a Black solider in the Vietnam War? The film's director, Ben Stiller, explained that the decision to present Downey, Jr.'s character in blackface ostensibly served as a metacommentary on the extreme measures actors will take for their roles. Tony Horkins, "Exclusive: Stiller Talks Tropic Thunder," Empire (Mar. 18, 2008).[6] Wendler's elusive definition of "respect" might prevent such a screening from being held, even when its purpose might be to interrogate the use of racist tropes for satirical purposes. *See also Matal v. Tam*, 582 U.S. 218, 228-29 (2017) (trademark registration wrongly denied to "THE SLANTS"—a band name selected by its lead singer to "'reclaim' and 'take ownership' of stereotypes about people of Asian ethnicity"—because of its perceived offensiveness).

And how about other films or dramatic works that depict the kinds of caricatures Wendler finds offensive? According to him, these depictions are "derisive, divisive and demoralizing misogyny, *no matter the stated intent*."

---

[5] *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998) (the words "respect and decency" are "undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns").

[6] https://web.archive.org/web/20120120063111/http://www.empireonline.com/news/story.asp?NID=22188.

ROA.3852 (emphasis added). Applying that view, could he prohibit screenings of *La Cage aux Folles* or *The Adventures of Priscilla, Queen of the Desert* because both films center drag queens as their main characters and feature drag performances? Could he ban films like *Some Like It Hot*, *Tootsie*, or *Mrs. Doubtfire* simply because they feature male characters who disguise themselves as women? Or if Wendler is more willing to tolerate fictionalized depictions of drag, where do documentaries fall within his nebulous definition of "respect"? Could Wendler intervene to prevent a screening of *Paris Is Burning*—even when intended to provoke a discussion of the violence, racism, homophobia, and transphobia experienced by queer Black and Brown people in the 1980s? And assuming Wendler's reasoning would apply to other limited and nonpublic forums, could he require that *RuPaul's Drag Race* be banned from streaming platforms accessed via the university's network?

That Wendler is so offended by the concept of drag demonstrates to some extent that drag as an art form is having its intended effect. Drag performers often use their art to push boundaries and cause offense—as much good art does. At its core, drag is a form of visual satire because it relies on the use of exaggeration and provocation to offer political and social commentary about all sorts of important issues, including "sex, sexuality, and gender norms[.]" ROA.3843. But just as the federal government cannot ban trademarks that could cause offense, *Tam*, 582 U.S. at 243, President Wendler cannot ban performances he is personally offended by—

certainly not under a policy which permits him to police speakers based on whether their speech meets his personal, unwritten criteria for "respect." *See Iancu*, 588 U.S. at 395 (differential treatment of content based on its perceived offensiveness is viewpoint discrimination).

That conclusion does not change even if Legacy Hall is a limited public forum. Even under the lesser scrutiny applied in those circumstances, "prior restraints on speech … must contain neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum *and* (2) viewpoint-based censorship." *Freedom from Relig. Found.*, 955 F.3d at 429 (emphasis in original).[7]

President Wendler's actions here failed in both respects. *First*, his decision to bar Spectrum WT's drag show prevented a performance from being staged in a forum designed for that precise purpose. *See* ROA.3848; *Conrad*, 420 U.S. at 557. *Second*, President Wendler's own public statements and trial testimony dispelled any notion that his decision was motivated by anything *but* viewpoint animus. *See* ROA.3851-54. As the Supreme Court in *Healy* emphasized, a university "may not restrict speech or association simply because it finds the views expressed by any

---

[7] *See also* Eugene Volokh, "Fifth Circuit: West Texas A&M Violated First Amendment by Blocking Student Group's Drag Show," The Volokh Conspiracy (Aug. 18, 2025), https://reason.com/volokh/2025/08/18/fifth-circuit-texas-am-violated-first-amendment-by-blocking-student-groups-drag-show/ ("If the rationale for the drag show ban is that drag shows are 'sexist' … that just means that the ban is viewpoint-based, and thus unconstitutional in a limited public forum as well.").

group to be abhorrent." *Healy*, 408 U.S. at 187-88; *see also Texas A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 807 (S.D. Tex. 2025), *appeal docketed*, No. 25-20108 (5th Cir. Apr. 2, 2025) (finding a prior restraint through a "viewpoint-based prohibition on expressive conduct imposed before it takes place, in a forum that is designated for a wide range of speech and conduct").

The district court's contrary conclusion—that President Wendler did not impose a prior restraint—rests on two errors. The first is that Wendler's decision acted merely as a "time, place, or manner" restriction simply because Spectrum was "free to hold the show elsewhere on campus, such as in a traditional public forum." ROA.3879. But that fact has no bearing on the validity of a policy which, like here, "delegates overly broad discretion to the decisionmaker," thereby creating an "impermissible risk of suppression of ideas[.]" *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (citing *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940)). It is precisely because Wendler claims the power to impose his subjective will on the University's general event registration policies—and has twice exercised that power to cancel Spectrum WT's drag performances—that his decisions are "inherently inconsistent" with a valid "time, place, and manner regulation[.]" *Id.* at 130-31 (quoting *Heffron v. ISKCON*, 452 U.S. 640, 649 (1981)).

The district court's second error is that the "procedural safeguards" it found would "meaningfully limit [Wendler's] discretion" do not come close to the basic

safeguards that the Supreme Court requires—safeguards which are "designed to obviate the dangers of a censorship system." *Conrad*, 420 U.S. at 559 (quoting *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). In *Conrad*, the Supreme Court struck down the decision of a municipal board to prevent a production of *Hair* from being staged in a city-owned theater. In finding that the board imposed a prior restraint, the Court reaffirmed the requirement that all licensing schemes ensure: (1) the "burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor"; (2) "any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo"; and (3) "a prompt final judicial determination must be assured." *Id.* at 560.

But the district court did not find that any of these three safeguards were present. *See* ROA.3880. Instead, it avoided *Conrad* entirely to conclude that the "core value" of "respect for others' identities" was alone enough of a constraint on President Wendler's authority to prevent him from censoring disfavored speakers.[8]

[8] The district court only addressed *Conrad* once: to distinguish drag shows from other performances which consist of the "'acting out of the written word' like a traditional play or musical." ROA.3866. Not only would that rule eviscerate First Amendment protection for all forms of silent, passive, and non-verbal artistic expression, *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557, 568-69 (1995), it also fails to acknowledge that *Conrad* sets a floor for the procedural protections required of *all* speech licensing schemes, and fails to apply those requirements here. *See Conrad*, 420 U.S. at 559; *Widmar*, 454 U.S. at 267 n.5 (denial of student group access to campus facilities must be scrutinized as prior restraint) (citing *Healy*, 408 U.S. at 181, 184).

That defies the basic dictates of *Conrad* and provides a clear basis for reversal. Indeed, "no less [than *Conrad*'s requirements] must be expected of a system that regulates use of a public forum." *Conrad*, 420 U.S. at 560.

## III. Compared to *Healy* and *Widmar*, *CLS Hastings* is a Poor Fit.

Following from its conclusion that Legacy Hall is a limited public forum, the district court adopted the view that *CLS Hastings* strongly informs (if not controls) the outcome. ROA.3881-86. *See Christian Legal Soc'y Ch. of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661 (2010). But *CLS Hastings* only applies if this Court accepts that President Wendler's actions were not viewpoint discriminatory—a bridge too far. Though the district court found "President Wendler never tried to suppress the *viewpoint* Spectrum wishes to express," ROA.3877, that contention is impossible to square with President Wendler's own words justifying his personal intervention to cancel the show.

Still, *CLS Hastings* is instructive for its contrasts—between the application of a facially neutral "all-comers policy," on the one hand, and the decision to directly target a particular group for exclusion from a campus forum because of dislike of the group or its message, on the other. Though the district court held that President Wendler's actions here resembled the former, they more closely resemble the latter.

Indeed, cases like *Healy* and *Widmar*—discussed at length in *CLS Hastings* and distinguished by the district court—are powerful comparators. In *Healy*, the

president of Central Connecticut State College overruled the recommendation of the college's student affairs committee that a chapter of Students for a Democratic Society be recognized as an official student organization. *Healy*, 408 U.S. at 173-74. Several days later, the president issued a statement to explain his reasoning, claiming that "[t]he published aims and philosophy of the Students for a Democratic Society, which include disruption and violence, are contrary to the approved policy [of the college]." *Id.* at 174 n.4. The Supreme Court sided with the students, concluding that the college "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Id.* at 187-88.

Likewise, in *Widmar*, a student religious group had been permitted to use facilities at the University of Missouri at Kansas City for its meetings, until university officials suddenly decided to exclude the student group under a dormant five-year-old policy prohibiting the use of campus facilities "for purposes of religious worship or religious teaching." *Widmar*, 454 U.S. at 265. Though the Supreme Court acknowledged "a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities," it held that a policy which targets religious groups for exclusion from campus meeting spaces and other facilities failed strict scrutiny. *Id.* at 267 n.5, 269-70.

*Healy* and *Widmar* are notable for their similarities to this case: each involves the decision of university officials to target particular student groups for exclusion

from campus forums. But even more crucial for Spectrum WT's case is how the Supreme Court characterized the official action in *Healy* and *Widmar*: each was a prior restraint. In *Healy*, the Court explained "the effect of the College's denial of recognition was a form of prior restraint, denying to petitioners' organization the range of associational activities" to which other student organizations were entitled. *Healy*, 408 U.S. at 184; *see also Gay Student Servs.*, 737 F.2d at 1325. The Court in *Widmar* went even further, adding that "the denial to particular groups of use of campus facilities for meetings and other appropriate purposes must be subjected to the level of scrutiny appropriate to *any form of prior restraint*." *Widmar*, 454 U.S. at 267 n.5 (emphasis added) (cleaned up).

The district court's contrary reading of *CLS Hastings* is strained and should be rejected. The court equates Wendler's targeted denial of Spectrum's drag shows with the "all-comers" policy upheld in *CLS Hastings,* declaring the two policies viewpoint-neutral and "legally analogous." ROA.3883-84. But the policy in *CLS Hastings* was genuinely neutral because it enabled school officials to enforce the school's Nondiscrimination Policy "without inquiring into [a student group's] motivation[.]" *CLS Hastings*, 561 U.S. at 688. President Wendler, by contrast, made individualized, viewpoint-driven judgments to cancel Spectrum WT's events based on his personal view that drag shows violate the University's core values.

Moreover, the district court distinguished *Healy* on the grounds that, unlike the complete ban of the student group there, President Wendler merely denied Spectrum WT the use of "*one* venue to host *one* type of event." ROA.3881. But whether a particular ban is total or partial is of no consequence to the conclusion that Wendler's actions were a prior restraint. The Supreme Court considered and disposed of precisely that point in *Conrad*, explaining that "*it does not matter*" whether the effect of the denial was not the "total suppression of the [performance] in the community." *Conrad*, 420 U.S. at 556 (emphasis added). "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Id.* (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939)).

Contrary to the district court's conclusions, the doctrine of prior restraint provides a clear rule of decision against President Wendler's viewpoint-discriminatory actions and places *CLS Hastings* in proper perspective. *CLS Hastings* is readily distinguishable because the "access barrier" imposed here was not "reasonable and viewpoint neutral," 561 U.S. at 679, and Appellant should succeed on its prior restraint claim under a straightforward application of cases like *Healy* and *Widmar*. Both cases address viewpoint-based censorship in the public university setting, and are lodestars here. Applying their teachings, President Wendler's actions were precisely the kind of prior restraint that the Founders intended to prevent. The

district court thus erred in concluding that President Wendler's actions were viewpoint-neutral "time, place, or manner" restrictions. This Court should reverse and hold that President Wendler's viewpoint-based decision to cancel Spectrum WT's drag shows was an unconstitutional prior restraint.

## CONCLUSION

For these reasons and the reasons stated by Appellant, the Court should reverse the district court and render judgment, including injunctive relief, for Appellant.

Dated: July 24, 2026

Respectfully submitted,

*/s/ Peter B. Steffensen*
Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC[9]
P.O. Box 750116
Dallas, Texas 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

*Attorneys for Amici Curiae*

[9] The First Amendment Clinic is grateful for the contributions of SMU Dedman School of Law students Sean Nussbaum and Brian E. Adams to this brief.

## CERTIFICATE OF SERVICE

I certify that on July 24, 2026, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amici Curiae*

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,143 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amici Curiae*