**No. 26-10127**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

SPECTRUM WT,

*Plaintiff-Appellant,*

v.

WALTER WENDLER, IN HIS OFFICIAL CAPACITY AS THE PRESIDENT OF WEST TEXAS A&M UNIVERSITY,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of Texas in No. 2:23-cv-48,
Hon. Matthew J. Kacsmaryk, U.S. District Judge

---

# EN BANC BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF TEXAS AND EQUALITY TEXAS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT

---

***Counsel for*** **Amici Curiae**

Brian Klosterboer
Chloe Kempf
Charelle Lett
Thomas Buser-Clancy
Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(346) 299-6811
bklosterboer@aclutx.org

## CONSENT

The undersigned counsel verifies that both the Plaintiff-Appellant and Defendant-Appellee do not oppose the filing of this brief.

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

**Case Number and Style**: 26-10127, *Spectrum WT v. Wendler*

The undersigned counsel of record adopts Plaintiff-Appellee's certificate of interested persons and supplements it to certify that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**1. *Amici-Curiae***

ACLU of Texas
Equality Texas

**2. Counsel for *Amici-Curiae***

Brian Klosterboer
Chloe Kempf
Charelle Lett
Thomas Buser-Clancy
Adriana Piñon

Respectfully,

*/s/ Brian Klosterboer*
Brian Klosterboer
*Counsel of Record for*
Amicus Curiae
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* .......... 1
INTRODUCTION .......... 2
ARGUMENT .......... 5
I. Drag Shows Must Be Analyzed Under the Same Standards as Other Live Performances .......... 6
II. Drag Shows Need Not Articulate a Single, Discernible Message to Be Subject to the First Amendment .......... 9
III. Wendler's Drag Ban Rests on His Opposition to the Viewpoints Drag Shows Convey .......... 12
IV. Wendler Is Not Alone in Targeting Drag Shows .......... 13
V. Drag Has a Rich History and Is Deeply Important to the LGBTQ+ Community .......... 15
A. Drag Has Existed for as Long as Theater Itself .......... 15
B. Drag in Texas Has a Rich History .......... 18
VI. Drag Is Neither Misogynistic Nor Inherently Sexual—and Even If It Were, the First Amendment Would Still Protect It .......... 21
CONCLUSION .......... 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 3, 11

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) .......... 7

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .......... 27

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) .......... 25

*Friends of George's, Inc. v. Mulroy*,
108 F.4th 431 (6th Cir. 2024) .......... 15

*Healy v. James*,
408 U.S. 169 (1972) .......... 5

*HM Fla.-ORL, LLC v. Sec'y of Fla. Dep't of Bus. & Pro. Regul.*,
160 F.4th 1282 (11th Cir. 2025) .......... 15

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*,
515 U.S. 557 (1995) .......... 10, 11

*Imperial Sovereign Ct. of Montana v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) .......... 15

*Iota XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993) .......... 23

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
584 U.S. 617 (2018) (Thomas, J., concurring) .......... 9

*Matal v. Tam*,
582 U.S. 218 (2017) .......... 5

*Naples Pride, Inc. v. City of Naples*,
No. 2:25-CV-291-JES-KCD, 2025 WL 1370174 (M.D. Fla. May 12, 2025), *injunction stayed pending appeal* (11th Cir. June 6, 2025) ........ 24

*Reno v. ACLU*,
521 U.S. 844 (1997) ........ 26

*Roth v. United States*,
354 U.S. 476 (1957) ........ 7, 26

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. ("FAIR")*,
547 U.S. 47 (2006) ........ 11

*Sable Commc'ns of Cal., Inc. v. FCC.*,
492 U.S. 115 (1989) ........ 24

*Schacht v. United States*,
398 U.S. 58 (1970) ........ 8

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) ........ 3, 6, 9

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) ........ 6, 8, 27

*Spectrum WT v. Wendler*,
816 F. Supp. 3d 648 (N.D. Tex. 2026) ........ *passim*

*Spectrum WT v. Wendler*,
No. 26-10127, Dkt. 59 (5th Cir. July 17, 2026) ........ 23

*Spence v. State of Wash.*,
418 U.S. 405 (1974) ........ 10, 15

*Texas v. Johnson*,
491 U.S. 397 (1989) ........ 10

*United States v. O'Brien*,
391 U.S. 367 (1968) ........ 11

*United States v. Ragsdale*,
426 F.3d 765 (5th Cir. 2005) ........ 26

*United States v. Salcedo*,
924 F.3d 172 (5th Cir. 2019) ........ 26

*Vance v. Universal Amusement Co.*,
445 U.S. 308 (1980) ........ 26

*Whitney v. California*,
274 U.S. 357 (1927) (Brandeis, J., concurring) ........ 23

*Woodlands Pride v. Paxton*,
168 F.4th 293 (5th Cir. 2026) ........ 14, 24

**Statutes**

Tex. Penal Code §§ 43.23-24 ........ 27

Texas Governor Signs Law ........ 14

**Other Authorities**

Benji Hart and Michael Roberson, *The Ballroom Scene Has Long Offered Radical Freedoms for Black and Brown Queer People. Today, That Matters More Than Ever*, TIME (Feb. 26, 2021), https://time.com/5941822/ballroom-voguing-queer-black-culture-renaissance/. ........ 17, 18

Cari Shane, *The First Self-Proclaimed Drag Queen Was a Formerly Enslaved Man*, SMITHSONIAN MAGAZINE (June 9, 2023), https://www.smithsonianmag.com/history/the-first-self-proclaimed-drag-queen-was-a-formerly-enslaved-man-180982311/ ........ 16, 17

*Covering Anti-Drag Legislation*, Ass'n of LGBTQ+ Journalists (June 19, 2025), https://www.nlgja.org/blog/2025/06/covering-anti-drag-legislation/ ........ 14

E-mail from Walter V. Wendler to All Students, Faculty, and Staff, W. Tex. A&M Univ., *A Harmless Drag Show? No Such Thing* (Mar. 20, 2023), https://www.myhighplains.com/news/local-news/wtamu-president-provides-reasoning-on-canceling-on-campus-drag-show-in-letter-to-students-staff-faculty/ .................................... 3, 4

Emily Martin, *From police raids to pop culture: The early history of modern drag*, NATIONAL GEOGRAPHIC (June 2, 2023), https://www.nationalgeographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture. ...............................16, 17, 18

Greg Abbott (@GregAbbott_TX), TWITTER (June 24, 2023, 11:03 PM), https://twitter.com/gregabbott_tx/status/1672817859729162240?s=12&t=PdsS2XI_vKHecU3T2VPeyw...........................................................14

Hugh Ryan, *How Dressing in Drag Was Labeled a Crime in the 20th Century*, HISTORY CHANNEL (Sept. 14, 2023), https://www.history.com/news/stonewall-riots-lgbtq-drag-three-article-rule.................................................................................19

Jennifer Wilber, *Gender Roles and Gender Relations in Shakespeare's "Twelfth Night"*, HUBPAGES (Oct. 29, 2023), https://discover.hubpages.com/literature/Gender-Roles-and-Gender-Relations-in-Shakespeares-Twelfth-Night...........................................16

Kiana Shelton, *The Joy of Drag,* PSYCHIATRIC TIMES (June 29, 2022), https://www.psychiatrictimes.com/view/the-joy-of-drag.......................7

Lauren McGaughy, *A brief history of drag queens in Texas*, THE DALLAS MORNING NEWS (Oct. 28, 2022) ..................................................18

*Misogyny*, Merriam-Webster, https://www.merriam-webster.com/dictionary/misogyny .......................................................21

Pien Pullens & Anick Vollebergh, *'Work!' Ballroom Discipline, Faking, and the Production of Queer Freedom*, 25 Tijdschrift voor Genderstudies 318 (2022), https://www.aup-online.com/content/journals/10.5117/TVGN2022.4.003.PULL. ............7

Robert Downen, *How Texas activists turned drag events into fodder for outrage*, TEX. TRIBUNE (Feb. 24, 2023, 5:00 AM), https://www.texastribune.org/2023/02/24/texas-drag-protests-children/ .......... 20, 22

Scottie Andrew, *The US has a rich drag history. Here's why the art form will likely outlast attempts to restrict it*, CNN (April 29, 2023), https://www.cnn.com/style/article/drag-queen-us-history-explainer-cec/index.html.......... 6

*Statement On The Adoption Of Conference Committee Report For Senate Bill 12, Banning Children's Exposure To Drag Shows*, LIEUTENANT GOVERNOR OF TEX. DAN PATRICK (May 28, 2023), https://www.ltgov.texas.gov/2023/05/28/statement-on-the-adoption-of-conference-committee-report-for-senate-bill-12-banning-childrens-exposure-to-drag-shows/. .......... 14

Steve Ramos and David Taffet, *Drag queens pulled us through, one dollar at a time*, DALLAS VOICE (April 25, 2014), https://dallasvoice.com/drag-queens-pulled-through-dollar-time/.......... 19, 20

*The fabulous history of drag*, BBC BITESIZE (May 2019), https://www.bbc.co.uk/bitesize/articles/zbkmkmn.https://www.bbc.co.uk/bitesize/articles/zbkmkmn.......... 16

Todd Camp, *Fort Worth LGBT Community*, TEX. STATE HISTORICAL ASS'N (May 12, 2021), https://www.tshaonline.org/handbook/entries/fort-worth-lgbt-community.......... 19

Vienna J. Ainsworth, *Legalizing Homophobia*, 88 Alb. L. Rev. 643 (2025) .......... 21

*What Does LGBTQ+ Stand For?*, The Annie E. Casey Foundation, https://www.aecf.org/blog/lgbtq-definitions#LGBTQ.......... 5

## INTEREST OF *AMICUS CURIAE*[1]

The American Civil Liberties Union of Texas ("ACLU of Texas") is a nonpartisan, nonprofit organization with thousands of members and supporters across the State. The ACLU of Texas works with communities, at the State Capitol, and in the courts to fulfill the promises of the Constitution for every Texan, no exceptions. From Amarillo to Brownsville and Beaumont to El Paso, we believe in a Texas that works for all of us—a Texas where each person has an equal say in the decisions that shape our future and everyone can build a good life. The ACLU of Texas has expertise in the First Amendment and an interest in guarding against government censorship of free expression and ideas.

Equality Texas engages, educates, and undertakes policy advocacy to secure full equality for LGBTQ+ Texans. In addition to advocating to protect all forms of gender expression, Equality Texas is committed to defending safe spaces for LGBTQ+ Texans. Drag performances have also helped raise funds to support the work that Equality Texas does on behalf of the LGBTQ+ community in Texas.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E); 5th Cir. R. 29.2.

## INTRODUCTION

Drag is a form of artistic and creative expression that is deeply rooted in our country's culture and tradition. Like theater, ballet, or abstract art, drag shows have a rich history, are inherently expressive, and are subject to constitutional protection. The First Amendment gives breathing room to the performing arts and shields them from government oppression by requiring officials to satisfy strict scrutiny when they suppress viewpoints in any forum or content in designated public forums. The First Amendment also requires mandatory safeguards before imposing any prior restraint. These guardrails ensure that public universities remain vibrant marketplaces of ideas rather than places where officials may freely proscribe topics or genres they dislike.

The district court's holding that Spectrum WT ("Spectrum")'s drag performances "may lack constitutional protection" because they are not "expressive," *Spectrum WT v. Wendler*, 816 F. Supp. 3d 648, 668 (N.D. Tex. 2026), is sharply at odds with Supreme Court precedent and the nature, context, and history of drag shows. The district court employed the wrong test for determining whether Spectrum's drag shows are inherently expressive by their very nature, like theater or ballet, or whether they are "expressive conduct," like burning a flag or draft card. The Supreme Court has steadfastly refused to require a "particularized message" for expressive

works like drag shows, musicals, websites, or parades, and instead found them inherently expressive by their nature. *See, e.g.*, *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023). The staging of drag performances is analytically indistinguishable from other performance art and should be treated the same under the First Amendment.

Instead of assessing drag performances as a whole, the district court focused its analysis myopically on narrow aspects of drag shows by highlighting discrete examples of sexual conduct. But President Walter Wendler ("Wendler") took a more categorical approach. He sweepingly barred ***all*** drag shows from being shown on campus by stating unequivocally that "West Texas A&M University ***will not*** host a drag show on campus."[2] In his view, a "harmless drag show" is ***"[n]ot possible"***—regardless of the specific content or audience.[3]

Rather than address the categorical nature of Wendler's ban, the district court hypothesized that it "***may*** be impractical to restrict minors'

---

[2] *See* E-mail from Walter V. Wendler to All Students, Faculty, and Staff, W. Tex. A&M Univ., *A Harmless Drag Show? No Such Thing* (Mar. 20, 2023), https://www.myhighplains.com/news/local-news/wtamu-president-provides-reasoning-on-canceling-on-campus-drag-show-in-letter-to-students-staff-faculty/ (emphasis added).

[3] *Id.* (emphasis added).

access to shows" at Legacy Hall and some such shows "***likely*** . . . would be sexually graphic." *Spectrum WT*, 816 F. Supp. 3d at 667-68 (emphases added). But Wendler barred the entire genre of drag from West Texas A&M University ("WTAMU"), even if Spectrum plans the most PG-friendly show for an all-adult audience. No one disputes that campus officials could discipline a performer *ex post facto* for violating reasonable, viewpoint-neutral campus policies during a show, such as engaging in obscenity. But Wendler went far beyond this by preemptively banning ***all*** drag shows on campus—***before*** speech occurs—***regardless of the shows' content or age-limitations***.

Wendler's rationale for categorically banning drag on campus reveals that he considers the entire genre to convey viewpoints he dislikes. According to Wendler, drag shows are inherently "wrong" because they "exaggerat[e] aspects of womanhood (sexuality, femininity, gender)" and "demean" women.[4] As *Amici* explain in this brief, Wendler is mistaken: many women perform in and cherish the artistry of drag, which typically challenges restrictive gender stereotypes. *See infra* Section VI. But even if Wendler were correct, Spectrum's drag shows would be no less shielded, for the

---

4 *Id.*

Constitution does not permit government officials to censor viewpoints even if they find them "offensive," *Matal v. Tam*, 582 U.S. 218, 223 (2017), or "abhorrent," *Healy v. James*, 408 U.S. 169, 187 (1972). And far from being universally hated or lacking serious value, drag has a rich and deep history as a source of joy and expression for LGBTQ+ Texans.[5] Under any level of scrutiny, Wendler cannot completely ban this art form at WTAMU without violating the First Amendment.

## ARGUMENT

Like other live performances, such as theater, opera, or modern dance, drag shows are inherently expressive and cannot be reduced to pure conduct. Because the district court acknowledged that even nude dancing finds some shelter within the First Amendment, *Spectrum WT*, 816 F. Supp. 3d at 671, President Wendler's argument that drag shows are not subject to ***any*** constitutional protection plainly falls flat. Although Wendler misconstrues the history and meaning of drag, he clearly understands but disapproves of the gender-related messages it conveys. Prohibiting the entire genre of drag

---

5 LGBTQ+ is an umbrella term that includes people "who identify as lesbian, gay, bisexual, transgender, queer or questioning, with the plus sign representing other identities." *What Does LGBTQ+ Stand For?*, The Annie E. Casey Foundation, https://www.aecf.org/blog/lgbtq-definitions#LGBTQ (last visited July 23, 2026).

from a university is a quintessential example of viewpoint discrimination and prior restraint that the Constitution does not permit.

## I. Drag Shows Must Be Analyzed Under the Same Standards as Other Live Performances

Drag is not materially different from other types of performance art. As the Supreme Court has explained, "live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad*, 452 U.S. at 65. Drag shows, like other forms of live entertainment, "frequently mix[] speech," such as "the acting out—or singing out—of the written word," with "live action or conduct." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975).

The district court tries to distinguish this binding precedent by stating, without explanation, that "Spectrum does not—and could not—argue that sexualized drag is the 'acting out of the written word' like a traditional play or musical." *Spectrum WT*, 816 F. Supp. 3d at 671. But drag shows ***do*** contain the acting out of the written and spoken word: they often include singing, dancing, lip-synching, comedy, and verbal remarks.[6] While drag performances sometimes involve improvisation, they also often rely on

---

[6] *See* Scottie Andrew, *The US has a rich drag history. Here's why the art form will likely outlast attempts to restrict it*, CNN (April 29, 2023), https://www.cnn.com/style/article/drag-queen-us-history-explainer-cec/index.html.

"highly scripted and codified movements and aesthetics,"[7] much like a musical or play.

While "[d]rag has many interpretations," it "is loosely defined as performing in an exaggerated way that caricatures or challenges male or female stereotypes," including through "bold costumes, makeup, and characters."[8] "At its core, drag is a creative act—a powerful and personal form of self-expression"[9]—which one could equally say of the symphony, modern dance, or abstract art.

Instead of viewing Spectrum's drag shows as a whole, the district court dissected them into component parts and focused on the most sexual aspects of every show. The Supreme Court has squarely rejected this approach, since judging works "by the effect of isolated passages upon the most susceptible persons[] might well encompass material legitimately treating with sex" and "must be rejected as unconstitutionally restrictive of the freedoms of speech and press." *Roth v. United States*, 354 U.S. 476, 489 (1957); *see also Ashcroft*

---

[7] Pien Pullens & Anick Vollebergh, *'Work!' Ballroom Discipline, Faking, and the Production of Queer Freedom*, 25 Tijdschrift voor Genderstudies 318 (2022), https://www.aup-online.com/content/journals/10.5117/TVGN2022.4.003.PULL.

[8] Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES (June 29, 2022), https://www.psychiatrictimes.com/view/the-joy-of-drag.

[9] *Id.*

*v. Free Speech Coal.*, 535 U.S. 234, 248 (2002) (explaining that performance art must be "judged by considering the work as a whole . . . even though the scene in isolation might be offensive"). If this were not the case, then an entire musical could be unshielded by the First Amendment simply because it contains brief nudity or a simulated sex scene. *Contra Se. Promotions*, 420 U.S. at 550 (rejecting the district court's reasoning that nudity or simulated sex within a musical rendered it "pure conduct" and "not entitled to First Amendment protection").

In every type of performance art, each aspect of a performance could be picked apart, analyzed separately, and reduced to pure conduct divorced from any expressive message. A kiss in *Romeo and Juliet* could be viewed solely as a sexual act with no inherent message; the rumble in *West Side Story* could be viewed as meaningless roughhousing; or a violinist pulling their bow across a string could be interpreted purely as conduct with no meaning at all. But when performers take to the stage before a live audience—as Spectrum intends to do—each aspect of their performance, whether song, dance, gestures, or the spoken word, is meant to express and connect with the audience. It does not matter whether the performance is "crude and amateurish and perhaps unappealing," *Schacht v. United States*, 398 U.S. 58, 61-62 (1970), or whether the work is so abstract that the audience

discerns no message at all. Live performances are inherently expressive and subject to the First Amendment.

The district court therefore erred by fixating on the most sexual aspects of each performance while ignoring the works as a whole. Tellingly, Wendler's own edict never mentioned sexual conduct or the specifics of each performance: his prohibition was absolute, forbidding all drag shows alike.

## II. Drag Shows Need Not Articulate a Single, Discernible Message to Be Subject to the First Amendment

The district court further erred by requiring Spectrum to establish that each of its performances demonstrate "(1) '[a]n intent to convey a particularized message'; and (2) a 'great' likelihood 'that the message would be understood by those who viewed it.'" *Spectrum WT*, 816 F. Supp. 3d at 668 (quoting *Spence v. State of Wash.*, 418 U.S. 405, 410–11 (1974)). The Supreme Court has never applied this test to live performances, which are inherently expressive by their very nature. *See, e.g.*, *Schad*, 452 U.S. at 65. Instead, this test only applies to instances of conduct, such as "burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 651–52 (2018) (Thomas, J., concurring).

Even assuming that an entire drag show could be reduced to pure conduct akin to flag burning, the district court still misapplied *Texas v. Johnson*, which asked whether the "conduct [of flag burning] possesses sufficient communicative elements to bring the First Amendment into play." 491 U.S. 397, 404 (1989). There, the Supreme Court noted that it had previously "asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Spence*, 418 U.S. at 411). This quote comes from dicta in *Spence* that did not establish a rule that ***all*** expressive activities must convey a "particularized message." *Id.* at 410–11. While *Spence*'s observation about the display's message was helpful for that conduct at issue to be considered expressive, neither *Spence* nor *Johnson* held that a "particularized message" is always required. Instead, the Supreme Court simply used this language to illustrate that the conduct at issue was expressive, especially since the acts of burning a flag or hanging up an upside-down peace sign were not obviously or inherently expressive on their own.

In *Hurley*, the Supreme Court explicitly rejected the district court's reading of *Spence* by holding that "a narrow, succinctly articulable message ***is not*** a condition of constitutional protection." 515 U.S. at 569 (emphasis

added). Otherwise, the First Amendment "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.* The Court held that a parade containing "multifarious voices" and no "exact message" was still fully shielded by the First Amendment. *Id.* The district court tried to distinguish *Hurley* by stating that it "is better understood as ensuring that conduct that is ***inherently expressive by nature*** retains First Amendment protection," *Spectrum WT*, 816 F. Supp. 3d at 670 (emphasis added), but it did not explain why drag shows, like other live performances, do not readily fall within that category. In *303 Creative*, the Supreme Court further reaffirmed *Hurley*, explaining that a speaker "does not forfeit constitutional protection simply by combining multifarious voices" into a website without one particularized message. 600 U.S. at 588 (quoting *Hurley*, 515 U. S. at 569).

The district court's reliance on *United States v. O'Brien* fares no better since *O'Brien* assumed that "the alleged communicative element [of burning a draft card] is sufficient to bring into play the First Amendment." 391 U.S. 367, 376 (1968). And *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. ("FAIR")* is not to the contrary: law schools' exclusion of military recruiters was not inherently expressive because "[t]he expressive

component of a law school's actions is not created by the conduct itself but by the speech that accompanies it." 547 U.S. 47, 65 (2006). In contrast, when drag artists go on stage for a performance, it is obvious that they seek to connect with the audience and express themselves, regardless of whether they have a particularized message.

## III. Wendler's Drag Ban Rests on His Opposition to the Viewpoints Drag Shows Convey

Even if Spectrum were required to show that its performances convey a message that the audience would understand—an erroneous test—it would still prevail because Wendler banned drag shows from campus precisely because he understands that they challenge gender norms.

As Wendler testified at trial, he views drag shows as intrinsically linked to "gender ideology" and stated that every drag performance "diminishes sex as an identifiable or useful category." *See Spectrum WT*, 816 F. Supp. 3d at 657. In his proclamation banning drag shows, Wendler claimed that any "performance exaggerating aspects of womanhood (sexuality, femininity, gender)" is inherently "wrong."[10] His overarching rationale for banning the genre is its "gender-bending," which Spectrum agrees "shatters sex, sexuality, and gender norms." *Id.* at 656.

---

[10] *See supra* note 3.

The district court also acknowledged that drag shows generally "convey a message of 'bending,' or at least challenging, gender norms." *Id.* at 669. And even though Wendler himself seems to understand this message, the district court nevertheless found that ***two*** of Spectrum's shows do not "send a clear enough message of 'gender bending' that a viewer would likely understand it." *Id.* at 670. The court thus implied that other Spectrum performances ***do*** convey a sufficiently particularized message. But it erred by requiring every performance to do so—especially when Wendler banned ***all*** drag shows university-wide precisely because he understands them to subvert gender norms. In short, Wendler cannot claim that Spectrum's shows convey no message at all when their underlying message is why he banned them.

## IV. Wendler Is Not Alone in Targeting Drag Shows

Wendler did not ban drag shows in a vacuum or through a reasoned application of WTAMU's policies. He was president of the university in 2019, when he permitted students to hold a drag show in Legacy Hall. *See Spectrum WT*, 816 F. Supp. 3d at 659. But in 2023, he changed his tune and prohibited these shows entirely.

This timing coincides with other government officials seeking to prohibit drag performances and drive them from public view. Two months

before Wendler issued his proclamation, Lieutenant Governor Dan Patrick introduced a bill in the Texas Senate to "push back against the radical left's disgusting drag performances."[11] When signing that bill into law several months later, Governor Greg Abbott declared: "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[12] Texas Senate Bill 12 (2023) remains in active litigation,[13] and Arkansas, Tennessee, Florida, and Montana all enacted similar laws in 2023.[14] But Wendler's drag ban goes beyond most of these laws, since it is not aimed at "sexual" drag shows or those performed in front of minors, and instead prohibits the art form

---

[11] *Statement On The Adoption Of Conference Committee Report For Senate Bill 12, Banning Children's Exposure To Drag Shows*, LIEUTENANT GOVERNOR OF TEX. DAN PATRICK (May 28, 2023), https://www.ltgov.texas.gov/2023/05/28/statement-on-the-adoption-of-conference-committee-report-for-senate-bill-12-banning-childrens-exposure-to-drag-shows/.

[12] Greg Abbott (@GregAbbott_TX), TWITTER (June 24, 2023, 11:03 PM), https://twitter.com/gregabbott_tx/status/1672817859729162240?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

[13] The Fifth Circuit recently vacated the permanent injunction that had blocked this law since September 2023, on standing grounds, without identifying any error in the district court's core First Amendment holdings. *Woodlands Pride v. Paxton*, 168 F.4th 293, 308 (5th Cir. 2026). Instead, the court remanded with instructions to conduct further legal analysis of plaintiffs' facial challenges to the law, and the parties submitted supplemental briefing to the district court on July 14, 2026.

[14] *Covering Anti-Drag Legislation*, Ass'n of LGBTQ+ Journalists (June 19, 2025), https://www.nlgja.org/blog/2025/06/covering-anti-drag-legislation/.

entirely. These other laws targeting drag have also been declared unconstitutional, were narrowly interpreted, or continue to be litigated.[15]

## V. Drag Has a Rich History and Is Deeply Important to the LGBTQ+ Community

This effort to restrict drag is part of a broader targeting of LGBTQ+ people, who have long used drag as a source of joy, liberation, and economic empowerment. The historical and political context of drag artistry independently strengthens its First Amendment protection. *See Spence*, 418 U.S. at 410 ("[T]he context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol.").

### A. Drag Has Existed for as Long as Theater Itself

Subverting and challenging gender roles has been a key element of live performance since the days of Shakespeare, when the Church of England

---

15 *See, e.g.*, *Imperial Sovereign Ct. of Montana v. Knudsen*, 170 F.4th 820, 832 (9th Cir. 2026) (affirming a preliminary injunction against a Montana law that banned "drag story hours" and other drag shows under the guise of "sexually oriented performances"); *HM Fla.-ORL, LLC v. Sec'y of Fla. Dep't of Bus. & Pro. Regul.*, 160 F.4th 1282 (11th Cir. 2025) (granting rehearing *en banc* in challenge to Florida law targeting drag shows); *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 440 (6th Cir. 2024) (adopting Tennessee courts' narrowing construction of a law targeting drag shows—requiring works to be judged as a whole from the perspective of a "reasonable 17-year-old"—while holding the challenger lacked standing).

allowed only men to perform on stage.[16] Some of Shakespeare's most famous works wrote gender-bending roles into the script, including *As You Like It* and *Twelfth Night*.[17] Similar roles have existed for millennia in China, India, and Greece.

In 1860s Victorian England, Ernest Boulton became the first person to describe his cross-dressing stage routine as drag.[18] Around the same time, a formerly enslaved person in Washington, D.C., named William Dorsey Swann, became the first self-proclaimed "queen of drag."[19] In the late 1880s, Swann was repeatedly arrested for throwing parties where guests dressed in gowns and danced together.[20] Newspapers said Swann's guests likely

---

16 *The fabulous history of drag*, BBC BITESIZE (May 2019), https://www.bbc.co.uk/bitesize/articles/zbkmkmn.https://www.bbc.co.uk/bitesize/articles/zbkmkmn

17 Jennifer Wilber, *Gender Roles and Gender Relations in Shakespeare's "Twelfth Night"*, HUBPAGES (Oct. 29, 2023), https://discover.hubpages.com/literature/Gender-Roles-and-Gender-Relations-in-Shakespeares-Twelfth-Night.

18 Emily Martin, *From police raids to pop culture: The early history of modern drag*, NATIONAL GEOGRAPHIC (June 2, 2023), https://www.nationalgeographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture.

19 Cari Shane, *The First Self-Proclaimed Drag Queen Was a Formerly Enslaved Man*, SMITHSONIAN MAGAZINE (June 9, 2023), https://www.smithsonianmag.com/history/the-first-self-proclaimed-drag-queen-was-a-formerly-enslaved-man-180982311/.

20 *Id.*

competed in a cakewalk, a dance resembling voguing that enslaved people invented to mimic plantation owners.[21]

These traditions live on in the LGBTQ+ community today. By the early 1900s, Black and Brown drag artists in Harlem hosted competitions that became some of the most popular social events in New York City.[22] At the same time, Vaudeville theater was popular across the country; and one of the country's first movie stars, Julian Eltinge, was a renowned female impersonator.[23]

Although Vaudeville eventually lost its appeal, the art of drag endured, particularly among drag performers who were Black, Brown, and LGBTQ+.[24] These artists used drag as a form of self-expression and liberation amidst overlapping discrimination, stigma, and oppression.[25] Excluded from much of society because of race, gender identity, and sexual orientation, Black and Brown drag artists hosted drag pageants that ignited a vibrant "House

---

21 *Id.*

22 *Id.*

23 *Supra* note 18.

24 *Id.*

25 Benji Hart and Michael Roberson, *The Ballroom Scene Has Long Offered Radical Freedoms For Black and Brown Queer People. Today, That Matters More Than Ever*, TIME (Feb. 26, 2021), https://time.com/5941822/ballroom-voguing-queer-black-culture-renaissance/.

Ballroom" scene.[26] For decades, these drag ballrooms served as a refuge and epicenter for the LGBTQ+ community, and their artistry achieved worldwide acclaim.[27]

### B. Drag in Texas Has a Rich History

Drag has as long history in Texas, as it does across the country. In the late 19th century, female impersonators got top billing at the Texas State Fair.[28] Drag shows grew in popularity during Prohibition, when underground clubs drew large audiences to LGBTQ+ performers, but popularity did not stop law enforcement from targeting drag artists.[29] In the mid-1930s, a San Antonio club was raided and seven drag performers arrested.[30] In 1938, a Houston drag show venue was set on fire just after a grand jury decided to look into its "type of entertainment."[31]

---

26 *Id.*

27 *Supra* note 18.

28 Lauren McGaughy, *A brief history of drag queens in Texas*, THE DALLAS MORNING NEWS (Oct. 28, 2022), https://www.dallasnews.com/news/politics/2022/10/28/a-brief-history-of-drag-queens-in-texas/.

29 *Id.*

30 *Id.*

31 *Id.*

Backlash intensified after World War II, when same-sex relations were criminalized and heavily policed.[32] Drag shows in the LGBTQ+ community were often forced underground and raided by police, who relied on local cross-dressing ordinances to surveil, target, and arrest drag performers and LGBTQ+ Texans.[33] In 1973, seven drag performers were arrested and charged in Fort Worth under a city ordinance that made it illegal for anyone to wear clothing "in a dress not belonging to his or her sex."[34] The charges were dismissed, and the city ordinance was ultimately overturned.[35]

By the 1980s, drag artists could perform with less risk of arrest, and they took to the stage "[i]n almost every gay bar in Texas" to raise money for those losing to their lives to AIDS.[36] As the *Dallas Voice* remembered*:*

> [T]he drag queens looked out across a ravaged community and sang for dollars. One dollar became 10. The 10 dollars became a thousand, and the thousand dollars became millions. On that

---

32 *See* Hugh Ryan, *How Dressing in Drag Was Labeled a Crime in the 20th Century*, HISTORY CHANNEL (Sept. 14, 2023), https://www.history.com/news/stonewall-riots-lgbtq-drag-three-article-rule.

33 *Id.*

34 Todd Camp, *Fort Worth LGBT Community*, TEX. STATE HISTORICAL ASS'N (May 12, 2021), https://www.tshaonline.org/handbook/entries/fort-worth-lgbt-community.

35 *Id.*

36 Steve Ramos and David Taffet, *Drag queens pulled us through, one dollar at a time*, DALLAS VOICE (April 25, 2014), https://dallasvoice.com/drag-queens-pulled-through-dollar-time/.

> foundation, . . . [t]he sick and the dying had a place to get medical help, food, a place to live and a place to rest.[37]

Still today, drag performances serve as a mode of free expression, a source of joy and liberation, and an engine of economic empowerment for Texas's LGBTQ+ community. Verniss McFarland III, founder of The Mahogany Project, a Houston nonprofit that provides resources and support to the Black Trans community, explained: "Drag is how we've buried our dead, and how we've raised money for our community and programs. . . . Drag provides sustainable life to all of our community."[38]

This history underscores the social, political, and cultural context that gives meaning to drag shows and strengthens their expressive nature. Spectrum's drag shows cannot be reduced to pure conduct because they continue a legacy of joy, liberation, and expression that has spanned generations. Just as someone who sees a Jackson Pollock painting for the first time might not know its significance to the history of art—and consider it splattered paint with no message or meaning—the district court erred by failing to recognize the inherently expressive nature of drag and its rich artistic, social, and political context.

---

37 *Id.*

38 Robert Downen, *How Texas activists turned drag events into fodder for outrage*, TEX. TRIBUNE (Feb. 24, 2023, 5:00 AM), https://www.texastribune.org/2023/02/24/texas-drag-protests-children/.

## VI. Drag Is Neither Misogynistic Nor Inherently Sexual—and Even If It Were, the First Amendment Would Still Protect It

Despite the history and significance of drag, President Wendler expressed unequivocal disapproval of ***all*** drag performances and the underlying messages they express. According to him, it is "[n]ot possible" to have a "harmless drag show" because the entire genre "demeans women" and showcases a "derisive, divisive, and demoralizing misogyny."[39] Even if accepted as true, Wendler's views do not justify a prohibition on drag, nor do they change the constitutional standards that apply. But Wendler's views are also wrong on their face and at odds with how drag has long been used to uplift and empower women by challenging gender norms.

Nothing in the record supports Wendler's contention that drag shows are inherently misogynistic.[40] First, people of every sex and gender perform drag and cherish the art form. "[D]rag is open to all genders, and how someone identifies outside of their drag persona does not dictate whether they are a drag king or queen."[41] Wendler focused his anti-drag proclamation

---

39 *See supra* note 3.

40 Misogyny is defined as "hatred of, aversion to, or prejudice against women." *Misogyny*, Merriam-Webster, https://www.merriam-webster.com/dictionary/misogyny (last accessed July 21, 2026).

41 Vienna J. Ainsworth, *Legalizing Homophobia*, 88 Alb. L. Rev. 643, 645 (2025).

solely on drag queens, and the Texas A&M University System explicitly states in its system-wide policy (which is currently enjoined and consolidated with this appeal) that drag shows ***only*** include "biological males" that "dress[] in women's clothing" and "demean[] women." *Spectrum WT*, 816 F. Supp. 3d at 657. But this definition misses the obvious fact that countless women perform and celebrate drag.

Drag is also a vehicle for empowering people of all genders, since "[d]rag, at its very core, has been about the self-expression of the oppressed, giving a voice to those whom society would rather silence."[42] Rather than promoting hatred for women or anyone else, drag shows typically "allow[] for self-discovery and let[] a performer embrace and celebrate an authentic version of themselves."[43] There is no evidence that any drag show in this case harms or denigrates women. In the unlikely event that someone views a particular drag show as offensive to women, that person has a right to critique and condemn it. But the First Amendment does not permit government officials to ban such performances across the board.[44]

---

42 *Id.* at 645-46.
43 *Id.* at 646.
44 Spectrum is correct when it points out that a one-time ticketed performance almost certainly does not meet the legal harassment standard as "severe, pervasive, and objectively offensive." *See* Appellant's En Banc.

Drag also cannot be equated with blackface, as Wendler wrongly contends. *Contra Spectrum WT*, 816 F. Supp. 3d at 675. To start, blackface is not banned or censored by the government the way Wendler and other officials have targeted drag. *See supra* Section IV. Students do not perform blackface today not because it is prohibited by the government, but because nearly everyone agrees it is abhorrent, and no one seeks to host such a performance in Legacy Hall. Any restriction aimed at a performance's viewpoint must satisfy the most exacting constitutional scrutiny—a burden Wendler has not even attempted to meet here. Short of satisfying strict scrutiny, government officials have no free-roaming power to banish viewpoints from campus stages, for "First Amendment principles governing live entertainment are relatively clear: short of obscenity, it is generally protected." *Iota XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 389-90 (4th Cir. 1993) (holding that a racist and sexist skit, where fraternity members dressed as women and wore blackface, must still be analyzed "within the constitutionally protected rubric of entertainment"); *see also Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J.,

---

Br., *Spectrum WT v. Wendler*, No. 26-10127, Dkt. 59 at 61 (5th Cir. July 17, 2026) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

concurring) (explaining that the remedy to odious or hateful speech "is more speech, not enforced silence" by the government).

Drag is also "not inherently sexual or explicit and is a popular form of entertainment for all ages." *Naples Pride, Inc. v. City of Naples*, No. 2:25-CV-291-JES-KCD, 2025 WL 1370174, at *2 (M.D. Fla. May 12, 2025), *injunction stayed pending appeal* (11th Cir. June 6, 2025). As with any art form, drag performers tailor their content to their audience, which can range from "all-ages shows like drag story time" to more "sexual shows" at "bars and nightclubs that are restricted to ages 21+." *See Woodlands Pride v. Paxton*, 168 F.4th 293, 307 (5th Cir. 2026). The district court nevertheless declared, without foundation, that "[t]he *raison d'être* of Spectrum's drag show ***is*** sexual provocation." *Spectrum WT*, 816 F. Supp. 3d at 655. But even if the district court's analysis were correct—and ***all*** of Spectrum's shows were designed to be "provocative" and "sexual"—their performances would ***still*** be subject to First Amendment protection.

The Supreme Court has repeatedly held that "[s]exual expression which is indecent but not obscene is protected by the First Amendment," *Sable Commc'ns of Cal., Inc. v. FCC.*, 492 U.S. 115, 126 (1989), and "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or

images that a legislative body thinks unsuitable for them," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). The test is not whether a show is "appropriate," *contra Spectrum WT*, 816 F. Supp. 3d at 667, but whether it meets the Supreme Court's strict requirements for obscenity or obscenity for minors.

As the district court noted, government officials may take certain steps to prevent minors from viewing works that are obscene to them if the work "(a) taken as a whole, and under contemporary community standards, appeal to the prurient interest ***of minors***; (b) depict or describe specifically defined sexual conduct in a way that is patently offensive ***for minors***; and (c) taken as a whole, lack serious literary, artistic, political, or scientific value ***for minors***." *Id.* at 668 (quoting *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 474 (2025)). Without examining any specific performance, the district court determined that hypothetical "[p]erformances with stripteases, prosthetic breasts, and sexualized erotic dancing appeal to the prurient interests ***of minors***, are patently offensive ***for minors***, and lack serious value ***for minors***." *Id.*

The court's analysis here is conclusory and flawed for multiple reasons.[45] First, the question of obscenity (or obscenity for minors) is "a question of constitutional judgment of the most sensitive and delicate kind." *Roth*, 354 U.S. at 498 (opinion of Harlan, J.). The inquiry must be tied to a specific performance, judged as a whole under community standards, and carefully assess the work's serious value. The government "has the burden of proving each element" of this test, *United States v. Ragsdale*, 426 F.3d 765, 771 (5th Cir. 2005), but the district court here held the government to no burden at all. The third prong of whether a work has "serious value" is "particularly important" because it sets "a national floor for socially redeeming value." *Reno v. ACLU*, 521 U.S. 844, 873 (1997). The district court never engaged with this prong nor the history and context of Spectrum's drag shows. *See supra* Section V. Even a cursory assessment of Spectrum's drag performance would have revealed its substantial value, which the court failed to consider.

Second, the existence of past obscenity (or obscenity for minors) is a "constitutionally deficient" way of "prohibit[ing] the future exhibition of

---

45 "Because of the First Amendment implications of obscenity laws," courts of appeals "must exercise 'independent constitutional judgment as to the obscenity of the materials in question.'" *United States v. Salcedo*, 924 F.3d 172, 176 (5th Cir. 2019) (citation omitted).

[performances] that have not yet been found to be obscene." *Vance v. Universal Amusement Co.*, 445 U.S. 308, 315-16 (1980). Obscenity laws operate by holding performers accountable ***after*** a performance crosses the constitutional line.[46] The district court improperly inverted this rule by allowing Wendler to forbid ***all*** drag shows before they occur—thereby imposing a prior restraint—based on the mere possibility that obscenity for minors might occur. But "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand[,]" for "the risks of freewheeling censorship are formidable." *Se. Promotions, Ltd.*, 420 U.S. at 559; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) ("Criminal sanctions may be applied only after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. . . [and] [a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.").

Third, even if the district court's analysis were correct, it acknowledged that intermediate scrutiny should apply when "restrictions burden adults'

---

[46] Texas statutes authorize criminal penalties for any person engaging in an obscene performance or who displays material harmful to minors. *See* Tex. Penal Code §§ 43.23-24.

rights to access such speech," as the drag ban does here by prohibiting Spectrum's adult members from viewing and participating in performances. *See Spectrum WT*, 816 F. Supp. 3d at 668. Yet the district court conducted no intermediate scrutiny analysis—and indeed, it conducted no scrutiny analysis at all. Wendler's viewpoint-discriminatory ban triggers the most exacting scrutiny, but it also likely fails any level of review, since there is no rational reason—much less an important or compelling one—to ban non-sexual drag shows performed solely among adults.

Ultimately, Wendler did not tether his drag ban to situations where a minor is present or where drag shows contain sexual, much less obscene, content. His complete prohibition on this cherished art form goes far beyond the narrow obscenity-for-minors exception to the First Amendment, and the Constitution does not permit such a sweeping restraint on speech.

## CONCLUSION

The Court should reverse the judgment below and remand with instructions to grant Spectrum the injunctive and declaratory relief to which the First Amendment entitles it.

DATED: July 24, 2026

Respectfully submitted,

*/s/ Brian Klosterboer*

Brian Klosterboer
Chloe Kempf
Charelle Lett
Thomas Buser-Clancy
Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF TEXAS
P.O. Box 8306
bklosterboer@aclutx.org
ckempf@aclutx.org
clett@aclutx.org
tbuser-clancy@aclutx.org
apinon@aclutx.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of July, 2026, a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which served counsel for the parties.

*/s/ Brian Klosterboer*
Brian Klosterboer

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,850 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia, font size 14.

*/s/ Brian Klosterboer*
Brian Klosterboer

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Brian Klosterboer*
Brian Klosterboer