No. 26-10127

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVEALL

*Plaintiffs-Appellants,*

*v.*

WALTER WENDLER

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
Case No. 2:23-cv-00048

## BRIEF OF EUGENE VOLOKH, DALE CARPENTER, AND THE CATO INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

EUGENE VOLOKH
Hoover Institution
Stanford University
434 Galvez Mall
Stanford, CA 94305
(650) 721-5092
volokh@stanford.edu

THOMAS A. BERRY
Cato Institute
1000 Mass. Ave., N.W.
Washington, DC 20001
tberry@cato.org

DALE CARPENTER
SMU Dedman School of Law
3315 Daniel Ave.
Dallas, TX 75206
Tel: (214) 768-2638
dacarpenter@smu.edu

JOSHUA J. BENNETT
*Counsel of Record*
Baker & Hostetler LLP
2850 N. Harwood, Ste. 1100
Dallas, TX 75206
Tel: (214) 210-1166
jjbennett@bakerlaw.com

*Counsel for Proposed Amici*

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellants' Certificate of Interested Persons (and any supplement) and in the Certificates of Interested Persons of any other amici curiae—the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

1. **Amici Curiae**
   Prof. Eugene Volokh
   Prof. Dale Carpenter
   The Cato Institute

2. **Attorneys for Amici Curiae**
   Eugene Volokh
   Hoover Institution, Stanford University
   434 Galvez Mall
   Stanford, CA 94305
   (650) 721-5092
   volokh@stanford.edu

   Dale Carpenter
   SMU Dedman School of Law
   3315 Daniel Ave.
   Dallas, TX 75206
   Tel: (214) 768-2638
   dacarpenter@smu.edu

   Thomas A. Berry
   Cato Institute
   1000 Mass. Ave., N.W.
   Washington, DC 20001
   tberry@cato.org

Joshua J. Bennett
*Counsel of Record*
Baker & Hostetler LLP
2850 N. Harwood, Ste. 1100
Dallas, TX 75206
Tel: (214) 210-1166
jjbennett@bakerlaw.com

No publicly traded company has an ownership interest of 10% in any person listed above.

/s/ Joshua J. Bennett
EUGENE VOLOKH
DALE CARPENTER
THOMAS A. BERRY
JOSHUA J. BENNETT

iii

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ....... ii

TABLE OF AUTHORITIES .................................................................v

INTEREST OF *AMICI CURIAE* .................................................1

INTRODUCTION .................................................................................2

ARGUMENT ..........................................................................................4

    I.    Viewpoint Discrimination Is Forbidden Even in Limited Public Fora and Nonpublic Fora. ..............................................4

    II.    The Government Engaged in Impermissible Viewpoint Discrimination. ....................................................................5

    III.    The Court's Decision in *CLS* Cannot Justify Viewpoint Discrimination and Is No Substitute for Strict Scrutiny. ..........9

CONCLUSION ....................................................................................14

CERTIFICATE OF SERVICE .........................................................16

CERTIFICATE OF COMPLIANCE .................................................17

CERTIFICATIONS UNDER ECF FILING STANDARDS ...................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Pastides,*
    263 F. Supp. 3d 565 (D.S.C. 2017)......................................................6–7

*Christian Legal Soc. v. Martinez,*
    561 U.S. 661 (2010) ..........................................................*passim*

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
    473 U.S. 788 (1985)......................................................4, 10–12

*Cuffley v. Mickes,*
    208 F.3d 702 (8th Cir. 2000) ...............................................8

*Feminist Majority Found. v. Hurley,*
    911 F.3d 674, 717 (4th Cir. 2018) ......................................7

*Gay & Lesbian Students Ass'n v. Gohn,*
    850 F.2d 361 (8th Cir. 1988) ...............................................5

*Good News Club v. Milford Cent. Sch.,*
    533 U.S. 98 (2001) ...............................................................4

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
    993 F.2d 386 (4th Cir. 1993) ...............................................6

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993) ..............................................................4

*Little Pencil, LLC v. Lubbock ISD,*
    616 Fed. Appx. 180 (5th Cir. 2015)......................................4

*Matal v. Tam,*
    582 U.S. 218 (2017) ..............................................................5

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ..............................................................6

*Regan v. Taxation with Representation of Wash.,*
    461 U.S.540 (1983) ............................................................12

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1983) ........................................................................14

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ......................................................................4–5

*Spectrum WT v. Wendler,*
  151 F.4th 714 (5th Cir. 2025) ................................................7, 10–13

*Speech First, Inc. v. Cartwright,*
  32 F.4th 1110 (11th Cir. 2022) ........................................................6

*Texas v. Knights of Ku Klux Klan,*
  58 F.3d 1075 (5th Cir. 1995) ........................................................7–8

*Tex. A&M Queer Empowerment Council v. Mahomes,*
  772 F. Supp. 3d 792 (S.D. Tex. 2025) ..............................................7

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) ......................................................................13

*United States v. Perkins,*
  99 F.4th 804 (5th Cir. 2024) ...........................................................3

## Other Authorities

Volokh, *Freedom of Expressive Association and Government Subsidies,*
  58 Stan. L. Rev. 1919 (2006) ..........................................................9

## INTEREST OF *AMICI CURIAE*[1]

*Amicus Curiae* Eugene Volokh is the Thomas M. Siebel Senior Fellow at the Hoover Institution at Stanford University and the Gary T. Schwartz Distinguished Professor of Law Emeritus at UCLA School of Law. He is the author of over 50 law review articles on the First Amendment, and of the casebook *The First Amendment and Related Statutes* (8th ed. 2023). He has extensively studied and written about, among many other First Amendment topics, content-based restrictions on speech.

*Amicus Curiae* Dale Carpenter is the Judge William Hawley Atwell Chair of Constitutional Law, Altshuler Distinguished Teaching Professor, and Professor of Law at Southern Methodist University Dedman School of Law. A nationally recognized expert in constitutional law, the First Amendment, and LGBT rights, Professor Carpenter regularly teaches courses and publishes in these areas. He has an interest in the reasoned and consistent application of First Amendment doctrine and has often participated as *amicus curiae* to that end. *See, e.g.*, Amicus Brief, *Book People, Inc. v. Wong*, No. 23-50668 (5th Cir. Nov. 18, 2023); Amicus Brief, *303 Creative LLC v. Elenis*, No. 21-476 (U.S. May 31, 2022).

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae* or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E), (b)(4); 5th Cir. R. 29.2. *Amici* Eugene Volokh and Dale Carpenter appear in their individual capacity; institutional affiliations are listed for identification purposes only.

Amicus curiae The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review.*

*Amici curiae* submit this brief to clarify why the panel majority opinion is correct and consistent with both the First Amendment and the Supreme Court's precedents, including *Christian Legal Soc. v. Martinez,* 561 U.S. 661 (2010).

All appellants have consented to the filing of this brief; all appellees have stated that they do not oppose the filing of this brief.

## INTRODUCTION

When the government operates a place or program that allows a wide range of private speech, it may not discriminate among speakers or groups based on their viewpoints. That is true even when the place or program is a limited public forum or nonpublic forum rather than a traditional or designated public forum. Here, the canceled drag show was speech protected by the First Amendment, and President Wendler violated the First Amendment when he cited the show's "objectionable message" (alleged sexism) to justify its cancelation and without trying to sat-

isfy strict scrutiny—just as the prior panel majority concluded. And that conclusion holds true no matter how the forum (Legacy Hall) is classified, whether as a designated public forum (as the prior panel held); a limited public forum, as the district court concluded; or even a nonpublic forum. Viewpoint discrimination is presumptively unconstitutional in all such fora.

Despite what the district court concluded below, the Supreme Court's decision in *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010) ("*CLS*") neither requires nor permits a different result. Applying the Rule of Goose and Gander, the district court concluded that since *CLS* permits universities to expel Christian legal societies from limited public fora on campus if those societies won't agree to open their membership to all comers in exchange for the university's subsidy, the government can cancel and refuse to host drag shows in limited public fora because such shows "are derisive, divisive, and demoralizing misogyny, no matter the stated intent." ROA.3852.

Yet "[w]hat is good for the goose, is good for the gander—but not necessarily a pterodactyl." *United States v. Perkins*, 99 F.4th 804, 820 (5th Cir. 2024). Here, the government's confessed viewpoint discrimination is more pterodactyl than gander to *CLS*'s goose. The *CLS* majority upheld the open-to-all-comers requirement on the grounds that it was a content-neutral restriction that applied to all groups and did not discriminate based on viewpoint. That holding cannot justify the viewpoint-

3

based discrimination that occurred here. The en banc court should therefore reverse the district court's judgment and render judgment for Spectrum WT.

## ARGUMENT

### I. Viewpoint Discrimination Is Forbidden Even in Limited Public Fora and Nonpublic Fora.

In limited public fora and nonpublic fora, the government may impose reasonable viewpoint-neutral restrictions, but not viewpoint-based restrictions. "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). "These principles provide the framework forbidding the State to exercise viewpoint discrimination, even when [a] limited public forum is one of its own creation." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). This requirement of viewpoint neutrality in limited public fora and nonpublic fora has been reaffirmed repeatedly, including with regard to use of space in public schools and universities (as in *Rosenberger* itself). *See, e.g., CLS*, 561 U.S. at 681–83 (student-only access to facilities in a university); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107–09 (2001) (likewise); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392–93 (1993) (use of space in a school); *Little Pencil, LLC v. Lubbock ISD*, 616 F. App'x 180, 181 (5th Cir.

4

2015) (holding that school district could refuse to run a local tattoo parlor's ads on its jumbotron because that was a "content-based, viewpoint-neutral limitation[]"); *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 366–67 (8th Cir. 1988) (cash subsidies to student clubs). Viewpoint discrimination in limited public fora or even in nonpublic fora is an "egregious" and "blatant" violation of the First Amendment. *Rosenberger*, 515 U.S. at 829–30. The district court agreed on this point: "In no forum may the government discriminate based on a speaker's viewpoint without surviving strict scrutiny." ROA.3870.

## II.    The Government Engaged in Impermissible Viewpoint Discrimination.

The government's confessed reason here for banning drag shows is the shows' perceived viewpoint: The government asserts that by airing publicly what government officials consider "sexist" tropes that support improper views of gender, the drag show undermines the university's preferred message that all people should be treated equally. ROA.3851–52. And such restrictions targeted at views that are perceived as bigoted are of course viewpoint-based. *See Matal v. Tam*, 582 U.S. 218, 243–44 (2017) (Alito, J., plurality opinion) (concluding that the government engaged in viewpoint discrimination when it refused to register the trademark "The Slants" on grounds it "disparage[s] . . . or bring[s] . . . into contemp[t] or disrepute" any "persons, living or dead"); *see also id.* at 248–49 (Kennedy, J. concurring) ("The [Lanham Act's anti-disparagement clause] . . . re-

flects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination."); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386–89 (1992) (outlining the difference between content-neutral and viewpoint-based speech restrictions, and observing that "a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion" because such a law would be impermissibly viewpoint-based).

Indeed, *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993), correctly held that a university engaged in viewpoint discrimination when its admitted reason for punishing several students for dressing in drag or blackface during a public performance included the performance's disrespectful nature, which "ran counter to the views the University sought to communicate to its students and the community" by "scoff[ing] at [the University's] goals of racial integration and gender neutrality." *Id.* at 391–92. Likewise, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), correctly held that a government policy that prohibited "speech that denigrates rather than validates certain characteristics" was an impermissible viewpoint-based distinction. *Id.* at 1126. The district court thus erred in concluding that restrictions on "a blackface performance, a white-supremacist rally, . . . or an antisemitic 'Shylock' skit mocking Jews," ROA.3885, or drag shows that supposedly "denigrat[e]" women, ROA.3878, would be viewpoint-neutral.

Some members of this Court have suggested that *Iota Xi* might have been decided differently had *CLS* preceded it. *See Spectrum WT v. Wendler*, 151 F.4th 714, 736 (5th Cir. 2025) (Ho, J., dissenting). But *Iota Xi* and *CLS* are entirely consistent, for the reasons given above: Both cases recognize that *viewpoint-based* restrictions are unconstitutional, including restrictions on discriminatory viewpoints. *CLS*, 561 U.S. at 684–85; *Iota Xi*, 993 F.2d at 391–92. And judges continue to cite *Iota Xi* as good law even after *CLS*. *E.g.*, *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 806 (S.D. Tex. 2025) (Rosenthal, J.); *Abbott v. Pastides*, 263 F. Supp. 3d 565, 578 (D.S.C. 2017), *aff'd*, 900 F.3d 160 (4th Cir. 2018); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 717 (4th Cir. 2018) (Agee, J. concurring) (citing *Iota Xi* as grounds for rejecting a feminist group's request to ban from campus an expressive forum (YikYak) under Title IX because "universities cannot 'restrict expression because of its message or its ideas' such as by 'silencing speech on the basis of its viewpoint'" (quoting *Iota Xi*, 993 F.2d at 393)).

Despite what the district court concluded (ROA.3878), this Court's decision in *Texas v. Knights of Ku Klux Klan*, 58 F.3d 1075 (5th Cir. 1995), lends no support to the government's actions here. As the Court explained in detail there, Texas's decision to deprive the Klan of the ability to adopt a stretch of highway in the state's Adopt-a-Highway program right outside the entrance to a desegregated housing project was *viewpoint neutral*. *Id.* at 1080–81. Before seeking participation in the state's

Adopt-a-Highway program, the Klan had threatened and engaged in so many acts of intimidation that a federal court enjoined the Klan (and its members) from further engaging in such acts and from impeding residents' access to the development—conduct that is not entitled to First Amendment protection as "expressive." *Id.* at 1077. Texas's desire to prevent the Klan's participation in the Adopt-a-Highway program along that particular stretch of road thus had nothing to do with the Klan's *expression*, "but rather results from the foreseeable impact of Program participation by the Klan, given the past conduct of the Klan, upon the peace and privacy of the project residents and use of the State's highways." *Id.* at 1081.

Had Texas banned the Klan from all participation in the program, and for every stretch of highway, because of the message the Klan conveyed, the result would have been different. *See Cuffley v. Mickes*, 208 F.3d 702, 705–07 (8th Cir. 2000) (holding that a Missouri government agency's decision excluding the KKK categorically from the state's adopt-a-highway program violated the First Amendment because the ban was "based on the Klan's views"). Indeed, President Wendler's candor here about why he will not permit Spectrum WT's drag shows matches that of the state official in *Cuffley* whose candor justified an injunction in the Klan's favor. *Id.* at 706–07 (noting the official's admissions that the Klan's application had been denied "on the basis of their beliefs" and based on the government's view about "what they believe in and what

8

they advocate"). And the same would of course have been true in *Knights* if Texas focused not on the Klan's "past conduct" and thus the "foreseeable impact" of allowing the Klan into the forum, but merely on a nonviolent group's allegedly "denigrating" black residents, as here. *See Cuffley*, 208 F.3d at 705 n.2 (citing and distinguishing *Knights* on exactly those grounds).

## III. The Court's Decision in *CLS* Cannot Justify Viewpoint Discrimination and Is No Substitute for Strict Scrutiny.

The district court's broad observation that CLS "counsels judges to 'respect university officials when it comes to regulating student activities to ensure an inclusive educational environment for all" cannot justify the viewpoint discrimination apparent in this record. ROA.3883 (quoting *Spectrum WT*, 151 F.4th at 733 (Ho, J., dissenting)). Any deference that precedent affords university officials applies only to viewpoint-neutral regulations, such as blanket prohibitions on the exclusion of prospective members in exchange for government subsidies. *See generally* Volokh, *Freedom of Expressive Association and Government Subsidies*, 58 Stan. L. Rev. 1919, 1924–31 (2006) (discussing difference between content-neutral subsidy cases and viewpoint-discriminatory ones).

Indeed, in the very first line of its very first paragraph, *CLS* said that "In a series of decisions, this Court has emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the

groups' viewpoints." 561 U.S. at 667–68 (citing *Rosenberger*, 515 U.S. 819, a limited forum case). But it held that the policy at issue in *CLS* did not violate that principle because the policy *did not* restrict groups' speech based on viewpoint: "Although registered student groups must conform their *conduct* to the Law School's regulation by dropping access barriers, they may express any *viewpoint* they wish—including a discriminatory one." *CLS*, 561 U.S. at 696 & n.26 (emphasis added).

Nor did *CLS* rest on any broad principle that university officials are owed some kind of special deference or respect that obviates the need to analyze whether a university's content-based restrictions are narrowly tailored to serve compelling state interests, or, worse, are viewpoint-based. *Cf. Spectrum WT*, 151 F.4th at 735–37 (Ho, J., dissenting) (arguing for "respect" for university "expertise" under *CLS*, without considering whether the university's restrictions in this case are content- or viewpoint-neutral). The Court's reference respect to the "expertise and experience of school administrators" applied only to discerning whether the restriction is *reasonable*. *CLS*, 561 U.S. at 687–88. But no deference is provided when deciding whether a restriction is viewpoint-neutral, nor can deference justify one that is plainly viewpoint-based (and thus blatantly unconstitutional). Quite the contrary. The Court made clear in *CLS* that "This Court is the final arbiter of the question whether a public university has exceeded constitutional constraints," and rejected any no-

10

tion that "we owe [any] deference to universities when we consider that question." 561 U.S. at 686.

Nor does *CLS*'s allowing a content-neutral restriction on student clubs' membership criteria mean that "*a fortiori*" universities can impose viewpoint-based restrictions on other clubs, including "to protect the dignity and safety of women." *Spectrum WT*, 151 F.4th at 739 (Ho, J., dissenting). Under *CLS*, governments are free to open a subsidy program only to nondiscriminatory groups so long as the government limits the subsidy in content-neutral ways that are reasonably applied; viewpoint-based restrictions continue to be barred. *See* 561 U.S. at 696; *Cornelius*, 473 U.S. at 806 (same). Indeed, the Court in *CLS* took pains to make clear in several passages that the "all-comers" policy there was constitutional because that policy was facially viewpoint-neutral:

- "[T]he First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Id.* at 667.

- "Any access barrier must be reasonable and viewpoint neutral." *Id.* at 674.

- "The fact that a university expends funds to encourage a diversity of views from private speakers, this Court has held, does not justify it in discriminating based on the viewpoint of private persons whose speech it facilitates." *Id.* at 682 n.13 (cleaned up).

11

- "The State may not . . . discriminate against speech on the basis of . . . viewpoint." *Id.* at 685 (cleaned up).

- "If restrictions on access to a limited public forum are viewpoint discriminatory, the ability of a group to exist outside the forum would not cure the constitutional shortcoming." *Id.* at 690 (cleaned up).

- "Although registered student groups must conform their conduct to the Law School's regulation by dropping access barriers, they may express any viewpoint they wish—including a discriminatory one." *Id.* at 696 n.26.

To be sure, the *CLS* dissent argued that the policy in that case was "not viewpoint neutral because it was announced as a pretext to justify viewpoint discrimination," *id.* at 707 (Alito, J., dissenting); *see also id.* at 724 (Alito, J., dissenting) (concluding that "[a]s interpreted by Hastings and applied to CLS," the law school's actions "constituted viewpoint discrimination"). But the majority did not endorse the dissent's assertion as to this point: As noted above, the majority upheld the law school's policy only after repeatedly stressing that it was "viewpoint neutral" as written, *id.* at 694–97 (and indeed remanded the case so that the lower court "may consider CLS's pretext argument if, and to the extent, it is preserved," *id.* at 697). *See also Cornelius*, 473 U.S. at 812 (holding that although the government's policy of limiting a government charity drive to certain participants was facially viewpoint-neutral, remand was required to deter-

12

mine whether such exclusions were "in fact based on the desire to suppress a particular point of view"). Whatever the merits of the *CLS* dissent's analysis may be, "only the Supreme Court can overturn its own precedents." *Spectrum WT*, 151 F.4th at 735 (Ho, J., dissenting). This Court must therefore treat *CLS* as precedent for endorsing facially viewpoint-neutral restrictions, but for rejecting rather than embracing viewpoint-based ones. There is, in fact, no precedent for endorsing viewpoint discrimination in such fora.

And indeed open-access rules like those upheld in *CLS* are generally treated as content-neutral. *E.g.*, *CLS*, 561 U.S. at 694 ("It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24 (1983) (treating antidiscrimination rules as "not distinguish[ing] between prohibited and permitted activity on the basis of viewpoint"); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643, 648 (1994) (treating laws that required carriage cable systems to carry local broadcast stations as "content-neutral" and acting "without reference to the content of speech"). Such rules do not treat expressive associations differently based on what the associations say, nor are they justified by the content, much less by the viewpoint, of the expressive associations' speech. And they reflect the principle that the government may deny subsidies even on content-based but viewpoint-neutral grounds, so long as the content-based distinction is part of the definition of the pro-

13

gram. *E.g., Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 548–51 (1983) (concluding that content-based but viewpoint-neutral exclusions of electioneering and lobbying speech from tax subsidies are constitutional).

Here, however, the university's actions were indubitably and admittedly viewpoint-based. *See supra* Part II. The university cannot engage in such viewpoint discrimination consistent with the First Amendment, just as a public university could not permissibly withdraw a subsidy from a student association out of fear that the group might use the subsidy to show films in the forum celebrating marriage between one man and one woman. And, despite the panel dissent's contrary suggestion, *CLS* does not authorize government to discriminate based on viewpoint. To the contrary, *CLS* continues the Court's "tradition of protecting the freedom to express the thought that we hate,'" including "discriminatory" "viewpoint[s]." *CLS*, 561 U.S. at 696 n.26.

## CONCLUSION

*CLS* and many other cases make clear: The government may not discriminate based on viewpoint even in limited public fora and nonpublic fora, and certainly in designated public fora. The restriction in this case was viewpoint-based, and therefore unconstitutional. For this reason, this Court should affirm the panel majority's judgment that Plaintiffs are likely to succeed on the merits.

14

Date: <u>July 24, 2026</u>                Respectfully submitted,

/s/ Joshua J. Bennett

EUGENE VOLOKH
Hoover Institution
Stanford University
434 Galvez Mall
Stanford, CA 94305
(650) 721-5092
volokh@stanford.edu

DALE CARPENTER
SMU Dedman School of Law
3315 Daniel Ave.
Dallas, TX 75206
Tel: (214) 768-2638
dacarpenter@mail.smu.edu

THOMAS A. BERRY
Cato Institute
1000 Mass. Ave., N.W.
Washington, DC 20001
tberry@cato.org

JOSHUA J. BENNETT
Baker & Hostetler LLP
2850 N. Harwood, Ste. 1100
Dallas, TX 75206
Tel: (214) 210-1166
jjbennett@bakerlaw.com

*Counsel for Amici Curiae*

15

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2026, an electronic copy of the fore-going was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

/s/ Joshua J. Bennett
JOSHUA J. BENNETT

16

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 29(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,294 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Joshua J. Bennett
JOSHUA J. BENNETT

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Joshua J. Bennett
JOSHUA J. BENNETT