No. 26-10127

# In the United States Court of Appeals for the Fifth Circuit

SPECTRUM WT,

*Plaintiff–Appellant*,

v.

WALTER WENDLER,

*Defendant–Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

## APPELLEE'S EN BANC BRIEF


KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

CHRISTOPHER J. PAVLINEC
Assistant Attorney General

*Counsel for Appellee*

# Certificate of Interested Persons

Spectrum WT,

*Plaintiff–Appellant*,

v.

Walter Wendler,

*Defendant–Appellee.*

---

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

---

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ William F. Cole
William F. Cole
*Counsel for Appellee*

## Statement Regarding Oral Argument

The Court has calendared this case for oral argument on September 23, 2026. Appellee agrees that oral argument would be helpful to the Court in addressing the complex First Amendment issues presented.

# Table of Contents


Certificate of Interested Persons ..... i
Statement Regarding Oral Argument ..... ii
Table of Authorities ..... iv
Introduction ..... 1
Statement of Jurisdiction ..... 3
Issues Presented ..... 3
Statement of the Case ..... 3
I. Factual Background ..... 3
A. Spectrum plans a charity drag show ..... 3
B. Spectrum applies to reserve Legacy Hall for the drag show ..... 5
C. President Wendler does not approve Spectrum's drag show ..... 6
D. Spectrum's later applications for drag shows are also not approved ..... 8
II. Procedural Background ..... 9
Summary of the Argument ..... 11
Standard of Review ..... 14
Argument ..... 14
I. Spectrum Failed to Prove Its First Amendment Claims at Trial. ..... 14
A. Spectrum did not meet its burden to prove it wished to engage in inherently expressive conduct. ..... 15
B. If First Amendment conduct is implicated, the University applied reasonable, viewpoint-neutral restrictions in a limited public forum. 26
C. The University's forum-based restriction is not a prior restraint. ..... 46
II. The Remaining Permanent-Injunction Factors Support Affirmance ..... 48
Conclusion ..... 50
Certificate of Compliance ..... 51

# Table of Authorities

**Page(s)**

**Cases:**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 15

*Alexander v. United States*,
509 U.S. 544 (1993) .......... 47

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......... 29, 33, 49

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) .......... 28

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011) .......... 30, 39

*Brown v. Louisiana*,
383 U.S. 131 (1966) .......... 17

*Cabrol v. Town of Youngsville*,
106 F.3d 101 (5th Cir. 1997) .......... 16, 22

*Cath. Leadership Coal. of Tex. v. Reisman*,
764 F.3d 409 (5th Cir. 2014) .......... 47

*Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*,
660 F. App'x 600 (10th Cir. 2016) .......... 48

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 41

*Chiu v. Plano Indep. Sch. Dist.*,
260 F.3d 330 (5th Cir. 2001) .......... 28, 29, 33, 35, 49

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
561 U.S. 661 (2010) .......... 1, 2, 10, 11, 13, 28, 29, 33, 35, 36
37, 38, 39, 40, 41, 42, 45, 46, 48, 49

*City Council of L.A. v. Taxpayers for Vincent*,
466 U.S. 789 (1984) .......... 41

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) .......... 25

*City of Dallas v. Stanglin*,
490 U.S. 19 (1989)....................16, 24

*City of Erie v. Pap's AM*,
529 U.S. 277 (2000).................... 23

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994).................... 45, 46

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984).................... 18

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)....................26, 29, 30

*Cressman v. Thompson*,
798 F.3d 938 (10th Cir. 2015)....................15

*Currier v. Potter*,
379 F.3d 716 (9th Cir. 2004).................... 34

*District of Columbia v. Heller*,
554 U.S. 570 (2008).................... 25

*Doe v. Santa Fe Indep. Sch. Dist.*,
168 F.3d 806 (5th Cir. 1999).................... 29, 30

*Estiverne v. La. State Bar Ass'n*,
863 F.2d 371 (5th Cir. 1989).................... 29

*Fairchild v. Liberty Indep. Sch. Dist.*,
597 F.3d 747 (5th Cir. 2010).................... 27, 28

*Freedom from Religion Found., Inc. v. Abbott*,
58 F.4th 824 (5th Cir. 2023).................... 34

*Freedom from Religion Found., Inc. v. Abbott*,
955 F.3d 417 (5th Cir. 2020)....................27, 47

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001)....................28, 35

*Greer v. Spock*,
424 U.S. 828 (1976).................... 26

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992).................... 29, 34

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) .......... 36

*Healy v. James*,
408 U.S. 169 (1972) .......... 36, 37, 43, 45

*Heaney v. Roberts*,
846 F.3d 795 (5th Cir. 2017) .......... 41

*Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) .......... 22

*Hunt v. Bd. of Regents of Univ. of N.M.*,
792 F. App'x 595 (10th Cir. 2019) .......... 45

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) .......... 16, 21, 22

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) .......... 27, 28

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993) .......... 20

*Just. For All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) .......... 30

*Keister v. Bell*,
29 F.4th 1239 (11th Cir. 2022) .......... 29, 30

*La Union del Pueblo Entero v. Abbott*,
167 F.4th 743 (5th Cir. 2026) .......... 14

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) .......... 12, 27, 29, 41

*Lichtenstein v. Hargett*,
83 F.4th 575 (6th Cir. 2023) .......... 17, 19, 22

*Littlefield v. Forney Indep. Sch. Dist.*,
268 F.3d 275 (5th Cir. 2001) .......... 17, 22

*Matal v. Tam*,
582 U.S. 218 (2017) .......... 43

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) .......... 27

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
432 U.S. 43 (1997) .......... 16

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 48

*Papish v. Bd. of Curators of the Univ. of Mo.*,
410 U.S. 667 (1973) .......... 43, 44, 45

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) .......... 27, 29, 30, 34, 39

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
748 F.3d 583 (5th Cir. 2014) .......... 25

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .......... 27, 28

*Police Dep't of Chi. v. Mosley*,
408 U.S. 92 (1972) .......... 15

*R.A.V. v. St. Paul*,
505 U.S. 377 (1992) .......... 41, 44

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 15

*Reeves v. McConn*,
631 F.2d 377 (5th Cir. 1980) .......... 45, 46

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 28, 41

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .......... 12, 15, 17, 18, 20, 21, 22, 44

*Schacht v. United States*,
398 U.S. 58 (1970) .......... 24

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) .......... 23

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) .......... 23, 24, 35, 47, 48

*Spectrum WT v. Wendler*,
151 F.4th 714 (5th Cir. 2025) .......... 9, 10, 39, 42

*Spectrum WT v. Wendler*,
157 F.4th 673 (5th Cir. 2025) .................................................................... 10

*Spence v. Washington*,
418 U.S. 405 (1974) .................................................................... 16, 17, 22

*Stromberg v. California*,
283 U.S. 359 (1931) ....................................................................15

*Tagami v. City of Chicago*,
875 F.3d 375 (7th Cir. 2017) ....................................................................

*Texas v. Johnson*,
491 U.S. 397 (1989) ...............................1, 10, 11, 15, 16, 17, 18, 19, 21, 22, 23, 25,

*The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*,
76 F.4th 569 (7th Cir. 2023) .................................................................... 22

*Tinker v. De Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ...................................................................., 17

*United States v. Bjerke*,
796 F.2d 643 (3d Cir. 1986) .................................................................... 34

*United States v. O'Brien*,
391 U.S. 367 (1968) ....................................................................16, 44

*Valentine v. Collier*,
993 F.3d 270 (5th Cir. 2021) .................................................................... 48

*Voting for Am., Inc. v. Steen*,
732 F.3d 382 (5th Cir. 2013) ....................................................................18, 22, 25

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ....................................................................

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) .................................................................... 27

*Wandering Dago, Inc. v. Destito*,
879 F.3d 20 (2d Cir. 2018) .................................................................... 44

*Widmar v. Vincent*,
454 U.S. 263 (1981) ....................................................................13, 29, 35, 36, 48

*Yeasin v. Durham*,
719 F. App'x 844 (10th Cir. 2018) .................................................................... 45

*Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.*,
720 F.2d 1429 (5th Cir. 1983) .......... 34

**Constitutional Provisions, Rules and Statutes:**

U.S. Const. amend I .......... 1, 3, 9, 10, 11, 12, 14, 15, 16, 17, 21
22, 23, 24, 25, 26, 33, 41, 44

U.S. Const. amend. XIV .......... 16, 23

20 U.S.C. § 1681(a) .......... 38, 49

28 U.S.C. § 1291 .......... 3

28 U.S.C. § 1331 .......... 3

28 U.S.C. § 1343 .......... 3

Tex. Educ. Code § 1.002(a) .......... 38

34 C.F.R. § 106.31(a)(1) .......... 38

Fed. R. Civ. P. 52(a) .......... 14

**Other Authorities:**

University Rule 08.02.99.W1, Expressive Activity on Campus .......... 5, 31, 32

## Introduction

The First Amendment does not compel public universities to open their indoor event spaces for any conceivable event their students wish to host. Instead, universities are entitled to adopt reasonable policies, "due decent respect" by federal courts, that help advance their educational mission and enforce "[n]ondiscrimination" policies and "state-law proscriptions on discrimination." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 687, 689-90 (2010) ("*CLS*").

That principle controls this appeal. In March 2023, Dr. Walter Wendler, longtime President of West Texas A&M University, cancelled Spectrum WT's charity drag show because he concluded that the event consisted of "conduct" and "impertinent gestures" that "[m]ock[] or objectif[y]" women "based on appearance, bias or predisposition" in a manner contrary to "the purpose of" the University, its "educational mission," and state and federal antidiscrimination law. ROA.4437-39. Spectrum sued, asserting violations of the First Amendment, but the district court rejected its claims after trial.

This Court should affirm. At the outset, Spectrum did not meet its burden to prove that its drag shows involved inherently expressive conduct protected by the First Amendment. At trial, Spectrum failed to present evidence that its alleged message of "breaking gender norms," ROA.4259, would have been "overwhelmingly apparent" to audience members, *Texas v. Johnson*, 491 U.S. 397,

404, 406 (1989), from watching student performers dancing and lip-syncing to music while clad in costume.

But even if Spectrum had carried its burden on expressive conduct, the University's exclusion of its drag shows from Legacy Hall comports with the Constitution. Legacy Hall—an indoor event venue that student groups may reserve for use after securing approval from the University—is a limited public forum because it is not generally accessible to students or the public for indiscriminate use. And because Legacy Hall is a limited public forum, the University need only show that its exclusion of Spectrum's drag shows was "reasonable" in the light of the forum's purpose and viewpoint neutral. *CLS*, 561 U.S. at 679. It was both.

The University's exclusion of Spectrum's drag shows was grounded in President's Wendler's judgment about the shows' effect on the educational environment and out of concern for compliance with antidiscrimination law—decisions the Supreme Court has held federal courts are bound to respect. *Id.* at 686-87. That decision was also viewpoint neutral: President Wendler testified unequivocally that he did not cancel Spectrum's drag shows because of any viewpoints the organization transmitted but because the *conduct* of those shows would have a deleterious impact on the University's educational environment. That is a critical distinction that underpins all forms of antidiscrimination law, which regulates discriminatory actions as conduct, not expression.

## Statement of Jurisdiction

Spectrum invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343. ROA.237-71. Spectrum timely noticed its appeal of the district court's January 17, 2026, final judgment on February 12. ROA.3901-03. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

**1.** Whether Spectrum demonstrated that the conduct in which it sought to engage—presenting student performers dancing and lip-syncing to music while clad in costuming and makeup that is sometimes associated with the opposite sex of the performer, ROA.4246-48, 4259—transmits messages about "breaking gender norms" that would be overwhelmingly likely to be understood by viewers such that it constitutes inherently expressive conduct protected by the First Amendment.

**2.** Whether Legacy Hall—a University-owned, on-campus event space that may be reserved for use through a multi-step event-approval process—constitutes a limited public forum, and whether the University's exclusion of Spectrum's drag shows from that forum, grounded in concerns about the educational environment, antiharassment, and antidiscrimination, was a reasonable, viewpoint-neutral restriction on the forum.

## Statement of the Case

### I. Factual Background

#### A. Spectrum plans a charity drag show

West Texas A&M University (the "University") is a public university located in the Texas Panhandle, just south of Amarillo. It is part of the Texas A&M

University System, which includes ten other universities. ROA.3206. Since 2016, Dr. Walter Wendler has served as the University's President and chief executive officer. ROA.3207, 4185.

Spectrum is one of several recognized student organizations at the University. ROA.3207. It has around 30 members, who are undergraduate or graduate students. ROA.2679. Its mission is to "provide a safe space for LGBT+ students and allies to come together," "raise awareness of the LGBT+ community," and "promote diversity, support, and acceptance on campus and in the surrounding community." ROA.3207. To further these ends, Spectrum hosts weekly meetings and puts on programs throughout the school year, including "Lavender Prom," "Queer History Night," and "Queer Movie Night." ROA.4183, 4263-65. Since the events underlying this lawsuit, Spectrum has continued to host a variety of similar gatherings on the University's campus without "interference," "discipline," or "issues." ROA.4346-47, 12069-73 (listing dozens of events since 2023).

In 2022, Spectrum planned to host a charity drag show, ROA.3207, with the proceeds of ticket sales to be donated to the "Trevor Project," a "charity aimed at preventing suicide in the LGBTQ+ community," ROA.4127-28, 4241, 4446 (flyer). Spectrum's president during that time testified that drag shows "involve[] a person making a character, coming up with . . . the music" and "lip-syncing to [that] music and dancing to [that] music" through a "choreograph[ed]" "routine" while in costume. ROA.4247-48. Often—but "not always"—the performer dresses in attire associated with the opposite sex. ROA.4248.

### B. Spectrum applies to reserve Legacy Hall for the drag show

In January 2023, Spectrum submitted a "reservation request" to the University to reserve Legacy Hall for its charity drag show on March 31. ROA.3207, 3507. Legacy Hall is a "multi-purpose" event space housed in the University's Jack B. Kelley Student Center ("JBK"). ROA.3474. Certain areas of the University campus—including "places located outside a building or facility that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks," ROA.4483—are "deemed traditional public forums" in which "[a]ny person is permitted to engage in expressive activities . . . freely" and "without a permit or other permission from the institution," ROA.4486.[1] But students who wish to use University facilities, such as classrooms and other indoor spaces like Legacy Hall, must specifically request and reserve them. ROA.4855.

In the JBK Center (which includes Legacy Hall), the University has expressly "reserve[d] the right to deny space usage for any group/event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies." ROA.4820 (2012), 4836 (2023), 4855 (2025). Similarly, it has "reserve[d] the right to cancel or interrupt any event in the interest of public safety, noncompliance with university policies, or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University." ROA.4820 (2012), 4836 (2023), 4855 (2025).

---

[1] This policy was updated in April 2026. *See* University Rule 08.02.99.W1 Expressive Activity on Campus, https://perma.cc/7JEX-3ZKJ ("2026 Amended Policy"). President Wendler agrees that this Court can take judicial notice of this policy. Spectrum.Br.6 n.1.

The event-approval process for the JBK Center moves forward in an "iterative" five-step process that includes a "reservation request," "risk assessment" for the event, and review of marketing materials. ROA.3505-06, 8048, 8059-62, 8067-80. This process could include "subsidiary steps," such as checking "liability insurance" or requiring "participant waivers." ROA.3505-06; *see also* ROA.4879 (describing the "release form" and its legal implications).

For Spectrum's drag show, this process included back-and-forth emails with University staff working out logistical details. Spectrum began the reservation process for its March 2023 drag show in January of that year, ROA.3507, 3297-3311, and spent the next two months in conversation with University staff attempting to secure approval. That process required the submission of a "risk assessment matrix," ROA.8048-49, 8059-62, which, in turn, generated several lines of inquiry from University staff about the event, ROA.8292-96. Beyond logistics, University staff sought to ensure that "warning labels" would be affixed to event materials and participants would get preapproval for "their dress and performance." ROA.8293. The University also requested that Spectrum alter the graphics on one of its advertisements, ROA.8292-94, and later worked with Spectrum to ensure its posters include the required contents, ROA.8303-06. Spectrum even submitted for approval a list of songs to University staff before the event to ensure appropriateness. *See* ROA.8297-8302; *see also* ROA.3526-28; ROA.12130.

### C. President Wendler does not approve Spectrum's drag show

Ultimately, Spectrum's drag show did not go forward in Legacy Hall. Exercising his authority to foster a healthy campus culture and effective educational

environment—and consistent with University policies in the Code of Student Life promoting "respect for the dignity of all individuals" and prohibiting "harassment" and "disruptive activity," ROA.5127, 5138-39—on March 20 President Wendler cancelled Spectrum's drag show. ROA.4437-39.

President Wendler explained his reasoning in a University-wide email. ROA.4437-39. Although he commended Spectrum's "noble" goal of "focus[ing] on suicide prevention" in the LGBTQ+ community and encouraged students to "send the dough" to the Trevor Project, ROA.4437, 4439, President Wendler explained that drag shows "exaggerat[e] aspects of womanhood (sexuality, femininity, gender)" and thereby "stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood," ROA.4437. He further explained that, "no matter the stated intent," "[s]uch conduct runs counter to the purpose of" the University, which "endeavors to treat all people equally," "intends to provide fair opportunities to all based on academic performance," and whose "educational mission" seeks to "elevate students based on achievement and capability . . . without regard to group membership." ROA.4438; *see also* ROA.4175-76, 4188-89 (President Wendler testifying to the same).

President Wendler also grounded his decision in antidiscrimination law, observing that the University is "charged by the state of Texas to treat each individual fairly," ROA.4438, and that federal agencies like the EEOC aim to root out "harassment" and "acts of prejudice," which "even when not criminal[,] are harmful," ROA.4438-39. As he explained, "impertinent gestures" that "[m]ock[] or objectify[] in any way members of any group based on appearance, bias or

predisposition" may flout these guarantees. ROA.4438, 4439. That is why he would similarly exclude from Legacy Hall "'blackface' performances" or "a quinceañera celebration" that "debased Latinas." ROA.4437-38; *see* ROA.4177-78, 4228, 4229-30 (President Wendler testifying that he would not permit shows mocking various racial, religious, or sexual groups).

In lieu of the on-campus show, Spectrum held an off-campus show at Sam Houston Park on March 31. ROA.4287-94. According to Spectrum's representative, it was a "success" and the "best attended Spectrum event." ROA.4289-90. Spectrum raised around $9,000 in donations for this show. ROA.3331-32.

Members of Spectrum and others also participated in on-campus protests of President Wendler's decision. ROA.3374-76, 11727. There is no indication that the University interfered with these protests, ROA.3374-76, 3648-52, even though some of the protestors dressed in drag, ROA.3649, 12528. At the time, President Wendler saw these protests in an "open public forum," but he "didn't sense" that they "were acting in a way that was demeaning to women." ROA.4162-63.

### D. Spectrum's later applications for drag shows are also not approved

Spectrum again applied to host a drag show in Legacy Hall on March 24, 2024. Spectrum received tentative approval, ROA.3208, 3546-47, and went through a risk assessment with University staff, ROA.8147-56. But this show did not receive full approval, and President Wendler penned another University-wide email, citing "reasons given previously" as one of his rationales for not permitting it. ROA.4441.

Spectrum applied for a third time to have a drag show in Legacy Hall on April 17, 2026. ROA.2688-89. For this show, Spectrum was "in the very, very early planning

stages." ROA.2688. As of December 2025, Spectrum's President did not know "who will perform" or "what the performances . . . will consist of." ROA.2688. And at trial, Spectrum's former president was "aware that there is a plan for one" but was "not aware about anything else about it." ROA.4297.

## II. Procedural Background

Four days after the 2023 drag show was disapproved, Spectrum and two of its then-student officers sued President Wendler (among others), alleging that the cancellation of the drag show violated their First Amendment rights in several ways. ROA.34-76, 250-53 (operative amended complaint). Spectrum sought both a temporary restraining order and a preliminary injunction. ROA.144-46. Spectrum later withdrew its TRO request, opting to hold its drag show off campus instead. ROA.190-91, 254, 4288. The district court later denied Spectrum's motion for a preliminary injunction, ROA.867-92, and Spectrum appealed, ROA.900-01.

A panel of this Court reversed, entered an injunction, and remanded. *Spectrum WT v. Wendler*, 151 F.4th 714 (5th Cir. 2025). The majority concluded that conduct is inherently expressive and protected by the First Amendment so long as "conveying some message, even if nearly opaque or perhaps smeared, was intended." *Id.* at 725. Applying that standard to Spectrum's drag show, the majority held that "a message in support of LGBT+ rights was intended." *Id.* The majority also held that Legacy Hall is a designated public forum because the University's facility-use policy "contains no limits on public expression of particular kinds or by particular groups" and there was no evidence that "a request for use has been denied to a student or an outside group." *Id.* at 727. The majority also rejected the

applicability of *CLS*, reasoning that *CLS* involved a limited public forum and an expressive-association claim, unlike here. *Id.* at 728.

Judge Ho dissented. He explained that Legacy Hall is a limited public forum because the University's facility-use policy limited what speech was permissible. *Id.* at 738 (Ho, J., dissenting). And in the light of the "educational context," he explained that, under *CLS*, "Judges owe university administrators 'due decent respect' when considering constitutional objections to their decisions." *Id.* at 734.

This Court later issued an order to rehear the case en banc, *Spectrum WT v. Wendler*, 157 F.4th 673, 674 (5th Cir. 2025) (per curiam), but the district court's intervening entry of final judgment mooted those proceedings, ROA.3889-90.

The district court held a one-day bench trial on January 14, 2026. ROA.4086-4432. It later issued findings of fact and conclusions of law rejecting Spectrum's First Amendment claims, ROA.3842-87, and entered final judgment, ROA.3888.

At the outset, the district court rejected that Spectrum's planned 2026 show is constitutionally protected. First, the court reasoned that the show "may lack constitutional protection" because it would be "sexually graphic" with minors present. ROA.3860-62. Second, the court concluded that Spectrum's proposed show is not inherently expressive conduct under the two-part *Johnson* test. ROA.3862-67. The court also determined that Legacy Hall is a limited public forum, ROA.3867-77, that the University's policy is reasonable and viewpoint neutral, ROA.3877-79, and that this policy is not a prior restraint, ROA.3879-81. Finally, the court concluded that *CLS* further supported finding that the University's policy is reasonable and viewpoint neutral. ROA.3881-86.

Spectrum timely appealed. ROA.3901. On May 15, the parties filed a joint petition for initial hearing en banc in this case, Dkt. 41, and in *Texas A&M Queer Empowerment Council v. Mahomes*, No. 25-20108. On June 22, this Court granted the petitions. Dkt. 51.

## Summary of the Argument

This Court should affirm the district court's judgment because Spectrum did not meet its burden to establish an entitlement to injunctive or declaratory relief on its First Amendment claims.

**I.** Spectrum failed to prove that the University's exclusion of its drag shows from Legacy Hall violated the First Amendment. At trial, Spectrum failed to marshal evidence to show that it intended to engage in any First Amendment-protected activity. The Free Speech Clause protects only conduct that is "inherently expressive"—that is, conduct "sufficiently imbued with elements of communication." *Johnson*, 491 U.S. at 404. Conduct qualifies as such only if "[1] an intent to convey a particularized message was present, and . . . [2] the likelihood was great that the message would be understood by those who viewed it." *Id.*

But Spectrum failed to adduce evidence that it would be "overwhelmingly apparent," *id.* at 406, to viewers that student performers dancing and lip-syncing on stage to music while clad in costume and makeup (sometimes, but not always, associated with the opposite sex), ROA.4246-48, were transmitting a message of "messing with and breaking gender norms," ROA.4259; *see* ROA.4250-51 (similar). Spectrum cannot alter that conclusion by pointing (at 23) to flyers advertising its event or after-the-fact question-and-answer sessions: "The fact that such

explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*"). Nor can Spectrum meet its evidentiary burden by arguing that it is sufficient that audience members would understand it sought to communicate *some* kind of message. The Supreme Court has rejected the argument that "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.'" *Id.* at 65-66.

Even if Spectrum carried its burden to demonstrate that it planned to engage in inherently expressive conduct protected by the First Amendment, the University's exclusion of its drag shows from Legacy Hall is not unconstitutional because it is a reasonable, viewpoint-neutral restriction in a limited public forum. Legacy Hall—an indoor event space on the University campus that may be reserved for student use with University approval—is a limited public forum. Unlike a designated public forum, Legacy Hall is not "open for indiscriminate public use for communicative purposes." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993). Instead, students who would like to use the forum must obtain approval from the University that is secured through a multi-layered approval process. ROA.3505-06, 4875. And the University expressly "reserves the right to deny space usage" for Legacy Hall or "cancel or interrupt any event" taking place there if it "conflicts with the University's mission or policies" or if it "can be viewed as inappropriate or not consistent with the mission of" the University. ROA.4855.

Because Legacy Hall is a limited public forum, the University need only show that its exclusion of Spectrum's drag shows from that forum was reasonable and

viewpoint neutral. *CLS*, 561 U.S. at 679. It was both. The Supreme Court "ha[s] never denied a university's authority to impose reasonable regulations compatible with [its] mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). And it has deemed "reasonable" university efforts to enforce "[n]ondiscrimination" policies and "state-law proscriptions on discrimination." *CLS*, 561 U.S. at 689-90. That is precisely what the University did here. As President Wendler explained, by excluding Spectrum's drag shows from Legacy Hall, he sought to prevent events that would "[m]ock[] or objectify[]" women "based on appearance, bias or predisposition" in violation of "the purpose of" the University, its "educational mission," and state and federal antidiscrimination law. ROA.4438-39.

The University's exclusion of Spectrum's drag shows from Legacy Hall is also viewpoint neutral. President Wendler testified that he did not cancel Spectrum's drag shows "because [h]e disagreed with any viewpoints that [he] thought would be expressed at those drag shows by Spectrum," ROA.4180, but because the *conduct* at those shows would be harmful to the educational environment, ROA.4175-76, 4438-39. Moreover, he explained that drag shows are barred "no matter the stated intent"—whether to mock the LGBTQ+ community or stand in solidarity with it. ROA.4437-38; *see* ROA.4177-78. And since the "conduct" to be regulated is that of "harassment" or "acts of prejudice," ROA.4438-49, he is prepared to apply the University's policy to performances denigrating a variety of racial, religious, or sexual groups. ROA.4437-38; *see* ROA.4177-78, 4228, 4229-30.

**II.** Nor has Spectrum demonstrated that it will suffer irreparable harm in the absence of an injunction or that the balance of equities and public interest support injunctive relief. Because Spectrum has not identified any First Amendment violation, it cannot bootstrap that deficient claim into irreparable injury. And both the public interest and balance of harms tip in favor of the University, as a holding with an overly expansive forum analysis or finding of viewpoint discrimination would force universities to host conduct that is antithetical to their mission, harmful to the educational environment, and at odds with antidiscrimination law—which might encourage universities to close such forums entirely.

## Standard of Review

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *La Union del Pueblo Entero v. Abbott*, 167 F.4th 743, 754 (5th Cir. 2026) ("*LUPE*"); Fed. R. Civ. P. 52(a). An issue raising "the First Amendment's protection of free speech is a mixed question of law and fact and reviewed *de novo*." *LUPE*, 167 F.4th at 754 (quotation marks omitted).

## Argument

### I. Spectrum Failed to Prove Its First Amendment Claims at Trial.

The Court should affirm the district court's judgment rejecting Spectrum's First Amendment claims. At trial, Spectrum did not prove that the drag shows it wished to hold in Legacy Hall—involving performers clad in costume dancing and lip-syncing to music, ROA.4246-48—constituted inherently expressive conduct

entitled to First Amendment protection. But even if Spectrum had marshalled evidence of such inherently expressive conduct, Legacy Hall is a limited public forum, and the University applied reasonable, viewpoint-neutral standards when it excluded Spectrum's drag show.

### A. Spectrum did not meet its burden to prove it wished to engage in inherently expressive conduct.

**1.** The Free Speech Clause forbids the government to "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). Although "[t]he First Amendment literally forbids the abridgment only of 'speech,'" the Supreme Court has "long recognized that its protection does not end at the spoken or written word." *Johnson*, 491 U.S. at 404. In addition to "pure speech," *Cressman v. Thompson*, 798 F.3d 938, 952 (10th Cir. 2015)—which includes everything from "pictures, films, paintings, drawings, engravings" to "oral utterance and the printed word," *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (citations omitted)—the prohibition extends to certain nonverbal "conduct that is inherently expressive," *FAIR*, 547 U.S. at 66; *see Cressman*, 798 F.3d at 954 ("symbolic speech").

The Supreme Court has recognized such inherently expressive conduct as including "saluting a flag (and refusing to do so)," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), "wearing an armband to protest a war," *Tinker v. De Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969), "displaying a red flag," *Stromberg v. California*, 283 U.S. 359, 369 (1931), "and even '[m]arching,

walking, or parading' in uniforms displaying the swastika," *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43 (1997) (per curiam). *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) (collecting these authorities). This line of cases recognizes "that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Johnson*, 491 U.S. at 404 (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974) (per curiam)).

At the same time, however, the Supreme Court has cautioned that it "cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). After all, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). So, to determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Supreme Court has long instructed courts to consider "whether 'an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (alterations omitted) (quoting *Spence*, 418 U.S. at 410-11). Ultimately, "[i]n order for a message to be delivered by conduct, it must, in context, be reasonably apprehended by viewers." *Cabrol v. Town of Youngsville*, 106 F.3d 101, 109 (5th Cir. 1997).

In applying this test, identifying "the context in which" the conduct "occurred" is key. *Johnson*, 491 U.S. at 405. Indeed, "[t]he protection of the First

Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001). Thus, it was critical in *Spence* that the defendant's "taping of a peace sign to his flag was 'roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy.'" *Johnson*, 491 U.S. at 405 (quoting *Spence*, 481 U.S. at 410). And in *Tinker*, that the students wore "black armbands to protest American military involvement in Vietnam." *Id.* at 404 (citing *Tinker*, 393 U.S. at 505). Or in *Brown v. Louisiana*, that African Americans engaged in a "sit-in . . . in a 'whites only' area to protest segregation." *Id.* (citing 383 U.S. 131, 141-42 (1966)). Likewise, in *Johnson*, that the defendant "burned an American flag as part—indeed, as the culmination—of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President." *Id.* at 406.

As the Supreme Court has elaborated, the message, or "the point," of the conduct should be "overwhelmingly apparent" for it to be deemed inherently expressive. *FAIR*, 547 U.S. at 66 (quoting *Johnson*, 491 U.S. at 406). That is, "a viewer must be able to understand the message from the conduct *alone*." *Lichtenstein v. Hargett*, 83 F.4th 575, 594 (6th Cir. 2023). But if conduct is "expressive only because" it is "accompanied . . . with speech explaining it," it is unlikely to qualify as inherently expressive. *FAIR*, 547 U.S. at 66. "The fact that such explanatory speech is necessary is strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *Id.* Otherwise, "[i]f combining

speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

**2.** "As the party invoking the First Amendment's protection, [Spectrum] ha[d] the burden to prove that it applies." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). But Spectrum failed to prove that its planned drag shows were intended to convey a message that in "context" had a "great" likelihood of being understood by viewers. *Johnson*, 491 U.S. at 405.

Spectrum's president testified that drag performances "involve[] a person making a character, coming up with . . . the music" and "lip-syncing to [that] music and dancing to [that] music" through a "choreograph[ed]" "routine" while in costume. ROA.4246-48. Often—but "not always"—the performer dresses in attire associated with the opposite sex. ROA.4248. And the shows "typically consist of multiple performers" each "trying to convey their own message." ROA.4250. Spectrum's shows would also involve judges (local drag performers) who are "looking for how well the makeup was done, how well the hair was done, how well the outfit and the performance matches the idea of the . . . character." ROA.4257.

At the outset, it is far from clear that Spectrum even met *Johnson*'s first prong—the "intent to convey a particularized message," 491 U.S. at 404—because two of the organization's presidents testified that it is the individual performers, rather than the organization, that speaks through the drag shows, and Spectrum does not tell the performers what messages to convey or dance routines to perform. ROA.4268-70, 4347-51; *see* ROA.4351 ("We are not trying to convey a specific message, no.").

Nevertheless, even if the Court were to credit Spectrum's president's testimony that it intended to convey a message of "messing with and breaking gender norms," ROA.4259; *see* ROA.4250-51 (similar), Spectrum failed to satisfy the second prong of *Johnson* by presenting evidence that "the likelihood was great that [its] message would be understood by those who viewed it." 491 U.S. at 404.

As the district court held, Spectrum failed to show that the likelihood is "great," *Johnson*, 491 U.S. at 404, or "high" that, standing "alone," *Lichtenstein*, 83 F.4th at 594, viewers of Spectrum's drag shows would necessarily equate students dancing to music on stage while clad in costume with a message of "bending gender norms," ROA.3864-65. Although Spectrum's president testified that drag performances "always challenge gender norms," ROA.4248, two examples it offered undercut that categorical assertion. First, while "a character lift[ing] off her wig to show shower petals as she was going insane" might well convey "the idea of her character being unhinged," ROA.4256, it is not obvious that it sends a message about "breaking gender norms." Likewise, a male member of Spectrum donning feminine attire and performing to "a Green Day Song" might well telegraph a message "of protest towards cancellation of the drag show," ROA.4254, but it is far from clear that it communicates anything about gender norms, *see* ROA.3864-65 (district court supplying additional examples); *cf. Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017).

Spectrum might argue that the fact that performers "normally" (but "not always") appear in attire associated with the opposite sex is what conveys the organization's message of breaking gender norms. ROA.4248. But cross-dressing

does not necessarily transmit that message. Consider an "ugly woman" skit involving members of a fraternity donning the attire of, and caricaturing, the opposite sex, *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 387-88, 391 (4th Cir. 1993), or a film scene featuring men dressed in women's clothing that compares being drafted in the Army to being drafted into a women's chorus, ROA.12583.

Spectrum also suggested that the "integral attribute[]" of "identifying a drag show" is that "it's an LGBTQ+ group trying to put it on." ROA. 4257-58. But that argument proves too much. Not everything an LGBTQ+ group does conveys a message relating to subverting gender norms. *Cf.* ROA.4328-29 ("There's different drag shows for different reasons at different places at different times."). A fundraiser taking the form of a juggling competition or a footrace or a bowling tournament would not transmit such a message just because an LGBTQ+ club hosts it or because it benefits an LGBTQ+ charity.

**3.** Spectrum offers several arguments in response, but none has merit. *First*, Spectrum contends (at 28) that "Spectrum's flyers for the 2023 event" provide the requisite context because they "leave no doubt as to [the event's] communicative context as an LGBTQ+ group event expressing ideas about gender norms and sending a message of support for an LGBTQ+ charity." But that is a concession that "[t]he expressive component" of Spectrum's actions is "not created by the conduct itself but by the speech that accompanies it." *FAIR*, 547 U.S. at 66. And "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue

here is not so inherently expressive that it warrants protection." *Id.* Spectrum cannot rely on its flyers to bring its conduct within the ambit of the First Amendment.

Spectrum similarly errs by arguing (at 23) that its drag shows are inherently expressive because "performers answer[] questions in character." No evidence indicates that these questions or answers concern breaking gender norms, *cf.* ROA.4255-56, so tacking speech onto the end of the performance does not help transmit Spectrum's alleged message. Regardless, the evidence shows that this question-answer portion occurs "[a]fter the performance." ROA.4255. That means the performance itself would be "expressive only because" Spectrum "accompanied [its] conduct with speech explaining it." *FAIR*, 547 U.S. at 66. But "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

*Second*, Spectrum contends (at 26-27) that "the district court's reasoning" that Spectrum's message was not overwhelmingly likely to be understood by viewers is inconsistent with *Hurley*. In Spectrum's telling (at 24), so long as the audience "understand[s] the performance is saying *something*," the second prong of *Johnson* is met. But that would collapse *Johnson*'s two-part test into a single inquiry: so long as the speaker intends to say something through an action, the First Amendment applies. Such an inquiry mirrors the long-rejected notion that "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *FAIR*, 547 U.S. at 65-66.

*Hurley* did not overrule *Johnson* or *Spence*, and this Court continues to apply that two-part test. *See, e.g.*, *Voting for Am.*, 732 F.3d at 388; *Littlefield*, 268 F.3d at 282-83; *Cabrol*, 106 F.3d at 109. True, the "first element"—an intent to convey a particularized message—may "not pose a high bar" following *Hurley*, but "[t]he second element—that the audience will likely understand the message—has more bite." *Lichtenstein*, 83 F.4th at 594. Even Spectrum's own authority confirms this: while the audience need not understand a granular, "specific message" that the performer "was attempting to convey," they still must at least infer "a generalized message." *Holloman v. Harland*, 370 F.3d 1252, 1271 (11th Cir. 2004). The problem for Spectrum is that, as the district court found, ROA.3864-66, no evidence supports the notion that the audience was overwhelmingly likely to understand even its "generalized messages" about breaking gender norms. *Supra* at 18-20; *cf. The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 577 (7th Cir. 2023) ("On its own, paying bail for a pretrial defendant does not communicate even the most general version of The Bail Project's message—its opposition to cash bail.").

*Third*, Spectrum argues (at 22-23) that its drag shows are "stage performances" or "live entertainment such as musical[s] and drama[s]," no different from those performed by the Ancient Greeks or written by Shakespeare, which are categorically inherently expressive. Initially, it is far from clear that Spectrum's collection of choreographed, costumed dance routines is more analogous to Macbeth, Les Misérables, or Swan Lake than it is to unprotected recreational ballroom dancing. *Cf. Stanglin*, 490 U.S. at 25. But regardless, Spectrum's trio of cases (at 22-23) does not help it because none articulates the standards for determining when conduct is

"sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Johnson*, 491 U.S. at 404.

Take *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981). There, the Supreme Court invalidated the criminal convictions of the proprietors of an adult bookstore who were fined under a city ordinance for hosting nude dancing on the premises. *Id.* The Court held that the ordinance was unconstitutionally overbroad because it banned all forms of "live entertainment, including nonobscene nude dancing that is otherwise protected by the First Amendment." *Id.* at 76. There was no question that the First Amendment applied because the Supreme Court had already held that "nude dancing is not without its First Amendment protections from official regulation"—though it declined to delineate the level of "First Amendment protection [that] should be extended to nude dancing, live or on film" because of the ordinance's overbreadth problem. *Id.* at 66. Overbreadth is not at issue here. Moreover, nude dancing enjoys constitutional protection because it conveys "an erotic message," *City of Erie v. Pap's AM*, 529 U.S. 277, 290 (2000)—a message Spectrum disclaims, *see* ROA.4311-15.

Or consider *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975). There, the Court held that a municipality's decision to deny a production company use of a municipal theater to screen a controversial musical was a prior restraint in violation of the First Amendment. *Id.* at 552-57. The Court explained that "[o]nly if we were to conclude that live drama is unprotected by the First Amendment—or subject to a totally different standard from that applied to other forms of expression—could we possibly find no prior restraint here." *Id.* at 557. But the Court

elaborated that "[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Id.* And "[b]y its nature, theater usually is the acting out—or singing out—of the written word." *Id.* at 557-58. Yet no evidence indicates that Spectrum's drag shows would involve "the acting out—or singing out—of the written word." *Id.* Instead, Spectrum has described its conduct as involving dancing and lip-syncing while in costume. *See* ROA.4246-48; *cf. Stanglin*, 490 U.S. at 25.

Last, consider *Schacht v. United States*, 398 U.S. 58 (1970). In *Schacht*, the Supreme Court overturned the conviction of a person who was fined for wearing a U.S. Army uniform "without authority" because he was not a member of the armed forces. *Id.* at 59. Schacht argued that he was authorized to wear the uniform by a federal statute allowing actors to wear an armed-forces uniform while portraying a member of the armed forces "in a theatrical or motion-picture production," so long as "the portrayal does not tend to discredit that armed force." *Id.* at 60-61. The Supreme Court held that the statute applied because Schacht took part in a "street skit" that "expose[d] the evil of the American presence in Vietnam and was part of a larger, peaceful antiwar demonstration." *Id.* at 60, 61-62. It also held that the "discredit" clause of that statute violated the First Amendment because it was viewpoint discriminatory: It left "Americans free to praise the war in Vietnam but [could] send persons like Schacht to prison for opposing it." *Id.* at 63. But the case presented no question about the level of constitutional protection afforded to Schacht's conduct.

*Fourth*, Spectrum argues (at 24) that its performances are expressive because President Wendler surmised that they promote an "ideology." Not so. True, in response to Spectrum's counsel's questions, President Wendler agreed that, by "demeaning women, disrespecting women and offending women," drag shows—in general—"promot[e] some sort of ideology" that may include "a monolithic view of what a woman is and her purpose." ROA.4127. But the relevant question here is whether Spectrum's purported message about breaking gender norms would be "overwhelmingly apparent" to viewers *of Spectrum's shows*. *Johnson*, 491 U.S. at 406. And President Wendler's testimony is unhelpful to Spectrum on that score. In response to the question "Do you know what, if any, expressive message or specific expressive message Spectrum intended to convey in those drag shows?" President Wendler testified: "I do not." ROA.4180.

**4.** When a government entity's decisions or policies "regulate conduct only and do not implicate the First Amendment, rational basis scrutiny is appropriate." *Voting for Am.*, 732 F.3d at 392 (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008)). Under rational-basis review, this Court must assume the University's exclusion of Spectrum's drag shows from Legacy Hall is valid, and it must be sustained so long as the policy "is rationally related to a legitimate state interest." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 594 (5th Cir. 2014) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).

The University's exclusion of Spectrum's drag shows satisfies rational-basis review. President Wendler determined that the proposed drag shows would

"exaggerat[e] aspects of womanhood (sexuality, femininity, gender)" and thereby "stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood." ROA.4437. Such "conduct" and "impertinent gestures" would "[m]ock[] or objectify[]" women "based on appearance, bias or predisposition" in a manner contrary to "the purpose of" the University, its "educational mission," and perhaps state and federal antidiscrimination law. ROA.4437-39. These are entirely rational reasons that survive rational-basis review.

### B. If First Amendment conduct is implicated, the University applied reasonable, viewpoint-neutral restrictions in a limited public forum.

Even if Spectrum planned to engage in inherently expressive conduct protected by the First Amendment, the University's exclusion of its drag shows from Legacy Hall comported with the Constitution because Legacy Hall is a limited public forum, and the University's policy is reasonable and viewpoint neutral.

#### 1. Legacy Hall is a limited public forum.

**a.** "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). "[T]he Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Id.* at 800 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). "The existence of a right of access to public

property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983). Such questions are answered using the Supreme Court's "'forum-based' approach for assessing restrictions that the government seeks to place on the use of its property." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("*ISKCON*")).

The Supreme Court has recognized "two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums," *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020), differentiated by the level of scrutiny applicable to speech restrictions in each. "The action—in this case and most others—exists at the line between designated and limited public forums." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010).

A designated public forum is "'government property that has not traditionally been regarded as a public forum [but] is intentionally opened up for that purpose.'" *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Such forums are sometimes referred to as designated public forums of "unlimited character," *ISKCON*, 505 U.S. at 678, owing to the fact that they are "open for indiscriminate public use for communicative purposes," *Lamb's Chapel*, 508 U.S. at 392. Thus, "a designated public forum consists of government property that has been opened for the purpose of functioning, more or less, as a traditional public forum, even though

it does not possess the historical pedigree of a traditional public forum." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017). "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." *Pleasant Grove*, 555 U.S. at 469-70.

Limited public forums, on the other hand, are "forums opened for public expression of particular kinds or by particular groups." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (per curiam) (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001), and *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)); *cf. ISKCON*, 505 U.S. at 678 (designated public forums of a "limited . . . character"). "The necessities of confining a forum to the limited and legitimate purpose for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Fairchild*, 597 F.3d at 758 (quoting *Rosenberger*, 515 U.S. at 829). The Supreme Court has therefore "appl[ied] a less restrictive level of scrutiny to speech in limited public forums as compared to other environments." *CLS*, 561 U.S. at 680. As a result, "[w]hen a public body establishes a limited public forum . . . that body may restrict the expression that takes place within the forum so long as the restriction (1) does 'not discriminate against speech on the basis of viewpoint' and (2) is 'reasonable in light of the purpose served by the forum.'" *Chiu*, 260 F.3d at 346 (quoting *Good News Club*, 533 U.S. at 106-07).

**b.** "In distinguishing between the two types of forums," this Court's "precedent directs [the] focus on two factors: (1) the government's intent with

respect to the forum, and (2) 'the nature of the [forum] and its compatibility with the speech at issue.'" *Chiu*, 260 F.3d at 346 (quoting *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 378 (5th Cir. 1989)).

"The Supreme Court has consistently emphasized that public entities have broad discretion to control access to and use of property or events that are not traditional public forums." *Id.* at 346-47 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)). "The government creates a designated public forum 'only by intentionally opening a nontraditional forum for public discourse.'" *Id.* at 347 (quoting *Cornelius*, 473 U.S. at 802). "To create such a forum, the government must allow 'general access' to, or 'indiscriminate use' of, the forum in question." *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 819-20 (5th Cir. 1999) (internal citations omitted) (first quoting *Cornelius*, 473 U.S. at 801, then *Perry*, 460 U.S. at 47); *see Lamb's Chapel*, 508 U.S. at 392 (describing a designated public forum as "open for indiscriminate public use for communicative purposes").

Furthermore, "[t]he Supreme Court has recognized that universities differ from other public fora in important ways." *Keister v. Bell*, 29 F.4th 1239, 1252 (11th Cir. 2022) (citing *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981)); *see also CLS*, 561 U.S. at 685-87. "Among other distinctions, universities have a particular mission to educate." *Keister*, 29 F.4th at 1252. "So when it comes to their campus and facilities, universities generally may issue reasonable regulations that are consistent with that mission." *Id.* Thus, even in a designated public forum, a university may impose "limits necessary to preserve the academic mission and to maintain order." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992). Although "university

public-speaking venues often qualify as limited public fora," a "college campus 'will surely contain a wide variety of fora on its grounds.'" *Keister*, 29 F.4th at 1252 (quoting *Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir. 2011)); *see also Just. For All v. Faulkner*, 410 F.3d 760, 766-67 (5th Cir. 2005) (same). Therefore, the Court "must first identify the precise piece of campus the speaker wishes to access." *Keister*, 29 F.4th at 1252.

Here, that portion of the University is Legacy Hall—a "multi-purpose" event space that can host a broad range of events. ROA.3206, 3474. The evidence in the trial record indicates that the University intended Legacy Hall to be a limited, rather than a designated, public forum. Critically, this space is not "general[y] access[ible]" to the public—or even the student body—for "indiscriminate use." *Doe*, 168 F.3d at 819-20 (quoting *Cornelius*, 473 U.S. at 801, then *Perry*, 460 U.S. at 47). Instead, groups wishing to use Legacy Hall must submit a request for use of the space that is approved by the University through an "iterative" five-step process. ROA.3457, 3505-06; *see also* ROA.4875 (describing three-step reservation process including a request, tentative confirmation, and final confirmation). Even then—and as with all "campus spaces, rooms, buildings, and facilities," ROA.5079—the University expressly "reserves the right to deny space usage" for Legacy Hall or to "cancel or interrupt any event" taking place there if it "conflicts with the University's mission or policies," or if it "can be viewed as inappropriate or not consistent with the mission of West Texas A&M University." ROA.4855.

The facts of this case demonstrate this multi-layered process in action. The evidence shows that Spectrum began the reservation process for its March 2023 drag

show in January of that year, ROA.3507, 8052, and spent the next two months in conversation with University staff attempting to secure approval. That process required the submission of a "risk assessment matrix," ROA.8048-49, 8059-62, which, in turn, generated several lines of inquiry from University staff about the event, ROA.8292-96. Beyond logistics, University staff sought to ensure that "warning labels" would be affixed to event materials and that participants would get preapproval for "their dress and performance." ROA.8293. The University also requested that Spectrum alter the graphics on one of its advertisements, ROA.8292-94, and later worked with Spectrum to ensure its posters include the required contents, ROA.8303-06. Spectrum even submitted a list of songs to University staff for approval before the event. *See* ROA.8297-8302; *see also* ROA.3527-28, 12130 (noting that "JBK has an approved list of music").

This reservation-based system that vests final approval in the University regarding use of the property does not bear the hallmarks of a designated public forum, like campus "streets, sidewalks, or parks," ROA.4483, where "[m]embers of the university community are allowed to assemble or distribute written material . . . without a permit or other permission from the institution," ROA.4486. And indeed, when the University intends to create a designated public forum, it does so explicitly. For example, it has expressly "deemed" "[t]he common outdoor areas of the university's campus" to be "traditional public forums." ROA.4448; *see* 2026 Amended Policy, *supra* at 1 (same). Those areas include "places located *outside a building or facility* that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks." ROA.4483 (emphasis added); *see* 2026 Amended Policy, *supra* at

1 (designating some "common outdoor spaces" as public forums and others as "not" public forums). But the University has not done so for venue spaces and other *indoor* facilities like Legacy Hall. Instead, the University System has expressly deemed "meeting rooms, theatres, [and] auditoriums" to be "limited forums for the purpose of promoting the mission of the System." ROA.5464.

**c.** Spectrum makes three arguments for classifying Legacy Hall as a designated public forum, but none should carry the day.

*First*, Spectrum attempts to brush off (at 54-56) the University's reserved right to cancel an event or deny access to Legacy Hall if an event is inconsistent with university policy or its mission, ROA.4855, 5709, by contending that this limitation is "supersed[ed]" by other System and University policies barring viewpoint- and content-based discrimination, *see* ROA.4483-85 (A&M System Policy); 2026 Amended Policy, *supra* at 2 (University Policy). But the System Policy forbidding viewpoint-based denials of campus facilities is inapposite because the University's exclusion of Spectrum's drag shows from Legacy Hall is not viewpoint based. *See infra* at 40-46. And the University Policy stating that a decision to confirm a reservation will not "be based on the content or viewpoint of the expressive activity or upon the expected reaction of others" is inapplicable here because it concerns "reservable *designated* public forums," not *limited* public forums like Legacy Hall. 2026 Amended Policy, *supra* at 1; ROA.5464. Moreover, Spectrum points to nothing indicating that these generalized university and system policies have supplanted the more specific policies governing Legacy Hall. ROA.4855; *cf.* ROA.4186-88 (President Wendler testifying that these policies apply "today" to "Legacy Hall").

*Second*, Spectrum argues (at 57) that Legacy Hall is a designated public forum because the University's "practice" shows that it has allowed "broad access" to that facility, including "concerts, beauty pageants, plays, parties, political talks, worship services, fashion shows—and, in 2019, a drag show."

But the fact that a University is infrequently called upon to enforce the limits on its forum hardly shows that there are no limits at all. In *CLS* for example, the University "ha[d] more than 60 registered [student] groups and, in all its history, ha[d] denied registration to exactly one: the Christian Legal Society." 561 U.S. at 707 (Alito, J., dissenting). Yet this fact did not change the Supreme Court's conclusion that it was confronting a limited public forum. *See id.* at 679 & n.12. So too here. That the University infrequently excludes events from Legacy Hall is more indicative of fact that the University is rarely faced with requests to host events in Legacy Hall that might violate its policies or rules. For example, the University is not required to open its indoor event spaces for minstrel shows, Nazi plays, or KKK rallies merely because it has not had occasion to exclude them before. Were such a rule adopted, the University "might elect not to open such property for any public discourse," which "would conflict with the broad First Amendment policy of encouraging public discourse on issues of community interest." *Chiu*, 260 F.3d at 347 (citing *Ark. Educ. Television*, 523 U.S. at 681).

Spectrum's attempt to draw parallels between its drag shows and past events that Legacy Hall has hosted fails. In the University's judgment, the events identified—concerts, beauty pageants, worship services, political talks—do not pose the same risks to the educational environment that the drag shows at issue here did.

ROA.4189.[2] But even if these past events could be construed to have violated the *current* limits on the forum, it is well established that "a state is not required to indefinitely retain the open character of" a designated or limited public forum. *Perry*, 460 U.S. at 46; *see also Freedom from Religion Found., Inc. v. Abbott*, 58 F.4th 824, 835 (5th Cir. 2023) (same); *Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004); *United States v. Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986); *Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.*, 720 F.2d 1429, 1432 (5th Cir. 1983). Even if this past practice suggests that the University once considered drag shows to be consistent with the limits on the forum, the evidence in the record shows that any such designation had changed, at a minimum, by the date that the University cancelled Spectrum's 2023 drag show.

Spectrum responds that the government's policy is indicated by its "*consistent* practice, not each exceptional regulation that departs from the consistent practice." Spectrum.Br.58 (quoting *Hays Cnty. Guardian*, 969 F.2d at 118). But *Hays County Guardian* explained that "a general policy of open access does not vanish when the government adopts a specific restriction on speech." 969 F.2d at 117-18. Unlike the "outdoor grounds of the campus such as the sidewalks and plazas" at issue in *Hays County Guardian*, *id.* at 116, here Legacy Hall has never had a "general policy of open access" but instead the University operates a reservation-based system that requires University approval before hosting events. *See supra* at 30-32.

---

[2] Spectrum also gestures (at 57) to a drag show hosted at the University in 2019. *See* ROA.3391. But there is no evidence in the record about this show, let alone evidence demonstrating that this show was "[m]ocking or objectifying in any way members of any group based on appearance, bias or predisposition." ROA.4438.

*Third*, citing *Southeastern Promotions*, Spectrum argues (at 57-58) that it would be consistent with the nature of Legacy Hall to host a drag show because it is a theater and the "compatibility [inquiry] asks whether the venue can host the mode of expression." Yet Spectrum overlooks that "[a] university differs in significant respects from public forums such as . . . municipal theaters" like the one at issue in *Southeastern Promotions. Widmar*, 454 U.S. at 267 n.5. "A university's mission is education," so it is entitled "to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* That is precisely what the University has done here. *See infra* at 35-40.

**2. The University's actions survive constitutional scrutiny.**

Because Legacy Hall is a limited public forum, the University need only show that its "access barrier" is "reasonable and viewpoint neutral" to survive constitutional scrutiny. *CLS*, 561 U.S. at 679. It is both.

**a. The University's restriction is reasonable in the light of the forum's purpose.**

**i.** In determining whether the University's restriction "is 'reasonable in light of the purpose served by the forum,'" *Chiu*, 260 F.3d at 346 (quoting *Good News Club*, 533 U.S. at 107), the Supreme Court has instructed that the "inquiry [be] shaped by the educational context in which it arises," *CLS*, 561 U.S. at 685. That is, "'First Amendment rights . . . must be analyzed in light of the special characteristics of the school environment.'" *CLS*, 561 U.S. at 685-86 (quoting *Widmar*, 454 U.S. at 286 n.5). While "the campus of a public university . . . possesses many of the characteristics of a public forum," it "differs in significant respects from public

forums such as streets or parks or even municipal theaters." *Widmar*, 454 U.S. at 267 n.5.

"A university's mission is education, and decisions of [the Supreme] Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* Universities thus "may expect that [their] students adhere to generally accepted standards of conduct." *Healy v. James*, 408 U.S. 169, 192 (1972) (citation omitted). And schools may restrict "student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns" and "members of the public might reasonably perceive [those actions] to bear the imprimatur of the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271, 273 (1988). Moreover, "[a] college's commission—and its concomitant license to choose among pedagogical approaches—is not confined to the classroom, for extracurricular programs are, today, essential parts of the educational process." *CLS*, 561 U.S. at 686. So schools "enjoy a significant measure of authority over the type of officially recognized activities in which their students participate." *Id.* at 686-87 (quotation omitted). Thus, courts must be "mindful that" the University's decisions regarding "student[]group[s]" are "due decent respect." *Id.* at 687.

No doubt, courts are "the final arbiter of the question whether a public university has exceeded constitutional constraints." *Id.* at 686. But when assessing the reasonableness of a university's restriction, the Supreme Court has cautioned courts to "resist substitut[ing] their own notions of sound educational policy for those of the school authorities which they review." *Id.* (quotation omitted). That is

because "judges lack the on-the-ground expertise and experience of school administrators." *Id.* So courts must afford due "regard for school administrators' judgment" and "'approach [the] task with special caution.'" *Id.* at 687 (quoting *Healy*, 408 U.S. at 171).

**ii.** Under these standards, the University's cancellation of Spectrum's drag show is reasonable in the light of the educational environment. As President Wendler explained, the drag shows in question were "performance[s] exaggerating aspects of womanhood (sexuality, femininity, gender)" that would "stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood." ROA.4437. In his judgment, this type of "demeaning and denigrating" performance would "diminish respect for half of our population on the campus." ROA.4176.

Such a result would be inimical to the University's goal of fostering an educational environment that "treat[s] each individual fairly" and "elevate[s] students based on achievement and capability," "without regard to group membership." ROA.4438. As President Wendler testified, permitting such shows would undercut the University's core value of respect and thereby "compromise[]" and "dilute[]" "the conditions for learning and studying." ROA.4175-76; *see also* ROA.4188-89 (explaining that the drag shows would impede the University's "educational mission"). As he put it, "[o]ffering respect, not ridicule, is the order of the day for fair play and is the WT way." ROA.4439.

But it was not simply concerns about the University climate that motivated the event's cancellation: President Wendler expressed concern that, by "[m]ocking or

objectifying" women "based on appearance, bias or predisposition," Spectrum's drag shows might rise to the level of "harassment" or "acts of prejudice" that are barred by University policies prohibiting such behavior and requiring equal treatment. ROA.4438-39; *see also* ROA.4935 (core values of "respect for the dignity of all individuals" and "cooperation"), 4947-48 (policies prohibiting "disorderly conduct," "disruptive activity" and "harassment"). Nor was it just University policy driving his concerns: President Wendler also referenced state and federal mandates requiring universities to provide equal opportunities to all students regardless of sex. *See* Tex. Educ. Code § 1.002(a); 20 U.S.C. § 1681(a); 34 C.F.R. § 106.31(a)(1).

These are exactly the types of judgments that the Supreme Court has held are reserved for administrators and which the federal courts are ill-equipped to second guess. In *CLS*, the Supreme Court deemed "reasonable" the law school's "all-comers policy" because it "helps Hastings police the written terms of its Nondiscrimination Policy" and "encourages tolerance, cooperation, and learning among students." 561 U.S. at 688, 689, 690. Moreover, that policy "incorporates—in fact, subsumes—state-law proscriptions on discrimination" and "conveys the Law School's decision to decline to subsidize with public monies and benefits conduct of which the people of [the State] disapprove." *Id.* at 689-90 (quotation marks omitted). These are the exact concerns undergirding the University's decision to cancel Spectrum's drag show, *supra* at 37-38, and they are no less reasonable when made by West Texas A&M rather than Hastings Law School.

The reasonableness of the University's actions is "all the more creditworthy in view of the 'substantial alternative channels that remain open for . . . communication to take place.'" *Id.* at 690 (quoting *Perry*,460 U.S. at 53). The University did not take the drastic step of denying Spectrum status as an official student organization—and the concomitant benefits that flow from such recognition—like Hastings Law School did in *CLS*; it merely cancelled a single type of event over concerns that "the way in which [Spectrum] wished to deliver its message," *Spectrum WT*, 151 F.4th at 728, might border on harassment or discrimination.

But the University has imposed no barrier to Spectrum communicating its message of "breaking gender norms." ROA.4259. To the contrary, the University has hosted many Spectrum events, including "Lavender Prom," "Queer History Night," and "Queer Movie Night" without objection or interference. ROA.4183, 4263-65, 4297-99, 4355-56, 12069-73. Such events have continued unimpeded—including a "protest" of the drag-show cancellation in "an open public forum"—during the pendency of this litigation. ROA.4162-63. And as for the 2023 drag show, it was relocated to a public park in the area. ROA.3431-33, 4288, 4289-90; *see Bloedorn*, 631 F.3d at 1241 (observing that "off-campus locations" and the "public streets and sidewalks" surrounding the campus constituted "ample alternative channels for communication").

**iii.** Spectrum attempts to avoid *CLS* by arguing (at 67-68) that, unlike the University administrators at Hastings Law School who had only a "binary" choice to grant or deny the Christian Legal Society access to a forum, here President Wendler "exercises unbounded authority to determine whether speech is

'respectful' enough for Legacy Hall." But Spectrum is mistaken. Administrators at Hastings Law School and the University here had an equivalent amount of (broad) authority to determine whether certain conduct violated university policy or state-law proscriptions on discrimination. *CLS*, 561 U.S. at 688, 689, 689-90. That is what Spectrum really takes issue with. But once the decision was made that the plaintiff was (in the university's view) violating those policies, the university's choice regarding "access" to the forum, *id.* at 679, was equally "binary" in each case—grant or deny access to the forum (there, RSO status; here, use of Legacy Hall).

Spectrum is wrong to argue (at 68) that the University is "wielding the stick of prohibition" rather than "dangling the carrot of subsidy." *CLS*, 561 U.S. at 683. This appeal concerns Spectrum's access to a single campus venue for a single type of performance. By excluding Spectrum's drag shows from Legacy Hall, the University does not "require action" from Spectrum; it is simply "withhold[ing] benefits." *Id.* at 682; *see* ROA.3489 (explaining that a student organization would "pay more" for an off-campus venue than for Legacy Hall).

Spectrum also complains (at 48-49) that the University lacked "empirical evidence" that Spectrum's drag shows would impede the educational environment. But *CLS* does not require empirical proof or pre-conduct complaints—"perceived harms" suffice for a university to act. 561 U.S. at 696.

**b. The University's restriction is viewpoint neutral.**

**i.** The University's application of its nondiscrimination policies to deny access to Legacy Hall for Spectrum's drag shows is also viewpoint neutral. "'[T]he First Amendment forbids the government to regulate speech in ways that favor some

viewpoints or ideas at the expense of others.'" *Lamb's Chapel*, 508 U.S. at 394 (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). Indeed, "[w]hen the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals may express on that subject, 'the violation of the First Amendment is all the more blatant.'" *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (quoting *Rosenberger*, 515 U.S. at 829).

"Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (quoting *Rosenberger*, 515 U.S. at 829). It is "thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. But "[w]here the [State] does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *CLS*, 561 U.S. at 696 (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992)). Indeed, "nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses." *R.A.V.*, 505 U.S. at 385. So when a university's "policy aims at the *act*[*s*]" of a student group, *i.e.*, its "conduct—not its . . . perspective"—it does not violate the Constitution's mandate of viewpoint neutrality. *CLS*, 561 U.S. at 696.

The University's restriction of Spectrum's drag shows does not run afoul of these principles. In the preliminary-injunction appeal, the panel found that Spectrum "was told to abandon *the way in which* it wished to deliver its message, *i.e.*, the message of support of the LGBT+ community through the *delivery mechanism* of a

drag show." *Spectrum WT*, 151 F.4th at 728 (emphases added). Yet critically, "[o]n the record so far, President Wendler's objections were *not to the message* but to the way it would be delivered." *Id.* (emphasis added). The trial record amply confirms the panel's preliminary assessment.

President Wendler testified unequivocally that he did not cancel Spectrum's drag shows "because [h]e disagreed with any viewpoints that [he] thought would be expressed at those drag shows by Spectrum." ROA.4180; *see* ROA.4180-81. Instead, he did so because drag shows "demean[] a significant portion of [the University's] population." ROA.4180. As he explained, because the drag shows would "stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood," they were barred "no matter the stated intent"—whether to mock the LGBTQ+ community or stand in solidarity with it. ROA.4437-38; *see* ROA.4177-78 (President Wendler testifying to same). And since the "conduct" to be regulated was that of "harassment," "impertinent gestures," or "acts of prejudice," ROA.4438-39, President Wendler was prepared to apply the University's policy in various circumstances, including to "'blackface' performances," a "quinceañera celebration" that "debased Latinas," and hypothetical performances denigrating other racial, religious, or sexual groups. ROA.4437-38; *see also* ROA.4177-78, 4228, 4229-30 (President Wendler testifying to same). Stated differently, the University's cancellation of the drag shows "draws no distinction between groups based on their message or perspective." *CLS*, 561 U.S. at 694.

**ii.** Spectrum offers three arguments for why the University's exclusion of its drags shows from Legacy Hall is viewpoint based, but none should prevail.

*First*, relying on *Matal v. Tam*, 582 U.S. 218 (2017), *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667 (1973) (per curiam), and *Healy*, 408 U.S. 169, Spectrum argues (at 38-40, 44-45) that the restriction on its drag shows violates the principle that speech may not be banned because it offends. But each case is distinguishable because all involve regulations of pure speech, not conduct. And *Matal* is further distinguishable because it did not arise in the university context.

In *Matal*, the Supreme Court held unconstitutional a provision of the Lanham Act forbidding the registration of a trademark that would "disparage" persons, institutions, beliefs, or national symbols. 582 U.S. at 227. A plurality of the Court reasoned that the Lanham Act's disparagement clause "discriminates on the bas[i]s of 'viewpoint,'" because "[g]iving offense is a viewpoint." *Id.* at 243 (plurality op.). Stated differently, because "an applicant may register a positive or benign mark but not a derogatory one," the disparagement clause "reflects the Government's disapproval of a subset of messages it finds offensive." *Id.* at 249 (Kennedy, J., concurring).

Unlike in *Matal*, the University is not attempting to shield students' sensibilities from *speech* it finds offensive but instead seeks to prevent *conduct* that might rise to the level of harassment or discrimination. "The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Johnson*, 491 U.S. at 406. And "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important government

interest in regulating the nonspeech element"—such as preservation of mission-consistent use of school property—"can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376.

That is particularly true here: "Most antidiscrimination laws 'regulate[]'" discriminatory practices "as conduct, not as expression," and "not because of the viewpoints such" practices express, but "because of the immediate harms such discrimination causes." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) (citation modified). The Supreme Court has explained that even "words can in some circumstances violate laws directed not against speech but against conduct" and those laws still comport with First Amendment. *R.A.V.*, 505 U.S. at 389. That is why Congress can constitutionally "require an employer to take down a sign reading 'White Applicants Only'" as part of its effort to "prohibit employers from discriminating in hiring on the basis of race." *FAIR*, 547 U.S. at 62. Or why it may, consistent with the First Amendment, regulate "sexually derogatory" words that "may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." *R.A.V.*, 505 U.S. at 389. In neither case should the law "be analyzed as one regulating the employer's speech rather than conduct." *FAIR*, 547 U.S. at 62. So too here.

*Papish* is off point for similar reasons. There, the Supreme Court held that a university violated the First Amendment when it expelled a graduate student for distributing a newspaper on campus that contained "forms of indecent speech" that violated university policy. 410 U.S. at 667. The Court held "that the mere dissemination of ideas—no matter how offensive to good taste—on a state university

campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670. Crucially, the university's actions in *Papish* could not "be justified as a nondiscriminatory application of reasonable rules governing conduct," *id.* at 671, and the case did not involve "any disruption of campus order or interference with the rights of others," *id.* at 670 n.6. As discussed, the same is not true here, where the University prohibited Spectrum's drag shows due to the specter of harassment, discrimination, and acts of prejudice. *Cf. Yeasin v. Durham*, 719 F. App'x 844, 851-52 (10th Cir. 2018) (distinguishing *Papish* because it did not "concern university-student conduct that interferes with the rights of other students or risks disrupting campus order"); *Hunt v. Bd. of Regents of Univ. of N.M.*, 792 F. App'x 595, 604-05 (10th Cir. 2019) (similar).

Last, in *Healy* a university completely banned a student group from campus because it thought its "mission [was] violent and disruptive" and its "philosophy repugnant." *CLS*, 561 U.S. at 683. The Supreme Court held that "a public educational institution exceeds constitutional bounds . . . when it 'restrict[s] speech or association simply because it finds the views expressed by [a] group to be abhorrent.'" *Id.* at 683-84 (quoting *Healy*, 408 U.S. at 187-88). But here the University has not excluded Spectrum's drag shows from Legacy Hall because President Wendler finds its speech or viewpoints abhorrent, but because the *conduct* of its shows would have a negative effect on the University's educational environment. *See supra* at 37-38.

*Second*, citing *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994), and *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir. 1980), Spectrum contends (at 41) that the

government may not restrict a medium of expression that a speaker finds effective even if other avenues of communication remain available. But neither case involved a limited public forum, so each is inapposite. *Gilleo*, for example, involved an overbroad city ordinance banning the display of most signs in one's home—private property where the government must have a particularly strong justification "to constrain a person's ability to *speak*." 512 U.S. at 58. And *Reeves* concerned a sound amplification ban on "the streets and sidewalks of a downtown business district"—quintessential traditional public forums. 631 F.3d at 384. By contrast, the availability of alternative channels of communication *is* relevant in the context of a limited public forum like Legacy Hall. *See CLS*, 561 U.S. at 690.

*Third*, Spectrum homes in (at 42-43) on President Wendler's testimony that drag shows convey "some sort of an ideology"—one he even "disagree[s] with." ROA.4127, 4214. But again, President Wendler's testimony is clear that he excluded Spectrum's drag shows from Legacy Hall because the "conduct" of drag shows ROA.4438—that is, their "gestures" and the "way they're presented," ROA.4176—amounts to "acts of prejudice," ROA.4439, which harm the educational environment and violate university policy and antidiscrimination law, *see* ROA.4175-76, 4438-39—*not* because he "disagreed with any viewpoints that [he] thought would be expressed at those drag shows," ROA.4180.

### C. The University's forum-based restriction is not a prior restraint.

The Court should also reject Spectrum's argument (at 45-53) that the University's exclusion of its drag shows from Legacy Hall operates as a prior restraint on Spectrum's speech. The classic description of a prior restraint is an

"administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). And prior restraints may also include "speech licensing schemes that give the licensor too much discretion in how to exercise his authority" as well as "regulations that require registration before certain types of speech." *Id.*

The University's policies regarding the use of Legacy Hall look nothing like an administrative or judicial order prohibiting certain communications without prior approval from the University. Indeed, the University has not forbidden Spectrum to communicate about drag shows or to obtain its approval before doing so; it has merely denied Spectrum the use of a particular university-owned facility to host a drag show. *See, e.g.*, ROA.3374-76, 3648-52. And to the extent that Spectrum means to invoke (at 51) the related "unbridled discretion" doctrine applicable to certain speech-licensing schemes, this Court has held that "prior restraints on speech in limited public forums must contain neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum *and* (2) viewpoint based censorship." *Freedom From Religion Found.*, 955 F.3d at 429. As demonstrated above, the University's actions are reasonable, *supra* at 35-40, and viewpoint neutral, *supra* at 40-46, under the limited-public-forum framework.

Spectrum primarily leans on (at 47-53) *Southeastern Promotions*, but it is distinguishable for at least two reasons. First, it "predate[s] the Supreme Court's delineation of limited public fora as a distinct type of government property" and thus

does not adequately account for permissible content-based restrictions developed in later cases like *CLS*. *See Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 660 F. App'x 600, 604 (10th Cir. 2016). Second, *Southeastern Promotions* involved a "municipal theater[]," not a university. 420 U.S. at 555. The Supreme Court has explained that a "university differs in significant respects from public forums such as streets or parks or even *municipal theaters*." *Widmar*, 454 U.S. at 267 n.5 (emphasis added). Because a "university's mission is education, . . . decisions of [the Supreme Court] have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* Spectrum thus fails to demonstrate that a prior-restraint analysis like the one in *Southeastern Promotions* applies in the context of a university-created limited public forum.

## II. The Remaining Permanent-Injunction Factors Support Affirmance.

Spectrum also did not show that it is suffering or will suffer irreparable injury or that the balance-of-harms and public interest factors warrant a permanent injunction. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *Nken v. Holder*, 556 U.S. 418, 435 (2009) (last two factors merge when government is opposing party).

Because the University's exclusion of drag shows from Legacy Hall does not violate the First Amendment, *supra* at 14-48, Spectrum has not "los[t]" "First Amendment freedoms for even [a] minimal period[] of time," Spectrum.Br.69-70 (quotation omitted).

Nor do the equities favor Spectrum. An injunction premised on an overly capacious forum analysis that would require universities to permit conduct at odds with the educational environment and antidiscrimination law—merely because the university opened a forum for broad, but not unlimited, speech—may disincline universities "to open such property for any public discourse." *Chiu*, 260 F.3d at 347 (citing *Ark. Educ. Television*, 523 U.S. at 681). "That result would conflict with the broad First Amendment policy of encouraging public discourse on issues of community interest." *Id.* Moreover, any harm to Spectrum is minimal where substantial alternative channels of communication are available. *Supra* at 39.

Similarly, finding that the University engages in viewpoint discrimination by prohibiting Spectrum from hosting its drag shows in Legacy Hall—after determining that this "conduct" amounts to "harassment," "impertinent gestures," and "acts of prejudice," and prohibiting it "no matter the stated intent," ROA.4438-39—undermines educators' ability to ensure a safe learning environment for women and adhere to its Title IX obligations. *CLS* instructs that these judgments are "due decent respect." 561 U.S. at 687.

## Conclusion

This Court should affirm.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Appellee*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,981 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William F. Cole
William F. Cole