**No. 26-10127**

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

SPECTRUM WT,

*Plaintiff-Appellant*,

v.

WALTER WENDLER, in his official capacity as the President of West Texas A&M University,

*Defendant-Appellee*.

On Appeal from the United States District Court for the Northern District of Texas, Amarillo Division, Civil Action No. 2:23-cv-48
Hon. Matthew J. Kacsmaryk Presiding

---

# APPELLANT'S EN BANC REPLY BRIEF

---

JT Morris
*Counsel of Record*
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
jt.morris@fire.org
sam.rudovsky@fire.org

Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
adam@fire.org

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iv

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..... 1

ARGUMENT ..... 3

I. When Public Universities Restrict Expression Based on its Expressive Content, the First Amendment Requires Demanding Scrutiny. ..... 3

A. Public universities do not avoid rigorous First Amendment scrutiny by simply invoking a policy, preference, or mission statement. ..... 3

B. Wendler's reliance on *CLS* and *Hazelwood* is wrong. ..... 7

II. The First Amendment Protects Spectrum's Drag Performances. ..... 9

A. Settled precedent rejects Wendler's cramped view of First Amendment protection for expressive conduct. ..... 11

B. Wendler is wrong about Spectrum's intent to convey a message. ..... 15

C. Wendler's "explanatory speech" arguments lack merit. ..... 16

III. This is a Straightforward Case of Unconstitutional Viewpoint Discrimination. ..... 18

IV. Wendler Cannot Overcome the Heavy First Amendment Presumption Against Prior Restraints. ..... 22

V. WTAMU's Policies and Undisputed Practices Establish Legacy Hall as a Designated Public Forum. ..... 26

VI. Wendler's Brief Proves the Drag Show Ban Cannot Satisfy Strict Scrutiny. ..... 31

VII. The Irreparable Harm Spectrum Is Suffering and the Public Interest Cement the Need for a Permanent Injunction. ............... 33

CONCLUSION ........................................................................................ 35

CERTIFICATE OF SERVICE ................................................................. 36

CERTIFICATE OF COMPLIANCE ......................................................... 37

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 16, 17

*Bd. of Educ. of the Westside Cmty. Schs. v. Mergens*,
496 U.S. 226 (1990) .......... 9

*Boos v. Barry*,
485 U.S. 312 (1988) .......... 22

*Bowman v. White*,
444 F.3d 967 (8th Cir. 2006) .......... 28

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 20, 21

*Christian Legal Society v. Martinez*,
561 U.S. 661 (2010) .......... passim

*City of Dallas v. Stanglin*,
490 U.S. 19 (1989) .......... 14

*Concerned Women for Am., Inc. v. Lafayette Cnty.*,
883 F.2d 32 (5th Cir. 1989) .......... 28

*Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*,
473 U.S. 788 (1985) .......... 25, 26

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) .......... 6, 21

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008) .......... 5, 6, 21

*Fellers v. Kelley*,
No. 25-1442, 2026 WL 2517131 (1st Cir. Aug. 26, 2026) .......... 21

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) .......... 13, 14

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992) .......... 29, 30

*Hazelwood School District v. Kuhlmeier*,
484 U.S. 260 (1988) .......... 7, 9

*Healy v. James*,
408 U.S. 169 (1972) .......... passim

*Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) .......... 13, 14, 15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) .......... 12, 13, 14

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993) .......... 4, 21

*Just. for All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) .......... 27

*Lichtenstein v. Hargett*,
83 F.4th 575 (6th Cir. 2023) .......... 15

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 33

*Matal v. Tam*,
582 U.S. 218 (2017) .......... 6, 19, 22

*NAACP v. Button*,
371 U.S. 415 (1963) .......... 20

*Papish v. Bd. of Curators of Univ. of Mo.*,
410 U.S. 667 (1973) .......... 2, 4, 19

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .......... 22

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 31

*Reges v. Cauce*,
175 F.4th 1014 (9th Cir. 2026)........................................................... 22

*Robinson v. Hunt Cnty.*,
921 F.3d 440 (5th Cir. 2019) ............................................................. 19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .................................................................... passim

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) ................................................................... 13, 17

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001)............................................................... 5, 9

*Schacht v. United States*,
398 U.S. 58 (1970) ................................................................... 11, 12

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) ......................................................................... 10

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) .................................................................... passim

*Spectrum WT v. Wendler*,
151 F.4th 714 (5th Cir. 2025).............................................. 10, 14, 15

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022)........................................................ 5, 32

*Spence v. Washington*,
418 U.S. 405 (1974) ......................................................................... 12

*Tex. A&M Queer Empowerment Council v. Mahomes*,
772 F. Supp. 3d 792 (S.D. Tex. 2025) ................................................ 12

*Texas v. Johnson*,
491 U.S. 397 (1989) ................................................................ 12, 19, 20

*Thomas v. Chicago Park Dist.*,
534 U.S. 316 (2002) ......................................................................... 28

*United States v. O'Brien*,
391 U.S. 367 (1968) .......... 20

*Widmar v. Vincent*,
454 U.S. 263 (1981) .......... passim

**Statutes**

Tex. Educ. Code § 51.9315(b)(1) .......... 29

**Regulations**

Texas A&M System Policy 08.01.01, *Civil Rights Compliance*
(Aug. 15, 2022) .......... 6

West Texas A&M University Policy 08.02.99.W1, Expressive
Activity on Campus (revised Apr. 27, 2026) .......... 27, 29

**Other Authorities**

Walter Wendler,
*When Disagreement Becomes "Harm," the University Stops Educating and Starts Enforcing*, The Heart and Soul of the Texas Panhandle (Aug. 24, 2026) .......... 34

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

President Wendler invites this Court to rewrite decades of controlling First Amendment precedent and defer to his "judgment" after he imposed a prior restraint at West Texas A&M University (WTAMU), aimed at suppressing a disfavored "ideology." The Court should decline that invitation—forcefully—and reverse the district court's denial of a permanent injunction against Wendler and WTAMU's viewpoint-based censorship.

Wendler's position rests on several legal errors. His proffered test for when the First Amendment protects live theater like Spectrum's drag performances clashes with Supreme Court precedent and would unravel protection for artistic expression. Wendler also skirts the Supreme Court's cases establishing he and WTAMU are engaging in unconstitutional viewpoint discrimination by banning drag performances because their "ideology" might offend others. And he disregards precedent establishing that a reservation process cannot transform a designated public forum into a limited one, any more than requiring parade permits in public streets transforms those traditional public forums into limited ones. These constitutional principles are not lost on

Wendler, who in imposing the campus drag show ban conceded it defies "the law of the land." ROA.4439.

Wendler insists WTAMU can ban drag performances from campus because they "might border on harassment" or "might violate its policies or rules." Wendler Br. 33, 39. But the First Amendment demands more than guessing games. As the Supreme Court has twice affirmed, speculation cannot justify restricting student expression at public universities, where First Amendment protections are "nowhere more vital." *Healy v. James*, 408 U.S. 169, 180 (1972); *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981).

Still, Wendler insists this Court is "ill-equipped to second guess" his "judgment." Appellee's Brief ("Wendler Br."), ECF 114 at 38. Wrong. Time and again, the Supreme Court has upheld First Amendment rights against public university administrators exercising their judgment to suppress viewpoints and impose prior restraints. *Healy*, 408 U.S. at 187–88; *Widmar*, 454 U.S. at 268–69; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 836–37 (1995); *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

This case is no different. The Court should reverse.

# ARGUMENT

## I. When Public Universities Restrict Expression Based on its Expressive Content, the First Amendment Requires Demanding Scrutiny.

When public university officials restrict the expressive content of student speech, as Wendler and WTAMU have, courts owe that decision no deference. Rather, precedent commands a court to rigorously scrutinize the restriction, and hold officials to the demanding burden the First Amendment requires. *See* Appellant's Brief ("Spectrum Br."), ECF 59 at 20 (detailing the standard of review in First Amendment cases that requires independent examination of the whole record). That is the standard the Court should apply here.

### A. Public universities do not avoid rigorous First Amendment scrutiny by simply invoking a policy, preference, or mission statement.

The essence of Wendler's argument boils down to this: Courts owe public university administrators broad deference when they restrict student expression, so long as they invoke the mere prospect of discriminatory harassment, appeal to the educational environment, or make lofty statements about "respect." *E.g.*, Wendler Br. 3, 37–38, 45–46, 48. But that's not how the First Amendment works at public universities.

No matter what mission statement, policy, or preference an administrator invokes to target student expression, those reasons "do[] not exempt its actions from constitutional scrutiny." *Widmar*, 454 U.S. at 268. That is why, for example, the Supreme Court held the First Amendment prohibited a public university from suppressing a student group's expression, even though administrators found its "philosophy abhorrent." *Healy*, 408 U.S. at 187. Likewise, the Court held a public university could not raise "conventions of decency" to punish a student's speech, "no matter how offensive to good taste." *Papish*, 410 U.S. at 670. And it affirmed a public university cannot trumpet its mission or values to silence disfavored perspectives. *Widmar*, 454 U.S. at 268–69; *see also IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.,* 993 F.2d 386, 392–93 (4th Cir. 1993) (holding a public university violated the First Amendment when it punished students for holding an "ugly woman" skit the dean deemed "incompatible with … the University's mission of promoting diversity").

The same holds true here. Wendler may wish for the Court to skip past scrutinizing WTAMU's ban on campus drag performances and

simply respect his appeals to the educational environment. But the First Amendment commands otherwise.

Nor does Wendler raising the "specter" of discriminatory harassment exempt the drag show ban from rigorous scrutiny. Wendler Br. 45. To begin, there is no "categorical harassment exception" to the First Amendment. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001). And for good reason—laws and campus policies addressing discriminatory harassment tend to invite censorship, requiring they clear demanding constitutional hurdles. *E.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1121 (11th Cir. 2022); *DeJohn v. Temple Univ.*, 537 F.3d 301, 313–18 (3d Cir. 2008) (explaining dangers to free expression from harassment policies targeting expression of a "'gender-motivated' nature" that "offends someone").

In the same way, Title IX, the federal law prohibiting discrimination based on sex, is no safe haven from First Amendment protections. *See* Wendler Br. 49. Instead, public universities cannot punish conduct based on discriminatory harassment unless it is "so severe, pervasive, and objectively offensive that it denies its victims the

equal access to education." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999); *see also DeJohn*, 537 F.3d at 318.

This is not to say that public universities have no leeway to regulate expression. They may enforce discriminatory harassment laws with evidence meeting the *Davis* standard. *See Davis*, 526 U.S. at 652.[1] They may punish unprotected speech, like true threats. And they may enforce rules preventing substantial disruption to the university's academic functions. *See Healy*, 408 U.S. at 184.

But in all cases, a public university *must* meet its constitutional burden to justify restricting campus speech. No matter the forum, the First Amendment bars public universities from suppressing speech because of its ideology, perceived offensiveness, or other viewpoint. *Rosenberger*, 515 U.S. at 829–30; *see also Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion). When a university restricts a speaker's use of a designated public forum based on content, like barring a category of artistic performance from campus theatres, it must satisfy strict scrutiny

[1] *See also* Texas A&M System Policy 08.01.01, *Civil Rights Compliance* (Aug. 15, 2022) https://policies.tamus.edu/08-01-01.pdf [https://perma.cc/UZ77-L6V6] (incorporating the *Davis* standard).

with "empirical evidence" showing the group will violate the law or university policy. *Widmar*, 454 U.S. at 270, 275. And if the university imposes a prior restraint on student speech, it faces a "heavy burden" to justify its constitutionality, which it cannot satisfy with mere "fear or apprehension." *Healy*, 408 U.S. at 184, 191.

For this reason, Wendler fails to meet his heavy burden to justify suppressing expression. His speculation that Spectrum's drag performance "*might* violate its policies or rules" or "*might* rise to the level of harassment or acts of prejudice," Wendler Br. 33, 38 (emphasis added), because its "ideology" "demeans," ROA.4438, offends the First Amendment at every turn. *See infra*, Sections III–IV, VI.

### B. Wendler's reliance on *CLS* and *Hazelwood* is wrong.

Hoping to shield his and WTAMU's actions from rigorous scrutiny, Wendler retreats into two Supreme Court decisions: *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010) (*CLS*), and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). *E.g.*, Wendler Br. 1–2, 36, 38. Neither decision impacts the constitutional questions here.

*CLS* does not oblige federal courts to routinely give public university administrators "due respect" when they restrict student

expression in the name of curbing discrimination or harassment. Rather, it is a narrow decision that involved "a novel question": "May a public law school condition its official recognition of a student group—and the attendant use of school funds and facilities—on the organization's agreement to open eligibility for membership and leadership to all students?" *CLS*, 561 U.S. at 668. That "condition" was a narrow restriction on access to a limited public forum, which the Court held was viewpoint-neutral based on the parties' stipulation. *Id.* at 675, 679.

*CLS*'s "novel question" has no relevance here. The restriction on Spectrum's speech is viewpoint-based and bars access to a designated public forum. *See* Spectrum Br. 36–45, 53–60; *see also infra* Sections III, V. And *CLS* emphasized that when public universities target the expressive content of a student group's speech, they face rigorous constitutional scrutiny. *See* 561 U.S. at 684 n.15, 696. To illustrate that point, the Supreme Court stressed its "series of decisions" invalidating a public university's efforts to deny student speakers access to campus forums based on the expressive content of their speech. *Id.* at 667–68 (citing *Rosenberger*, *Healy*, and *Widmar*). Those decisions, not *CLS*, control here.

This Court should also reject Wendler's invitation to apply *Hazelwood*'s allowance for K-12 schools to limit student speech based on "pedagogical concerns." Wendler Br. 36. For one thing, Wendler offers no decision in which this Court extended *Hazelwood* to public universities. What's more, "*Hazelwood*'s permissive 'legitimate pedagogical concern' test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself." *Saxe*, 240 F.3d at 213 (citing *Rosenberger*, 515 U.S. at 834). When it comes to a student group's speech, the notion that public universities "do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of the Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion). No one would view Spectrum's after-hours drag performance as the speech of WTAMU. And if WTAMU wants to distance itself from Spectrum's message, "the school's proper response is to educate the audience rather than squelch the speaker." *Saxe*, 240 F.3d at 214 (citation omitted).

## II. The First Amendment Protects Spectrum's Drag Performances.

Live theatre is an essential form of human expression, and drag performances like Spectrum's are no exception. They bear every conventional marker of a theatrical performance, combining costumes,

music, makeup, stage personas, the spoken word, and choreography in a ticketed production. And as *amici* explain, drag shows carry a long and rich history as a means of expression. Br. of Amici Curiae ACLU of Texas and Equality Texas, ECF 110 at 15–20; Br. of Amicus Curiae Professors, ECF 95-1 at 8–20.

To that end, drag performances like Spectrum's are inherently expressive, falling comfortably within First Amendment protection. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–58 (1975); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). This is not a close call. Just consider the dissent in Spectrum's interlocutory appeal—even it did not disagree with the majority's holding that Spectrum's performances are protected expression. *Spectrum WT v. Wendler*, 151 F.4th 714, 726 (5th Cir. 2025); *id.* at 733–39 (Ho, J., dissenting).

Without having seen Spectrum's performance, President Wendler confessed the students would engage in "artistic expression" conveying an "ideology." ROA.4437–38. The conclusion is inescapable: Wendler cannot attribute an ideological message to Spectrum's show while simultaneously denying it is expressive.

Yet that is what he does, parroting the district court's misreading of Supreme Court precedent and cramped view of the First Amendment that would leave expression open to interpretation without protection from government censors. The Supreme Court has rejected that view, and this Court should do the same.

### A. Settled precedent rejects Wendler's cramped view of First Amendment protection for expressive conduct.

That theatrical performances like drag shows are inherently expressive is a commonsense truth. "Since time immemorial, [] theatrical performances, often performed by amateurs, have played an important part in the entertainment and the education of the people of the world." *Schacht v. United States*, 398 U.S. 58, 61 (1970). And as Spectrum has explained, because theatrical performances are inherently expressive, the First Amendment protects them. Spectrum Br. 21–25.

Wendler's attempt to subject Spectrum's performance to a different constitutional standard clashes with the Supreme Court's instruction that there is "no reason to hold theater subject to a drastically different standard" from other expressive mediums. *Se. Promotions*, 420 U.S. at 557–58. After all, "[a]n actor, like everyone else in our country, enjoys a

constitutional right to freedom of speech." *Schacht*, 398 U.S. at 63. And acting is precisely what drag performers do, including those in Spectrum's shows. *See* ROA.4255–56 (170:15-171:20); *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 806 (S.D. Tex. 2025).

Yet Wendler insists, as did the district court, that under *Spence v. Washington* and *Texas v. Johnson*, Spectrum must prove a "great likelihood" its audience would take away a singular, precise understanding of its message. Wendler Br. 18 (quoting *Texas v. Johnson*, 491 U.S. 397, 405 (1989)); ROA.3864 (quoting *Spence v. Washington*, 418 U.S. 405, 411 (1974)). That is not the law.

As the Supreme Court clarified years after *Johnson* and *Spence*, some conduct is so inherently expressive that "a narrow, succinctly articulable message is not a condition of constitutional protection." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). An artistic work does not lose constitutional protection because its meaning is subtle, multifaceted, or open to competing interpretations. Otherwise, the First Amendment "would never reach the

unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.*

So even if *Hurley* did not completely overrule *Spence* or *Johnson*, *see* Wendler Br. 21–22, it "liberalized" the test from those decisions. *Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004). *Spence* and *Johnson* may still strictly apply when determining whether otherwise non-expressive conduct becomes expressive in context. But *Hurley* confirms the government may not invoke *Spence's* "particularized message" language to censor art, parades, stage performances, or any other intrinsically expressive activity just because audience members might not readily perceive a specific message. *Hurley*, 515 U.S. at 569; *see also Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 63–64, 66 (2006) (*FAIR)* (citing both *Johnson* and *Hurley* with approval and distinguishing activities whose "expressive nature" or "expressive quality" is clear).

To that end, the right standard is "whether the reasonable person would interpret [the activity] as [conveying] *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman*, 370 F.3d at 1270 (citing *Hurley*, 515 U.S. at 569); *see also Fort*

*Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241–43 (11th Cir. 2018). The interlocutory panel majority agreed. *Spectrum WT*, 151 F.4th at 725 (citing *Hurley*, 515 U.S. at 569). And so should this en banc Court.

Spectrum's drag performance fits that bill. Attendees, having purchased a ticket, would see performers donning gender-challenging costumes to assume crafted stage personas while dancing on stage to choreographed music in a venue open to a host of expression. *E.g.*, ROA.4246–48 (161:23-163:14); ROA.4348 (263:20-23). That is not akin to "cross-dressing," Wendler Br. 19–20, or "recreational ballroom dancing," Wendler Br. 22 (citing *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)). Any audience member would know Spectrum is communicating a message.

Wendler argues that even if *Hurley* sets the right standard, Spectrum must show its audience would infer "a generalized message." Wendler Br. 22 (quoting *Holloman*, 370 F.3d at 1271). Nowhere in *Hurley* does any such requirement appear, even as Wendler misinterprets *Holloman* as reading it into *Hurley*. If anything, *Holloman* suggests the expression there—a student raising his fist in the air in protest—is closer

to "pure speech" than expressive conduct, as it lacked "substantive 'non-speech' elements that are necessary to remove something from the realm of 'pure speech' into the realm of expressive conduct." 370 F.3d at 1270. So too with Spectrum's drag performances—they are "purely communicative." *See id.* While Wendler protests he is regulating only conduct, he identifies no non-speech element of Spectrum's shows calling their communicative nature into question. *See infra* Section III.

Even if a "generalized message" is required, Spectrum's shows meet that mark. As the interlocutory panel majority fittingly concluded, a drag performance is a "deliberate and theatrical subversion of gender-based expectations," and Spectrum's message of support for the LGBTQ+ community "would have been unmistakable." *Spectrum WT*, 151 F.4th at 725–26; *see also* Br. of Amicus Curiae Professors, ECF 95-1 at 8–25 (explaining the pro-LGBTQ+ and gender-related messages drag shows typically convey). Wendler cannot overcome these conclusions.

### B. Wendler is wrong about Spectrum's intent to convey a message.

Wendler concedes the requirement that a speaker intend to convey a message does "not pose a high bar" following *Hurley*. Wendler Br. 22 (quoting *Lichtenstein v. Hargett*, 83 F.4th 575, 594 (6th Cir. 2023)). Still,

he argues Spectrum does not intend to convey a message because "it is the individual performers, rather than the organization, that speaks through the drag shows." Wendler Br. 18. That's wrong on the record—Spectrum intends to communicate a collective message through its drag shows. ROA.4250–51 (165:2-166:8); ROA.4328–29 (243:10–244:8). And it's wrong on the law—a speaker "'does not forfeit constitutional protection simply by combining multifarious voices' in a single communication." *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023) (quoting *Hurley*, 515 U.S. at 569).

### C. Wendler's "explanatory speech" arguments lack merit.

The interviews Spectrum's performers have with the host reenforce why the First Amendment protects the show, no matter what Wendler argues. *See* Wendler Br. 20–21. Live theatre "frequently mixes speech with live action or conduct." *Se. Promotions*, 420 U.S. at 557–58. Following that tradition, those conversations are intrinsic to the performances' expressive nature, just like the choreography and gender-challenging costume choices.

For that reason, the Court should reject Wendler's efforts to paint those interviews as mere "explanatory speech" that deprives Spectrum's

shows of First Amendment protection. Wendler Br. 21 (citing *FAIR*, 547 U.S. at 66). Wendler misreads *FAIR*. The relevant question is not whether expressive conduct is accompanied by speech, as is “frequently” the case in live theatre. *Se. Promotions*, 420 U.S. at 557–58. Rather, as *FAIR* makes clear, it is whether that speech is “necessary” for an observer to perceive that the conduct sends a message at all. *FAIR*, 547 U.S. at 66.

As Chief Justice Roberts stressed during a recent argument, *FAIR* “involved [law] schools providing rooms for the military recruiter,” and “what the Court said is empty rooms don’t speak.” *303 Creative LLC v. Elenis*, Tr. of Oral Arg. at 65:1–9, 600 U.S. 570 (2023). So whatever “expressive component” the law school wanted to convey with “empty rooms,” it could emanate only from “speech that accompanie[d] it.” *FAIR*, 547 U.S. at 66.

Drag shows are no empty room, and no comparable explanation is necessary. Even before the host asks a question, an audience member watching a costumed, choreographed drag performance on a theatre stage understands the performance is expressive. The interviews only augment that expression, no different from how a narrator augments a

play's expression, or an album's liner notes augment the music's message. They do not create the expression.

For the same reason, Wendler's argument that Spectrum's promotional flyer was "explanatory speech" also fails. Wendler Br. 20. The flyer was not necessary for an audience member to understand the expressive quality of Spectrum's show. It simply augmented the show's context and the messages about the LGBTQ+ community and gender norms drag performances necessarily convey. *See* Spectrum Br. 28–29.

## III. This is a Straightforward Case of Unconstitutional Viewpoint Discrimination.

President Wendler and WTAMU are committing unconstitutional viewpoint discrimination. They are suppressing drag performances based on their purported "ideology," which *Rosenberger* affirms is textbook viewpoint discrimination. 515 U.S. at 829, 836. And while Wendler insists he does not "disagree[] with any viewpoints [he] thought" Spectrum might express through its performances, he embraces his decision to cancel them because, in his view, they "demean" and "stereotype" women. Wendler Br. 42.

Wendler's rationale—restricting expression based on his subjective evaluation of offensiveness—is exactly what the Supreme Court and this

Court have held as unconstitutional viewpoint discrimination. *Matal*, 582 U.S. at 243; *Papish*, 410 U.S. at 670; *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019). That's just as true if WTAMU and Wendler are banning drag performances because they find the means Spectrum is using to convey its views offensive. Spectrum Br. 41.

Wendler tries avoiding *Matal* and *Papish* by arguing they involved "pure speech" instead of expressive conduct. Wendler Br. 43. But as explained, theater is akin to "pure speech." In any case, *Johnson* quickly disposes of Wendler's argument. As the Supreme Court explained: "nothing in our precedents suggests that a State may foster its own view of the flag by prohibiting expressive conduct relating to it." 491 U.S. at 415. Likewise, WTAMU and Wendler cannot prohibit drag shows to foster their own views of gender and respect. Wendler's argument "cannot depend … on the distinction between written or spoken words and nonverbal conduct." *Id.* at 416.

Wendler also attempts to dodge the First Amendment's bar against viewpoint discrimination by characterizing the drag show ban as targeting conduct instead of protected expression. Wendler Br. 43–46. But "the First Amendment is no word game. And the rights it protects

cannot be renamed away or their protections nullified by 'mere labels.'" *Chiles v. Salazar*, 146 S. Ct. 1010, 1023 (2026) (quoting *NAACP v. Button*, 371 U.S. 415, 429 (1963)). Spectrum's shows are protected theatrical expression—full stop. They "do[] not become conduct just because [Wendler] may call it that." *Id.*

By Wendler's admission, WTAMU is restricting "artistic expression" and a "performance" (which Wendler calls a "slapstick sideshow") over concerns that it "stereotype[s]," "mock[s]," and "demeans." ROA.4437–39; *see also* Wendler Br. 42. How can one "stereotype," "mock," or "demean" but through expression? Wendler's words show WTAMU's viewpoint-based restriction is "directly related to expression in the context of activity." *Johnson*, 491 U.S. at 410; *cf. United States v. O'Brien*, 391 U.S. 367, 377 (1968) (holding that only if a restriction on expressive conduct is "unrelated to the suppression of free expression" does the government avoid heightened scrutiny).

So although Wendler insists WTAMU is not restricting Spectrum's expression, but targeting conduct under "the *specter* of harassment, discrimination, and acts of prejudice," Wendler Br. 45 (emphasis added), his rationale for the restriction proves him wrong. What's more, a public

university cannot suppress expression based on the specter of harassment. *See Healy*, 408 U.S. at 191; *Fellers v. Kelley*, No. 25-1442, 2026 WL 2517131, at *6 (1st Cir. Aug. 26, 2026) (holding a "lack of any evidence demonstrating harassment … defeats" a school's argument that it had an affirmative duty under Title IX" to regulate speech). Instead, it can punish discriminatory harassment only if it proves conduct was "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." *See Davis*, 526 U.S. at 651; *see also DeJohn*, 537 F.3d at 318.

Here, Wendler admitted no one had complained of harassment when he decided to cancel Spectrum's performances. ROA.4138–39 (53:23-54:3); ROA.4161 (76:12-24). Merely slapping the "harassment" label on protected expression is no cover for viewpoint discrimination. *See Chiles*, 146 S. Ct. at 1023. Whatever campus rule or discriminatory harassment policy Wendler and WTAMU invoke, they must "accomplish[] [their] goals in some fashion other than silencing speech on the basis of its viewpoint." *IOTA XI*, 993 F.2d at 393.

Nor does any potential effect on viewers, including someone taking offense, transform Spectrum's protected expression into regulable

conduct. *Boos v. Barry*, 485 U.S. 312, 321 (1988); *Reges v. Cauce*, 175 F.4th 1014, 1035–36 (9th Cir. 2026). And here, by suppressing speech because he believes it offends women, Wendler is violating the First Amendment bar against viewpoint discrimination. *Matal*, 582 U.S. at 243 ("Giving offense is a viewpoint"). No matter what "cultural issues" and "local standards" Wendler and WTAMU consider in determining whether expression is "respectful," ROA.4144, "the point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content," including content officials deem offensive. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992).

## IV. Wendler Cannot Overcome the Heavy First Amendment Presumption Against Prior Restraints.

As Spectrum has established, WTAMU's ongoing ban on drag shows is an unconstitutional prior restraint. It prohibits expression before it occurs, and it lacks the objective, clear, and narrow guardrails the Constitution requires for the government to overcome the heavy presumption against prior restraints. Spectrum Br. 45–53.

Wendler fails to address two key facts cementing the drag show ban as an unconstitutional prior restraint. First, he does not contest that

WTAMU is blocking Spectrum from taking the Legacy Hall stage based on mere speculation, which cannot overcome the heavy presumption against prior restraints. *Healy*, 408 U.S. at 184, 194; *Widmar*, 454 U.S. at 275. Second, he does not contest that the ban is founded upon the university president's claimed power to subjectively determine whether expression is "disrespectful or demeaning" to any group. *See* Spectrum Br. 51–52.

In fact, Wendler highlights the purely subjective nature of the ban by pointing out that while he twice canceled Spectrum's performance, he allowed "protestors dressed in drag" because he "didn't sense" they were "demeaning to women." Wendler Br. 8. By restricting speech in advance based on the subjective judgments of an official, the drag show ban is a 21st century reboot of the unconstitutional prior restraint in *Southeastern Promotions v. Conrad*, where officials excluded the musical *Hair* from a public theatre because it did not fit the city's requirement for entertainment to be "clean and healthful and culturally uplifting." 420 U.S. at 549. Entreaties to vague notions of respect and offensiveness may be the practice of authoritarian "socialist regimes," *see id.* at 563 (Douglas, J., concurring), but they are foreign to the First Amendment.

Though Wendler claims WTAMU "has merely denied Spectrum the use of a particular university-owned facility to host a drag show," Wendler Br. 47, that makes no constitutional difference. The prior restraints the Supreme Court invalidated in *Healy, Widmar*, and *Southeastern Promotions* all denied a group access to a public forum. *See Healy*, 408 U.S. at 181–82; *Widmar*, 454 U.S. at 265–67; *Se. Promotions*, 420 U.S. at 552. To that end, *Healy* and *Widmar*, both invalidating a prior restraint at a public university, refute Wendler's suggestion that public universities face a lesser burden to justify prior restraints. Wendler Br. 47.

Wendler also maintains the drag ban is permissible under *CLS* because it is a "content-based restriction" in a limited public forum. Wendler Br. 48. But as explained, the drag ban is a *viewpoint*-based restriction. And the argument that it is a permissible content-based restriction fails, too. Wendler Br. 47–48. Above all, Legacy Hall is a designated public forum, where WTAMU's content-based restriction faces—and fails—strict scrutiny. *See* Spectrum Br. 54–66; *infra* Sections IV–V.

Even were Legacy Hall a limited public forum, the ban still fails to overcome the heavy presumption against prior restraints. A blanket ban on a genre of stage performance, precisely the type of expression for which WTAMU has opened Legacy Hall, is far from "reasonable in light of the purpose served by the forum." *See Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985).

*Healy* further negates Wendler's claim. In *Healy*, a university president denied a student group recognized status. 408 U.S. at 184. A student group recognition program typically is a limited public forum, because it is reserved "for certain groups." *Rosenberger*, 515 U.S. at 829. Yet the Supreme Court held the president in *Healy* imposed an unconstitutional prior restraint based on his subjective view that the group's philosophy was "abhorrent" and his unfounded "fear or apprehension" that the group might disrupt the campus. 408 U.S. at 187, 191. That is precisely what Wendler and WTAMU are doing.

This point also underscores why Wendler misrelies on *CLS*. He suggests the administrators in *CLS* had the "equivalent amount of (broad) authority" as he purports to exercise here, but fails to explain why. Wendler Br. 40. In any event, he's wrong. The stipulated "all

comers" policy in *CLS* constrained administrators with objective, narrow, and clear criteria: grant recognized status if a student group agreed to let all students join, regardless of their beliefs, or deny it if they did not. Spectrum Br. 68; *see also CLS*, 561 U.S. at 675.

Suppose the policy in *CLS* did not constrain administrators to a binary choice, but enabled them to deny recognized status to any student group who advocated an "ideology" administrators believed "demeaning or disrespectful" to any group. Those subjective, viewpoint-driven criteria would place the policy squarely within the holdings of *Healy*, *Widmar*, and *Rosenberger*—decisions *CLS* pointedly reaffirmed. 561 U.S. at 667–68 ("[T]his Court has emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints"). Wendler and WTAMU's reliance on those same criteria draws a clear line between the unconstitutional drag show ban and *CLS*'s "all comers" policy.

## V. WTAMU's Policies and Undisputed Practices Establish Legacy Hall as a Designated Public Forum.

Wendler has no answer for the central factors establishing Legacy Hall as a designated public forum: WTAMU's policy and practice and Legacy Hall's compatibility with expressive activity. *Cornelius*, 473 U.S.

at 802–03 (establishing forum analysis factors) (citing *Widmar*, 454 U.S. at 267; *Se. Promotions*, 420 U.S. at 555). WTAMU and System policies both adopt—for "buildings" and "facilities"—the language this Court held creates a designated public forum. Spectrum Br. 6 & n.1, 54–55 (citing *Just. for All v. Faulkner*, 410 F.3d 760, 768 (5th Cir. 2005)).

Wendler does not dispute that any student group or member of the public can reserve Legacy Hall, highlighting the lack of limits on speakers. Nor does he identify any objective limits on content in Legacy Hall. Wendler Br. 26–35; *see also Just. for All*, 410 F.3d at 766–69 (a university's "minimal" limits on content establish a designated public forum). That's because there are none.

WTAMU policy requires administrators to decide reservations without regard to content or viewpoint.[2] And the array of expressive activities hosted in Legacy Hall and its built-in stage over the years—from the political to the religious, and from concerts to theatrical performances—proves WTAMU's consistent practice places no limits on

[2] *See* WTAMU Policy 08.02.99.W1, Expressive Activity on Campus §§ 4.1, 4.2, 4.4, 4.5 (revised Apr. 27, 2026) https://www.wtamu.edu/_files/docs/about/rules-procedures/08-02-99-W1-Expressive-Activity-onCampus.pdf [perma.cc/T2YE-WAF6] ("Expressive Activities Policy"); Spectrum Br. 54–55.

content. ROA.4116–17 (31:17-32:18); ROA.3500–03 (88:17-91:10). Those past uses also show Spectrum's proposed performance is compatible with the venue. Spectrum Br. 57–58; ROA.3206, 3474.

Wendler urges that WTAMU's use of a reservation system renders Legacy Hall a limited public forum. Wendler Br. 30–31. Not so. Whether "a group must obtain permission" to "gain access to" the forum does not alter its classification. *Concerned Women for Am., Inc. v. Lafayette Cnty.*, 883 F.2d 32, 33–35 (5th Cir. 1989); *see also Bowman v. White*, 444 F.3d 967, 972–73, 976–79 (8th Cir. 2006) (holding parts of college campus to be designated public forums, despite requiring use permits for non-university entities).

What's more, the reservation process—requesting space, supplying event information and risk assessments, and obtaining confirmation—serves logistics; it does not limit speakers or content. *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) (holding the "object of" a public park permit system "is not to exclude communication of a particular content, but to coordinate multiple uses of limited space"). On the other hand, WTAMU policy refers to "reservable designated public

forums," revealing its understanding that a reservation system facilitates, not limits, a designated public forum.[3]

Wendler also insists a "procedures and guidelines" manual for Legacy Hall staff overrides the "generalized" System and University policy. Wendler Br. 5, 32 (citing ROA.4855–71). But the manual's operative provision permits staff to deny or cancel events conflicting with WTAMU "policies." ROA.4855. That confirms the manual *incorporates* those policies—including the Expressive Activities Policy's prohibition on content discrimination in reservation decisions—rather than overriding them.[4]

Nor does the manual's reference to WTAMU's "mission" provide any objective limit on content. For one, free expression is "central to the mission" of WTAMU, not subordinate to the president's subjective conceptions of respect. Tex. Educ. Code § 51.9315(b)(1). A university's educational mission may permit content-neutral, reasonable regulations on the time, place, or manner of speech; it does not itself limit an otherwise open forum to academic speech. *See Hays Cnty. Guardian v.*

---

[3] Expressive Activities Policy, *supra* note 2, at 1.

[4] Expressive Activities Policy, *supra* note 2, at §§ 4.4–4.5.

*Supple*, 969 F.2d 111, 117–18 (5th Cir. 1992). And WTAMU's practice proves it does not limit Legacy Hall to academic content. It has welcomed a revolving door of outsiders and student organizations hosting many events with no apparent academic function—like beauty pageants, weddings, fashion shows, concerts, and parties. ROA.4116–17.

Wendler claims WTAMU enforces mission-based limits only "infrequently" because he is rarely "called upon" to do so. Wendler Br. 33. But that underscores the absence of an objective limit on content. In Wendler's long tenure, he has barred only Spectrum's performance from Legacy Hall based on his view of what is "inconsistent" with WTAMU's mission, and he speculates he would do the same if a parade of horribles visited campus. ROA.4437–38; *see also* ROA.4177–78, 4228, 4229–30.

In essence, Wendler is using the drag show ban as evidence of a content limit in Legacy Hall—a limitation that WTAMU policy prohibits. That is precisely the circular justification this Court has rejected. *Hays Cnty. Guardian*, 969 F.2d at 118. Forum classification follows "consistent practice, not each exceptional regulation that departs from the consistent practice." *Id*.

Wendler also says the "University System has expressly deemed 'meeting rooms, theatres, [and] auditoriums' to be 'limited forums,'" pointing to a bare recital in the Texas A&M System Board of Regents' currently enjoined resolution banning campus drag performances. Wendler Br. 32 (citing ROA.5464). But that label does not supplant the policies and consistent practices establishing Legacy Hall as a designated public forum. The resolution directs universities to adopt future policies (ROA.5466), but Wendler identifies no implementing policy limiting Legacy Hall to certain speakers or subjects, or even declaring it a limited public forum.

## VI. Wendler's Brief Proves the Drag Show Ban Cannot Satisfy Strict Scrutiny.

Wendler fails to address the strict scrutiny the First Amendment demands for a content-based speech restriction in a designated public forum. *See generally* Wendler Br.; *accord Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Widmar*, 454 U.S. at 269–70. If anything, his brief confirms he cannot satisfy that rigorous standard.

Start with a telling omission. Wendler makes no attempt to defend the district court's erroneous conclusion that Spectrum's performances are "too sexualized" and "too provocative" for First Amendment

protection. *See* Spectrum Br. 32–36 (explaining the district court's error). Wendler's silence speaks volumes, confirming this case is entirely about Wendler and WTAMU suppressing an "ideology" under the facades of the "educational environment" and "the specter of harassment," not post-hoc rationales about "sexualized" expression.

And of course, those facades fail to satisfy strict scrutiny. While Wendler makes lofty appeals to the "educational environment" and the "expertise and experience of school administrators," he offers no evidence Spectrum's drag performances would disrupt the educational environment or violate university harassment policy or Title IX. *See, e.g.*, Wendler Br. 2, 37. Rather, Wendler offers only conjecture, claiming Spectrum's performances "might" amount to discriminatory harassment or "might" violate its policies. Wendler Br. 33, 38–39, 43.

But "might" is precisely the "undifferentiated fear or apprehension" the Supreme Court held is not a constitutionally permissible reason to suppress protected expression at a public university. *Healy*, 408 U.S. at 190–91. That rule makes sense. Otherwise, universities could wield policies as a pretext to target disfavored views, just as Wendler and WTAMU have. *See Cartwright*, 32 F.4th at 1125.

To that end, Wendler's lack of "empirical evidence" is fatal under strict scrutiny. *Widmar*, 454 U.S. at 275. There is no compelling government interest here, nor any legitimate one.

While Wendler cherry-picks language from *CLS* about a university's interest in redressing "perceived harms," Wendler Br. 40, he omits that the Court invoked that language only because it was "satisfied" that the law school's policy "is justified without reference to the content or viewpoint of the regulated speech." *CLS*, 561 U.S. at 697 (citation omitted) (cleaned up). But when a public university restricts the expressive content of student expression, as WTAMU is doing, it must present evidence of *actual* harm. *Widmar*, 454 U.S. at 275. The First Amendment demands no less.

## VII. The Irreparable Harm Spectrum Is Suffering and the Public Interest Cement the Need for a Permanent Injunction.

Because Wendler and WTAMU are violating Spectrum's First Amendment rights—and have for over three years—irreparable harm is presumed. *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025). The Court should reject Wendler's argument that Spectrum is suffering no harm because WTAMU is not violating the First Amendment. *See* Wendler Br. 38.

As to the public interest at stake, perhaps no one has summed it up better than President Wendler. Just a week before Spectrum filed this reply, Wendler wrote:

> When disagreement is mislabeled as harm, the university stops educating and starts enforcing. And once a university becomes an enforcement culture, it forfeits the public trust that makes it worth sustaining.
>
> In a constitutional republic, citizens must be able to disagree without hatred and argue without fear. Universities should be training grounds for that kind of civic maturity. … Once a campus adopts the habit of labeling dissent as "harm," several predictable results follow. [Students] figure out quickly which opinions are safe to repeat. That is not education; it is conditioning.[5]

Wendler's words reflect the vital constitutional principle in the balance: The First Amendment guarantees that opinions at a public university evolve through open debate, not an administrator decreeing an idea or perspective "harmful." No matter one's personal views on drag performances, Spectrum has a First Amendment right to take the Legacy

[5] Walter Wendler, *When Disagreement Becomes "Harm," the University Stops Educating and Starts Enforcing*, The Heart and Soul of the Texas Panhandle (Aug. 24, 2026), https://walterwendler.com/2026/08/when-disagreement-becomes-harm-the-university-stops-educating-and-starts-enforcing [perma.cc/94XG-QWU5].

Hall stage, just as others have the right to disagree with the show. This Court should uphold that principle.

## CONCLUSION

For these reasons and those Spectrum provides in its principal brief, the Court should reverse.

Dated: August 31, 2026

Respectfully,

/s/ JT Morris
JT Morris
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
jt.morris@fire.org
sam.rudovsky@fire.org

Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
adam@fire.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

This certifies that on August 31, 2026, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.

/s/ JT Morris
JT Morris
*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,448 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses a proportionally spaced typeface: 14-point Century Schoolbook font for text and 14-point Century Schoolbook font for footnotes.

Dated: August 31, 2026

/s/ JT Morris
JT Morris
*Attorney for Plaintiff-Appellant*